June 22, 2007

2

4

8

12

16

20

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The
Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church
and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St.
Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church,
and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

July 13, 2007

44

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

54

Goodwin Procter,
Heather H. Anderson,
Soyong Cho,
Counsel for the Episcopal Church

July 27, 2007

58

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,

Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

66

August 17, 2007

68

70

74

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,

Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

August 17, 2007

88

92

94

98

Troutman Sanders, L.L.P.,

Bradfute W. Davenport, Jr.,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Soyong Cho,
Counsel for the Episcopal Church

August 31, 2007

110

112

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

August 31, 2007

126

128

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

August 31, 2007

132

136

Goodwin Procter,
Heather H. Anderson,
Soyong Cho,
Counsel for the Episcopal Church

September 10, 2007

140

142

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

September 10, 2007

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Soyong Cho,
Counsel for the Episcopal Church

152

December 21, 2007

158

168

172

174

176

178

182

184

200

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church Trustees, Potomac Falls Church, and The Falls Church

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Sands, Anderson, Marks & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Counsel for Truro Church and its Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church
and their Related Trustees

R. Hunter Manson,
Counsel for St. Stephen's Church

204

January 7, 2008

210

218

228

234

236

238

242

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Soyong Cho,
Counsel for the Episcopal Church

January 11, 2008

258

264

266

278

284

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,

Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Counsel for Truro Church and its Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church, and their Related Trustees

R. Hunter Manson,
Counsel for St. Stephen's Church

January 11, 2008

304

306

316

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Soyong Cho,
Counsel for the Episcopal Church

318

January 17, 2008

320

324

328

Winston & Strawn,
Gordon A. Coffee,

Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Counsel for Truro Church and its Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,

330

Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

R. Hunter Manson,
Counsel for St. Stephen's Church

January 17, 2008

334

338

342

346

352

354

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Soyong Cho,
Counsel for the Episcopal Church

April 23, 2008

356

Winston & Strawn,
Gordon A. Coffee,

_____

Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Heather A. Jones,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,

Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

April 23, 2008

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

April 23, 2008

380

Andrews Kurth, L.L.P.,
Jennifer L. Spina,
Thomas E. Starnes

April 23, 2008

396

400

406

412

414

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

April 23, 2008

418

420

424

430

438

440

Goodwin Procter,
Heather H. Anderson,
Soyong Cho,
Counsel for the Episcopal Church

May 2, 2008

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,

Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Heather A. Jones,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

May 9, 2008

448

450

452

454

458

462

464

470

472

478

484

488

490

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

492

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The
Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church
and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St.
Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church,
and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

May 9, 2008

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

May 9, 2008

498

502

504

508

510

512

514

516

Commonwealth of Virginia,
*ex rel.* Robert F. McDonnell,
in his official capacity as
Attorney General of Virginia

Robert F. McDonnell,
Attorney General of Virginia

William E. Thro,
State Solicitor General

Stephen R. McCullough,
Deputy State Solicitor General

May 9, 2008

526

530

535

542

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

June 16, 2008

550

552

554

556

558

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church
and their Related Trustees
Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St.
Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church,
and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

June 16, 2008

562

572

574

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
William H. Hurd,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

June 23, 2008

582

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,

Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

June 23, 2008

Commonwealth of Virginia,

*ex rel.* Robert F. McDonnell,
in his official capacity as
Attorney General of Virginia

Robert F. McDonnell,
Attorney General of Virginia

William E. Thro,
State Solicitor General

Stephen R. McCullough,
Deputy State Solicitor General

June 23, 2008

598

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
William H. Hurd,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

June 26, 2008

604

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church
of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The
Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,

Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church
and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St.
Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church,
and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

June 26, 2008

614

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
William H. Hurd,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

July 2, 2008

616

622

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church
of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Heather A. Jones,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

July 2, 2008

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
William H. Hurd,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

634

638

Winston & Strawn,
Gordon A. Coffee,

Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Heather A. Jones,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,

644

Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

July 8, 2008

646

648

650

654

664

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
William H. Hurd,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

670

July 28, 2008

672

674

684

688

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,

Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Heather A. Jones,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

July 28, 2008

694

706

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
William H. Hurd,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

August 4, 2008

710

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church
Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Heather A. Jones,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,

E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

722

August 4, 2008

724

728

730

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
William H. Hurd,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

.

August 7, 2008

738

742

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Sarah W. Price,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Heather A. Jones,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church
and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St.
Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church,
and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

August 7, 2008

748

750

752

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
William H. Hurd,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

August 13, 2008

754

756

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church
of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Heather A. Jones,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,
Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

August 13, 2008

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
William H. Hurd,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

772

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

August 15, 2008

Winston & Strawn,
Gordon A. Coffee,
Gene C. Schaerr,
Steffen N. Johnson,
Andrew C. Nichols,
Counsel for Truro Church and its Related Trustees, The Falls Church, Church of the Apostles, and Church of the Epiphany

Semmes, Bowen & Semmes, P.C.,
James A. Johnson,
Paul N. Farquharson,
Scott H. Phillips,
Counsel for The Falls Church

Gammon & Grange, P.C.,
Scott J. Ward,
Timothy R. Obitts,
Robert W. Malone,
Counsel for Christ the Redeemer Church, Potomac Falls Church, and The Falls Church

R. Hunter Manson,
Counsel for St. Stephen's Church

Sands, Anderson, Marks, & Miller,
J. Jonathan Schraub,
George O. Peterson,
Michael T. Marr,
Heather A. Jones,
Counsel for Truro Church and its Related Trustees

Walsh, Collucci, Lubeley,
Emerick & Walsh, P.C.,
E. Andrew Burcher,

Counsel for Church of the Word, St. Margaret's Church, St. Paul's Church and their Related Trustees

Mary A. McReynolds, P.C.,
Mary A. McReynolds,
Counsel for Church of the Apostles, Church of the Epiphany, Herndon, St. Margaret's Church, St. Paul's Church, Haymarket, and St. Stephen's Church, and their Related Trustees

Carr & Carr,
James E. Carr,
Counsel for Church of Our Saviour at Oatlands and its Related Trustees

August 15, 2008

782

Troutman Sanders, L.L.P.,
Bradfute W. Davenport, Jr.,
William H. Hurd,
George A. Somerville,
Joshua D. Heslinga,
Mary C. Zinsner,
Counsel for The Protestant Episcopal Church in the Diocese of Virginia

Goodwin Procter,
Heather H. Anderson,
Adam Chud,
Soyong Cho,
Counsel for the Episcopal Church

**CIRCUIT COURT OF FAIRFAX COUNTY**

In re Multi-Circuit
Episcopal Church
Property Litigation

Case Nos. CL 2007-0248724, CL 2006-15792, CL 2006-15793, CL 2007-556, CL 2007-1235, CL 2007-1236, CL 2007-1237, CL 2007-1238, CL 2007-1625, CL 2007-5249, CL 2007-5250, CL 2007-5362, CL 2007-5363, CL 2007-5364, CL 2007-5682, CL 2007-5683, CL 2007-5684, CL 2007-5685, CL 2007-5686, CL 2007-5902, CL 2007-5903, and CL 2007-11514

BY JUDGE RANDY I. BELLOWS

April 3, 2008

Of the several issues now before the Court, the sole issue that is ripe for decision, and the one that therefore shall be decided today, is whether the powers and the authorities of Va. Code § 57-9(A) (hereinafter "§ 57-9(A)") may be invoked in the instant litigation.

That matter requires the resolution of four questions:

First, what are the definitions of "church" and "religious society," as those terms are used in § 57-9(A), and do either of these terms apply to the Protestant Episcopal Church in the Diocese of Virginia (hereinafter "Diocese"), the Protestant Episcopal Church in the United States of America (hereinafter "ECUSA"), or to the Anglican Communion?

Second, what is the definition of "attached," as that term is used in § 57-9(A), and does the term apply to the congregations that are the plaintiffs in this litigation (hereinafter "CANA Congregations"), in that they are "attached" to the Diocese, the ECUSA, or the Anglican Communion?

Third, what is the definition of "branch," as that term is used in § 57-9(A), and are any of the following entities, the Convocation of Anglicans in North America (hereinafter "CANA"), the American Arm of the Church of Uganda, the Church of Nigeria, or the Anglican District of Virginia (hereinafter "ADV"), "branches" of the Diocese, the ECUSA, or the Anglican Communion?

Fourth, and perhaps most importantly, what is the definition of "division," as that term is used in § 57-9(A), and has such a "division" occurred in a "church or religious society" to which the CANA Congregations were attached?

For the reasons stated in this opinion, the Court finds in the affirmative as to each of these questions. In other words, the Court finds adequate support in the record to conclude that § 57-9(A) has been properly invoked. The Court notes that it does not decide today any issue related to the constitutionality of § 57-9(A), except in one discrete respect. That one discrete respect relates to the ECUSA/Diocese's assertion that constitutional jurisprudence requires the Court to interpret a statute, if possible, in a way that preserves its constitutionality. See, e.g., Opp'n Br. for the Episcopal Church and the Diocese 9 (stating that "the principle of constitutional avoidance dictates that statutes be interpreted to avoid potential constitutional issues whenever possible"). While there is nothing remarkable or controversial in this approach to statutory interpretation, the Court finds it unavailing in this case, for the reasons stated in this opinion.

The Court will hear oral argument on the constitutional issues in accordance with the Order issued today. The obvious advantage to the Court and the parties in bifurcating the issue of statutory interpretation and applicability, on the one hand, and constitutionality, on the other, is that the parties at oral argument on the constitutional issues will not have to engage in speculation regarding the Court's interpretation of the statute but, rather, will know the precise contours of the Court's reasoning.

Second, the Court does not address or decide in this opinion the validity of the various votes taken by the CANA Congregations to disaffiliate from the ECUSA and the Diocese. The Court will reach that decision, as necessary, at a later point in time.

Finally, this opinion does not address the merits of the ECUSA's and the Diocese's declaratory judgment actions, which have been set for trial in October 2008.

*Summary*

The only way in which this Court could find a "division" *not* to exist among the pertinent entities in this case is to define the term so narrowly and restrictively as to effectively define the term out of existence. The ECUSA and the Diocese urge upon this Court just such a definition and further assert that any definition other than the one for which they argue would render the statute unconstitutional. See Opp'n Br. for the Episcopal Church and the Diocese 9 (stating that "[c]onstitutional avoidance compels the [ECUSA]'s and the Diocese's interpretation of § 57-9"). The Court rejects this invitation. Whether or not it is true that only the ECUSA's and the Diocese's proposed definition can save § 57-9(A) from constitutional infirmity, there is no constitutional principle of which this Court is aware that would permit, let alone require, the Court to adopt a definition for a statutory term that is plainly unwarranted. Rather, the definition of "division" adopted by this Court is a definition which the Court finds to be consistent with the language of the statute, its purpose and history, and the very limited case law that exists. Given this definition, the Court finds that the evidence of a "division" within the Diocese, the ECUSA, and the Anglican Communion is not only compelling, but overwhelming. As to the other issues in principal controversy, the Court finds the Anglican Communion to be a "church or religious society." The Court finds each of the CANA Congregations to have been attached to the Anglican Communion. Finally, the Court finds that the term "branch" must be defined far more broadly than the interpretation placed upon that term by ECUSA and the Diocese and that, as properly defined, CANA, ADV, the American Arm of the Church of Uganda, the Church of Nigeria, the ECUSA, and the Diocese, are all branches of the Anglican Communion and, further, CANA and ADV are branches of ECUSA and the Diocese.

## I. *Background*

This litigation arises out of profound discord within the Diocese, the ECUSA, and the Anglican Communion itself. By all accounts, this internal conflict has been brewing for many years. See, e.g., Defs.' Ex. 68 at 29, "Deposition of Bishop-Elect David Anderson," in which Bishop Anderson, the President and Chief Executive Officer of the American Anglican Council, and a Bishop-Elect of CANA, states that:

[T]he division, starting small, as like a hairline crack on your windshield, has just – as things have gone on and more things have happened, the crack, the division, has simply gotten more pronounced.

Q: So this is not a new thing, the division of the church?

A: It is a growing, ongoing one that became more clearly observable in the, probably, late '90s.

Q: Is it possible to pinpoint when the division in the church occurred or began?

A: It would be difficult to pick a moment. I would use a comparison about when a marriage fails and it is hard to say this is the moment that the marriage – where it started, but usually the significant, observable phenomena are preceded by smaller things leading up to that.

However, the evidence produced at trial indicates that the ultimate catalyst of the conflict, triggering a series of events culminating in the present litigation, was the ECUSA 2003 General Convention.

This letter opinion sets forth, in chronological order, an account of key events that have occurred within all levels of the Anglican Communion, the ECUSA, and the Diocese. This letter opinion also includes excerpts from letters and correspondence between clergy and other leaders within the Anglican Communion, ECUSA, and the Diocese, which have become part of the record in this litigation. This factual background serves as the foundation for the Court's legal analysis and conclusions. First, however, this opinion describes the structural nature of ECUSA, the Diocese, and the Anglican Communion.

A. *Structural Context*

1. ECUSA

The Protestant Episcopal Church in the United States of America ("ECUSA") is "a constituent member of the Anglican Communion. . . ." (Defs.' Ex. 2, "Constitution and Canons of the Episcopal Church in effect since January 1, 2007," at 1.) It considers itself to be "a Fellowship within the One, Holy, Catholic, and Apostolic Church, of those duly constituted Dioceses, Provinces, and regional Churches in communion with the See of Canterbury, upholding and propagating the historic Faith and Order as set forth in the Book of Common Prayer." (Defs.' Ex. 2 at 1.) ECUSA's

governing body is the General Convention, which consists of the House of Bishops and the House of Deputies. (Defs.' Ex. 2 at 1.) Essentially, the General Convention is a bicameral legislature, in that "[e]ither House may originate and propose legislation, and all acts of the Convention shall be adopted and be authenticated by both Houses." (Defs.' Ex. 2 at 1.) Each ECUSA bishop has a "seat and a vote in the House of Bishops," (Defs.' Ex. 2 at 1) while the House of Deputies is composed of a mix of "ordained persons," presbyters, deacons, and laypeople.[1] The House of Bishops elects ECUSA's Presiding Bishop, which is ECUSA's "Chief Pastor and Primate" (Defs.' Ex. 2 at 28) by majority vote (Defs.' Ex. 2 at 1).

ECUSA is further subdivided into either Dioceses or Missions.[2] (See Defs.' Ex. 2 at 5-6.) Each Diocese chooses its Bishop or Bishop Coadjutor according to "rules prescribed by the Convention of that Diocese," while Bishops of Missionary Dioceses are "chosen in accordance with the Canons of the General Convention." (Defs.' Ex. 2 at 3.) Dioceses are grouped into geographical Provinces (Defs.' Ex. 2 at 42-43), except that, pursuant to ECUSA's Constitution, "no Diocese shall be included in a Province without its own consent." (Defs.' Ex. 2 at 7.) Each Province has a Synod, which has its own House of Bishops and House of Deputies. (Defs.' Ex. 2 at 43.) Also of note is that, by the terms of its Constitution, ECUSA requires that the Book of Common Prayer be used in all its Dioceses. (Defs.' Ex. 2 at 8.)

2. Diocese of Virginia ("Diocese")

The Diocese's Constitution states that "[t]he order, government, and discipline of the Protestant Episcopal Church in the Diocese of Virginia shall be vested in the Bishop, and in the Council of the Diocese. . . ." (Defs.' Ex. 3, "Constitution and Canons of the Diocese in effect until the adjournment of the

---

[1] See Defs.' Ex. 2 at 2 ("The Church in each Diocese which has been admitted to union with the General Convention, each area Mission established as provided by Article VI, and the Convocation of the American Churches in Europe, shall be entitled to representation in the House of Deputies by not more than four ordained persons, Presbyters or Deacons, canonically resident in the Diocese and not more than four Lay Persons, confirmed adult communicants of this Church, in good standing in the Diocese but not necessarily domiciled in the Diocese; but the General Convention by Canon may reduce the representation to not fewer than two Deputies in each order. Each Diocese, and the Convocation of the American Churches in Europe, shall prescribe the manner in which its Deputies shall be chosen.").

[2] A Mission may be established "in any area not included within the boundaries of any Diocese of [ECUSA] or of any Church in communion with [ECUSA]. . . ." (Defs.' Ex. 2 at 6.)

Annual Council on January 27, 2007 (including throughout December 2006)," at 6.) The Council is comprised of the "Clerical order" and the "Lay order." The Clerical order is composed of "the Bishop or Bishops and all other ministers canonically resident in the Diocese of Virginia," while the "Lay order consist[s] of both the "Lay Delegates," and the "Lay members ex officio." The Lay Delegates consist of delegates from each church, as chosen by its Vestry. (Defs.' Ex. 3 at 6.) The Lay members *ex officio* include "the Lay members of the Standing Committee, the Lay members of the Executive Board, the Chancellor, the Presidents of the Regions, the President of the Episcopal Church Women of the Diocese, and five lay persons, not over 21 years of age at the time of election, to be elected on or before May 1 as Youth Delegates by five of the Regional Councils designated on an annual rotating basis by the Standing Committee." (Defs.' Ex. 3 at 6-7.) The Council conducts annual meetings. (Defs.' Ex. 3 at 6.)

In addition to the Bishop, officers of the Diocese include a Secretary, Treasurer, Chancellor, and a Registrar. The Diocese's Constitution also mandates that a Standing Committee and an Executive Board "conduct . . . the affairs of the Diocese." (Defs.' Ex. 3 at 7.) The Standing Committee "consist[s] of twelve members, six of the Clerical order, and six of the Lay order," (Defs.' Ex. 3 at 10) while the Executive Board consists of "[o]ne member elected by each Regional Council,"[3] and "[t]he Bishop, the Bishop Coadjutor if there be one, and the Suffragan Bishops if there be such." (Defs.' Ex. 3 at 15-16.)

At the local level, each Church[4] within the Diocese has a Vestry, which consists of three to twelve members who are elected by the Church's adult communicants. (Defs.' Ex. 3 at 21.) The Church's head pastor, known as the

---

[3] The Diocese of Virginia is divided into Regions, of which every Church in the Diocese is a member. Each Region has its own Regional Council. (Defs.' Ex. 3 at 17-18.)

[4] The Diocese defines "Church" as "[a] group of people (1) which acknowledge the jurisdiction of the Bishop or Ecclesiastical Authority of the Diocese of Virginia, (2) among whom there is a regular program of identifiable Episcopal services (including regular celebration of the Holy Communion) at a designated place or places of worship, (3) which as a group shares in the support of the Episcopate of the Diocese, (4) which makes provision for the pastoral administrations of the church to its members, and (5) which functions under the supervision of a Priest or Deacon. . . ." (Defs.' Ex. 3 at 19.) The Diocese's Canons further state that "The Rector and Vestry of a Church as herein defined are expressly designated as the 'Rector and Vestry of a Parish' for purposes of the Constitution and Canons of the Episcopal Church." (Defs.' Ex. 3 at 20.)

Rector, presides at Vestry meetings, and is in fact elected by the Church's Vestry, with "the advice of the Bishop and in compliance with General Convention Canon III. 17." (Defs.' Ex. 3 at 22, 24.)

### 3. The Anglican Communion

The Anglican Communion is described as a "family of churches . . . shar[ing] a kind of historical relationship, one with another . . . understanding and seeing [their] common ancestry in the Church of England through the See of Canterbury."[5] (Trial Tr. 862:10-15, Nov. 13th-20th, 2007.) It is "a family of . . . 38 . . . regional and national churches that share a common history of their understanding of the Church catholic through the See of Canterbury," (Trial Tr. 846:4-8) and "a way by which . . . Anglicans say [they] are related to, [they] have a historic relationship with the Archbishop of Canterbury." (Trial Tr. 848:21-849:2.) The Anglican Communion has also been described as "a widely diverse international society of churches." (Trial Tr. 928:20-21.) In the Lambeth Commission on Communion's 2004 Windsor Report, it formally referred to itself as:

> that *part* of the Body of Christ which shares an inheritance through the Anglican tradition, that is, from the Church of England, whose history encompasses the ancient Celtic and Saxon churches of the British Isles, and which was given fresh theological expression during the period of the Reformation in

---

[5] This description of the Anglican Communion was provided by ECUSA/Diocese expert witness Ian Douglas. Dr. Douglas is the Angus Dun Professor of Mission and World Christianity at the Episcopal Divinity School in Cambridge, Massachusetts. He received a Ph. D. in Religious Studies from Boston University and a Master of Divinity from Harvard Divinity School in Cambridge, Massachusetts. (Defs.' Ex. 41, "Curriculum Vitae of the Rev. Dr. Ian Douglas," at 2.) Dr. Douglas stated that his "proved discipline is missiology," which is the "study of the theology, history, and anthropology of [C]hristian mission." (Tr. 831:10-14, 833:6-8.) Dr. Douglas is an ordained priest of the Episcopal Church and is currently a Priest Associate at St. James's Episcopal Church in Cambridge, Massachusetts. (Tr. 834:12-14.) His various positions, appointments, and honors include: Member of the Design Group for the 2008 Lambeth Conference of Anglican Bishops; Clergy Member-Elect for ECUSA; Co-editor of the Oxford University Press: *Handbook of Anglican Studies*; Editorial Board Member of the *Journal of Anglican Studies*; Member of the Executive Council of ECUSA; Clerical Deputy from the Diocese of Massachusetts to the House of Deputies of the General Convention of ECUSA; and Member of the Jubilee Committee of the Diocese of Massachusetts. (Def. Ex. 41 at 3-5, 7.)

the sixteenth and seventeenth centuries. . . . The very fact that the family of churches which traces its roots back to the ancient churches of the British Isles should call itself an Anglican Communion is itself indicative of the twin fundamental concepts on which the community is built: our shared inheritance ("Anglican") and our worldwide fellowship as God's children ("communion").

(Pls.' Ex. 61, "The Lambeth Commission on Communion's 2004 Windsor Report," at 25.)

Further, the Anglican Communion states that it believes:

Communion clearly makes demands on all within it. It involves obligations, and corresponding rights, which flow from the theological truths on which the life of the Christian community rests. . . . The commitments of communion provide objective criteria by which to understand the rights and responsibilities that go with the relationship and which promote and protect the common good of the worldwide community of churches. Many obligations are implicit in the foundation, purposes, forms, subjects, and substance of communion, and thus relate to matters of critical common concern to the global Anglican fellowship. For instance, the divine foundation of communion should oblige each church to avoid unilateral action on contentious issues which may result in broken communion. It is an ancient canonical principle that what touches all should be decided by all. . . . Communion obliges each church . . . to act interdependently, not independently.

(Pls.' Ex. 61 at 26-27.)

The core structures of the Anglican Communion include the Archbishop of Canterbury, who is known as the Anglican Communion's "focus of unity," along with three "Instruments of Communion," that are also known as "Instruments of Unity." (Pls.' Ex. 61 at 41; Trial Tr. 849:16-850:3.) These are: (1) the Lambeth Conference (hereinafter "Lambeth"); (2) Anglican Consultative Council (hereinafter "ACC"); and (3) the Primates' Meeting.

### a. *The Archbishop of Canterbury*

The Archbishop of Canterbury is known as the "chief pastor of the entire Communion." (Pls.' Ex. 61 at 31.) To illustrate the role of the Archbishop of Canterbury, the Lambeth Commission on Communion's 2004 Windsor Report states that "[i]t is important to note that these Bonds of Unity are different in kind from those which operate in the Roman Catholic Church, in which the Pontiff, with the support of the Curia, enjoys 'supreme, full, immediate, and universal ordinary power,' which he can always freely exercise. The Anglican way, theological, symbolic, and practical, is diffused among the different aspects of the life of the Communion precisely in such a way as to give supreme authority, in the sense outlined above, to scripture as the locus and means of God's word, energizing the Church for its mission and sustaining it in its unity." (Pls.' Ex. 61 at 34 (footnotes omitted)).

"From the beginning, the Archbishop of Canterbury, both in his person and his office, has been the pivotal instrument and focus of unity; and relationship to him became a touchstone of what it was to be Anglican." (Pls'. Ex. 61 at 41.) Thomas Cranmer was the first Archbishop of the Reformation period, and he wrote the first *Book of Common Prayer*. (Pls.' Ex. 61 at 41, n. 55.) Following the American Revolutionary War, American Anglicans looked to the Archbishop of Canterbury to consecrate new bishops, and "[t]hereafter it was successive Archbishops of Canterbury who consecrated bishops for Canada, the West Indies, India, and the developing English colonial territories, and it was to Archbishops of Canterbury that these churches tended to turn for assistance both in spiritual and political matters when problems arose." (Pls.' Ex. 61 at 41-42.)

### b. *The Lambeth Conference*

The Lambeth Conference is a once every ten years conference of all of the Bishops of the Worldwide Anglican Communion. (Trial Tr. at 396:9-12.) The Lambeth Conference passes various "resolutions," which are described as "non-binding" upon the various churches that serve as members of the Communion. (Trial Tr. at 851:21-852:15.) It was begun in 1867, but did not become the "Lambeth Conference" until 1877, when a second meeting of the conference was held. (Trial Tr. at 1035:5-11.) From its beginnings, "the Lambeth Conference has proved to be a powerful vehicle for the expression of a concept central to Anglican ecclesiology, the collegiality of the bishops." (Pls.' Ex. 61 at 43.)

### c. *Anglican Consultative Council ("ACC")*

The Anglican Consultative Council is described as "a consultative body made up of members, sometimes understood as representatives . . . from the 38 churches who come together every two or three . . . years, in various parts of the world to . . . take counsel to consider the initiatives and hopes and dreams before the Anglican Communion as a family of churches, to pray together, to worship together, to study [the scriptures] together." (Trial Tr. at 853:20-854:7.) The ACC was established in 1968. (Pl. Ex. 61 at 43.) The ACC's "powers" include the following:

a. To facilitate the co-operative work of the member churches of the Anglican Communion. . . .

c. To advise on inter-Anglican, provincial, and diocesan relationships, including the division of provinces, the formation of new provinces and of regional councils, and the problems of extra-provincial dioceses.

d. To develop as far as possible agreed Anglican policies in the world mission of the Church and to encourage national and regional churches to engage together in developing and implementing such policies by sharing their resources of man power, money, and experience to the best advantage of all.

e. To keep before national and regional churches the importance of the fullest possible Anglican collaboration with other Christian churches.

f. To encourage and guide Anglican participation in the ecumenical movement and the ecumenical organizations, to co-operate with the World Council of Churches and the world confessional bodies on behalf of the Anglican Communion, and to make arrangements for the conduct of pan-Anglican conversations with the Roman Catholic Church, the Orthodox churches, and other churches. . . .

j. To obtain, collect, receive, and hold money, funds, and property, old and new, by way of contributions, donations, subscriptions, legacies, grants, and any other lawful method, and accept and receive gifts of property of any description (whether subject to any special trust or not).

(Defs.' Ex. 42, "The Constitution and Bylaws of the Anglican Consultative Council," at 449.)

The ACC's membership consists of the Archbishop of Canterbury, as well as a combination of bishops, priests, and laypersons from each of the member churches. (Defs.' Ex. 42 at 451-52.) The ACC also appoints a Standing Committee, composed of nine members, which meet annually. (Defs.' Ex. 42 at 450.)

### d. *The Primates' Meeting*

The Primates' Meeting is composed of the head or "top" Bishops from each church or province in the Anglican Communion. Since 1979, the Primates have scheduled meetings for every other year, at which they "come together . . . to . . . take counsel, to pray together, to worship together for the sake of building relationships across the Anglican Communion under the Presidency of the Archbishop of Canterbury." (Trial Tr. at 858:9-22.)

## B. *Chronology of Major Events*

This Court describes in considerable detail the evidentiary foundation for its finding that a "division" under § 57-9(A) has occurred. In doing so, this Court emphasizes that no statement, expression, or comment in this opinion is intended by the Court to express a view on the substance or the merits of the matters giving rise to the division. The Circuit Court is a secular institution of government, and it is not entitled or permitted to have any view or opinion on a matter of religious orthodoxy.

### 1. Genesis of the Conflict

At ECUSA's 2003 General Convention, the three major points of controversy included: (1) confirmation of the election of the Rev. Gene Robinson as a Bishop within ECUSA; (2) a resolution that recognized the blessings of same-sex unions; and (3) the rejection of a resolution concerning the "historic formularies of the Christian faith." See Trial Tr. at 313:9-314:20; Pls.' Ex. 262, "Letter dated August 15, 2003, to Most Rev. and Rt. Hon. Rowan Williams from Rt. Rev. Peter James Lee," at 1.

Subsequent to the Convention, on August 15, 2003, Bishop Peter James Lee, the Bishop of the Diocese of Virginia, wrote a letter to then-Presiding Bishop of ECUSA, the Most Rev. Frank T. Griswold, and praised Presiding

Bishop Griswold for the "impressive . . . way [Bishop Griswold] led [the House of Bishops] through the vote for consent on Canon Robinson." (Pls.' Ex. 160, "Letter from Rt. Rev. Peter James Lee to The Most Rev. Frank T. Griswold, 8/15/2003," at 1.) However, Bishop Lee further informed Presiding Bishop Griswold that Bishop Lee was concerned about the reaction within his Diocese to the events of the 2003 Convention, in that Bishop Lee was "[r]eceiving hundreds of letters, most of which [were] negative, including some from vestries of some of [the] larger parishes, putting their pledges in escrow so neither the diocese nor the national church is supported." (Pls.' Ex. 160 at 1.) Further, Bishop Lee stated that he "hope[d] that David Beers,[6] under [Presiding Bishop Griswold's] direction, [would] convene some sort of cabinet of thoughtful chancellors in the next few weeks to brainstorm what possible responses might be made should there be an attempt to create a parallel province." (Pls.' Ex. 160 at 1.)

That same day, Bishop Lee wrote directly to the Archbishop of Canterbury, the Most Rev. and Rt. Hon. Rowan Williams, stating that:

> The worldwide publicity given to our recent General Convention is spinning the reports in ways that are not entirely accurate. . . .
>
> A number of the congregations of the Diocese of Virginia are unhappy with me because I consented to Canon Robinson's consecration. . . . As I understand it, they are planning to draft plans for a parallel province of the Communion and hope to convince you and the other Primates when you meet in London in October to support such a plan.
>
> I appeal to you not to support such a divisive effort. Surely we can arrange some form of flying bishops for congregations that are unhappy with their diocesans but to create a parallel province would create havoc in the American Church and raise all sorts of questions regarding property, pensions, the authority of existing canons, and the like. . . .
>
> Please know that you are in my daily prayers as you wrestle with this fractious Communion.

[6] David B. Beers, Esq., is counsel to the law firm of Goodwin Procter in Washington, D.C., and is the Chancellor to the Presiding Bishop of the ECUSA. He has held the position of Chancellor since November of 1991. Mr. Beers testified that the position of Chancellor entails being the Presiding Bishop's "counsel for ecclesiastical matters and secular matters." (Trial Tr. at 1218:19-1219:17.)

(Pls.' Ex. 262 at 1-2.)

Similarly, on October 1, 2003, Bishop Lee wrote to one of the Anglican Communion's Primates, the Most Rev. Robin Eames of Northern Ireland, stating that Bishop Lee was "appeal[ing] for pastoral understanding of the breadth of the Episcopal Church in the United States (ECUSA). . . ." (Pls.' Ex. 164, "Letter from Rt. Rev. Peter James Lee to The Most Rev. Robin Eames, 10/1/2003" at 1.) Bishop Lee stated that he wanted "to ask that the primates take no action at [their] London meeting in October that [would] damage the unity of ECUSA or encourage intrusions of foreign bishops into [ECUSA's] life that [would] undermine the integrity of [ECUSA's] dioceses." (Pls.' Ex. 164 at 1.) The other pertinent portion of this correspondence reads as follows:

> The Diocese of Virginia is the largest diocese in ECUSA in terms of baptized members. Because I and a 6 to 2 majority of our lay and clergy deputies at the General Convention voted to confirm Gene Robinson as Bishop of New Hampshire, some of our people and congregations are upset. . . .
>
> I can understand if the primates need to convey some sense of disappointment over ECUSA's confirmation of the bishop-elect of New Hampshire. I plead for your patience as we seek to work out our own differences and ask your help in preventing any single primate or group of primates from creating a dissident ecclesial body in the United States that will confuse our people and distract us from mission.
>
> As one of the first Anglican communities outside the British Isles, the Church in Virginia cherishes our partnership with the Anglican Communion. We hope the Primates' Meeting will continue to recognize our loyalty to the communion and honor our self-governing tradition.

(Pls.' Ex. 164 at 1-2.)

Despite Bishop Lee's entreaties, however, the dispute continued to broaden, spilling over into all parts of the Anglican Communion. On April 27, 2004, then-Presiding ECUSA Bishop, the Most Rev. Frank T. Griswold, wrote a letter to the Archbishop of Kenya, The Most Rev. Benjamin Nzimbi, which reads in pertinent part as follows:

I am grieved that you have reached the decision that we can no longer walk this path together. You recognize the long history of our partnership in the Gospel, which has never been about anything less than the advancement of God's kingdom, whether in Kenya or in the United States.

Nonetheless, I respect your decision and that of the church in whose name you speak. Our sharing of resources has never come with strings attached.

Our partnership has many dimensions, ranging from the sharing of financial resources, whether from the General Convention budget, Episcopal Relief and Development, or the United Thank Offering, to the sharing of people, whether through missionaries, companion dioceses, or theological students. . . . Financial resources shared . . . derive both from dioceses that consented to the consecration of Bishop Robinson and from dioceses that withheld consent; we do not make a distinction.

(Pls.' Ex. 268, "Letter dated April 27, 2004, to Most Rev. Benjamin Nzimbi from Most Rev. Frank T. Griswold," at 1.)

Back in Virginia, Bishop Lee attempted to address the concerns raised by several congregations by making arrangement for "alternate Episcopal care." On September 7, 2004, the Diocese sent out a press release entitled, "Former Archbishop of Canterbury Accepts Bishop Lee's Invitation to Preside at Supplemental Confirmations." This press release reads in its entirety as follows:

The former Archbishop of Canterbury, Lord Carey of Clifton, has accepted an invitation from the Rt. Rev. Peter James Lee, Bishop of the Episcopal Diocese of Virginia, to preside at two supplemental confirmation services on Wednesday, September 15, 5:30 p.m. and 8:30 p.m. at Truro Church in Fairfax, Va. The services are especially provided for those congregations that are unhappy with Bishop Lee's consent of the consecration of the Bishop of New Hampshire and feel the need for alternate Episcopal ministry.

"Lord Carey is coming at my invitation as an expression of pastoral outreach from the office of the Bishop," said the Rt. Rev. Peter James Lee. "My hope is that this pastoral gesture will

be seen as a way of accommodating people who have differing views within the Diocese of Virginia. I'm grateful to Lord Carey for his willingness to come."

The special services are in keeping with a pledge Bishop Lee made in his pastoral address to the Annual Council of the Diocese in January, in which he stated that he would make provisions for alternate Episcopal care for any congregation that requested it.

Speaking of his upcoming visit, Lord Carey said, "I feel deeply touched by Bishop Peter Lee's invitation to conduct two confirmation services in his diocese. The present strains on the Anglican Communion demand firm leadership, generosity, and kindness. I have accepted his invitation to be his representative out of my respect for him and for the Rev. Martyn Minns [rector of Truro Church], both of whom are good friends."

In an August 25 letter to the editor of *The Daily Telegraph* (London), Lord Carey wrote, "The Diocese of Virginia is pioneering a way of responding to the deep divisions in Episcopal Church of the U.S. I salute Peter Lee's spirit of generosity and humility as a demonstration that, in these critical days for the Anglican Communion, it is possible to avoid schism, if American bishops pay attention to the many Episcopalians who are exceedingly distressed by the consecration of Gene Robinson."

(Pls.' Ex. 74, "'Former Archbishop of Canterbury Accepts Bishop Lee's Invitation to Preside at Supplemental Confirmations,' The Diocese of Virginia Press Release, 9/7/2004," at 1.)

2. The Windsor Report

A month later, in October of 2004, the escalating conflict within the whole of the Anglican Communion was addressed in a landmark document entitled the "Windsor Report," issued by the Lambeth Commission. Due to increasing discord relating to issues of human sexuality within the Anglican Communion, in October of 2003, the Archbishop of Canterbury established the "Lambeth Commission" upon the suggestion of the Anglican Primates. The described "mandate" of this Commission was to "seek a way forward which would encourage communion within the Anglican Communion. . . . [I]t

requested consideration of ways in which communion and understanding could be enhanced where serious differences threatened the life of a diverse worldwide Church." (Pls.' Ex. 61 at 5.)

The Foreword to the Windsor Report, authored by the Most Rev. Dr. Robin Eames, Archbishop of Armagh and Chairman of the Lambeth Commission, reads in pertinent part as follows:

> Since the 1970s controversies over issues of human sexuality have become increasingly divisive and destructive throughout Christendom. Within the Anglican Communion, the intensity of debate on these issues at successive Lambeth Conferences has demonstrated the reality of these divisions.
>
> The decision by the 74th General Convention of the Episcopal Church (USA) to give consent to the election of bishop Gene Robinson to the Diocese of New Hampshire, the authorizing by a diocese of the Anglican Church of Canada of a public Rite of Blessing for same sex unions, and the involvement in other provinces by bishops without the consent or approval of the incumbent bishop to perform Episcopal functions have uncovered major divisions throughout the Anglican Communion. There has been talk of crisis, schism, and realignment. Voices and declarations have portrayed a Communion in crisis.
>
> Those divisions have been obvious at several levels of Anglican life: between provinces, between dioceses, and between individual Anglican clergy and laity. The popular identification of "conservatives" and "liberals," and "the west" as opposed to "the global south," has become an over-simplification - divisions of opinion have also become clear within provinces, dioceses, and parishes. . . .
>
> What could be termed "the human face" of these divisions has become clear to the Commission. Within provinces, dioceses and parishes, where individual Anglican Christians have experienced degrees of alienation and exclusion due to difference of opinion between leadership and members, there has been much pain and disillusionment. Further questions have surfaced about Episcopal oversight within a diocese where significant groups of Anglicans have become alienated from their bishop. . . .

 The depth of conviction and feeling on all sides of the current issues has on occasions introduced a degree of harshness and a lack of charity which is new to Anglicanism. A process of dissent is not new to the Communion, but it has never before been expressed with such force nor in ways which have been so accessible to international scrutiny.

 The "bonds of affection" so often quoted as a precious attribute of Anglican Communion life, as well as the instrument of communion and unity, have been threatened by the current divisions. . . .

 [I]f realistic and visionary ways cannot be agreed to meet the levels of disagreement at present or to reach consensus on structures for encouraging greater understanding and communion in the future, it is doubtful if the Anglican Communion can continue in its present form.

(Pls.' Ex. 61 at 4-6.)

The Windsor Report embarked upon an extensive analysis of the current difficulties within the Communion, noting that one of the reasons for the Communion's present problems was that "it was assumed by [ECUSA] and the Diocese of New Westminster [Canada][7] that they were free to take decisions on matters which many in the rest of the Communion believe can and should be decided only at the Communion-wide level." (Pls.' Ex. 61 at 22.) The Windsor Report further commented that the actions of various bishops within ECUSA "raise[] the question of their commitment to [ECUSA]'s interdependence as a member of the Anglican Communion to which its own Constitution and Canons makes reference." (Pls.' Ex. 61 at 52.) In the corresponding footnote to this statement, the Windsor Report states that "[t]he Preamble to the ECUSA *Constitution and Canons* characterizes the church as 'a constituent member of the Anglican Communion.' . . ." (Pls.' Ex. 61 at 52, n. 91.)

The Windsor Report reflects upon the balance within the Anglican Communion between independence of the various provinces on the one hand, versus the interdependence mandated by the fact that the various provinces are part of a "Communion," stating that, "Since autonomy is closely related to interdependence and freedom-in-relation, there are legitimate limits (both

---

[7] See *supra* (stating that a diocese of the Anglican Church of Canada had authorized a public Rite of Blessing for same sex unions.)

substantive and procedural) on the exercise of this autonomy, demanded by the relationships and commitments of communion and the acknowledgement of common identity. Communion is, in fact, the fundamental limit to autonomy." (Pls.' Ex. 61 at 36.)

The Windsor Report made various "recommendations" to the Anglican Communion. These included that ECUSA "be invited to express its regret that the proper constraints of the bonds of affection were breached in the events surrounding the election and consecration of a bishop for the See of New Hampshire," and that "pending such expression of regret, those who took part as consecrators of Gene Robinson should be invited to consider in all conscience whether they should withdraw themselves from representative functions in the Anglican Communion." (Pls.' Ex. 61 at 53-54.) The Windsor Report acknowledged that the Diocese of New Westminster and ECUSA might argue that the Windsor Report's recommendations and advice have "only moral authority," but nevertheless the Report still declared that:

> we believe that it must be recognized that actions to move towards the authorization of such rites in the face of opposition from the wider Anglican Communion constitutes a denial of the bonds of Communion. In order for these bonds to be properly acknowledged and addressed, the churches proposing to take action must be able, as a beginning, to demonstrate to the rest of the Communion why their proposal meets the criteria of scripture, tradition, and reason.

(Pls.' Ex. 61 at 56.)

On the other hand, the Windsor Report also had criticism for those bishops from various provinces within the Anglican Communion who disagreed with the actions of ECUSA and "who believe[d] it [wa]s their conscientious duty to intervene in provinces, dioceses, and parishes other than their own." (Pls.' Ex. 61 at 59.) The Windsor Report called on these bishops who had seen fit to intervene to "express regret for the consequences of their actions," and "to affirm their desire to remain in the Communion," as well as "to effect a moratorium on any further interventions." (Pls.' Ex. 61 at 59.) The Windsor Report concluded with the following warning:

> There remains a very real danger that we will not choose to walk together. Should the call to halt and find ways of continuing in our present communion not be heeded, then we shall have to

begin to learn to walk apart. We would much rather not speculate on actions that might need to be taken if, after acceptance by the primates, our recommendations are not implemented. However, we note that there are, in any human dispute, courses that may be followed: processes of mediation and arbitration; non-invitation to relevant representative bodies and meetings; invitation, but to observer status only; and, as an absolute last resort, withdrawal from membership.

(Pls.' Ex. 61 at 60.)

The Windsor Report proved disappointing to some Primates within the Anglican Communion. For example, on October 19, 2004, the Primate of All Nigeria, the Most Rev. Peter J. Akinola, expressed his dissatisfaction as follows:

After an initial reading [of the Windsor Report] it is clear to me that the report falls far short of the prescription needed for this current crisis. It fails to confront the reality that a small economically privileged group of people has sought to subvert the Christian faith and impose their new and false doctrine on the wider community of faithful believers. We have watched in sadness as sisters and brothers who have sought to maintain their allegiance to the "faith once delivered to the saints" have been marginalized and persecuted for their faith. We have been filled with grief as we have witnessed the decline of the North American Church. . . .

Where [in the Windsor Report] are the expressions of deep concern for the men and women whose witness is jeopardized and whose lives are at risk because of the actions of ECUSA [Episcopal Church of the United States of America]? Where are the words of "deep regret" for the impact of ECUSA's actions upon the Global South and our missionary efforts? . . . .

The report correctly notes that the Episcopal Church and the Diocese of New Westminster have pushed the Anglican Communion to the breaking point. It rightly states that they did not listen to the clear voices of the Communion and rejected the counsel of all four Instruments of Unity. . . . They are hell bent on destroying the fabric of our common life, and we are told to sit and wait.

We have been asked to express regret for our actions and "affirm our desire to remain in the Communion." How patronizing! We will not be intimidated. In the absence of any signs of repentance and reform from those who have torn the fabric of our Communion, and while there is continuing oppression of those who uphold the Faith, we cannot forsake our duty to provide care and protection for those who cry out for our help.

The report rightly observes that if the "call to halt" is ignored "then we shall have to begin to learn to walk apart." The Episcopal Church and Diocese of New Westminster are already walking alone on this, and, if they do not repent and return to the fold, they will find that they are all alone. They will have broken the Anglican Communion.

(Defs.' Ex. 63A, "Redacted copy of portions of Christ's Ambassadors Church webpage, http://www.uncompromisedgospel.org (as printed November 6, 2007)," at 584-85.)

Between February 20th and 25th of 2005, the Anglican Primates met at the Dromantine Retreat and Conference Centre, Newry, in Northern Ireland, at the Archbishop of Canterbury's invitation. The primary purpose for this meeting was to analyze, discuss, and consider the 2004 Windsor Report.[8] On February 24, 2005, the Primates issued a communique[9] through the Anglican Communion News Service, which summarized the proceedings of their Northern Ireland meeting. The communique stated that the Primates "welcome[d] the general thrust of the Windsor Report as offering a way forward for the mutual life of [the Anglican] Communion." (Defs.' Ex. 19 at 1.) The most relevant provisions of this communique as they relate to the instant litigation are as follows:

---

[8] See Defs.' Ex. 19, "The Anglican Communion Primates' Meeting Communique, February 2005," at 1 ("The most pressing business facing the Primates' Meeting was consideration of the Windsor Report 2004, in which the Lambeth Commission on Communion had offered its recommendations on the future life of the Anglican Communion in the light of developments in Anglican life in North America." (endnotes omitted)).

[9] A "communique" is "a communication at the close of [a Primates'] meeting that talks about what was discussed." (Defs.' Ex. 70, "Videotaped Deposition of Bishop Katharine Jefferts Schori, Tuesday, October 30, 2007, New York, New York," at 118.)

12. We as a body continue to address the situations which have arisen in North America with the utmost seriousness. Whilst there remains a very real question about whether the North American churches are willing to accept the same teaching on matters of sexual morality as is generally accepted elsewhere in the Communion, the underlying reality of our communion in God the Holy Trinity is obscured, and the effectiveness of our common mission severely hindered.

13. We are persuaded however that, in order for the recommendations of the Windsor Report to be properly addressed, time needs to be given to the Episcopal Church (USA) and to the Anglican Church of Canada for consideration of these recommendations according to their constitutional processes.

14. Within the ambit of the issues discussed in the Windsor Report and in order to recognize the integrity of all parties, we request that the Episcopal Church (USA) and the Anglican Church of Canada voluntarily withdraw their members from the Anglican Consultative Council for the period leading up to the next Lambeth Conference. During that same period we request that both churches respond through their relevant constitutional bodies to the questions specifically addressed to them in the Windsor Report as they consider their place within the Anglican Communion.

15. In order to protect the integrity and legitimate needs of groups in serious theological dispute with their diocesan bishop, or dioceses in dispute with their Provinces, we recommend that the Archbishop of Canterbury appoint, as a matter or urgency, a panel of reference to supervise the adequacy of pastoral provisions made by any churches for such members in line with the recommendation in the Primates' Statement of October 2003. Equally, during this period we commit ourselves neither to encourage nor to initiate cross-boundary interventions.

16. Notwithstanding the request of paragraph 14 of this communique, we encourage the Anglican Consultative Council to organize a hearing at its meeting in Nottingham, England, in June 2005 at which representatives of the Episcopal Church (USA) and the Anglican Church of Canada, invited for that

specific purpose, may have an opportunity to set out the thinking behind the recent actions of their Provinces, in accordance with paragraph 141 of the Windsor Report. . . .

19. These strategies are intended to restore the full trust of our bonds of affection across the Communion.

(Defs.' Ex. 19 at 2-3 (internal citations and endnotes omitted).)

3. Discord within the Diocese

Meanwhile, events were continuing to unfold at the level of the Diocese of Virginia, which had witnessed the appointment of a "Reconciliation Commission," whose purpose was to address the ongoing conflict within the Diocese.

Dr. Paul Julian[10] testified that, following the 2003 Convention, the Diocese developed a "Reconciliation Commission." This Commission "was established by a resolution of the 209th Diocesan Council in 2004, and its task was to find ways to bring about some peaceful conflict resolution in the Diocese [following] the rather controversial events of the [2003 ECUSA] Convention." (Trial Tr. 403:18-404:1.) Resolution R-24sa set up the Reconciliation Commission, whose members were appointed by Bishop Lee. This Resolution reads in its entirety as follows:

Whereas, we in the Diocese of Virginia as members of the worldwide Anglican Communion are united in Christ and are called to live out our witness in our workplaces, churches, and communities; and

Whereas, profound differences have arisen over issues addressed at the 74th General Convention, specifically the consent to the election of the Rev. Canon V. Gene Robinson and Resolution C051 dealing with the blessing of same sex unions, and

Whereas, these differences go beyond the issue of homosexuality to the interpretation of Scripture; and

---

[10] Dr. Julian was called as a witness for the CANA Congregations. Dr. Julian is a member of Truro Church, where he has served on its Vestry and as its Senior Warden between 2001 and 2004. In addition, Dr. Julian served as a delegate to the Diocese's Annual Council from 2001 to 2006. (Trial Tr. 399:4-402:21.)

Whereas, following the October 2003 meeting of the Primates, the Archbishop of Canterbury established a Commission to address the dangers to the Anglican Communion, of which we are members, raised in part by actions of the 74th General Convention, and that that Commission was directed to report back to the Primates by October 2004; and

Whereas, that Commission is chaired by the honored guest of the 209th Annual Council of the Diocese of Virginia, the Most Rev. Robin Eames, Archbishop of Armagh and Primate of All Ireland; and

Whereas, the Primates urged "a lengthy process of prayer, reflection, and substantial work in and alongside the Commission which we have recommended"; now therefore be it

Resolved, that in response to the Primates' call for a period of prayer and reflection, this Council respectfully requests the Bishop to appoint a Reconciliation Commission to offer guidance over the next 12 months for how members of the Diocese can prayerfully reflect on our differences and discern God's will in addressing those differences; and be it further

Resolved, that this Commission periodically over the next 12 months offer guidance through the *Virginia Episcopalian*, the diocesan web site, and other diocesan communications for ways that parishes and missions can offer meaningful opportunities for reflection, prayer, worship, and discussion of the aforementioned issues; and be it further

Resolved, that this Commission report to the 210th Annual Council ways that the Diocese of Virginia can increase trust and respect for conscience, thereby helping to maintain unity; and be it further

Resolved, that in making its recommendations, this Commission should draw from the work of the ongoing diocesan Sexuality Dialogue Group; and be it further

Resolved, that the Diocese of Virginia reaffirm to truly live its formal vision and mission statement – "Empowered by the Holy Spirit and under the leadership of the Bishops, our mission as the Diocese of Virginia is to provide direction and support to every member in witnessing to the world God's love

in the living Christ; so that daily we are called to live out our witness in our workplaces, churches, and communities;" and be it further

Resolved, that these actions reflect the hope of this Council that the Diocese of Virginia will serve as a model for civil, candid and prayerful discussion during these challenging times in our Church and society.

(Pls.' Ex. 147, "Journal of the 209th Annual Council," at 210-11.)

This Commission first met on March 15th, 2004. Ten meetings were conducted between March 2004 and January of 2005. (See Trial Tr. 414:2-415:22.)

In January of 2005, the Reconciliation Commission made its report to the 210th Diocesan Council, which was distributed to each of the delegates at that Council. (Trial Tr. 420:21-421:2.)

The 210th Annual Council also witnessed the passage of Resolution R-22s, "Diocesan Response to the Windsor Report." (Pls.' Ex. 148, "Journal of the 210th Annual Council," at 210-11.) This Resolution reads:

Whereas, We in the Diocese of Virginia are members of the Anglican Communion are united in Christ and are called to live out our witness in our workplaces, churches, and communities; and

Whereas, We desire to serve as a model of civility to the Anglican Communion for resolution of the present divisions by working together and honoring conscience through a process that is respectful and peaceful; and

Whereas, We respect the Windsor Report of the Lambeth Commission on Communion, which has recommended to the Episcopal Church concrete ways to strengthen the Anglican Communion; and

Whereas, The 210th Annual Council recognizes that the Windsor Report admonishes the Episcopal Church for failing, in its recent actions regarding the approval of the election of the Bishop of New Hampshire and the adoption of Resolution C051 pertaining to the blessing of same gender unions, to give adequate consideration to the impact that these decisions had on bonds of affection with other parts of the Anglican Communion; and

Whereas, The 210th Annual Council recognizes that the Windsor Report admonishes those bishops throughout the Anglican Communion who have intervened in dioceses and provinces other than their own; and

Whereas, The Lambeth Conference of 1998 commends us to listen to the experience of homosexual persons and to assure them that they are loved by God and that all baptized, believing, and faithful persons, regardless of sexual orientation, are full members of the Body of Christ; and

Whereas, Bishop Lee has served as a model of civility and generosity and has called us to embrace the concept of mutual submission, which, according to the New Testament, means that we voluntarily refrain from actions that hurt our brothers and sisters or create stumbling blocks for others in the life of faith; now therefore be it

Resolved, that the 210th Annual Council of the Diocese of Virginia expresses regret that the proper constraints of the bonds of affection were breached through the actions of the 74th General Convention and for the consequences which followed; and be it further

Resolved, That the 210th Annual Council of the Diocese of Virginia formally requests that the 75th General Convention of the Episcopal Church effect a moratorium on the election of and consent to the consecration of any candidate to the episcopate who is living in same-gender union, until some new consensus in the Anglican Communion emerges; and be it further

Resolved, That all Anglicans have a moral responsibility to acknowledge and respond with compassion and understanding to the pain and suffering of those who, because of their sexual orientation, endure marginalization and rejection; and be it further

Resolved, That the 210th Annual Council calls upon the member churches of the Anglican Communion to maintain faith with the traditions and polity of the Anglican Communion and the Episcopal Church while the implications of an Anglican Covenant are being studied; and be it further

Resolved, That the congregations and regions of the Diocese of Virginia be urged to use the Report of the Diocese of Virginia's Commission on Reconciliation as a vehicle to further theological conversation; and be it further

> Resolved, That this resolution represents the desire of the Diocese of Virginia to remain together and a part of the Anglican Communion.

(Pls.' Ex. 148 at 210-11).

The Reconciliation Commission declared that "[a]fter 10 meetings, the 13 members of the Reconciliation Commission have wrestled with how we might come to a civil and gracious response to the bitter divisions in parts of our diocese that have arisen in response to these decisions [of ECUSA]." Their report further declared that:

> Even as we struggle with the painful reality that polarizing conflict draws energy and attention from mission and ministry, we cannot avoid the difficult question: "Can we continue to live together?"
>
> We understand from some of those among us that the answer may ultimately be "No," and that in this case there must be provision for an amicable divorce. We do not see it as our charter to delve into this possibility, other than to acknowledge that, at some point, our church and our diocese may need to explore this eventuality.

(Pls.' Ex. 15, "Statement concerning the work of the Diocese of Virginia's Commission on Reconciliation, 1/14/05," at 1.)

Of note is the fact that the thirteen members of the Reconciliation Commission, within this statement, affirmed the fact that, despite their differences of opinion, they "profess[ed] a common commitment to the basic principles of Anglicanism, as articulated in the *Book of Common Prayer* . . . [and] a desire on the part of each person on the commission to remain in the Anglican Communion." (Pls.' Ex. 15 at 2.) The Commission further:

> acknowledge[d] that the church is currently struggling with differences in interpretation of the Biblical narrative in regard to human sexuality. These differences today – like ones that have come before – are profoundly real and threaten to divide not only our diocese, but also the Episcopal Church and the Anglican Communion itself.
>
> Although the election and consecration of a person in a same-sex relationship to be the Bishop of New Hampshire has become the flash point of difference, we believe that the issues of difference between us transcend conversation regarding human sexuality.

> There are larger issues of the interpretation of scripture, the apostolic tradition, and the relationship of the Episcopal Church with the Anglican Communion. In the context of our apostolic tradition and our relationship with the Anglican Communion, these differences have led to genuine pain, fear, confusion, and impaired communion. . . .
>
> We note that there has been little significant reconciliation, and many in the church are stuck in a "level 5 conflict."

(Pls.' Ex. 15 at 2-3.) The report concludes by declaring that "[w]ith this report, we conclude our work as the Reconciliation Commission. But the work of the diocese is far from over. The same issues that have divided this Commission continue as points of disagreement in the larger body." (Pls.' Ex. 15 at 11.)

### 4. Formation of CANA

On August 2, 2005, the Convocation of Anglican Nigerians in America was incorporated to "operate as a convocation or association of Anglican churches in North America as a part of the Church of Nigeria within the Anglican Communion. . . ." (Pls.' Ex. 69, "August 2, 2005, Articles of Incorporation for the Convocation of Anglican Nigerians in America (CANA)," at 3.)

As Registrar Abraham Yisa[11] testified, CANA began with a protest launched by the Church of Nigeria upon the consecration of Bishop Robinson. In Registrar Yisa's words:

---

[11] Registrar Yisa is a member of the Church of Nigeria, a province within the Anglican Communion. The Church of Nigeria is headed by the Primate of all Nigeria and is subdivided into ten regional provinces, each of which is headed by a regional archbishop. These provinces are also subdivided into dioceses; the Church of Nigeria is composed of 122 dioceses in all. Registrar Yisa is from Minna, a diocese under the province of Abuja. He is the Chancellor of the Diocese of Minna and has been so since that Diocese was created. (Trial Tr. at 541:17-544:11.) In 2005, Registrar Yisa was elected Registrar of the entire Church of Nigeria, which means that Registrar Yisa is the chief legal advisor of that church. (Trial Tr. at 544:19-545:2.) He also serves on the Standing Committee of the Church of Nigeria and on its General Synod, the highest legislative body of the Church of Nigeria. (Trial Tr. at 549:8-550:3.) He also represents the Church of Nigeria at the ACC. (Trial Tr. at 552:8-11.) Registrar Yisa was involved in the establishment of CANA and currently serves in an official capacity with CANA as the Chairman of CANA's Board of Trustees. (Trial Tr. at 609:18-610:3.)

Bishops, particularly our Primate, protested to the then primate of ECUSA. Our Synod wrote a peace compact. [The] General Synod, the Standing Committee protested, they [all] protested to the Archbishop of Canterbury. They protested to all instruments of unity.

Nigeria took exception to that interpretation of the Holy Scriptures which we believed was not . . . [the] historic faith delivered to the saints.

(Trial Tr. 556:13-21.)

Subsequently, the Church of Nigeria's Standing Committee adopted a resolution authorizing the Primate of the Church of Nigeria to explore ways and means of providing oversight to Anglican Nigerian priests and laity who were living in the USA but who had grown disillusioned with the ECUSA. This "resolution called for a Primate to give Episcopal oversight to . . . members of congregations in America that had broken off of ECUSA." (Trial Tr. at 580:1-3.) Upon receiving this resolution, Registrar Yisa decided "that it would require [a] [co]nstitutional amendment to be able to give effect to [the] resolution, and [he] advised the General Synod" accordingly. (Trial Tr. 580:6-18.)

In September of 2005, Registrar Yisa proposed his amendments to the General Synod of the Church of Nigeria. (Trial Tr. 581:2-9.) These amendments altered the structure of the Church of Nigeria within the Anglican Communion as follows: While the Church of Nigeria had formerly described itself as being "in full Communion with the See of Canterbury and with all Dioceses, Provinces, and Regional Churches which are in full Communion with the See of Canterbury" (Pls.' Ex. 137, "Constitution of the Church of Nigeria, Authenticated by the Primate, Archbishop & Metropolitan 9/20/1997," at 1), it now considered itself to be, following the passage of the constitutional amendment, only "in full communion with Anglican Dioceses and Provinces that hold and maintain the historic faith, doctrine, sacrament, and discipline of the One, Holy, Catholic, and Apostolic Church as the Lord has commanded in His holy word and as the same are received as taught in the *Book of Common Prayer* and the ordinal of 1662, and in the 39 Articles of Religion." (Trial Tr. 585:1-8.) Thus, Registrar Yisa testified, "this amendment changed the legal relationship between the Church of Nigeria, and ECUSA, as well as with other provinces [within the Anglican Communion.]" (Trial Tr. at 585:15-18.)

The Church of Nigeria further amended its constitution to state that "The General Synod shall have power . . . to create convocations, chaplaincies of like-minded faith[ful] outside Nigeria, and to appoint persons within or outside Nigeria to administer them, and the Primate shall give Episcopal oversight." (Trial Tr. 587:2-8.) Registrar Yisa describes this amendment as necessary in order to give the Church of Nigeria the constitutional authority "to create convocations outside [the] Church of Nigeria," since "[t]here was no provision for that in [the Church of Nigeria's former Constitution]." (Trial Tr. at 589:15-21.)

Finally, the third amendment consisted of altering the definition of "convocation" to "mean [a] non-geographic connection[12] of churches and mission[s]." (Trial Tr. 590:2-9.) Registrar Yisa considered the Church of Nigeria and ECUSA to be in "broken communion" with each other, meaning that "a number of things like the fellowship, exchange of visits by our clergy, by the Primates, training programs, retreats, workshops, indeed financial assistance in some cases were no longer there." (Trial Tr. 591:13-592:1.) Registrar Yisa testified that the Church of Nigeria now refuses financial contributions from ECUSA, and he stated that there is no longer any exchange of Bishops between the Church of Nigeria and ECUSA. (Trial Tr. 592:6-15.)

Registrar Yisa further testified that, following the adoption of these amendments, the Church of Nigeria established CANA (Trial Tr. 592:16-19), and he stated that "[a]s of 2005, [the Church of Nigeria] had about 16 CANA churches that had registered . . . but that number is much, much more than that now." (Trial Tr. 595:4-6.)

During the trial, Registrar Yisa read from a statement from the Province of the Southern Cone,[13] which declared that "ECUSA's action has forced painful division in the Communion and is a schism of their own making. . . . As a consequence, this Province now shares only a profoundly impaired communion with the ECUSA. . . ." (Trial Tr. 600:4-601:2.) Registrar Yisa confirmed that the provinces that have declared broken communion with ECUSA include the Province of Uganda, the West Indies, Kenya, and the Church of Nigeria, as well as the entire Southern Cone. (Trial Tr. 602:7-12.)

---

[12] In Pls.' Ex. 138, which contains the full text of the Church of Nigeria's Constitution following the amendments referred to above, the definition of "convocation" is stated as follows: " 'Convocation' shall mean non-geographic collection of Churches and Missions." (Pls.' Ex. 138 at 22.)

[13] Dr. Douglas, an expert witness for the ECUSA/Diocese, stated that the Southern Cone includes Argentina, Peru, and Uruguay. (Trial Tr. 846:22-847:1.)

Registrar Yisa testified that he believed CANA was necessary, due to the "division" in the ECUSA:

Q: You've testified that it was the division in the Episcopal Church that led to the establishment of CANA.
A: Yes.
Q: What led you to conclude that there was a need for the establishment of CANA?
A: I said it before, that the Nigerian Anglicans in America who were at issue with ECUSA left. They appealed for spiritual care, and the Church of Nigeria decided to give them that spiritual care through the Primate of the Church of Nigeria, and also to provide structures for them. That is the reason.
Q: In your experience with the Church of Nigeria and the Anglican Communion, has there ever been a comparable division within the Communion?
A: Not like this. . . .
A: They have had what are called differences in opinion which, through the instruments of . . . Communion we have been able to resolve. Like the issue of ordination of women. It was a difference, but we resolved it.

(Trial Tr. 613:1-614:1.)

Registrar Yisa confirmed that, at the present time, the Church of Nigeria has no relationship with the ECUSA. (Trial Tr. 684:2-11.)

5. Formation of the "Special Committee" and its Aftermath

The Court now turns its attention back to the Diocese of Virginia and to the individual congregations involved in the instant litigation. On September 27, 2005, the Rev. Dr. John Yates,[14] wrote to Bishop Lee to express his concerns regarding the anticipated controversy, stating:

---

[14] The Rev. Dr. Yates is the Rector of the The Church at the Falls, the Falls Church, and a graduate of Princeton Theological Seminary and the Fuller Theological Seminary. He was ordained as a deacon within the ECUSA in 1971, then a priest within ECUSA in 1972. (Trial Tr. 462:11-464:2.) He was received by the Church of Nigeria as a priest to serve in CANA in December of 2006. (Trial Tr. 464:8-10.) The Rev. Dr. Yates testified that, following the ECUSA General Convention of 2003, many Episcopal clergy and laypeople "felt it was time

Here is the pressure: If it becomes clear that ECUSA will not turn back on this issue, we are pained to say that we believe we will have to find a way to separate from ECUSA, while remaining Anglicans. We have no plan, no timetable of action. Our great hope is that here in Virginia there may be an opportunity to forge a better way, perhaps a middle way. This has always been your hallmark. What such a plan might look like I do not care to speculate about, but we would very much like to pursue with you and any whom you would designate as your representatives, just how we might achieve what could be seen to be a win-win solution.

Our people are extremely upset. We have all lost key church members and more are leaving all the time. We do not know how long we can hold together.

(Defs.' Ex. 51 A, "Redacted version of "Notes from a meeting between Bishop Peter James Lee and clergy from 19 parishes and missions in the Diocese of Virginia, September 20, 2005," at 1.)

The Rev. Dr. Yates testified that, in September of 2005, following the issuance of the Reconciliation Commission's report, he chaired a group of about twenty-five clergy who met for an afternoon with Bishop Lee to express the level of discord that was occurring in their respective churches. (Trial Tr. 476:9-22.) At this meeting, The Rev. Dr. Yates "made a request of Bishop Lee asking if he would appoint a special diocesan committee to give attention to this rising threat of division in the Diocese," since "[Yates] knew that . . . some Rectors were talking about the possibility of leaving the Episcopal Church." (Trial Tr. at 478:6-14.) Bishop Lee agreed to do so and established this committee, known as the "Special Committee." The committee was composed of Russell Palmore, Chancellor of the Diocese of Virginia; Carolyn Parkinson, a Rector from the Plains; Andrew Merrow, a Rector from Arlington; Hugo Blankenship, former Chancellor of the Diocese of Virginia, from Fairfax; Tom Yates, a former Vestry member of Truro Church; and The Rev. Dr. Yates. (Trial Tr. 479:11-480:6.) These six members of the Special Committee proceeded to meet every three to five weeks from December of 2005 through September of 2006. Yates described their purpose as to:

---

to begin giving consideration to a new expression of Anglicanism in North America." (Trial Tr. 466:18-466:20.)

seek[] to discern in what ways [they] could maintain a sense of common mission [during their] time of division, and . . . also seek[] to discern if there was a way that . . . should a church decide that they wanted to leave the Episcopal Church . . . to discern a way in which that decision could be reached and that step could be taken that would be done in a fair way that was reasonable and would be acceptable to all those involved.

(Trial Tr. 480:9-481:6.)

On September 23, 2006, the Special Committee issued its Report. The Report stated that "we candidly and regretfully acknowledge that we may be entering a period in the history of the Anglican Communion when we (the Church, the Body of Christ) will be walking the way of the Cross together, but apart." (Pls.' Ex. 67, "September 2006 Diocesan Special Committee Report," at 1.) The Report confirmed the common threads holding the six committee members together, "essentials both of the Faith and of Anglicanism drawn from the Bible, the Book of Common Prayer, the Hymnal, [and] the 39 Articles." (Pls'. Ex. 67 at 1.) The Report set forth a "Protocol for Departing Congregation[s]," which included specific criteria that would govern any congregational vote to leave the Diocese. In regard to the issue of whether a departing congregation would take with it its real and personal property, the Protocol provided that "the amount of the payment to the Diocese for its claim to . . . property and the terms of such payment shall be determined by agreement, after disclosure of the nature and amount of parish assets, between representatives of the departing congregation and representatives of the Diocese, appointed by the Bishop," and that further, "[a]ny agreement will require the further consent of the Bishop, Standing Committee, and Executive Board." (Pls.' Ex. 67 at 2-3.)

On October 3, 2006, Bishop Lee wrote a letter to each member of the Special Committee, thanking them for their service, and for their report, and stating further that "The report reflects the gracious and respectful pattern characteristic of Virginia Episcopalians as we deal with differences. I am grateful for your leadership in bringing this report forward, and I will share it in due course with the Standing Committee and the Executive Board." (Defs.' Ex. 64, "Letters from Bishop Peter James Lee to members of the Special Committee, Oct. 3, 2006," at 1-6.)

On November 17, 2006, the Diocese of Virginia issued a press release entitled, "Standing Committee Takes Further Review of Special Committee Report." This press release reads as follows:

> At a regularly scheduled meeting of the diocesan Standing Committee today in Fredericksburg, the Standing Committee further considered the report of the Special Committee appointed by Bishop Lee in late 2005 to help those churches continuing in conflict over the decisions of the 74th General Convention in 2003 to get on with their mission in as close a union as possible with the Diocese of Virginia.
>
> Though the Standing Committee today did not approve or endorse the report, the Standing Committee views the report as a potentially useful way forward for those congregations in a period of deliberate discernment over their future relationship with the Episcopal Church.
>
> "We view the report of the Special Committee as one of several possible approaches to achieve a mutually acceptable agreement," said Col. Jean Reed, president of the Standing Committee. . . .
>
> At a joint meeting Nov. 9 of the Executive Board with the Standing Committee, both bodies voted to receive the report but did not endorse or approve the report.
>
> "The Standing Committee intends to meet with those churches proposing to separate from the Episcopal Church and review their situations on a case by case basis," said Col. Reed.

(Pls.' Ex. 130, " 'Standing Committee Takes Further Review of Special Committee Report,' The Diocese of Virginia Press Release, 11/17/2006," at 1.)

On December 1, 2006, Bishop Lee wrote another letter, one quite different in nature from that of October 3, 2006. This December 1st letter was addressed "to the rectors, vestries, and wardens of congregations" who were choosing to take votes to determine whether to leave ECUSA and the Diocese. Stating that the letter's purpose was "to outline ways forward and potential consequences of decisions," Bishop Lee declared that the congregations contemplating leaving ECUSA and the Diocese "should not assume the Episcopal Church [would] endorse or approve the steps outlined in [the Special Committee's report]." (Defs.' Ex. 66, "Letter from Bishop Peter James Lee to rectors, vestries, and wardens of congregations, December 1, 2006," at 1.) Further, Bishop Lee warned that:

absent a negotiated settlement of property, an attempt to place your congregation and its real and personal property under the authority of any ecclesial body other than the Diocese of Virginia and the bodies authorized by its canons to hold church property will have repercussions and possible civil liability for individual vestry members.

(Defs.' Ex. 66 at 2.)

Five days later, on December 6, 2006, Bishop Lee sent a letter to those congregations who were preparing to gather to take a vote as to whether or not to depart from the Diocese. That letter reads in pertinent part as follows:

Dear Friend in Christ,

In a few days, your congregation will gather to discuss its future in the Episcopal Church and in the Diocese of Virginia. I write you today with this prayerful appeal that you affirm your ministry in the Episcopal Church and in the Diocese of Virginia.

Since the Reformation, our Anglican tradition has included persons with different theological emphases in one community of faith, affirming the same creeds, participating in the same sacraments, honoring Scripture as the basis of our faith, interpreted across the centuries through Reason and Tradition. The Diocese of Virginia, in particular, has affirmed the Windsor Report, issued in 2004 by the Lambeth Commission, as a way forward for our worldwide communion by actions of the Annual Council in 2005 (Resolution R22) and 2006 (Resolution R17). In addition, the Diocese of Virginia, following the recommendations of the Windsor Commission, continues to refrain from public rites of blessing of same gender unions. Since 1607, Anglicans in Virginia have been united in common worship and in common faith and I invite you to affirm that commonality when you gather in your parish meeting. Are there differences among us? Yes. And learning from one another in our differences is, instead of a threat to our mission, an opportunity to learn from each other about what mission in the 21st century requires of us.

American Christianity has been punctuated over the years by frequent divisions, with one group choosing to separate

because they believed the separated group might be more pure than their former identity. That has not been characteristic of the way we Anglicans have dealt with differences.

I encourage you when you vote, to vote for the unity and mission of the church, therefore remaining one with your diocese, and reject the tempting calls to division. . . .

(Pls.' Ex. 68, "December 6, 2006, letter from Bishop Peter J. Lee to the members of the Voting Congregations," at 1.)

At or around December 7th, 2006, shortly after the issuance of Bishop Lee's letter, a meeting was held between the Standing Committee of the Diocese, and the Rectors and Wardens of churches that had announced they would conduct votes regarding possible departure from the Diocese. (Trial Tr. 499:2-13.) The Rev. Dr. Yates testified that Bishop Lee explained that there had been some "changes in the environment by that time":

[Bishop Lee] told [those in attendance at the meeting] that there were some changes in the environment by that time. He [said] that since the work of the Special Committee had been completed, that a new Presiding Bishop of the Episcopal Church had been installed, and that the new administration brought in a rather different view about division.

The former Presiding Bishop had said that in matters of division of churches leaving the Diocese, that was going to be left up to the Bishop. But now it was going to be – it was going to become a matter of concern to the national church. The Bishop said there's a new sheriff in town, the situation is different.

(Trial Tr. 499:16-500:9.) This was described by CANA Congregation witness The Rev. Dr. Yates as a "total departure from the tenor of [the previous meetings]," that "was totally unexpected." (Trial Tr. 501:10-12.)

By December 18, 2006, twelve churches within the Diocese of Virginia voted both to separate from the Diocese and to retain their church property. These churches are All Saints' Church, Dale City; Christ our Lord, Lake Ridge; Church of the Holy Spirit, Ashburn; South Riding Church, Fairfax; Church of the Apostles, Fairfax; Church of the Word, Gainesville; Truro, Fairfax; The Falls Church, Falls Church; St. Stephen's, Heathsville; St. Margaret's Church, Woodbridge; Potomac Falls Episcopal, Sterling; Christ

the Redeemer, Centreville. (Pls.' Ex. 132, " 'News Update from the Diocese of Virginia,' 12/18/2006" at 1.) By the time of the § 57-9 trial in November of 2007, fifteen individual congregations had voted to leave the Diocese (Pls.' Ex. 301, "Deposition Designations of Peter James Lee," at 15),[15] and twenty-two clergy had been removed in the Diocese. (Pls.' Ex. 301 at 23.) Bishop Lee described this "removal" as a process by which a member of the clergy would first be "inhibited," and then, "unless they returned to the Episcopal Church within six months, they were removed." See Pls.' Ex. 301 at 20-22. The process of removal is called "deposing." (Pls.' Ex. 301 at 22.)

6. Evolution of CANA and the Formation of the Anglican District of Virginia ("ADV")

As the conflict within the Diocese escalated, CANA continued to evolve. In 2006, CANA's purpose broadened to encompass all Anglicans within North America who had broken away from the Episcopal Church. Thus, CANA changed its name to "Convocation of Anglicans in North America." (Trial Tr. 312:4-8.) At the time of trial, about 100 clergy had affiliated with CANA, 80% of whom were formerly affiliated with ECUSA. CANA allowed ECUSA bishops to transfer in, while non-ECUSA bishops were first required to be consecrated. (Trial Tr. 320:3-18.) In addition to CANA's Bishop, Martyn Minns, who was a witness for the CANA Congregations at trial, other CANA bishops include David Bena, formerly of the ECUSA Diocese of Albany. At the time of trial, CANA had plans to consecrate four other bishops, all of whom were formerly with ECUSA. (Trial Tr. 320:19-322:4.) Sixty congregations have affiliated with CANA, resulting in a membership of 12,000, with over 10,000 of those members coming directly from ECUSA. CANA has congregations in eighteen states, and the congregations of CANA that were formerly affiliated with ECUSA come from eight different dioceses, ranging from California to Connecticut. (Trial Tr. 324:1-325:17.) At the time of the trial, the latest church to join CANA was the Bishop Seabury Church in Connecticut, a church formerly affiliated with ECUSA. (Trial Tr. 325:18-326:5.)

---

[15] In addition to the twelve churches listed above, the other three are: Church of our Saviour at Oatlands, Church of the Epiphany, Herndon, and St. Paul's Church, Haymarket. See Pls.' Ex. 301 at 15-16.

The Anglican District of Virginia ("ADV") was incorporated on December 5, 2006. The ADV's Articles of Incorporation state that the ADV:

> is an association of Virginia churches, together with their clergy and laity, who join together to realign traditional Anglicans in Virginia displaced by the election of The Episcopal Church to walk apart from the Anglican Communion. . . . The Corporation forms a discrete ecclesiastical and legal structure and will provisionally come under the ecclesiastical jurisdiction of the Convocation of Anglicans in North America. . . . [by this] affiliation . . . the Corporation formally and immediately brings itself and all of its member churches, clergy, and laity into full communion with the foregoing constituent members of the Anglican Communion.

(Pls.' Ex. 70, "December 4, 2006, Articles of Incorporation for the Anglican District of Virginia, an Association of Churches," at 1.)

Since 2006, twenty congregations, comprising 7,500 members, affiliated with ADV, and almost all of ADV's members were former members of ECUSA congregations within the Diocese. All twenty of the ADV congregations are led by former ECUSA clergy.[16] (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 44.) Of these twenty congregations, eleven are affiliated with CANA, and four are affiliated with

---

[16] Similar to the churches that affiliated with CANA, some ECUSA/Diocese churches joined the Church of Uganda. The Rt. Rev. John Guernsey, who is the Rector of All Saints Church in Woodbridge, Virginia, the Dean of the Mid-Atlantic Convocation of the Anglican Communion Network and the Church of Uganda Bishop for Congregations in America (Trial Tr. 382:16-19), testified that, prior to its affiliation with the Church of Uganda, All Saints was affiliated with the Diocese. All Saints contemplated leaving after the General Convention of 2003. Bishop Guernsey testified that All Saints decided to join the Church of Uganda, as opposed to operating independently, because it wanted to remain a part of the Anglican Communion; this was "very important" to All Saints, since it "wanted to be a part of the worldwide church that [it] understood that [it] always had been a part of." (Trial Tr. 384:7-387:4.) In January of 2004, the Church of Uganda first began providing ecclesiastical oversight for congregations that wished to leave ECUSA. The first church to leave ECUSA to join the Church of Uganda was a Kentucky church that left in January of 2004. Bishop Guernsey became bishop of the American congregations of the Church of Uganda on September 2, 2007. Thirty-nine congregations have come under his ecclesiastical oversight. Ninety percent of the membership of those thirty-nine congregations came from ECUSA. (Trial Tr. 389:5-391:12.)

the American Arm of the Church of Uganda. Four others are "church plants," or "new churches." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 44, n. 25.) The twentieth church is said to have come "from another [ECUSA] diocese in Virginia." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 44, n. 25.)

7. Post-Separation Events within the Anglican Communion

Turning back to the events unfolding within the Anglican Communion, on February 15th, 2007, the Primates met in Dar es Salaam, Tanzania. Following this meeting, the Primates issued a communiqué, stating that "[s]ince the controversial events of 2003, [they] ha[d] faced the reality of increased tension in the life of the Anglican Communion, tension so deep that the fabric of [their] common life together ha[d] been torn." (Pls.' Ex. 12A, "The Communique of the Primates Meeting in Dar es Salaam, 2/19/07," (redacted) at ¶9.) The communique expressed dissatisfaction with the "response" of ECUSA to the whole controversy and stated that ECUSA "ha[d] not persuaded this meeting that we are yet in a position to recognize that The Episcopal Church has mended its broken relationships." (Pls.' Ex. 12A at ¶24.) Further, the communique stated:

> It is also clear that a significant number of bishops, clergy, and lay people in The Episcopal Church are committed to the proposals of the Windsor Report and the standard of teaching presupposed in it. These faithful people feel great pain at what they perceive to be the failure of The Episcopal Church to adopt the Windsor proposals in full. They desire to find a way to remain in faithful fellowship with the Anglican Communion. They believe that they should have the liberty to practice and live by that expression of Anglican faith which they believe to be true. We are deeply concerned that so great has been the estrangement between some of the faithful and The Episcopal Church that this has led to recrimination, hostility, and even to disputes in the civil courts.

(Pls.' Ex. 12A at ¶ 25 (internal citation omitted).) The communique further concluded that it "believe[d] that the establishment of a Covenant for the Churches of the Anglican Communion in the longer term may lead to the trust required to re-establish [its] interdependent life." (Pls.' Ex. 12A at ¶29.) The

communique concluded: "We do not underestimate the difficulties and heart-searching that our proposals will cause, but we believe that commitment to the ways forward which we propose can bring healing and reconciliation across the Communion." (Pls.' Ex. 12A at ¶37.)

On April 30, 2007, ECUSA Presiding Bishop Katherine Jefferts Schori wrote to Nigerian Primate Peter J. Akinola, requesting that Archbishop Akinola not install the Rev. Martyn Minns, former Rector of Truro, as a bishop of CANA, since this " 'would display to the world division and disunity.'. . ." (Pls.' Ex. 3, " 'Presiding Bishop urges Nigerian Primate to Reconsider plans to install bishop,' 5/1/07," at 2.) Bishop Schori also stated in her letter that if Archbishop Akinola were to travel from Nigeria to the United States to install Rev. Minns as a bishop of CANA, this would "violate the ancient customs of the church which limits the Episcopal activity of a bishop to only the jurisdiction to which the bishop has been entrusted, unless canonical permission has been given." (Pls.' Ex. 3, "Presiding Bishop urges Nigerian Primate to Reconsider plans to install bishop, 5/1/07," at 2.) Archbishop Akinola replied to Presiding Bishop Schori's letter by stating that the reason he was preparing to install The Rev. Dr. Minns was that:

> [a]t the emergency meeting of the Primates in October 2003 it was made clear that the proposed actions of the Episcopal Church would "tear the fabric of our Communion at its deepest level, and may lead to further division on this and further issues. . . ." Sadly, this proved to be true as many provinces did proceed to declare broken or impaired communion with the Episcopal Church. Since that time, the primates have established task forces, held numerous meetings, and issued a variety of statements and communiques but the brokenness remains, our Provinces are divided, and so the usual protocol and permissions are no longer applicable.
>
> You will also recall from our meeting in Dar es Salaam that there was specific discussion about CANA and recognition, expressed in the Communique itself, of the important role that it plays in the context of the present division within your Province. CANA was established as a Convocation of the Church of Nigeria, and therefore a constituent part of the Communion, to provide a safe place for those who wish to remain faithful Anglicans but can no longer do so within the Episcopal Church as it is currently being led.

It is my heartfelt desire, and indeed the expressed hope of all the Primates of the Communion, that the Episcopal Church will reconsider its actions and make such special measures no longer necessary. This is the only way forward for full restoration into fellowship with the rest of the Communion. . . .

You mention the call to reconciliation. As you well know, this is a call that I wholeheartedly embrace and indeed was a major theme of our time in Tanzania. You will also remember that one of the key elements of our discussion and the resulting Communique was the importance of resolving our current differences without resorting to civil law suits. You agreed to this. Yet it is my understanding that you are still continuing your own punitive legal actions against a number of CANA clergy and congregations. I fail to see how this is consistent with your own claim to be working toward reconciliation.

Once again, please know that I look forward to the day when this current crisis is behind us and we can all be reunited. . . .

(Pls. Ex. 13, "Letter from the Most Rev. Peter J. Akinola to the Rt. Rev. Katharine Jefferts Schori, 5/2/07," at 1-2.)

On May 6, 2007, Archbishop Akinola proceeded to write a letter directly to the Archbishop of Canterbury, Rowan Williams, in which Akinola declared that the Anglican Communion was "deeply divided," with the "decisions, actions, defiance, and continuing intransigence of The Episcopal Church" being at the heart of the division. Of the formation of CANA, Archbishop Akinola stated the following to the Archbishop of Canterbury:

We are a deeply divided Communion. As leaders of the Communion we have all spent enormous amounts of time, traveled huge distances, sometimes at great risk, and expended much needed financial resources in endless meetings, communiques, and reports, Lambeth Palace 2003, Dromantine 2005, Nottingham 2006, and Dar es Salaam 2007. We have developed numerous proposals, established various task forces and yet the division has only deepened. The decisions, actions, defiance, and continuing intransigence of The Episcopal Church are at the heart of our crisis.

As you well know, the Church of Nigeria established CANA as a way for Nigerian congregations and other alienated Anglicans in North America to stay in the Communion. This is not something that brings any advantage to us – neither financial nor political. We have actually found it to be a very costly initiative and yet we believe that we have no other choice if we are to remain faithful to the gospel mandate . . . although CANA is an initiative of the Church of Nigeria – and therefore a *bona fide* branch of the Communion – we have no desire to cling to it. CANA is for the Communion and we are more than happy to surrender it to the Communion once the conditions that prompted our division have been overturned.

(Pls.' Ex. 14, "Letter from the Most Rev. Peter J. Akinola to Archbishop Rowan Williams, 5/6/07," at 1.)

## II. *Procedural History of This Case*

In December of 2006 through January of 2007, eight of the CANA Congregations filed a "Petition for Approval of Report of Congregational Determination Pursuant to Va. Code § 57-9" with various circuit courts in Virginia. These were Truro Church, Church of the Apostles, and Church of the Epiphany, which filed their petitions in the Fairfax County Circuit Court; The Church at the Falls, the Falls Church, which filed its petition in the Circuit Court of Arlington County; St. Paul's Church and St. Margaret's Church, which filed their petitions in the Circuit Court of Prince William County; St. Stephen's Church, which filed its petition in the Circuit Court of Northumberland County; and The Church of Our Saviour at Oatlands, which filed its petition in the Circuit Court of Loudoun County.

Beginning on January 31, 2007, the Diocese filed complaints against each of the eight CANA Congregations that had filed § 57-9 petitions, as well as complaints against three other members of the CANA Congregations: Potomac Falls Church, Christ the Redeemer Church, and Church of the Word. The complaint alleged that "[t]he continued occupancy, possession, and use of the properties of [the individual CANA Congregation churches] by [their Rectors] and the Vestry defendants have resulted in a trespass, conversion, and illegal alienation of such properties in violation of the Constitution and Canons of The Episcopal Church and the Diocese, the deeds to such real property, and applicable Virginia law."

Then, on February 9, 2007, ECUSA filed its own separate complaint against the eleven CANA Congregations and their rectors, vestry members, and other leaders.

On April 10, 2007, a three judge panel appointed by the Supreme Court of Virginia pursuant to Va. Code § 8.01-267.4 issued an order transferring to, and consolidating all of the above proceedings, in the Circuit Court of Fairfax County.

On November 13th through November 20th, 2007, a five-day trial was held regarding the issue of the application of § 57-9(A) to the instant case. The final post-trial briefs were submitted to this Court on January 17, 2008.

## III. *Parties' Positions*

### A. *CANA Congregations*

Plaintiff CANA Congregations argue that the evidence at trial proved that the definition of "division" within § 57-9(A) is "a split, schism, or rupture in a religious denomination that involved the separation of a group of congregations, clergy, or members from the church and the formation of an alternative polity that disaffiliating members could join." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 7.) Plaintiffs further argue that "divisions . . . often result from internal strife, but the divisions themselves entail[] disaffiliating congregations or clergy and the formation of a new entity." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 9.) They also argue that the departure of a single congregation does not fit the definition of "division" under the statute, but that beyond this, the statute does not impose a specific size requirement. (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 9.)

In response to ECUSA/Diocese's argument that a "division" under § 57-9(A) must be one that is approved by the proper hierarchical authorities, Plaintiffs argue that, because the statute employs the words "occurred" and "occur" to describe the divisions, "the sense of the statute is that divisions 'happen,' often in unplanned ways, contrary to the TEC[17]-Diocese position that the statute is limited to divisions that result from a consensual,

---

[17] The CANA Congregations employed the abbreviation "TEC," standing for The Episcopal Church, rather than "ECUSA" in their post-trial briefs.

deliberative process by denominational authorities." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 14.) Plaintiffs argue that none of the adjectives that ECUSA/Diocese assert must characterize a division, e.g., that it be "authorized," "structural," "major, "great," "historic," "large," "true," "formal," "recognized," "confirmed," "approved," "significant," actually appear in the text of § 57-9. (Pls.' Post-Trial Reply Mem. 4.) Further, the CANA Congregations argue that the express text of the statute does not mandate that this Court "defer to denominational authorities in determining whether there has been a division," since "[t]he meaning of legislative enactments does not generally vary from dispute to dispute, and private parties rarely get to decide how a statute applies to them. . . ." (Pls.' Corrected Mem. in Opp'n to the Post-Trial Opening Br. of the Episcopal Church and the Diocese 18-19.)

Plaintiffs also argue that the record demonstrates that, between 1867 and 1869,[18] "at least twenty-five Methodist congregations and four Presbyterian congregations invoked [§ 57-9]," and that "[n]otwithstanding the absence of any evidence of denominational approval . . . the courts without exception ruled for the majority of the congregation." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 26.)

The CANA Congregations further argue that ECUSA/Diocese's definition of division, which is "a denominationally approved administrative or structural subdivision of an entity, such as a diocese, into two new entities," is unworkable, since "if 'division' were limited to administrative redistricting, the statute would never apply to TEC," in that "when TEC 'divides' up a diocese, it does not permit congregations to vote to determine which diocese to join and the resulting dioceses are not considered 'branches.' Thus, the statute would never have any application to Episcopal churches under such a definition of 'division'." (Pls.' Corrected Mem. in Opp'n to the Post-Trial Opening Br. of the Episcopal Church and the Diocese 14.)

The CANA Congregations' argument that there has been a "division" within the ECUSA and Diocese sufficient to satisfy § 57-9(A) is summarized as follows:

---

[18] The original statute that was the pre-cursor to today's 57-9 was passed on February 18, 1867. *Hoskinson v. Pusey*, 73 Va. (32 Gratt.) 428, 439 (1879) ("That action . . . is claimed to have been had under an act of the general assembly, passed February 18, 1867 (Acts of 1866-7, ch. 210, pp. 649, 650; Va. Code of 1873, ch. 76, § 9), which had the effect, as contended, to transfer the control and use of the property. . . .").

[M]uch of the evidence is undisputed. Numerous congregations and clergy have disaffiliated from [ECUSA] and formed new branches thereof. CANA is one such branch, and since its formation in 2005 CANA has quickly grown into a religious denomination that provides ecclesiastical oversight for some 60 congregations and 12,000 members, the vast majority of whom are former members of [the ECUSA]. Since intervening in this litigation, [the ECUSA] has studiously avoided referring to any "division," but its use of that term outside of this Court . . . confirm[s] that [the ECUSA] has experienced such a division.

(Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 2-3.)

Plaintiffs also argue that there is a division under § 57-9(A) within the Anglican Communion, as "evidenced by 2005 amendments to the Church of Nigeria's constitution, which ended that church's legal and structural relationship with TEC," as well as "by official statements of 'broken' and 'impaired' communion promulgated by multiple Anglican Provinces; and by a number of other official pronouncements from various organs of the Anglican Communion, all recognizing the existence of this international division." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 49.)

In regard to the question as to the proper interpretation of "branch," the CANA Congregations argue that the term "branch," as it is used in § 57-9(A), "was most commonly understood in mid-nineteenth century America to refer to an offshoot of a denomination created as a result of a division, or to the group left behind, not to an administrative sub-unit of a denomination or to a new diocese created by consensual administrative redistricting." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 30-31.) In addition, although this "new polity would vary from denomination to denomination, the 'essential definition' that applied 'across the board' was simply a new polity that had a historic affiliation with the prior denomination, a connection reflected in the fact that its members were 'people who belong[ed] to the original group'." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 31.) The CANA Congregations point out that the Reformed Episcopal Church, which "began with only seven ministers and 19 laypersons, and with only a few congregations [at] its first convention" was referred to as a "branch" of ECUSA by the Bishop of Minnesota during an address he made in 1874. (Pls.' Opening Post-Trial

Mem. Concerning Application of Va. Code § 57-9 at 32-33.) The CANA Congregations also argue that "the undisputed testimony showed that the Cumberland branch of the Presbyterian Church started with three ministers who formed a presbytery." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 33.) Thus, Plaintiffs argue that CANA and the American Arm of the Church of Uganda are "branches" of ECUSA, that ADV is a "branch" of the Diocese, and that the American Arm of the Church of Uganda, the Church of Nigeria, ADV, ECUSA, and the Diocese are all "branches" of the Anglican Communion.

In regard to the issue as to the nature of the Anglican Communion, Plaintiffs argue that the Anglican Communion is in fact a "church" or "religious society" as that term is used in § 57-9(A), and that, in addition, the CANA Congregations were formerly "attached" to the Anglican Communion, for purposes of § 57-9, through their affiliation with the ECUSA and the Diocese. In addition to these arguments, which were made by all of the CANA Congregations collectively, the Church of Our Saviour at Oatlands [hereinafter "COSO"] submitted its own supplemental brief, arguing that "section 57-9 unambiguously provides that the CANA Congregations may retain their own property upon majority vote in the event of a 'division'." (Individual Opp'n Br. of the Church of Our Saviour at Oatlands' Supplementing the CANA Congregations' Collective Opp'n Br. 2.) COSO argues that, were this Court to interpret § 57-9(A) so that "only the Diocese and TEC could determine when a 'division' cognizable under § 57-9 could occur," this would violate the CANA Congregations' own First Amendment rights, in that "[i]t is difficult to imagine a heavier burden upon the CANA Congregations than the seizure of their property and the use of that property to support religious practices with which the Congregations strongly disagree." (Individual Opp'n Br. of the Church of Our Saviour at Oatlands' Supplementing the CANA Congregations' Collective Opp'n Br. 2-3.) As stated above, these and all other constitutional arguments will be addressed at a later date.

## B. *ECUSA/Diocese*

Defendants ECUSA/Diocese, in contrast, argue that "a 'division' within the meaning [of § 57-9(A)] must be an institutional division in a 'church or religious society,' accomplished pursuant to that church or society's rules and polity," which results in "the creation of two or more entities which might properly be viewed as legal successors to the formerly undivided church." (Post-Trial Opening Br. for the Episcopal Church and the Diocese (Corrected

Per Errata Filed 01/07/08) at 5.) They argue that, "[c]ontrary to the Congregations' characterization of this definition, it does not require an 'amicable' separation; it does, however, require appropriate action of the regularly constituted body empowered to effect or recognize a structural division under the church's polity." (Post-Trial Opening Br. for the Episcopal Church and the Diocese (Corrected per Errata Filed 01/07/08) at 5.) Essentially, the ECUSA/Diocese argue that, unless a church's hierarchy formally declares or admits to a division, the statute does not apply. Because the governing authorities of the ECUSA and the Diocese have not acknowledged the occurrence of a division, the ECUSA/Diocese argue that there is no division here under § 57-9(A).

Further, the ECUSA/Diocese suggest that the CANA Congregations' definition of "division" would allow a hierarchical church to be "divest[ed] of its interest in local congregational property . . . by the acts of a few disgruntled individuals." (Post-Trial Reply Br. for the Episcopal Church and the Diocese 5, n. 3.) They state that "Virginia certainly has no interest in encouraging divisions and property disputes by making the statute so easily applicable through the acts of a few individuals." (Post-Trial Reply Br. for the Episcopal Church and the Diocese 5-6, n. 3.) Defendants argue that the "great nineteenth Century divisions" in the Methodist, Presbyterian, and Baptist denominations were the "impetus for § 57-9." They argue that the current split which resulted in the formation of CANA and ADV is not such a great division and thus § 57-9(A) should not be applied. (Opp'n Br. for the Episcopal Church and the Diocese 15-16.)

In regard to what constitutes a "branch," the ECUSA/Diocese argue that CANA and ADV are in no way "branches" of the ECUSA or the Diocese, because they no longer are connected in any way with ECUSA or the Diocese. Defendants set forth the following example to support their position: They argue that, in the past, "[t]he Episcopal Church in fact created a new missionary diocese to minister to Mexican Catholics who had become disaffected from, and were departing, the Catholic Church. Yet, not surprisingly, no one referred to or considered that Episcopal Diocese as a "branch" of the Catholic Church; it was a branch of the Episcopal Church, just as CANA is a 'branch' of the Church of Nigeria." (Opp'n Br. for the Episcopal Church and the Diocese 22 (citations omitted).)

As to the nature of the Anglican Communion, the ECUSA/Diocese argue that it is not a "church or religious society" under § 57-9(A), but is only "a family of [38] churches. . . . regional and national churches that share a common history of their understanding of the church catholic through the See of Canterbury." (Post-Trial Opening Br. for the Episcopal Church and the

Diocese (Corrected per Errata Filed 01/07/08) at 34.) For example, they cite the criteria relied upon by the IRS to determine what constitutes a church, arguing that the Anglican Communion does not satisfy most of these characteristics. (Post-Trial Opening Br. for the Episcopal Church and the Diocese (Corrected per Errata Filed 01/07/08) at 35 (citing *Spiritual Outreach Soc'y v. Commissioner*, 927 F.2d 335, 338 (8th Cir. 1991)). And since neither the Anglican Communion nor any other "association of independent churches like the Anglican Communion," existed in 1867, Defendants argue that the legislature could not have had these in mind when it used the words "church" and "religious society" within § 57-9(A). (Post-Trial Opening Br. for the Episcopal Church and the Diocese (Corrected per Errata Filed 01/07/08) at 36.)

Finally, ECUSA/Diocese argue that the CANA Congregations were not "attached" to the Anglican Communion, because the element of "control" is missing. (Post-Trial Opening Br. for the Episcopal Church and the Diocese (Corrected per Errata Filed 01/07/08) at 37.)

The Court notes that the ECUSA/Diocese also makes a "legislative history" argument in their post-trial briefs in regard to Va. Senate Bill 1305. See, e.g., (Post-Trial Reply Br. for the Episcopal Church and the Diocese 10-11.) According to the ECUSA/Diocese, SB 1305 (2005) "would have expanded [§ 57-9(A)] to apply to congregational votes determining '(i) to which branch of the church or society such congregation shall thereafter belong; *(ii) to belong to a different church, diocese, or society; or (iii) to be independent of any church, diocese, or society.*" (Post-Trial Opening Br. for the Episcopal Church and the Diocese (Corrected per Errata Filed 01/07/08) at 28-29.) ECUSA/Diocese's argument appears to be that the fact that a bill was proposed to broaden § 57-9(A)'s reach suggests that § 57-9(A), in its current incarnation, is not broad enough to encompass the instant situation. While this Court recognizes the value of legislative history on issues of statutory interpretation, "[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs.*, 531 U.S. 159, 170, 121 S. Ct. 675, 148 L. Ed. 2d 576 (2001).

## IV. *Discussion of Expert Testimony and Analysis*

### A. *Applicable Law*

In order to interpret § 57-9(A), this Court looks to the text of the statute itself, the historical context in which it was enacted, and applicable case law. The Court begins, as it must, with the text of the statute.

1. Statute

Section 57-9, in its entirety, states:

A. If a division has heretofore occurred or shall hereafter occur in a church or religious society, to which any such congregation whose property is held by trustees is attached, the members of such congregation over 18 years of age may, by a vote of a majority of the whole number, determine to which branch of the church or society such congregation shall thereafter belong. Such determination shall be reported to the circuit court of the county or city, wherein the property held in trust for such congregation or the greater part thereof is; and if the determination be approved by the court, it shall be so entered in the court's civil order book, and shall be conclusive as to the title to and control of any property held in trust for such congregation, and be respected and enforced accordingly in all of the courts of the Commonwealth.

B. If a division has heretofore occurred or shall hereafter occur in a congregation whose property is held by trustees which, in its organization and government, is a church or society entirely independent of any other church or general society, a majority of the members of such congregation, entitled to vote by its constitution as existing at the time of the division, or where it has no written constitution, entitled to vote by its ordinary practice or custom, may decide the right, title, and control of all property held in trust for such congregation. Their decision shall be reported to such court, and if approved by it, shall be so entered as aforesaid, and shall be final as to such right of property so held.

Va. Code Ann. § 57-9 (2007).

This Court is first required to consider the "plain meaning" of the words as they are used in the statute. This is one of the most basic principles of statutory construction within our legal system. See, e.g., *United States v. Gonzales*, 520 U.S. 1, 5, 117 S. Ct. 1032, 137 L. Ed. 2d 132 (1997) (using *Webster's Third New International Dictionary* to determine the "natural" meaning of a particular word as used in a statute, where "Congress did not add any language limiting the breadth of that word. . . ."); see also *Hackney v. Commonwealth*, 186 Va. 888, 891-92, 45 S.E.2d 241 (1947) (citing

*Webster's International Dictionary*, 2d ed., and *Bouvier's Law Dictionary*, to discern the definitions of words as used in the statute). As the Virginia Supreme Court states:

> Under basic principles of statutory construction, we consider all relevant provisions of a statute and do not isolate particular words or phrases. When the language of a statute is plain and unambiguous, we are bound by the plain meaning of that statutory language. Thus, when the General Assembly has used words that have a plain meaning, courts cannot give those words a construction that amounts to holding that the General Assembly meant something other than that which it actually expressed.

*Lee County v. Town of St. Charles*, 264 Va. 344, 348, 568 S.E.2d 680 (2002) (citations omitted). See also, *Vaughn v. Beck*, 262 Va. 673, 677, 554 S.E.2d 88 (2001) ("Under basic rules of statutory construction, we examine the language of [the statute] in its entirety and determine the intent of the General Assembly from the words contained in the statute, unless a literal construction of the statute would yield an absurd result. . . . Thus, when the General Assembly has used words of a plain and definite import, courts cannot place on them a construction that amounts to holding that the General Assembly meant something other than that which it actually expressed.") (citations omitted).

Further, this Court must also look to the definition of words used in a statute "[a]t the time of [its] enactment. . . . Courts cannot read into a statute something that is not within the manifest intention of the Legislature as gathered from the statute itself. To depart from the meaning expressed by the words is to alter the statute, to legislate and not to interpret." *Lewis v. Commonwealth*, 184 Va. 69, 73, 34 S.E.2d 389 (1945) (citations and internal quotation marks omitted).

And finally, "it is a well-established rule of statutory construction that, when the same word is used in different parts of the same statute, the presumption is that it is used in the same sense throughout the statute, unless a contrary intention clearly appears." *Bridgewater Mfg. Co. v. Funkhouser*, 115 Va. 476, 480, 79 S.E. 1074 (1913).

### a. *Plain Meaning of the Text*

Applying the foregoing principles, this Court first looks to the plain meaning of individual words in the statute, also taking into consideration the structure of sentences used, as well as the overall grammatical context of the various sentences and phrases within the statute.

The Court notes that both '§ 57-9(A) and (B) begin by using the same phrase "*If a division has heretofore occurred or shall hereafter occur in a. . . .*" At this point, then, the two sections begin to differ, as part A continues: "*church or religious society, to which any such congregation whose property is held by trustees is attached. . . .*" while part B continues: "*congregation whose property is held by trustees which, in its organization and government, is a church or society entirely independent of any other church or general society. . . .*"

Thus, the plain text of the statute makes clear that part B applies only to churches that are "entirely independent of any other church or general society."

However, the two sections then merge once again, as each states that, in the event of a "division," the individual congregation, by majority vote, may determine the destiny of its property. Thus, both section A and section B of § 57-9 provide that a congregational majority may determine the future of its property. There is, however, a significant distinction between § 57-9(A) and (B) regarding the procedure for a majority vote. In the case of an independent church, such as the one described in (B), those who may participate in the vote are those "*entitled to vote by [the congregation's] constitution as existing at the time of the division, or where it has no written constitution, entitled to vote by its ordinary practice or custom. . . .*" In contrast, in (A), those entitled to vote are "*the members of such congregation over 18 years of age. . . .*" Thus, in (B), the legislature defers completely to the independent church's constitution, ordinary practice, or custom, whereas, in (A), the legislature shows no such deference. Instead, § 57-9(A) appears to mandate a neutral rule that the members of the congregation over eighteen years of age may participate in the vote. More importantly, (A) appears to reflect a determination by the Virginia legislature to protect the voting rights of any local congregation which is subject to a hierarchical church's constitution or canons. This lends support to the notion that § 57-9(A) was not enacted in contemplation that "divisions" would always be consensual, authorized, or approved.

b. *Expert Testimony*

i. *Dr. Mark Valeri*

This Court also must consider the historical context in which the statute was codified. Although it has undergone minor non-substantive changes since its enactment in 1867, both sides concede that the statute remains

substantively the same today as it did in 1867. Dr. Mark Valeri,[19] an expert witness for the CANA Congregations, testified during the trial that, based upon a search of newspapers, religious journals/serials, religious pamphlets/tracts, and denominational histories that are widely available in Virginia, the most commonly understood definition of "division," as understood in the mid-nineteenth century, both nationally and specifically in Virginia, is the "separation out of [a] group of members of a religious . . . denomination in sufficient numbers to begin to form an alternative polity[,] and the renunciation of the authority of the original group in that process." (Trial Tr. 52:18-55:20.) Dr. Valeri also stated that there was a second common definition of "division," which "refers to internal strife or division as in our church is having a quarrel or division over a particular issue." (Trial Tr. 54:12-14.) Further, this "internal strife" frequently leads to a separation, according to Valeri, so that the second definition of "division" often merges into the first. See Trial Tr. 54:4-18. Further, Dr. Valeri stated that, typically, when a group left the particular denomination, it was not an amicable split, nor was it "with the approval or consent of the higher ecclesiastical authorities." (Trial Tr. 56:1-14.)

Dr. Valeri testified at length regarding the various splits among the Presbyterians throughout the nineteenth century. First, in 1837, due to a debate over "revivalism," and "ordination procedures," there was a split that resulted in the formation of a "new branch" of Presbyterianism, termed the "New school." (Trial Tr. at 57:21-58:15.) This was not a geographical split, since "[e]very state . . . had a mixture [of both Old School and New School groups]." (Trial Tr. 59:2-7.) The General Assembly, which was the "highest ecclesiastical authority in the Presbyterian Church in the mid-1800s," did not "approve" of this "division." (Trial Tr. 60:3-11.) In Dr. Valeri's words, "They [the Old School and New School] recognize each other exists, but they do not recognize the legitimacy of the other," (Trial Tr. 68:1-3) which is evidenced

---

[19] Dr. Valeri is a specialist in American religious history, which "encompasses the history of religious thought, religious life, religious congregations, and its interaction with society from the colonial period through the present." (Trial Tr. 45:8-16.) Dr. Valeri presently works at Union Theological Seminary in Richmond, Virginia. He obtained a M. Div. from Yale University, and a Ph. D. from Princeton University. The topic of his doctorate was American religious history. He has published numerous books and articles, including one book that, at the time of trial, was soon to be published, that focuses upon American religious history during the period from 1750 through 1910. He is also an ordained Presbyterian minister. He gives frequent lectures regarding American religious history, many of which relate specifically to Virginia religious history. (Trial Tr. 45:17-50:8.)

by the fact that "the old school begins deposing some of the new school ministers." (Trial Tr. 61:11-12.) Another word for "depose" is "defrock," which was considered a "vulgar kind of diction," at the time of the New School-Old School split. (Trial Tr. 61:17-22.) This split between the Old School and New School was far from amicable, as evidenced by the fact that the Old School apparently charged the New School with being "corrupt in doctrine, fanatical in practice, and guilty of the sin of schism." (Trial Tr. 65:2-10.) Dr. Valeri testified that this use of the word "schism" indicated that the religious body accused of "schism" was thought to be heretical, deviant, and "contemptuous of authorities." (Trial Tr. 65:6-16.) Eventually, "all of the ordinations which took place under this new school were considered invalid and not acceptable by the old school." (Trial Tr. 67:7-9.)

Following this Old School-New School split, the New School proceeded to itself divide, as, according to Dr. Valeri, "the southern synods or at least some Virginia synods split off from the general conference," to form the "United Synod." (Trial Tr. 73:1-21.) The United Synod then "engage[d] in activities that were condemned by the [N]ew school," including "sen[ding] unauthorized missionaries throughout into new school territories." (Trial Tr. 73:22-74:9.) As Dr. Valeri remarked, "when you send a [missionary] into the parish, into the parish of an existing church, it is a *de facto* statement of the illegitimacy of the current ministry in that location." (Trial Tr. 74:17-20.)

After discussing the above two major splits among the Presbyterians, Dr. Valeri also described a separate and smaller "division" which occurred with the departure of only three ministers from the Presbyterian Church, who left to form their own polity. (Trial Tr. 77:10-78:11.) "Entire congregations" proceeded to join these three ministers, and thus the Cumberland church continued to grow into its own denomination, the Cumberland Presbyterian Church. See Trial Tr. 77:10-78:19.

Dr. Valeri further described "division" as a "process" which:

> begins with disaffection or controversy and then a few members separate out. They are then joined by other members. They form a group and begin to actually talk of themselves as a separate group, and they are later joined by other groups over the period of weeks, months, sometimes years . . . the division is a process that begins small and then grows and that line of crossing between predivision to division is not a hard and fast line.

(Trial Tr. at 78: 20-79:16.)

Finally, Dr. Valeri discussed a split in the Old School itself, which resulted, according to Dr. Valeri, in the formation of the Presbyterian Church in the United States ("PCUSA," the preexisting denomination) and the Presbyterian Church in the Confederate States of America ("PCCSA," the new denomination). Dr. Valeri read excerpts from the *Christian Observer*, a newspaper founded in Louisville, Kentucky, around the year 1840, in which citizens are quoted as publicly describing this split in the Old School as a "division." (Trial Tr. 87:2-88:3.) This Old School split was in fact described by Dr. Valeri as being particularly acrimonious, as the PCUSA "actually had statutes in its own constitution which would have made the ordination of ministers in this new PCCSA invalid." (Trial Tr. 88:8-13.) Further, the PCCSA was "completely organized separately and independently from the Presbyterian Church," in that the breakaway PCCSA group had a "parallel General Assembly, parallel Synods, parallel presbyteries, parallel ordination – parallel and different ordination processes, different qualifications for ordination." (Trial Tr. 88:22-89:6.) Also according to Dr. Valeri, another act taken by the PCUSA to reflect its anger over the creation of the PCCSA included the passage of the "Gardiner Spring Resolutions," which "demanded that any Presbyterian minister profess fealty . . . to the federal union and disavow slave holding as a sin against God, and ministers who did [not do] that could not be ordained." (Trial Tr. at 89:11-90:1.)

Thus, the condition of the Presbyterian denomination as a whole in 1867 (the year in which the statute currently codified as § 57-9 was originally passed) was that there was still an Old School/New School division, as well as a division between the northern and southern Presbyterian churches. (Trial Tr. 91:1-4.)

Further, Dr. Valeri testified that all the above splits would have been characterized as "divisions," and that the "operating principle seems to be that groups of three feel themselves qualified to form themselves into new units." (Trial Tr. at 82:10-15, 92:6-9.) His definition of division "carries across" all denominations. (Trial Tr. 94:8-9; 56:15-17.) In contrast, he stated that, if a group of individuals from the Lutheran Church left the Lutheran Church and became Baptists, that this would be merely a "departure or transfer," rather than a "division." (Trial Tr. 92:16-93:2.)

Further, Dr. Valeri defined "branch" as "the new organization or polity[20] that results from the division." (Trial Tr. 94:17-18.) Dr. Valeri

---

[20] Dr. Valeri defines "polity" as "that structure which adjudicates not only what happens within an individual congregation [such as] how worship shall be conducted[,] but how

testified that a "branch" "contains more than one group, and it claims some affiliation[21] with the genetic origin of the original group and consists of people who belong to the original group." (Trial Tr. 94:19-21.) He testified that this definition of "branch" remains the same among denominations, "although the branch itself looks different[] . . . from denomination to denomination," in that "the shape, the coloration, the specifics look different . . . [f]or example, Episcopalians have Dioceses and Bishops. Presbyterians have presbyteries." (Trial Tr. 95:7-18.) It was not Dr. Valeri's view that "the new group [must] be acknowledged by the entity from which it divided in order to be viewed in common parlance as a branch." (Trial Tr. 95:19-21.) For example, the Cumberland Presbyterian Church, although it later reunited with the original Presbyterian entity from which it had previously divided, was on its own for ninety years, during which period of time, it was neither formally nor informally connected with the PCUSA, yet a 1904 *New York Times* article referred to Cumberland as a "branch" of the original Presbyterian entity from which it had divided. See Trial Tr. 96:1-98:1.

Dr. Valeri testified that the word "branch" is often used within the Christian Church to describe "the large deeply historical divisions in Christianity," including the three main branches: Roman Catholic, Eastern Orthodox, and Protestant, but that "branch" is also used to describe more narrow, particularized branches, so that Dr. Valeri would consider the Cumberland Presbyterian Church to be a "branch" of the original Presbyterian Church, and would also consider the Presbyterian Church's Old School and New School to be "branches" of each other. See Trial Tr. 97:21-100:7.

Dr. Valeri also testified that the three largest denominations in both the United States and Virginia in 1867 were the Methodists, the Baptists, and then the Presbyterians (in descending order of size). (Trial Tr. 103:9-104:1.) All of these denominations experienced divisions on multiple occasions, which were "a subject of frequent public commentary in the nineteenth century in Virginia," in "newspapers, religious tracts and pamphlets, denominational stories and histories." (Trial Tr. 104:15-105:5.)

---

congregations shall relate to each other and ordained people shall relate to each other . . . you must have more than one congregation to have a polity." (Trial Tr. 93:17-22.)

[21] Valeri defined "affiliation" for these purposes as "claim[ing], for example, to revere the same sacred texts or organize themselves in the basic similar polities. . . ." (Trial Tr. 95:3-5.)

Finally, Dr. Valeri testified that the Episcopal Church itself experienced a "division" during 1873-74,[22] the cause being "[d]ebate over liturgical practices and then the suspension of a pastor around whom a group of supporters of [the] pastor gather[ed] and beg[an] to have meetings." (Trial Tr. 105:19-22.) These supporters, numbering seven clergy and nineteen lay people, left the Episcopal Church to form the "Reformed Episcopal Church." (Trial Tr. 106:11-107:20.) The Reformed Episcopal Church continued to grow, as more congregations later followed the original seven clergy and nineteen lay people. The Episcopal Church reacted by "denounc[ing] the movement as a schism[23] and . . . depos[ing] its chief leader . . . which meant all of the subsequent ordinations he conducted were invalid." (Trial Tr. 107:10-108:1.) The Episcopal Church today still refers to this particular split as a "schism." Pl.'s Ex. 5, "The Episcopal Dictionary definition of 'Schism'," ("The earliest significant schism from the Episcopal Church was that of the Reformed Episcopal Church, which began in 1873. There were also some smaller schisms from it in the later twentieth century over *Prayer Book* revision and the ordination of women.") Today the Reformed Episcopal Church has grown to almost 6,000 members. (Trial Tr. 111:7-12.)

In sum, Dr. Valeri testified that the "average, ordinary Virginian in 1867" would have understood "division" to mean "the separation out of a group in rejection of the authority," and that "it is that act of division which creates a branch." This understanding would "encompass situations in which the church or religious society" did not "approve" of the division," as well as situations in which the "new entity, the new polity, was not formally affiliated with the church and religious society from which it divided." (Trial Tr. 115:15-116:15.)

---

[22] There was also considerable discussion during the trial regarding the alleged "division" of the ECUSA during the Civil War. The disagreement between the parties centered on whether this alleged "division" was acrimonious and caused by doctrinal or theological differences, or whether it was simply a "geographical" type of split mandated by the political realities on the ground caused by the war. This Court need not and does not resolve the disagreement.

[23] Valeri testified regarding the difference between "schism" and "division" as follows: "Structurally and procedurally they look very much alike, but the word 'schism' is [the] often used . . . word of the parent or originating denomination as a pejorative for what has gone on and implying that it is – has bad theology and a contemptuous order and ecclesiastical authority." (Trial Tr. 109:18-110:1.)

## ii. *Dr. Charles Irons*

CANA Congregations' expert witness Dr. Charles Irons,[24] testified that, in preparation for this case, he reviewed "congregational records, denominational records, denominational newspapers, secular newspapers from the period, some private papers," and "county court records." (Trial Tr. 175:9-19.) Dr. Irons stated that, in his opinion, "the most common definition of division would be the fragmentation of one religious jurisdiction to create two or more jurisdictions." (Trial Tr. 178:7-9.) "Division" could also mean, according to Dr. Irons, "internal conflict or discord within a religious body. Most often when it is used in that sense, it is the threat of division or talk of division." (Trial Tr. 178:12-16.)

Dr. Irons further stated that the definition of "branch," if "division" and "branch" are used in the same sentence, would mandate that "branch" is being used to describe one of the "resulting jurisdictions" of the "division." (Trial Tr. 180:1-16.) Dr. Irons corroborated Dr. Valeri's testimony that across all denominations, "[m]ost divisions [were] simply not consensual," and Dr. Irons stated that "Virginians would not have summarily construed [that a division was approved by the ecclesiastical authorities] at all." (Trial Tr. 181:17-19.)

Dr. Irons testified at length regarding the various national splits that occurred in the Methodist Church during the nineteenth century, which was the largest denomination in Virginia in 1867. (Trial Tr. 183:2-9.) Virginians would have known about all of these splits, and about nine out of the almost dozen Methodist splits that occurred during the nineteenth century impacted Virginia directly. (Trial Tr. 183:10-184:12.) Dr. Irons testified about the creation of the Methodist Episcopal Church South, which was one of the major splits that would have specifically impacted Virginia. In 1844, at the Methodist General Conference, the northern and southern factions within the Methodist church developed a "provisional plan of separation." (Trial Tr.

---

[24] Dr. Irons received his bachelor's degree, master's degree, and Ph. D. from the University of Virginia. The topic of his dissertation was the "conflict over slavery within Virginia churches," which covered the time period from 1740 through about 1870. He currently works at Elon University in North Carolina, where he is an assistant professor of history. He has also been a guest lecturer at the University of Virginia and Duke University. He has written numerous articles on the topic of Virginia history, and the topic of his forthcoming book is "on conflicts over slavery within Virginia churches, particularly between black and white evangelicals within Virginia churches." (Trial Tr. 170:6-174:3.)

189:1-16.) Dr. Irons stated that this so-called "plan of separation" was never ratified, since the three-quarters vote of all Methodists within the annual conferences that was required to ratify certain "points" of the plan never took place. See Trial Tr. 193:9-15. ECUSA/Diocese expert Dr. Mullen took issue with this (Trial Tr. 1049:19-1050:5), but acknowledged that, in any event, this plan of separation "broke down" soon after its enactment. (Trial Tr. 1158:12-15.) Then in 1845, these southern Methodist churches called for the organization of an independent jurisdiction of the Methodist Church in the south, which met in its first General Conference in 1846. This new southern entity was called the "Methodist Episcopal Church South," but was not recognized or acknowledged as valid by the Methodist Episcopal Church. (Trial Tr. 194:9-195:1.) This caused some upheaval within the Methodist Church in Virginia, since not all of the Methodist congregations in Virginia automatically joined the southern branch of the church. Dr. Irons testified that:

> [t]here were two primary groupings of Virginia Methodists who did not affiliate with the Methodist Episcopal Church South. One involved Methodists in the trans-Allegheny regions, but the other involved Methodists in the Baltimore Conference, a unique conference[25] that included parts of Pennsylvania, Delaware, Maryland, and Virginia.

(Trial Tr. 195:7-13.)

Yet another major split among the Methodists followed soon after when, in 1861, the Baltimore Conference renounced the authority of the General Conference of the Methodist Episcopal Church. This was due to the fact that the Baltimore Conference was angered over a resolution passed by the Methodist Episcopal Church during its 1860 General Conference. (Trial Tr. 196:1-199:6.) In that resolution, the Methodist Episcopal Church strongly condemned slavery. Because the Baltimore Conference had taken a different position on slavery,[26] the Baltimore Conference felt that this Methodist

---

[25] A "conference" is to the Methodist Church what the "Diocese" is to the Episcopal Church; it is a type of "governing body" within the Methodist Church. See Trial Tr. 195:14-22.

[26] That position was described by Dr. Irons as follows: "[t]he Baltimore Conference on the one hand prohibited slave owning among their ministers. On the other hand, the Baltimore Conference forbad identifying slavery as a sin or disciplining slave-holding members." (Trial Tr. 196:12-20.)

Episcopal Church resolution threatened the Baltimore Conference's neutrality. (Trial Tr. 198:20-199:6.) The Baltimore Conference thus "physically separat[ed] themselves from the Methodist Episcopal Church." (Trial Tr. at 200:8-10.) The Methodist Episcopal Church tried to "recoup their lost members and their lost churches by targeting individual congregations," one of its tactics being the formation of its own competing Baltimore Conference. There were then two different competing Baltimore Conferences in existence for about five years. (Trial Tr. 200:14-201:21.) This resulted in "[v]ery significant ecclesiastical disorder and competition" within the Methodist Church in Virginia in the 1860s. (Trial Tr. 202:6-10.) Dr. Irons testified that all these splits and infighting would have been characterized as "divisions" within the Methodist Church. See Trial Tr. 202:11-203:20. Dr. Irons rejected the idea that this particular Baltimore Conference division resulted from any formal "plan." (Trial Tr. 204:8-11.) Dr. Irons also testified regarding various Baptist divisions within Virginia, which this Court does not find relevant, due to the fact that the Baptist form of congregational government is very different from the hierarchical form of government in the Episcopal Church. See Trial Tr. 205:3-206:8.

Next, Dr. Irons testified to the history surrounding the enactment of the statutory provision that is codified today as § 57-9. It was initially enacted in 1867, and its sponsor was John Baldwin, who, at that time, was the Speaker of the House in the General Assembly. Mr. Baldwin came from Augusta County. (Trial Tr. 220:20-221:21.) Dr. Irons read from a newspaper article that described a particular Methodist congregation that had invoked § 57-9. The congregation was, in fact, represented in court by John Baldwin himself. (Trial Tr. 222:18-223:16.) The article was identified as Pls.' Ex. 48, "Article detailing Circuit Court case involving the local Methodist congregation, published in the *Staunton Spectator*, 6/25/1867," but was only read into the record by the witness, not admitted into evidence. One of the arguments that this Methodist congregation cited as being in its favor was that "the object of the law [which today is codified as § 57-9] of the last legislature was to protect local religious congregations who when their church divided were compelled to make a choice between the different branches of it, and to allow them in some such cases to take their property with them, and that it was the purpose of this congregation to claim the benefit of that protection." (Trial Tr. 224:1-8.) Dr. Irons confirmed that the article did not state that the "ecclesiastical authorities ha[d] to approve the division." (Trial Tr. 224:9-12.)

844

The Court ultimately accepted the congregation's petition, and accordingly entered the following order:

A Religious Congregation of Methodists in the town of Staunton this day presented to the Court certain papers in which it is recited & claimed that "the Baltimore Conference of the Methodist Episcopal Church severed its connection with the General Conference of said Church, by resolution adopted during its [illegible] in Staunton, Va., in March 1861 and in February 1866 by a unanimous vote, formed a union with the Methodist Episcopal Church South," which the said Congregation is one of the congregations of the said Baltimore Conference, known as Staunton Station, in Rockingham District, and which the said Congregation of Staunton Station having assembled at their Church on the [illegible] day of April 1867, to determine to which division of the Church they should thereafter belong; and the question having been submitted to the communicants and pew holders and pew-owners of said congregation over twenty-one years of age, it was determined by vote of the majority of the whole number that said congregation should thereafter belong to the Methodist Episcopal Church South; and it appearing to the Court from an inspection of the said papers that the vote of the said Congregation has been fairly taken, according to the provisions of the Act of Assembly in such cases made and provided, and that of 118 members of the said Congregation, entitled to vote [illegible] voted in accordance with the determination of the Congregation, and the remaining 17 either failed or refused to vote, the Court doth approve the proceedings of the said Congregation and their said determination, as having been taken and ascertained according to law, and doth order that such approval be entered of record; and that the said papers be filed and preserved by the Clerk among the records of the Court.

(Pls.' Ex. 96, "August County CL Order Book 6/28/1867.")

Dr. Irons also located other similar orders in various other Virginia counties, totaling twenty-nine. Of these twenty-nine orders, twenty-five were from Methodist congregations, and four were Presbyterian. (Trial Tr. 245:1-8.) Dr. Irons confirmed that, among the Methodist petitions he located, not all

chose to affiliate with the Methodist Episcopal Church South; one congregation chose to go with the Methodist Episcopal Church, which was the northern branch of the church. (Trial Tr. 242:11-22.) Dr. Irons testified that none of the congregations filing these petitions alleged that the division had been approved by "higher ecclesiastical authorities," nor did they allege that the petitions themselves "had been approved by higher ecclesiastical authorities." (Trial Tr. 245:9-246:2.) These petitions were all "uniformly accepted by the court." (Trial Tr. 230:10-11.)

### iii. *Dr. Ian Douglas*

ECUSA/Diocese expert Dr. Ian Douglas[27] testified that neither ECUSA nor a diocese within ECUSA can divide "without the action of [the] General Convention." (Trial Tr. 842:19-843:2.) Dr. Douglas testified that "there can be no division without formal approval of the division by the highest adjudicators of the religious body involved" (Trial Tr. 895:3-7) and that "the only way the [ECUSA] can effect a division is to carve up a diocese geographically." (Trial Tr. 898:8-11). On cross-examination, however, Dr. Douglas also testified that he did not perform any historical research, nor did he consult any historical reference books in order to formulate his definition of division. (Trial Tr. 892:2-15.) He further stated that "a congregation or a people [could] choose to leave a parish or leave [ECUSA], but that such action would "not fundamentally constitute a division or a departure of a parish . . . from the wider Episcopal Church" (Tr. 843:10-14), nor would this have a "structural impact" on ECUSA (Tr. 844:4-6). When asked whether it is possible for the Anglican Communion to divide, Dr. Douglas responded as follows:

> Q: Dr. Douglas, in your opinion, has the Anglican Communion divided?
> A: In my opinion it has not divided.
> Q: Could you explain that?
> A: Yes. The Anglican Communion is a family of churches, and we all share a kind of historical relationship, one with another, as brothers and sisters in Christ, understanding and seeing our common ancestry in the Church of England through the See of Canterbury. And as such as a family of churches

---

[27] See *supra*.

coming together to serve what God has called us to be about in the world; we as an Anglican Communion, I would argue, are in the process of becoming rather than dividing. I mean, this is a way by which families are learning to work together and live together in a new and deeper interdependent and mutually responsible manner.

Q: Dr. Douglas, in your view, would it be possible for the Anglican Communion to divide?

A: It really would not be possible for the Anglican Communion to divide because that presupposes some kind of intact whole that somehow will be broken by some action. Once again, it is a family of churches.

(Trial Tr. 862:6-863:8.)

Dr. Douglas acknowledged that, if the Church of Nigeria made a declaration of "broken communion" with the Episcopal Church (Trial Tr. 950:10-12), this would "alter[] the relationship between the Church of Nigeria and the Episcopal Church" (Trial Tr. 950:21-951:8). Dr. Douglas also acknowledged that "the amendments to the Church of Nigeria Constitution create a different way of defining one's self as being Anglican as compared to what . . . [has] historically [been] done, namely in relationship with the See of Canterbury" (Trial Tr. 955:20-956:2), since what the Church of Nigeria was trying to do by the amendments was to "elevate the 39 Articles of Religion and the Ordinal of the 1662 Prayer Book as normative for Anglican identity as compared to that historic relationship with the See of Canterbury" (Tr. 956:3-8). Cross-examination also indicated that in a previous deposition, Dr. Douglas, when asked "What concrete steps, if any, would you view as being necessary to evidence a division of the Anglican Communion?" answered "If one church or the other functioned as if they had no relationship with another church in the Anglican Communion." (Trial Tr. 959:15-960:10.) Finally, when asked by the Court whether "a province declaring that it was out of communion with another province [would] be the most severe action one province could take to disassociate itself from another province," Dr. Douglas responded in the affirmative. (Trial Tr. 993:18-994:2.)

In regard to the definition of "church or religious society," Dr. Douglas testified that he had never heard the Anglican Communion referred to as such. (Trial Tr. 845:21-846:1.) Significantly, Dr. Douglas also stated "I do not think it is fair to describe the Anglican Communion as a fellowship of churches because that implies a much looser kind of federation or voluntary association

that does not get at the historic DNA and relationship as a family of churches." (Tr. 912:17-21). Dr. Douglas further stated that he prefers the "metaphor of a family of churches" to describe the Anglican Communion (Tr. 913:10-13), in that it is "[a] family of churches with a shared history and a common DNA with a focus of unity in the Archbishop of Canterbury." (Tr. 917:21-918:1). Dr. Douglas defined "religious society" as "generally speaking . . . a voluntary grouping of people who have come together to effect some goal or achieve some end." (Trial Tr. 926:18-21.) Dr. Douglas stated: "I would say society, if that is what they are using to describe the Anglican Communion, I would want to say to them, say you know, honestly, it is more of a family of churches that shares a common history and commitment to continue to work together and not necessarily some voluntary association. . . ." (Trial Tr. 929:16-21.) In addition, Dr. Douglas stated that, in his opinion, individual congregations within ECUSA are not "attached" to the Anglican Communion, because "the Anglican Communion . . . is not some kind of intact whole . . . an individual cannot be attached to the Anglican Communion because . . . fundamentally the Communion does not exist in that kind of reality." (Trial Tr. 871:4-871:22). On cross-examination, Dr. Douglas testified that he does not base his definition of "attach" on any dictionary, historical source, or statute, but on his "perspective as a missiologist . . . and as a scholar of the church." (Trial Tr. 968:20-972:1.) However, it was Dr. Douglas' opinion that individual congregations are attached to both ECUSA and the Diocese, pursuant to his definition of attachment, which is "[b]elonging to, under the authority of a set of Constitution and Canons that are [the] agreed-upon polity of a church." (Trial Tr. 872:1-14.)

Dr. Douglas understood the term "branch" to mean, "something that is attached to a common trunk which has been nurtured from a common seed." (Trial Tr. 873:3-5.) Dr. Douglas stated that his definition of "branch" was not based upon any statute, historical use of the term, or dictionary. (Trial Tr. 901:1-11.) He testified that CANA and ADV are not "branches" of the Diocese or ECUSA (Trial Tr. 875:7-15), nor are CANA or ADV "branches" of the Anglican Communion. (Trial Tr. 879:2-5.) Dr. Douglas did not consider CANA or ADV to be a branch of the Anglican Communion, because "[w]hile they might be considered by the Nigerian church [to be] an ecclesial initiative of the Nigerian church, the presence of an Anglican incursion into another already established Anglican church is frowned upon by the Anglican Communion." (Trial Tr. 879:7-12.) Dr. Douglas presented the following example of a situation in which one religious entity would not be a "branch" of the other. Dr. Douglas stated that ECUSA at one time had a missionary

diocese in Mexico, which ECUSA began in order to serve "Roman Catholics who were alienated from the Roman Catholic Church in Mexico [and who] sought a relationship with [ECUSA]." (Trial Tr. 877:3-11.) Dr. Douglas stated that no one would have considered this Episcopal Missionary Diocese to be a "branch" of the Roman Catholic Church. (Trial Tr. 878:12-18.)

### iv. *Dr. Robert Bruce Mullen*

Dr. Robert Bruce Mullen,[28] provided expert testimony for ECUSA/Diocese related to American religious history, specifically Anglican history and the Anglican Communion. (Trial Tr. 1028:8-10.) Dr. Mullen testified that, in his opinion, the Anglican Communion is not a church or religious society "in any organizational sense." (Trial Tr. 1029:9-11.) In Dr. Mullen's opinion, the word "religious society" was used in the nineteenth century as a synonym for the word "church." See Trial Tr. 1031:13-1032:17. He stated that the word "religious society" would have also been used to describe a voluntary society, which means "persons coming together as individuals for a common purpose." (Trial Tr. 1032:19-1033:4.) The Anglican Communion would not fit this second definition, Dr. Mullen stated, because the Anglican Communion "is a communion of churches, not of individuals." (Trial Tr. 1033:14-17.) Dr. Mullen also stated that, prior to 1867, the term "religious society" would never have been used to describe "national or international associations of autonomous churches," since, prior to 1867, "there were no such groups." (Trial Tr. 1033:18-22.) Dr. Mullen additionally testified that he had never heard of the Anglican Communion being referred to as a religious society. (Trial Tr. 1034:19-21.)

---

[28] Dr. Mullen is employed at the General Theological Seminary Episcopal Church in New York, New York, where he is the Society for Promotion of Religion and Learning Professor of History in World Mission and Professor of Modern Anglican Studies. (Trial Tr. 1024:3-11.) His degrees include an M.A.R. *magna cum laude* from Yale Divinity School, and a Ph. D. in the history of Christianity from Yale University, where the subject of his dissertation was "the high church movement in the Episcopal Church in the nineteenth century, particularly how it related to the broader Evangelical culture." (Trial Tr. 1025:5-14.) Dr. Mullen has taught at various educational institutions, including Yale University, Wesleyan University, and North Carolina State University, as well as Duke Divinity School (Tr. 1025:18-1026:3), and his courses taught include the history of Christianity, with a specialty in American Religious History, focused upon Episcopal and Anglican studies. (Trial Tr. 1026:4-10.) He is the author of numerous books and articles regarding the history of Christianity, as well as the history of the Episcopal Church in particular. (Trial Tr. 1026:13-1027:18.)

In regard to the definition of the word "attach," Dr. Mullen testified that individual congregations within ECUSA are attached to their Diocese, and also "in certain key ways" are attached to ECUSA, but that "[individual congregations] are not attached to the Anglican Communion." (Trial Tr. 1035:17-1036:1.) Dr. Mullen defined attachment as having certain "indicia" that include "rules of worship, or order, and of ministry" which "bind [an] individual congregation" (Trial Tr. 1036:2-14), but that "[t]here are no parallel situations in the Anglican Communion (Trial Tr. 1036:21-22).

In regard to the definition of "branch," Dr. Mullen stated that CANA and ADV cannot be considered a branch of ECUSA, but that CANA and ADV can in fact be viewed as branches of the Church of Nigeria. (Trial Tr. 1037:17-1038:11.) Dr. Mullen testified that the word "branch" means to him, "[a]s a historian . . . an extension that grows out of an earlier body or another body of a Christian communion . . . it does not necessarily have to be legally connected." (Trial Tr. 1038:12-1039:6.) He also does not consider CANA or ADV to be branches of the Anglican Communion or of the Diocese. (Trial Tr. 1039:7-1040:12.)

Dr. Mullen further testified that, in his opinion as a historian, the term "division" as defined in the context of a religious denomination is the following:[29] "a formal separation of a larger religious body such that it looks markedly different after this has been done . . . it [is] much more formal . . . than just simply an informal separation." (Trial Tr. 1041:2-11.) He testified that in the nineteenth century, there would have been a distinction made "between a division and a denomination as a whole and a mere departure or separation from that denomination." (Trial Tr. 1046:20-1047:1.) So, "[t]he language of division tended to be specifically directed to some of the major things regarding the large Evangelical denominations." (Trial Tr. 1047:8-10.) Dr. Mullen testified that the "prominent division[s] in religious denominations" in the mid-nineteenth century included the following: (1) the "splitting of the Presbyterian Church in 1838 between an Old School and a New School primarily on questions of polity and theology"; (2) the 1844 division of the Methodists in regard to the question of slavery; (3) the 1845 Baptist division; (4) the 1857-59 separation of the Presbyterian New School into northern and southern branches; and (5) the 1861 division of the Old School Presbyterians between the Northern and Southern branch. (Trial Tr. 1047:16-1048:15.) Specifically in regard to the various splits among the

---

[29] On cross-examination, Dr. Mullen testified that he "d[id] not know what the public usage" of the term "division" would have been in the nineteenth century. (Trial Tr. 1100:6-22.)

Presbyterians, Dr. Mullen testified that these various splits were taken in accordance with official action by the church's governing authority. On cross-examination, however, Dr. Mullen acknowledged that the formal "Plan of Separation" was never ratified; nevertheless, by the 1850s, it had become a *"fait accompli."* See Trial Tr. 1154:9-1155:14; Trial Tr. 1054:16-1059:1. It was Dr. Mullen's opinion that all of these "divisions in religious denominations" were the ones that "prompted the Virginia Legislature to adopt § 57-9." (Trial Tr. 1061:21-1062:3.)

Finally, Dr. Mullen testified regarding the formation of the Reformed Episcopal Church in the 1870s, stating that this was not considered a "division" within ECUSA. (Trial Tr. 1071:9-1073:7.) Dr. Mullen further testified that the Reformed Episcopal Church and ECUSA have never been "in communion with each other," and that the Reformed Episcopal Church has never been a part of the Anglican Communion. (Trial Tr. 1075:18-1076:2.)

### v. *A Comment Regarding the Expert Testimony*

This Court views each of the four experts who testified as sincere professionals, each bringing a wealth of expertise to their task, and each attempting in good faith to assist the Court in its obligation to interpret § 57-9. Having said that, the Court finds the testimony of the two CANA congregation experts, Dr. Valeri and Dr. Irons, to be more persuasive and convincing. The Court found the opinions of the CANA experts to be tied directly to the particular and pertinent historical record relevant to the instant case. Some of the significant opinions offered by ECUSA/Diocese experts did not appear to be so tethered; rather, they appeared to be expressions of opinion based on the experts' general knowledge. Moreover, this Court found the testimony of CANA's expert, Dr. Irons, to be especially helpful to the Court in understanding the early history of § 57-9.

### 2. Case Law

At the outset, the Court must emphasize that there is no controlling Virginia case law on point with the issues confronting this Court. Indeed, there is almost no case law that can even be characterized as bearing on the issues before this Court. Nevertheless, there are a few cases that provide this Court some guidance.

*Brooke v. Shacklett*, 54 Va. (13 Gratt.) 301 (1856), addressed the issue as to which Methodist Church, the Methodist Episcopal Church or the Methodist Episcopal Church South, was the correct beneficiary of the trust in question. *Brooke* pre-dates the enactment of what is today § 57-9 by eleven years and involved a dispute among factions of the members of the congregations worshipping at two church-houses in Fauquier County, Virginia, one faction supported the Methodist Episcopal Church, while the other supported the Methodist Episcopal Church South. On appeal, the Virginia Supreme Court sets forth the language of the deed in question:

> the trustees are to hold the property conveyed to them, and their successors forever, in trust that they shall build or cause to be built thereon a house or place of worship for the use of the members of the Methodist Episcopal church in the United States of America, according to the rules and discipline which from time to time may be agreed upon and adopted by the ministers and preachers of the said church, at their general conferences in the United States of America; and in further trust and confidence that they shall at all times forever hereafter permit such ministers and preachers belonging to said church, as shall from time to time be duly authorized by the general conferences of the ministers and preachers of the said Methodist Episcopal church, or by the annual conferences authorized by the said general conference, to preach and expound God's holy word therein.

*Id.* at 314.

*Brooke* begins by setting forth a brief history of Virginia law relating to the validity of "devises and bequests to religious societies or congregations." *Id.* at 309. Significantly, the *Brooke* Court implies that, in Virginia, there is a distinct policy preference for the rights of local congregations: "No dedication of property to religious uses, which does not respect these rights of the local society or religious congregation . . . [and] which does not design such enjoyment of the uses of the property . . . by the *local* religious society or congregation, can be placed within the . . . statutes." *Id.* at 313 (emphasis added).

The *Brooke* Court found that the Methodist Episcopal Church had undergone a "division," after the date of the deed in question, but prior to the date on which *Brooke* was decided, "which was effected under certain

resolutions adopted by the general conference in 1844." *Id.* at 321. The *Brooke* Court then goes on to describe various of these "resolutions," which made up a "provisional plan of separation." *Id.* at 323.

*Brooke* describes these resolutions as follows:

> The first resolution declares, that, should the delegates from the annual conferences in the slaveholding states find it necessary to unite in a distinct ecclesiastical connection, the following rule shall be observed with regard to the northern boundary of such connection: All the societies, stations, and conferences adhering to the church in the south by a vote of a majority of the members of said societies, stations, and conferences, shall remain under the unmolested pastoral care of the southern church (and the ministers of the Methodist Episcopal church shall in no case attempt to organize churches or societies within the limits of the church south; nor shall they attempt to exercise any pastoral oversight therein, it being understood that the ministry of the south reciprocally observe the same rule in relation to stations, societies, and conferences adhering by vote of a majority to the Methodist Episcopal church); provided also that this rule shall apply only to societies, stations, and conferences bordering on the line of division, and not to interior charges, which shall in all cases be left to the care of that church within whose territory they are situated.
>
> By the second resolution, it is declared that ministers, local and traveling, of every grade and office in the Methodist Episcopal church may, as they prefer, remain in that church, or, without blame, attach themselves to the church south.
>
> And by the ninth, it is declared that all the property of the Methodist Episcopal church, in meeting-houses, parsonages, colleges, schools, conference funds, cemeteries, and of every kind, within the limits of the southern organization, shall be forever free from any claim set up on the part of the Methodist Episcopal church, so far as this resolution can be of force in the premises.

*Id.* at 321-22.

The *Brooke* Court acted upon the presumption that the 1844 plan of separation had been properly adopted by the Methodist general conference and was thus valid, and that, therefore, the provision of that plan which allowed

border societies to vote "to choose to which jurisdictional division of the church they [would] belong [either to the Methodist Episcopal Church, or Methodist Episcopal Church South]," *id.* at 326, was also valid. The *Brooke* Court found that this particular church was in fact a "border society," and that it had taken a valid vote to adhere to the Methodist Episcopal Church South. Therefore, *Brooke* held that the members of the Methodist Episcopal Church South were entitled to the church property under the language of the deed. *Id.* at 327-28.

*Brooke* also states the following:

> If, at any time *before* the division of the church, a controversy had arisen among the members of the society at Salem church-house, in respect to the occupancy of the house, each party under the lead of a preacher claiming its exclusive use for purposes of worship, the dispute must have been determined by enquiring, not which of the two parties constituted a majority or represented the wishes of a majority of the members of the society, but which of the two preachers had been appointed and assigned to the society in accordance to the laws of the church; which of the two parties was acting in conformity with the discipline of the church, and submitting to its lawful government.

*Id.* at 321 (emphasis added). The ECUSA/Diocese cite this passage as proof that *Brooke* supports its position. However, the *Brooke* decision was premised on a "division" whose existence was not in serious dispute. In other words, that "division," unlike the circumstances giving rise to the instant litigation, was formally recognized at the highest level of the hierarchy of the church, as manifested by the plan of separation. *Brooke* recognized, pre § 57-9, that, in such a situation, a particular congregation's vote to associate with a particular branch of the Methodist church was a *bona fide* exercise of that congregation's prerogative pursuant to the plan. That *Brooke* also states that a dispute within a congregation that occurs prior to a division should be resolved based on "which of the two parties were acting in accordance with the discipline of the church" is not helpful precedent to either party in this case because it does not address the question at the heart of this litigation, has a division occurred?

■■■■■■■■■■■

### b. *Hoskinson v. Pusey*

In *Hoskinson v. Pusey*, 73 Va. (32 Gratt.) 428 (1879), the first-known Virginia Supreme Court case in which the Court mentions the pre-cursor to today's § 57-9, the Virginia Supreme Court considered another church property dispute, once again pitting the Methodist Episcopal Church against the Methodist Episcopal Church South. This time, the property in dispute involved a "house of public worship," which the *Hoskinson* Court refers to as "Harmony Church," as well as a parsonage in Loudoun County. The deeds in question contained the exact same language as did the deed in *Brooke*. *Id*. at 430-31.

On appeal, the *Hoskinson* Court first summarized the history of the north-south split of the Methodist Church, according to the record developed by the lower court, which included the history of the Baltimore conference. The Baltimore conference chose, in 1846, to join the Methodist Episcopal Church. *Id*. at 432-33. But then, in 1861, at its annual conference at Staunton, a majority of the Baltimore Conference voted to become independent. This lasted until 1866, when the independent Baltimore Conference then voted at a conference in Alexandria, Va., to join the Methodist Episcopal Church South. Meanwhile, the minority at the Staunton conference who had disagreed with the majority vote had continued to hold their own Baltimore conference, which remained associated with the Methodist Episcopal Church. Thus, the *Hoskinson* Court noted there were two competing Baltimore conferences. *Id*. at 433-34.

After the 1866 Alexandria conference, the members of the Harmony Church voted to join the Methodist Episcopal Church South, but when the vote was taken, "none of the members who adhered to the Methodist Episcopal Church were present . . . or, if any were present, they did not vote." *Id*. at 434. The *Hoskinson* Court then embarks upon an analysis as to whether or not the Baltimore conference's actions in 1846 and the years thereafter were taken in accordance with the 1844 plan of separation. While this analysis is not germane to the instant litigation, it is noteworthy that the Supreme Court does address, at least tangentially, the Division Statute now known as § 57-9:

> It is also insisted that the action of the congregation of "Harmony" church, after the conference at Alexandria held in 1866, operated to transfer the title and control of the property to that portion of the congregation which adhered to the Methodist Episcopal Church South. That action has already been adverted

to, and is claimed to have been had under an act of the general assembly, passed February 18th, 1867 (Acts of 1866-7, ch. 210, pp. 649, 650; Code of 1873, ch. 76, § 9), which had the effect, as contended, to transfer the control and use of the property as aforesaid. It is not clear, from the evidence, whether this action of the congregation was had before or after the passage of the act referred to. I should rather infer that it was in 1866, before the act was passed. If that were so, of course there would be nothing in the point made by the appellants on the operation of the act. But suppose it was after the passage of the act. It is a sufficient answer to the claim of the appellants based on this statute, that it does not appear by the record that the provisions of the statute have been fully complied with. The portion bearing on this case reads as follows: "And whereas divisions have occurred in some churches or religious societies to which such religious congregations have been attached, and such divisions may hereafter occur, it shall, in any such case, be lawful for the communicants and pewholders over twenty-one years of age, by a vote of a majority of the whole number, as soon as practicable after the passage of this act, or whenever such division shall occur, to determine to which branch of the church or society such congregation shall thereafter belong; and which determination shall be reported to the said court, and, if approved, shall be so entered on the minutes, and shall be conclusive as to the title to and control of any property held in trust for such congregation, and shall be respected and enforced accordingly in all the courts of this commonwealth."

*Id.* at 439-40. The *Hoskinson* Court concludes that the statute was not complied with because "there is no evidence that the determination of the congregation manifested by the vote was reported to the Circuit Court of Loudoun County, approved by that court, and so entered on its minutes." *Id.* at 440. The *Hoskinson* Court also emphasizes that "[c]ompliance with these requirements is essential to the effect given by the statutes." *Id.* The Court further states that, if the statute had in fact been complied with:

the question would have been presented, whether the act does not encroach upon vested rights in puting it in the power of a majority of the members of the congregation to shift the title and

> use of the property without the consent and against the will of the minority; and the further question, how the operation of the statute is affected, if at all, by the provision of the state constitution on "church property," art. II.
>
> These are questions of interest and great practical importance. It is not necessary, however, to decide them in this case, as it is presented by the record, and I express no opinion upon them.

*Id.* at 440. Ultimately, the *Hoskinson* Court ruled in favor of those members of the congregation adhering to the Methodist Episcopal Church. *Id.* at 444.

The CANA Congregations argue that *Hoskinson* can and should be read as implicitly recognizing that the division statute does not require that a division be authorized or approved by a denomination. See Pls.' Corrected Mem. in Opp'n to the Post-Trial Opening Br. of the Episcopal Church and the Diocese 8-9) (stating that "the Court in *Hoskinson* provided a lengthy explanation of the Baltimore Conference division, concluding that MEC's 1844 Plan of Separation did not authorize congregations in that Conference to separate from MEC. Were the Church correct that § 57-9 applies only to denominationally authorized division, there is every reason to think that the [*Hoskinson*] Court would have relied on this fact as a basis for disqualifying the congregation from invoking § 57-9. The fact that the Court did not do so confirms that it did not view denominational approval of the division as a requirement for invoking the statute.") (citations omitted). That may be the case, but it is equally possible the *Hoskinson* Court simply did not reach this issue.

### c. *Finley v. Brent*

In *Finley v. Brent*, 87 Va. 103, 12 S.E. 228 (1890), the plaintiffs, members of the Methodist Protestant Church, alleged that they had been shut out of their church building by members of the Methodist Episcopal Church South. *Id.* at 104. As in *Brooke* and *Hoskinson*, the *Finley* Court was required to construe the language of the deed, which was:

> a grant in trust to trustees, by the said William Harding and wife, of a lot or parcel of land described therein, "on which the new Methodist Protestant Church, in Heathsville, was erected, in the said county of Northumberland, for the use and benefit of the

religious congregation of the Methodist Protestant Church at Heathsville, which will assemble there for the purpose of worship," to have and to hold the same "in trust for the sole and exclusive use and benefit of religious congregation of regular orthodox Methodist Protestants which may thereafter assemble there to worship, when the said house is completed, or at any church which may hereafter be built at or near the present site or situation, for the purpose of religious worship of the Methodist Protestants, and for no other use or purpose whatever."

*Id.* at 104. The members of the Methodist Episcopal Church South argued that they had taken a vote in accordance with the precursor of § 57-9, and that therefore this vote should "conclude questions as to the property held in trust for such congregation." *Id.* at 108. The lower court held in favor of the defendants, but on appeal, the Virginia Supreme Court declared that to allow the members of the Methodist Episcopal Church South to keep the church property would violate the Contracts Clause of both the United States and Virginia Constitutions. *Id.* at 108. The *Finley* Court thus reversed the holding of the lower court.

Nowhere does the *Finley* Court directly address any of the issues which are the subject of this opinion, as *Finley* does not concern the meaning of "division," "branch," "attach," or "religious society." However, *Finley* does provide this Court with a measure of guidance. First, *Finley* illustrates that this division involving the Methodist Church was far from amicable, in that members of the competing churches were actually "locking out" other members. *Id.* at 105. Second, it is important to note that the warring parties in *Finley* were considered to be *two separate denominations*. *Finley* states that:

They [the members of the Methodist Episcopal Church South] profess to adhere to a different denomination, and deny the government and discipline of the Methodist Protestant Church, and disbanded their church society, so far as they could do so, rather than submit to it; and, at the least, abandoned that church and adhered elsewhere.

*Id.* at 107-08. Yet *Finley* nowhere states that, because these were two separate denominations, the one denomination could not be a "branch" of the other and that, therefore, the precursor to today's § 57-9 could not be invoked. Rather, *Finley* decides the case on other grounds. Those other grounds may, of course,

be entirely relevant to the resolution of the constitutional contentions remaining before the Court, in particular, those contentions relating to the Contracts Clause.

### d. *Baber v. Caldwell*

*Baber v. Caldwell*, 207 Va. 694, 152 S.E.2d 23 (1967), involved the Level Green Christian Church, which had experienced "[i]ntra-congregational strife," followed by a division into two competing factions. The majority invoked § 57-9, and sued to "establish their right to control the activities of the Church and the use of its property." *Id.* at 695. The trial court held that the Level Green Christian Church was not an independent church, and held that the majority "had 'breached the trust' on which the Church property was held 'by diverting the property of the Church to their own use.'. . ." *Id.* at 696. The division in *Baber* resulted from "dissension" that "erupted" within the church over the appointment of a controversial pastor, whom a vocal minority of the congregation apparently resented. *Id.* at 696.

The bill of complaint, filed by the majority of the congregation:

> prayed that the defendants (the minority group) be enjoined "from further interfering with or disrupting the orderly and proper conduct and operation of said Level Green Christian Church, or interfering with its duly appointed minister in the performance of his duties, and from holding or attempting to hold any religious services in said Church contrary to the wishes and direction of the majority of the congregation of said Church and its Board of Elders and Deacons. . . ."

*Id.* at 697.

On appeal, the Virginia Supreme Court held that the Level Green Christian Church was in fact independent, and thus that § 57-9(B) applied, rather than § 57-9(A):

> We hold that the Level Green Christian Church is entirely independent of any other church or general society within the meaning of Code § 57-9. The first sentence of the section relates to churches, such as Episcopal and Presbyterian churches, that are subject to control by super-congregational bodies. The Level Green Christian Church is excluded from this category because

> it is autonomous. The third sentence of the section relates to the
> other category, autonomous or entirely independent churches.
> The Level Green Christian Church falls in that category. . . .

*Id.* at 698 (internal citations omitted). Thus, the Court remanded the case for further proceedings in accordance with its holding that the Level Green Christian Church was completely independent. *Id.* at 700.

While *Baber* clearly does not address the applicability of § 57-9(A), it does illuminate the meaning of "division" under the statute. *Baber* characterizes division in terms of "intra-congregational strife," "dissension," leading to a vote by the majority to "establish [its] right to control the activities of the Church and the use of its property," and to extinguish the minority's right in such property. This decision, therefore, provides further support for the notion that a division need not be consensual or amicable.

This Court is aware of only one additional Virginia Supreme Court decision regarding § 57-9 (or the predecessor statutes to § 57-9) between 1890 and 1967, which is *Cheshire v. Giles*, 144 Va. 253, 132 S.E. 479 (1926). Cheshire addressed that portion of a predecessor statute to § 57-9 that dealt with an independent church or religious society, so *Cheshire* is of little relevance to the instant case before this Court. Neither party referenced *Cheshire* in their respective post-trial briefs.

### e. *Norfolk Presbytery v. Bollinger*

*Norfolk Presbytery v. Bollinger*, 214 Va. 500, 201 S.E.2d 752 (1974), involved the application of Va. Code § 57-15, rather than § 57-9. In *Norfolk Presbytery*, the Grace Covenant Presbyterian Church voted to end its relationship with the Norfolk Presbytery and the Presbyterian Church in the United States, and to "become an independent and autonomous church." *Id.* at 501. The congregation apparently did *not* invoke § 57-9 upon its decision to sever its relationship with the Norfolk Presbytery and the Presbyterian Church in the United States. Following this, the trustees of Grace Covenant "filed their petition in the trial court praying that they be permitted to convey the real estate which they held for the church, comprising the property used for a church and elementary school and parsonage property. . . ." *Id.* at 501. The same day the petition was filed, the trial court "[b]y order entered . . . in the *ex parte* proceeding," approved this property transfer. Norfolk Presbytery immediately filed a motion to "set aside the order as contrary to the law and the evidence," and in the alternative, "moved for leave to file its petition as an

intervenor and to stay the order pending decision on this motion." The trial court denied both the Presbytery's motion to set aside, as well as its motion for leave to intervene, holding that its order granting the property transfer complied with Va. Code § 57-15. *Id.* at 501-02.

The text of § 57-15 as quoted by the *Norfolk Presbytery* Court reads as follows:

> The trustees of such church diocese, congregation, or church or religious denomination, or society or branch or division thereof, in whom is vested the legal title to such land held for any of the purposes mentioned in § 57-7, may file their petition in the circuit court of the county or the circuit or corporation court of the city wherein the land, or the greater part thereof held by them as trustees, lies, or before the judge of such court in vacation, asking leave to sell, encumber, extend encumbrances, improve, or exchange the land, or a part thereof; and upon evidence being produced before the court, or the judge thereof in vacation, that it is the wish of the congregation, or church or religious denomination or society, or branch or division thereof, or the constituted authorities thereof having jurisdiction in the premises, or of the governing body of any church diocese, to sell, exchange, encumber, extend encumbrances, or improve the property, the court, or the judge thereof in vacation, shall make such order as may be proper, providing for the sale of such land, or a part thereof, or that the same may be exchanged, encumbered, improved, or that encumbrances thereon be extended, and in case of sale for the proper investment of the proceeds. . . .

*Id.* at 502, n. 1. The Court notes that § 57-15 has undergone minor non-substantive changes since the time of the *Norfolk Presbytery* decision.

On appeal, the Virginia Supreme Court interpreted § 57-15:

> We construe Code § 57-15 to require that a church property transfer may be ordered only upon a showing that this is the wish of the duly constituted church authorities having jurisdiction in the premises. Under predecessor statutes only the congregation's wishes were to be considered in a proceeding to authorize a church property conveyance, but Code § 57-15 now

contemplates that the general church, or a division thereof, or certain ecclesiastical officials may be the proper parties to approve such a property transfer. In determining the proper party to approve the property transfer, the trial court must look to the organizational structure of the church. See Code § 57-9, which recognizes a distinction between an autonomous congregation and one which is part of a super-congregational or hierarchical denomination in providing for the determination of property rights upon a division of a church or congregation. In the case of a super-congregational church, we hold that Code § 57-15 requires a showing that the property conveyance is the wish of the constituted authorities of the general church.

*Id.* at 502-03 (internal citations omitted).

*Norfolk Presbytery*, in a footnote, cites the legislative history of § 57-15:

The predecessor statute, Code of 1887 (Annotated) § 1406, required only congregational approval as a prerequisite to court sanction of a church property conveyance. The statute, Code of 1904 (Annotated) § 1406, incorporated the amendment by Acts 1904, c. 209, to require evidence that the proposed conveyance is "the wish of said congregation, or church or religious denomination or society, or branch or division thereof," to which the words "or the constituted authorities thereof having jurisdiction in the premises" were added by Acts 1924, c. 372. Subsequently, by Acts 1962, c. 516, the language relating to a church diocese was added to this section, to § 57-7 and to other related sections.

*Id.* at 503, n. 2. A later Virginia Supreme Court case, *Green v. Lewis*, 221 Va. 547, 272 S.E.2d 181 (1980), confirmed that § 57-15 "require[s] that a church property transfer may be ordered only upon a showing that this is the wish of the duly constituted church authorities having jurisdiction in the premises. . . ." *Id.* at 553.

The Court thus holds that, "in view of [its] construction of Code § 57-15 . . . the trial court erred in denying the Presbytery's motion to intervene." *Id.* In the Court's view, the Presbytery was "entitled to present whatever evidence it had tending to establish its interest in the [church property sought

to be transferred]." *Id.* The Court further states that "[i]f, upon remand, the Presbytery does establish such a proprietary interest, it will be entitled to a permanent injunction against the conveyance. . . . If, however, the Presbytery is unable to establish a proprietary interest in the property, it will have no standing to object to the property transfer." *Id.*

In response to the assertion that the Court was violating the First Amendment by enmeshing itself in a controversy involving church property, the *Norfolk Presbytery* Court responded that it was doing no such thing, since "[t]he First Amendment requires only that such disputes be adjudicated according to 'neutral principles of law, developed for use in all property disputes,' and which do not involve inquiry into religious faith or doctrine." *Id.* at 504 (citing *United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969)). The *Norfolk Presbytery* Court further held that, specifically in Virginia, "it is proper to resolve a dispute over church property by considering the statutes of Virginia, the express language in the deeds, and the provisions of the constitution of the general church." *Id.* at 505.

Thus, *Norfolk Presbytery* concludes with the Court's ordering the trial court to allow the Norfolk Presbytery to intervene, since the Presbytery had "made sufficient allegations to be entitled to file its petition as an intervenor in order to have a determination made whether it had a proprietary interest in the property of Grace Covenant which could not be eliminated by unilateral action of the congregation." *Id.* at 507. The Supreme Court further ordered that the trial court on remand must consider "the language of the deeds and the constitution of the general church . . . in the application of neutral principles of law," with the Presbytery having the burden "of proving that the Trustees of Grace Covenant have violated either the express language of the deeds or a contractual obligation to the general church." *Id.*

*Norfolk Presbytery* demonstrates a key difference between §§ 57-9 and 57-15: just as § 57-9 requires only a majority approval of the congregation in order for the court to determine ownership of property upon a division, § 57-15 also originally required *only congregational approval* for a conveyance of property. However, § 57-15 was *affirmatively amended* to include the specific words: "constituted authorities," and "governing body of any church diocese." In contrast, § 57-9 contains absolutely no reference to the governing authorities of a church.

The Court also notes that there is a 1977 Virginia Circuit Court case, *Diocese of Southwestern Va. of the Protestant Episcopal Church in the U.S. v. Buhrman*, 5 Va. Cir. 497 (1977), which involved a single congregation that

broke away from the Episcopal Church in the Diocese of Southwestern Virginia to become independent. *Buhrman*, however, did not involve the application of § 57-9.

f. Reid v. Gholson

*Reid v. Gholson*, 229 Va. 179, 327 S.E.2d 107 (1985), deals with a dispute within a congregational church, as opposed to a hierarchical one. Nevertheless, *Reid* is significant for the way it defines "division" under § 57-9(B): "to separate from the body of [the] church . . . to rend it into groups, each of which seeks to take over all the property and characterize the other as apostate, excommunicated, and outcast . . . such a division [must be created] as a prerequisite to relief under § 57-9." *Id.* at 192.

V. *Findings and Conclusions*

A. *As Used in § 57-9(A), the Term "Church" or "Religious Society" Does Apply to the Diocese, the ECUSA, and the Anglican Communion*

Because the statute itself does not define "church or religious society," nor does any of the case law, this Court must resort to dictionary definitions of the terms. The relevant definition of "church" as found in Merriam-Webster's online dictionary is:

a body or organization of religious believers: as a: the whole body of Christians b: DENOMINATION <the Presbyterian church> C: CONGREGATION.

Merriam-Webster's Online Dictionary, http://www.merriam-webster.com /dictionary/church (last visited March 31, 2008).

This Court did not locate a similar definition of "religious society" in any modern dictionary, but relevant definitions of "society" as defined in Merriam-Webster's online dictionary include:

a: an enduring and cooperating social group whose members have developed organized patterns of relationships through interaction with one another b: a community, nation, or broad grouping of people having common traditions, institutions, and collective activities and interests.

Merriam-Webster's Online Dictionary, http://www.merriam-webster.com /dictionary/society (last visited March 31, 2008).

Around the time period during which the predecessor statute to § 57-9 was enacted, "society" was, similar to its definition today, defined as: "a number of persons associated for any temporary or permanent objects." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 56 (quoting Noah Webster, *A Dictionary of the English Language* 682 (1872) (preface dated 1867)).)

The parties do not dispute that the Diocese and ECUSA are "churches" or "religious societies" under § 57-9(A). In addition, the Court need not reach the question as to whether the Anglican Communion is in fact a "church" under § 57-9(A), because there is abundant evidence in the record to allow this Court to find that the Anglican Communion is, at the very least, a "religious society" under all of the above definitions, and therefore is a religious society under § 57-9(A).

For example, Professor Douglas, one of ECUSA/Diocese's experts, acknowledged at trial that the Anglican Communion is an enduring group whose members have developed organized patterns of relationships through their shared history. See Trial Tr. 908:21-911:15. Indeed, Professor Douglas testified that words like "association," "fellowship, and "society" "impl[y] a much looser kind of federation or voluntary association that does not get at the historic DNA and relationship [that the Anglican Communion possesses]." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 57.) Although ECUSA/Diocese experts refrained from using the exact words "religious society" to describe the Anglican Communion, the record reflects that the Anglican Communion has been referred to in pronouncements by its various leaders, as an "international society of churches," with the Archbishop of Canterbury described as its "chief pastor," or "President." See *supra*.

Further, in defining "religious society," this Court must look to the context in which that phrase is used within the statute. The Court notes that the only instance in which the exact phrase "religious society" appears in the statute's text is toward the beginning of the first sentence. The word "society" is then used a second time within the first sentence, but at this point, the word "religious" is dropped completely. Then, in subdivision (B) of the statute, the phrase "religious society" is not used at all; rather, the phrase "general society" is used. Thus, subdivision (B) applies only to "a church or society entirely independent of any other church *or general society. . . .*" (emphasis added). In considering the structure and content of this statute as a whole, it

appears that "religious society" and "general society" are used interchangeably, almost as synonyms. Thus, the manner in which these words and phrases are used throughout the statute suggests to this Court that the legislature intended a broader, more "general" definition of "religious society" than that which the ECUSA/Diocese would have this Court attribute to the phrase.

For all these reasons, this Court finds that the Anglican Communion is a "religious society," under § 57-9(A).

B. *As Used in § 57-9(A), the Term "Attached" Applies to the CANA Congregations, in That They Are "Attached" to the Diocese, the ECUSA, and the Anglican Communion*

As with the phrase "church or religious society," § 57-9(A) does not define "attach," nor does any case law. Thus, this Court resorts once again to the dictionary, in which the first three definitions of "attach" are as follows:

> 1: to take by legal authority especially under a writ <attached the property> 2 a: to bring (oneself) into an association <attached herself to their cause> b: to assign (an individual or unit in the military) temporarily 3: to bind by personal ties (as of affection or sympathy). . . .

Merriam-Webster's Online Dictionary, http://www.merriam-webster.com /dictionary/attach (last visited March 31, 2008).

Likewise, near the time of the enactment of the predecessor statute to § 57-9, the definition of "attach" was, similar to its present-day definition: "to connect, in a figurative sense." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 58 (citing Noah Webster, *A Dictionary of the English Language* 44 (1872) (preface dated 1867)).)

The second two definitions of "attachment" in the modern dictionary are most applicable in the present context. The parties concede that the CANA Congregations were attached to the Diocese and ECUSA for purposes of § 57-9(A). And, certainly, the CANA Congregations were in an association with the Anglican Communion through their former affiliation with ECUSA, as there is abundant evidence in the record, as set forth by this Court previously in the "Background" section of this letter opinion, that the individual congregations viewed themselves both as Episcopalians *and* members of the Anglican Communion. As they grew increasingly disillusioned with ECUSA

and the Diocese, it is clear that the CANA Congregations sought a way to preserve their ties with the Anglican Communion, while avoiding what they considered to be the misguided policies of the leadership of ECUSA and the Diocese. When the CANA Congregations voted to depart, they did not affiliate with the Roman Catholic Church, the Presbyterian Church, or the Methodist Church. Rather, they affiliated with a religious body to which they viewed themselves as already "attached" and "in communion" with, through their common affiliation as Anglicans, specifically, the Church of Nigeria, the largest province within the Anglican Communion. That makes this case entirely distinguishable from a situation in which, for example, a group of disillusioned Roman Catholics leave to join the Episcopal Church, or vice versa.

Likewise, the record reflects that the CANA Congregations were bound by personal ties of "affection or sympathy" with the Anglican Communion as members of ECUSA prior to disaffiliation and are still bound by personal ties of "affection or sympathy" with the Anglican Communion as members of the Church of Nigeria.

Thus, this Court finds that the CANA Congregations are "attached" to the Anglican Communion for purposes of § 57-9.

C. *As used in § 57-9(A), CANA, the American Arm of the Church of Uganda, the Church of Nigeria, ADV, ECUSA, and the Diocese are all "branches" of the Anglican Communion, and CANA and ADV are "branches" of ECUSA and the Diocese*

Once again, this Court looks to a commonly-used and readily-accessible secular dictionary for guidance. The most relevant dictionary definition of "branch" is as follows: "a part of a complex body: as a: a division of a family descending from a particular ancestor. . . ." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/branch (last visited March 31, 2008).

Likewise, around 1867, the definition of "branch" was "[a]ny arm or part shooting or extended from the main body of a thing." (Pls.' Opening Post-Trial Mem. Concerning Application of Va. Code § 57-9 at 31, n. 17 (citing Noah Webster, *A Dictionary of the English Language* 81 (1872) (preface dated 1867)).)

As the evidence at trial and the exhibits demonstrate, various Christian Protestant denominations have split apart from their parent denomination, as, for example, the Cumberland Presbyterian Church, the Methodist Episcopal

Church South, and the Reformed Episcopal Church, and yet are still considered "branches" of their "mother" church. The definition of "branch" proposed by the CANA Congregations, "an offshoot of a denomination created as a result of a division, or to the group left behind," is consistent with this historical evidence.

This Court need not reach the question of whether the CANA Congregations' proposed definition is correct for purposes of § 57-9(A), however. This is because it is clear that, under the simple dictionary definitions of "branch" described above, all of the various entities before this Court, including CANA, ADV, ECUSA, the Diocese, the Church of Nigeria, and the Church of Uganda, are "branches" of the Anglican Communion. Further, CANA and ADV are branches of both the ECUSA and the Diocese.

The Court would also note that all the various religious entities before it appear to be even more closely related to each other than were the Presbyterian Church in the United States of America and the Presbyterian Church in the United States or the Methodist Episcopal Church and Methodist Episcopal Church South, which were the religious bodies involved in the various § 57-9 petitions filed between 1867 and 1869 that are part of the record in this litigation. See, e.g. Pls.' Exs. 96, 97, 98, 118, and 119, which are copies of various orders entered by courts in Augusta and Rockbridge counties approving petitions of congregational majorities pursuant to the predecessor statute to § 57-9. This is because, unlike the Presbyterian Church in the United States of America and the Presbyterian Church in the United States or the Methodist Episcopal Church and Methodist Episcopal Church South, CANA, the American Arm of the Church of Uganda, the Church of Nigeria, ADV, ECUSA, and the Diocese, all continue to be, both directly and indirectly, common members of the Anglican Communion.

The Court does wish to address the example that ECUSA/Diocese set forth in support of their position as to the meaning of "branch." They argue that "[t]he Episcopal Church in fact created a new missionary diocese to minister to Mexican Catholics who had become disaffected from, and were departing, the Catholic Church," and that "no one referred to or considered that Episcopal Diocese as a "branch" of the Catholic Church; it was a branch of the Episcopal Church, just as CANA is a 'branch' of the Church of Nigeria." (Opp'n Br. for the Episcopal Church and the Diocese 22.) But this comparison proves too much. While it is certainly true that no one considered the Episcopal Diocese in Mexico to be a "branch" of the Roman Catholic Church, the Roman Catholic Church and the Episcopal Church are not members of a common international religious society with a common "chief

pastor," see *supra*, or "focus of unity." In contrast, ECUSA, the Diocese, CANA, ADV, the Church of Nigeria, and the Church of Uganda, are all joined together by their common membership in the Anglican Communion, by their adherence to that historical strand of Christianity known as Anglicanism, and by their shared desire to be a part of that particular branch of Christianity whose adherents call themselves Anglicans.

D. *As Used in § 57-9(A), a "Division" Has Occurred in a Church or Religious Society to Which the CANA Congregations Were Attached, at All Three Levels of the Diocese, the ECUSA, and the Anglican Communion*

The Court finds that the evidence presented at trial establishes that the definition of "division" as that term is used in § 57-9(A) is in fact that assigned to it by the CANA Congregations, which is "[a] split . . . or rupture in a religious denomination that involve[s] the separation of a group of congregations, clergy, or members from the church, and the formation of an alternative polity that disaffiliating members could join." (CANA Congregations Opening Post-Trial Mem. 7.)

The CANA Congregations also use the term "schism" in defining "division." This Court does not adopt the term "schism" for § 57-9 definitional purposes. In defining "division" for § 57-9 purposes, a secular Court should not use the language of "schism," a term heavy with religious connotations. Whether or not the current controversy can be characterized as a "schism" is a decision to be made (or not made) by the parties themselves or, for that matter, by other interested entities, but not by a secular court. The other terms used in the definition, "split" and "rupture," are neutral terms without this religious connotation.

In so concluding, the Court first looks to the language of the statute. The word "division" is used in different parts of the same statute, here § 57-9, so this Court must presume that the Virginia Legislature intended to use the word in the same sense throughout the statute. See, e.g., *Bridgewater Mfg. Co. v. Funkhouser*, 115 Va. 476, 480, 79 S.E. 1074 (1913). In fact, the first sentence of § 57-9(A), which speaks of "division" is exactly identical to that of § 57-9(B), both begin by stating, "If a *division* has heretofore occurred or shall hereafter occur in a. . . ." The word "division" has no modifiers. The words "formal" or "approved by the hierarchy," or "approved by the constituent authorities of the church" do not appear in either § 57-9(A) or (B).

In addition, the record demonstrates that ECUSA and Diocese leaders have in the past used the term "division" themselves to describe the very situation before this Court, as when, for example, Bishop Lee of the Diocese stated in his letter of December 6, 2006, "I encourage you when you vote, to vote for the unity and mission of the church, therefore remaining one with your diocese, and *reject the tempting calls to division. . . ." See supra.*

The Court notes that ECUSA/Diocese argue that "Virginia law confirms that a legally cognizable 'division' affecting property rights, as described in § 57-9(A), must be a structural division of the denomination accomplished in accordance with that denomination's own rules and polity," and therefore "without official action of the General Convention, the evidence demonstrates that no such division has occurred." (Post-Trial Opening Br. for the Episcopal Church and the Diocese (Corrected pursuant to Errata Filed 01/07/08) at 1.) But if this Court were to accept the ECUSA/Diocese's definition of "division," § 57-9(A) would *never* apply to the ECUSA/Diocese, since the record shows that, according to ECUSA's canons, the only "divisions" that are allowed are essentially geographic, and an ECUSA congregation is not allowed to decide which diocese to join. Under applicable case law and rules of statutory construction referred to elsewhere in this letter opinion, this Court cannot apply a statute in such a way as to render it meaningless as applied to a particular private party. Perhaps even more significantly, the definition urged by ECUSA/Diocese would make § 57-9(A) a nullity, for if division is defined as requiring the consent of the hierarchy, all the hierarchy need do to defeat the invocation of § 57-9(A) is refuse to recognize or approve the division. Moreover, if the history of division within churches or religious societies in the United States informs this Court of anything, it is that division is frequently nonconsensual and contested and takes place without the approval or affirmation of the hierarchy. Indeed, were it otherwise, there would be little need for a division statute, for churches would simply approve divisions and amicably divide up their property without intervention from secular institutions of government.

Finally, ECUSA/Diocese argue that the CANA Congregations' definition of "division" would permit a division to be "foisted upon [a hierarchical church] by the acts of a few disgruntled individuals." See Post-Trial Reply Br. for the Episcopal Church and the Diocese 5, n. 3. The CANA Congregations' definition, argues ECUSA/Diocese, would make the division statute too "easily applicable." The Court finds no merit in this position. The CANA Congregations' definition requires three major and coordinated occurrences: (1) a "split" or "rupture" in a religious denomination; (2) "the

separation of a group of congregations, clergy, or members from the church;" and (3) the formation of an "alternative polity that disaffiliating members could join." The ECUSA/ Diocese is correct that division, under § 57-9(A), ought not be "easy." Under the CANA Congregations' definition, it is not.

### 1. Division in the Diocese

The Court finds that, under § 57-9(A), a division has occurred within the Diocese. Over 7% of the churches in the Diocese, 11% of its baptized membership and 18% of the diocesan average Sunday attendance of 32,000 have left the Diocese in the past two years. (Pls.' Post-Trial Opening Mem. Concerning Application of Va. Code § 57-9 at 43 (citing Pls.' Ex. 132).) Further, about 20 congregations, comprising 7,500 members, have affiliated with ADV since it began in 2006, almost all of which were previous members of [ECUSA] churches. All twenty of the congregations are led by former ECUSA clergy. (Pls.' Post-Trial Opening Mem. Concerning Application of Va. Code § 57-9 at 44.)

As Plaintiffs state, "[i]n the year since its formation, then, ADV alone is already 25 percent larger than the Reformed Episcopal Church is even today," in that "the Reformed Episcopal Church currently has only 6,000 members." (Pls.' Post-Trial Opening Mem. Concerning Application of Va. Code § 57-9 at 44.) This Court does not, and need not, reach the issue as to how "large" a "division" must be for § 57-9(A) to apply. Rather, it finds only that the division which has occurred within the Diocese is of a magnitude large enough to satisfy the statute.

### 2. Division in the ECUSA

In addition, this Court finds that a division has occurred within the ECUSA. The record demonstrates that numerous congregations, clergy, and members have separated from ECUSA as a result of internal strife within ECUSA in order to establish a new "polity" for others to join. Since CANA was formed in 2005, about 60 congregations, comprising 12,000 members, affiliated with CANA, and over 10,000 of these members had previously been in ECUSA congregations. These members come from multiple states within the United States, and many of the congregations that joined CANA joined as "entire congregations." In addition, of the 100 clergy who have joined CANA, 80 were formerly clergy within the ECUSA. (Pls.' Post-Trial Opening Mem. Concerning Application of Va. Code § 57-9 at 34.)

Likewise, as Bishop John Guernsey testified during the trial, about 39 congregations, which together constitute over 11,000 members, have joined the American Arm of the Church of Uganda since the 2003 ECUSA General Convention. About 90 percent of these 11,000 were previously members of ECUSA congregations. (Pls.' Post-Trial Opening Mem. Concerning Application of Va. Code § 57-9 at 35.) As Plaintiffs state, "These congregations [just like the CANA Congregations] too come from 'a large number of states' and various TEC dioceses, have an average Sunday attendance of more than 6,200 people, are already larger than the Reformed Episcopal Church, and are rapidly growing." (Pls.' Post-Trial Opening Mem. Concerning Application of Va. Code § 57-9 at 35.)

The evidence thus confirms that a "split or rupture" in ECUSA that involves the separation of a group of congregations, clergy, or members from ECUSA and the formation of an alternative polity that disaffiliating members could and have joined has clearly occurred. And as with the Diocese, the Court finds that the division within ECUSA is of a large enough magnitude to satisfy the statute.

### 3. Division within the Anglican Communion

Finally, the Court finds that there has been a split within the Anglican Communion that also qualifies as a division under § 57-9(A). Numerous leaders within the Anglican Communion have referred to "divisions" within the Anglican Communion in various official documents, as well as the need for reconciliation among its members. See *supra*. This satisfies the first portion of the Court's definition of "division," which is "a split . . . or rupture in a religious denomination." The second portion of the definition, which involves separation and the formation of an alternative polity, is satisfied by the Church of Nigeria's historic alteration of its constitution, which allowed for the formation of CANA, and cut all financial and relational ties with ECUSA. This alteration of its constitution also altered the Church of Nigeria's relationship with the rest of the Anglican Communion, stating that the Church of Nigeria considered itself to be affiliated only with those who "adhered to the historic faith, doctrine, and discipline of the Anglican Communion," rather than simply with "all provinces that relate to the See of Canterbury. See *supra*.

## VI. *Conclusion*

ECUSA/Diocese argue that the historical evidence demonstrates that it is only the "major" or "great" divisions within nineteenth-century churches that prompted the passage of § 57-9, such as those within the Presbyterian and Methodist Churches. ECUSA/Diocese argue that the current "dispute" before this Court is not such a "great" division, and, therefore, this is yet another reason why § 57-9(A) should not apply. The Court agrees that it was major divisions such as those within the Methodist and Presbyterian churches that prompted the passage of § 57-9. However, it blinks at reality to characterize the ongoing division within the Diocese, ECUSA, and the Anglican Communion as anything but a division of the first magnitude, especially given the involvement of numerous churches in states across the country, the participation of hundreds of church leaders, both lay and pastoral, who have found themselves "taking sides" against their brethren, the determination by thousands of church members in Virginia and elsewhere to "walk apart" in the language of the Church, the creation of new and substantial religious entities, such as CANA, with their own structures and disciplines, the rapidity with which the ECUSA's problems became that of the Anglican Communion, and the consequent impact, in some cases the extraordinary impact, on its provinces around the world, and, perhaps most importantly, the creation of a level of distress among many church members so profound and wrenching as to lead them to cast votes in an attempt to disaffiliate from a church which has been their home and heritage throughout their lives and often back for generations. Whatever may be the precise threshold for a dispute to constitute a division under § 57-9(A), what occurred here qualifies.

For the foregoing reasons, this Court finds that the CANA Congregations have properly invoked § 57-9(A).

Further proceedings will take place in accordance with the Order issued today.

### Order

For the reasons stated in the Letter Opinion issued today, hereby incorporated by reference, the Court finds that the Plaintiff Congregations in the above-entitled matters have properly invoked Va. Code § 57-9(A). The Court further orders and schedules the following.

The Court hereby schedules oral argument for 10 a.m. on Wednesday, May 28, 2008, on the following three issues:

(1) Whether § 57-9(A), as interpreted by this Court, violates the Free Exercise Clause of the First Amendment to the United States Constitution;

(2) Whether § 57-9(A), as interpreted by this Court, violates the Establishment Clause of the First Amendment to the United States Constitution;

(3) Whether § 57-9(A), as interpreted by this Court, violates the religious freedom provisions of the Virginia Constitution.

On May 28, 2008, the Court will hear from the Diocese, ECUSA, the CANA Congregations, and the Office of the Attorney General of the Commonwealth of Virginia, *amicus curiae*.

In addition, if either party believes that today's letter opinion raises constitutional issues in addition to those that have already been briefed, that party must submit the appropriate supplemental brief by noon on Wednesday, April 23, 2008. The opposing party may then submit its opposition brief by noon on Friday, May 2, 2008. The Court will then determine whether to hear argument on additional issues at the May 28 hearing.

If either party wishes to submit a supplemental brief on either the Establishment Clause, Free Exercise Clause, or related Virginia constitutional issues in light of today's letter opinion, it should do so pursuant to the same schedule outlined above, with the supplemental brief due by noon on Wednesday, April 23, and opposition brief due by noon on Friday, May 2.

The Court will note that this order does not schedule briefing or argument on the constitutional Contracts Clause issue because it has been asserted that the Contracts Clause issue will require an evidentiary hearing and because it has been asserted that this evidentiary hearing will involve factual matters similar or identical to those factual matters at issue in the Declaratory Judgment actions and, therefore, should be heard with the Declaratory Judgment actions in October 2008. If either party wishes to address this issue, it may do so in the April 23 and May 2 filings.

Finally, the Court will determine the schedule for taking evidence and argument on the validity of the votes taken pursuant to § 57-9(A) at a later date.

May 12, 2008

The present motion before the Court is the Protestant Episcopal Church in the Diocese of Virginia ("Diocese") and the Episcopal Church's ("ECUSA") Motion for Leave to Amend Answers to § 57-9 Petitions. The

parties agreed to have the Court decide the motion on the papers in lieu of oral argument. For the reasons stated in this letter opinion, the motion is denied.

## I. *Moving Party's Position*

The ECUSA/Diocese seek leave to amend their answers to add the defense that the application of § 57-9(A) in this litigation violates Va. Code § 57-2.02. Specifically, the ECUSA/Diocese argue, first, that the CANA Congregations would not be prejudiced from the resulting amendment, since the defense would not require any further discovery and is closely tied to the ECUSA/Diocese's "arguments that application of § 57-9 requires strict scrutiny under and violates the Free Exercise Clause. . . ." (Mot. for Leave to Amend at 2.) Second, ECUSA/Diocese argue that § 57-2.02's reference to acts of a "government entity" applies to the application of § 57-9(A) in the present case, in that the General Assembly's passage of § 57-9(A), the Attorney General's attempt to intervene and status as *amicus*, and the possibility of this Court's entering an order approving the CANA Congregations' petitions each constitutes an "act" of a government entity sufficient to satisfy § 57-2.02. (Mot. for Leave to Amend at 2-3.) The ECUSA/Diocese also argue that the CANA Congregations constitute a government entity for purposes of § 57-2.02, asserting that they are persons acting under "color of state law." (Reply at 4.) Finally, the ECUSA/Diocese argue that § 57-2.02, which took effect on July 1, 2007, should be applied to this litigation, despite the fact that the CANA Congregations' § 57-9(A) Petitions were filed in December 2006 and January of 2007. The ECUSA/Diocese argue that such an application of § 57-2.02 is allowable in the instant case, since § 57-2.02 is in fact a procedural, rather than a substantive, law and, thus, may be applied to this litigation. (Reply at 1-2.)

## II. *Opposing Party's Position*

The CANA Congregations[30] argue that the Court should deny the ECUSA/Diocese's motion to amend because it would be "futile," as the amendment would not survive a subsequent motion to strike. Specifically, the CANA Congregations argue, first, that § 57-2.02 is "a change in the law, not a

---

[30] The Church of Our Saviour at Oatlands declined to join either the Opposition or the Surreply to the ECUSA/Diocese's motion to amend.

clarification of existing law," and "accordingly, [§ 57-2.02] only acts prospectively," as retroactive application of statutes is disfavored in Virginia. (Opp'n at 3.) Second, the CANA Congregations argue that they will be prejudiced if this Court allows the ECUSA/Diocese to amend their answers, since "ECUSA and the Diocese waited until April of this year, after the trial, after substantial rounds of post-trial briefing, and after an adverse decision by the Court on the application of § 57-9 to raise their § 57-2.02 argument." (Surreply at 4.) The CANA Congregations argue that "[t]he late assertion of [the § 57-2.02] defense would deny the CANA Congregations the ability to explore the merits of the defense and to develop arguments and evidence in opposition to it," and that the "ECUSA and the Diocese should not be permitted to reopen the trial on application of § 57-9 to add an affirmative defense after not only the close of evidence, but the submission of final post-trial briefs. . . ." (Surreply at 5-6.) Finally, the CANA Congregations argue that § 57-2.02 is not available to the ECUSA/Diocese in the instant case, since "an assertion of a § 57-2.02 violation, and enforcement thereof, can only be sought against a government entity," not against private parties, such as the CANA Congregations. (Opp'n at 4.)

## III. *Analysis*

### A. *Standard for Granting Leave to Amend*

Rule 1:8 of the Rules of the Supreme Court of Virginia states:

> No amendments shall be made to any pleading after it is filed save by leave of court. Leave to amend shall be liberally granted in furtherance of the ends of justice.
>
> In granting leave to amend the court may make such provision for notice thereof and opportunity to make response as the court may deem reasonable and proper.

Va. Sup. Ct. R. 1:8 (LexisNexis 2007).

Amendments to pleadings "are not a matter of right, but a trial court's decision refusing leave to amend after a showing of good cause is, *in ordinary circumstances*, an abuse of discretion. *Ford Motor Co. v. Benitez*, 273 Va. 242, 252, 639 S.E.2d 203 (2007) (citing *Mortarino v. Consultant Eng'g Servs.*, 251 Va. 289, 295-96, 467 S.E.2d 778 (1996)) (emphasis added). A court's primary consideration in deciding whether to allow an amendment is whether the opposing party will be prejudiced by allowing the amendment.

See, e.g., *Kole v. City of Chesapeake*, 247 Va. 51, 57, 439 S.E.2d 405 (1994) ("In the present case, nothing in the record suggests that the City would have been prejudiced by allowance of the amended bill of complaint. We conclude, therefore, that the trial court abused its discretion in failing to allow the filing of the amended bill.").

On the other hand, "[d]emonstrated futility may lead the Court to conclude, in the exercise of its discretion, that the ends of justice would not be advanced." *Booher v. Board of Supervisors of Botetourt County*, 65 Va. Cir. 53, 60 (2004).[31] For example, in *Hetland v. Worcester Mutual Ins. Co.*, No. 3477, 1980 WL 143082 (Va. Cir. Feb. 7, 1980), the Circuit Court of Frederick County, Virginia declined to grant Plaintiffs leave to amend their complaint, because "[t]o allow the amendment would result in a plea of the statute [of limitations]," and "the plea of the statute to the amendment, if allowed, would have to be sustained [by the *Hetland* Court]." *Id.* at *2. Thus it would be "empty . . . to grant an amendment knowing that the portion amended would be met with a plea of the statute and that such plea would have to be sustained." *Id.* The *Hetland* Court thus denied the motion to amend, on the grounds that to allow such an amendment would be futile. *Id.* Likewise, in *Tsapel v. Anderegg*, 51 Va. Cir. 139 (1999), the Court denied the plaintiff's motion for leave to amend her motion for judgment, because "[a]fter considering the tendered amendment and the parties' stipulation of facts, the court conclude[d] that the amendment would . . . not survive defendant's plea and motion." *Id.* at 142.

B. *Virginia Code § 57-2.02*

Va. Code § 57-2.02 states in its entirety:

§ 57-2.02. *Religious freedom preserved; definitions; applicability; construction; remedies.*
A. As used in this section:
"Demonstrates" means meets the burdens of going forward with the evidence and of persuasion under the standard of clear and convincing evidence.

---

[31] Notably, the ECUSA/Diocese do not challenge the contention that, if this Court finds that the CANA Congregations have demonstrated the futility of the proposed amendment, this Court may conclude, in the exercise of its discretion, that the ends of justice would not be advanced by allowing an amendment.

"Exercise of religion" means the exercise of religion under Article I, Section 16, of the Constitution of Virginia, the Virginia Act for Religious Freedom (§ 57-1 et seq.), and the First Amendment to the United States Constitution.

"Government entity" means any branch, department, agency, or instrumentality of state government, or any official or other person acting under color of state law, or any political subdivision of the Commonwealth and does not include the Department of Corrections, the Department of Juvenile Justice, and facility of the Department of Mental Health, Mental Retardation and Substance Abuse Services that treats civilly committed sexually violent predators, or any local, regional or federal correctional facility.

"Prevails" means to obtain "prevailing party" status as defined by courts construing the federal Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988.

"Substantially burden" means to inhibit or curtail religiously motivated practice.

B. No government entity shall substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability unless it demonstrates that application of the burden to the person is (i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest.

C. Nothing in this section shall be construed to (i) authorize any government entity to burden any religious belief or (ii) affect, interpret, or in any way address those portions of Article 1, Section 16, of the Constitution of Virginia, the Virginia Act for Religious Freedom (§ 57-1 et seq.), and the First Amendment to the United States Constitution that prohibit laws respecting the establishment of religion. Granting government funds, benefits, or exemptions, to the extent permissible under clause (ii) of this subsection, shall not constitute a violation of this section. As used in this subsection, "granting" used with respect to government funding, benefits, or exemptions shall not include the denial of government funding, benefits, or exemptions.

D. A person whose religious exercise has been burdened by government in violation of this section may assert that violation as a claim or defense in any judicial or administrative proceeding and may obtain declaratory and injunctive relief from a circuit court, but shall not obtain monetary damages. A person who prevails in any proceeding to enforce this section against a government entity may recover his reasonable costs and attorney fees. The provisions of this subsection relating to attorney fees shall not apply to criminal prosecutions.

E. Nothing in this section shall prevent any governmental institution or facility from maintaining health, safety, security, or discipline.

F. The decision of the circuit court to grant or deny declaratory and injunctive relief may be appealed by petition to the Court of Appeals of Virginia.

Va. Code Ann. § 57-2.02 (LexisNexis 2008).

## C. *Discussion*

As a preliminary matter, the Court notes that it need not reach the following issues: (1) whether the CANA Congregations would be prejudiced by allowance of the post-trial amendment; (2) whether § 57-2.02 is "explicitly procedural," as the ECUSA/Diocese argue (Reply at 2), or whether it is in fact "a substantive right granted to qualifying persons," as argued by the CANA Congregations (Surreply at 3). The Court would note, however, that, absent the grounds by which this motion is denied, it would likely hold that the CANA Congregations would be prejudiced by allowing the ECUSA/Diocese to amend their answers this late in the litigation, after the close of evidence in the § 57-9 trial, the submission of all post-trial briefs, and this Court's issuance of a letter opinion establishing that the CANA Congregations have properly invoked § 57-9(A).

This Court concludes that to grant the ECUSA/Diocese's motion for leave to amend their answers to their § 57-9 petitions would, in the end, prove futile. This is because it is clear from the face of § 57-2.02 that the statute does not apply to litigation between private parties, but only to litigation in which a governmental entity is a party. The statute clearly states that "No *government entity* shall substantially burden a person's free exercise of religion," § 57-2.02(B) (emphasis added), and "[a] person who

prevails in any proceeding to enforce this section against *a government entity*, may recover his reasonable costs and attorney fees." § 57-2.02(D) (emphasis added).

The ECUSA/Diocese argue that § 57-2.02's definition of "government entity" to include "any official or other person acting under color of state law" should be read to include the CANA Congregations, who are acting "under color" of § 57-9(A). The ECUSA/Diocese cite *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982), in support of their position. However, *Lugar*, involved an entirely different statute, 42 U.S.C. § 1983. Further, *Lugar* expressly limited its holding "to the particular context of prejudgment attachment." *Id.* at 939, n. 21. This Court thus declines to apply the reasoning of *Lugar* to the application of Va. Code § 57-2.02 in the instant litigation.

The instant litigation is not between a private party and a governmental entity but, rather, between private parties. This Court does not agree with the ECUSA/Diocese's argument that the Attorney General's involvement in this litigation somehow supports the ECUSA/Diocese's invocation of § 57-2.02 as a defense. This Court has not, as of this date, granted the Attorney General's motion to intervene, and the Attorney General, while an *amicus* on the § 57-9(A) constitutional issues, is not a party to this litigation. Nor is this Court persuaded that the mere fact that a Court of this Commonwealth is presiding over this § 57-9(A) litigation and may ultimately render a decision adverse to the ECUSA/Diocese gives a party justification for invocation of § 57-2.02 which otherwise would not exist. Suffice it to say, this Court is not a party to this litigation, and any decision this Court makes regarding § 57-9(A) will not convert the status of this Court from that of presiding officer to a party litigant.

In addition, although it is not necessary to consider federal law in regard to the resolution of the present motion, the manner in which the Religious Freedom Restoration Act ("RFRA") has been interpreted lends abundant support to this Court's decision to deny leave to amend. RFRA is substantially similar to § 57-2.02, and reads in pertinent part:

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b). . . .

(b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person

 (1) is in furtherance of a compelling governmental interest; and

 (2) is the least restrictive means of furthering that compelling governmental interest.

 (c) Judicial relief. A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

42 U.S.C. § 2000bb-1 (LexisNexis 2008).

 Multiple federal courts have concluded that RFRA "is applicable only to suits to which the government is a party." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) *cert. denied*, 127 S. Ct. 190, 166 L. Ed. 2d 142 (2006); see also *Rweyemamu v. Cote*, 520 F.3d 198, 203, n. 2 (2d Cir. 2008) ("[W]e think the text of RFRA is plain, in that it requires *the government* to demonstrate that application of a burden to a person is justified by a compelling governmental interest. Thus, we do not understand how it can apply to a suit between private parties, regardless of whether the government is capable of enforcing the statute at issue.") (internal citations omitted); *Redhead v. Conference of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 218 (E.D. N.Y. 2006) ("The court has strong reservations in proceeding on the assumption that the RFRA is applicable in a suit between private parties, especially considering the plain language of the statute that a party asserting an RFRA claim or defense may "obtain appropriate relief against *a government*."); *Hankins v. Lyght*, 441 F.3d 96, 115 (2d Cir. 2006) (Sotomayor, J., dissenting) ("[T]he majority concedes that it is unable to locate a single court holding that directly supports its novel application of RFRA to a suit between private parties. This is telling, for Congress enacted RFRA over twelve years ago. The plain language of the statute, its legislative history, and its interpretation by courts over the past twelve years demonstrate that RFRA does not apply to suits between private parties.") (citations omitted); Judge Sotomayor's dissent refers to the *Hankins* Court's holding, which was that RFRA did in fact apply to a dispute between private parties. Two years later, however, in *Rweyemamu v. Cote*, 520 F.3d 198 (2d Cir. 2008), another panel of the Second Circuit clarified, distinguished, and expressed reservations about the holding in *Hankins*, stating as follows:

> Refuting the defendants' argument that RFRA did not apply to their case in any event because it concerned a dispute between purely private parties and did not involve the government, the *Hankins* court held that RFRA applied because the federal statute at issue (the ADEA) was enforceable by a government agency (the EEOC); the government therefore could have been a party to the suit, and the court reasoned that the application of RFRA should not vary depending on whether the party actually bringing suit is a private party or the EEOC. . . .

> *Notwithstanding our own doubts about Hankins's determination that RFRA applies to actions between private parties* when the offending federal statute is enforceable by a government agency, there is no need for us to wrestle with RFRA's applicability because the defendants in this case, unlike in *Hankins*, have waived a RFRA defense.

*Id.* at 203-04 (emphasis added) (citations omitted). Thus, *Rweyemamu* casts doubt upon whether *Hankins* even remains good law. Further, it is clear that an analogy between the instant litigation and *Hankins* is unavailing, since unlike the ADEA, which was enforceable by the EEOC, § 57-9(A) is not enforceable by a government agency, and the government therefore could not have been a party to the instant litigation in the way that the government could have been a party in *Hankins*.

Also of note is the fact that the RFRA's definition of "government" is very similar to the definition of "government entity" in § 57-2.02, in that the RFRA defines "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2(1) (LexisNexis 2008).

## IV. *Conclusion*

This Court finds that, as in *Hetland*, it would be "empty . . . to grant [the ECUSA/Diocese's] amendment knowing that the portion amended would be met with a [motion to strike] and that such [motion to strike] would have to be sustained." The ECUSA/Diocese's Motion for Leave to Amend Answers to § 57-9 Petitions is therefore denied.

June 6, 2008

*Order*

The Court is in receipt of the parties' joint submission regarding legal issues that may be resolved without an additional evidentiary hearing. The parties state that there is just one issue that, at the present time, they can all agree is an issue that can be resolved without further evidence: "May the Court approve a petition under Va. Code § 57-9(A) without analyzing the factors used in *Green v. Lewis*, 221 Va. 547, 272 S.E.2d 181 (1980), to determine whether the Episcopal Church or the Diocese of Virginia has a proprietary or contractual interest in the properties at issue?"

The Court assumes that the "factors" referenced above are those set out in this sentence from *Green*: "In determining whether the A.M.E. Zion Church has a proprietary interest in the Lee Chapel property, we look to our own statutes, to the language of the deed conveying the property, to the constitution of the general church, and to the dealings between the parties." *Id.* at 555. Regarding this issue, the CANA Congregations assert in the joint submission that "this issue has been fully briefed, argued, and submitted to the Court, and . . . the Court has already resolved the statutory component of the issue." ECUSA and the Diocese "disagree that the issue has been fully briefed or argued, or submitted to the Court, and that the Court has resolved any component of the issue."

Although this Court does not agree with the manner in which the question is phrased, the Court does agree that this issue submitted jointly by the parties can be decided as a question of law without the taking of additional evidence. Therefore, the purpose of this Order is to set a schedule for the briefing of this matter. The fact that the Court is setting a briefing schedule should not be interpreted as a rejection of the CANA Congregations' position that the matter has been both briefed and resolved. Rather, the Court is setting a briefing schedule because ECUSA and the Diocese assert that they have not yet been heard on this issue. In addition, the Court adds several other questions that should be addressed in these briefs, all of which the Court believes are pure questions of law which can be resolved without taking additional evidence.

The questions the parties shall address in their briefs are as follows:

(1) Did the Supreme Court of Virginia, in *Green v. Lewis*, hold that a trial court presiding over a § 57-9(A) petition must consider the factors set out in *Green v. Lewis* in addition to making the determinations actually set

out in § 57-9(A)? Does the holding of *Green v. Lewis* apply only to proceedings under § 57-15 or does it apply to proceedings brought under § 57-9 as well?

(2) Has the Court in its April 3, 2008, opinion already resolved the issue described in Question 1 above, as asserted by the CANA Congregations?

(3) What is the meaning of the phrase "if the determination be approved by the court" as that phrase is used in § 57-9(A)? Specifically, once this Court determines that § 57-9(A) has been properly invoked, is the "approval" limited to a review of the vote taken or does it permit, or even require, as ECUSA and the Diocese assert, that the Court examine various other considerations, including those set forth in *Green v. Lewis*?

(4) What is the meaning of the phrase "shall be conclusive as to the title to and control" of the property in question, as that phrase is used in § 57-9(A)?

(5) What is the meaning of the phrase "congregation whose property is held by trustees," as that phrase is used in § 57-9(A)? Specifically, is Mr. Hurd correct when he asserted at oral argument on May 28th, 2008, that the phrase "congregation whose property is held by trustees" is not simply a reference to the property that is the subject of the § 57-9(A) petition but, rather, requires the Court to make an initial determination, prior to the Court's consideration of the validity of the vote, as to "who" owns the property at issue?

Each of the five issues listed above will be decided on the basis of the papers filed without oral argument.

The briefing schedule is as follows:

Parties' opening briefs: file by 4 p.m. on Monday, June 16th. Page limit: 20 pages;

Parties' responsive briefs: file by 4 p.m. on Monday, June 23rd. Page limit: 10 pages;

Parties' reply briefs: file by 4 p.m. on Thursday, June 26th. Page limit: 5 pages.

ECUSA and the Diocese will share their page limit. The CANA Congregations will share their page limit.

Because of the possibility that the resolution of these questions may, in the view of the parties, impact upon the constitutional issues, the Amici may, if they wish, file one brief of their own of no more than 10 pages by Monday, June 23rd at 4 p.m. So ordered this 6th day of June 2008.

June 27, 2008

The Court has now received and reviewed the briefs filed by all parties in response to this Court's June 6, 2008, order. In that order, this Court posed five questions to the parties, each of which the Court today resolves as matters of law. Those questions, and this Court's decisions regarding those five questions, are as follows.

(1) Did the Supreme Court of Virginia, in *Green v. Lewis*, hold that a trial court presiding over a § 57-9(A) petition must consider the factors set out in *Green v. Lewis*, in addition to making the determinations actually set out in § 57-9(A)? Does the holding of *Green v. Lewis* apply only to proceedings brought under § 57-15, or does it apply to proceedings brought under § 57-9 as well?

*Decision of the Court*: In this Court's April 3, 2008, Letter Opinion (hereinafter § 57-9 Opinion, 2008 Va. Cir. LEXIS 22), the Court found that "there is no controlling case law on point with the issues confronting this Court, and that "[i]ndeed, there is almost no case law that can even be characterized as bearing on the issues before this Court." § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22 at *130. The Court's view of the matter has not changed. *Green v. Lewis* is not a case interpreting or applying § 57-9(A). *Green* is a case interpreting and applying Va. Code § 57-15. ECUSA/Diocese argue that *Green* began as a § 57-9 case, and that therefore, the holding of *Green v. Lewis* applies to any case brought under § 57-9(A). See ECUSA/Diocese Resp. Br. Pursuant to June 6, 2008, Order at 1 ("[T]hey [the CANA Congregations] do not and cannot deny that both parties' pleadings invoked § 57-9, there was a congregational vote, those materials were before the Court, and, indeed, the Court quoted the congregation's resolutions."). ECUSA/Diocese likewise argue that the case of *Trustees of Cave Rock Brethren Church v. Church of the Brethren*, No. 1802 (Va. Cir. June 20, 1976) (unpublished), a Botetourt County Circuit Court case, was "explicitly litigated under § 57-9." (ECUSA/Diocese Opening Br. Pursuant to June 6, 2008, Order). *Cave Rock* never reached any of the issues that this Court is faced with, however. Moreover, *Cave Rock* involved the withdrawal of a single congregation from a supercongregational church. Finally, the petitioners invoked the portion of § 57-9 that applies to independent and autonomous congregations. (At the time *Cave Rock* was decided, § 57-9 had not yet been divided into sections lettered A and B). Thus, *Cave Rock* is not helpful.

This is incorrect for two reasons.

(1) Although ECUSA/Diocese are correct that the initial petition filed by the Pastor of the departing congregation in *Green*, Wesley J. Green, mentioned "§ 57-9," Pastor Green's invocation of this statutory section appears to be nothing more than "a basis for invoking the court's equitable jurisdiction." (CANA Congregations' Opening Br. Pursuant to the Court's June 6, 2008, Order.) The CANA Congregations correctly state in their brief that "[n]either petition [as originally filed with the circuit court that decided *Green*] contains any allegation (or denial) that (1) a 'division' had occurred in the AME Zion Church with which the congregation was affiliated, or (2) the congregation voted to affiliate with a 'branch' of the divided body." (CANA Congregations' Opening Br. Pursuant to the Court's June 6, 2008, Order.) Nowhere in the Chesterfield Circuit Court's eventual opinion or order does the trial court even cite § 57-9. See CANA Congregations' Opening Br. Pursuant to the Court's June 6, 2008, Order, Exs. A & B. Similarly, the briefs filed before the Supreme Court of Virginia in that case could not possibly lead a reader to believe that this was a § 57-9(A) case. See CANA Congregations' Opening Br. Pursuant to the Court's June 6, 2008, Order, Exs. C & D. And, finally, there is the Supreme Court of Virginia's decision in *Green*, which, in this Court's opinion, clearly establishes that the decision made by the Supreme Court of Virginia is under § 57-15, not § 57-9.

(2) This conclusion is corroborated by the circumstances giving rise to the suit in *Green*. That is because *Green* involved the withdrawal of a single congregation from a hierarchical church. Moreover, there was no alleged "division" within the A.M.E. Zion Church, which was the church to which the departing congregation in *Green* was attached. In other words, there was not even a colorable claim of division which could give rise to invocation of § 57-9(A).

ECUSA/Diocese further argue that, in addition to the holding of *Green*, the following language from *Norfolk Presbytery*, 214 Va. 500, 201 S.E.2d 752 (1974), suggests that this Court may not apply the plain language of § 57-9(A) to the instant dispute: "[I]t is proper to resolve a dispute over church property by considering the statutes of Virginia, the express language in the deeds, and the provisions of the constitution of the general church." *Id.* at 505. But *Norfolk Presbytery*, just like *Green*, did not involve invocation of § 57-9(A). ECUSA/Diocese concede this point, stating that "[t]here are many Virginia Code sections under which a property dispute between congregations (or majority factions thereof) and a general church might begin. In *Norfolk Presbytery*, it was § 57-15." (ECUSA/Diocese Resp. Br. Pursuant to June 6, 2008, at 3, n. 3.) And, while ECUSA/Diocese may argue that it ought not

make a difference that § 57-9 was not the subject of the opinion, this Court finds just to the contrary. Section 57-9(A) places a very substantial burden on the moving party, e.g. they must prove that there is a division, the requirements of attachment and branch must be met, and, of course, there is the requirement of a majority vote. Only if every criteria is met can § 57-9(A) be properly invoked and church property disputes resolved in accordance with the statute. To argue, in effect, that there is no material or practical difference between § 57-9 and § 57-15 is to give neither statute its proper due and to give *Norfolk Presbytery* and similar cases an application and breadth for which there is no support in the law.

In sum, *Green v. Lewis* does not hold that a trial court presiding over a § 57-9(A) petition must consider the *Green* factors in addition to making the determinations actually required by § 57-9(A), nor is that the import of the decision. Further, the holding of *Green* applies to § 57-15 proceedings, not § 57-9 proceedings.

(2) Has the Court in its April 3, 2008, opinion already resolved the issue described in Question 1 above, as asserted by the CANA Congregations?

*Decision of the Court*: Even if the Court did not squarely address Question # 1 in its April 3, 2008, opinion, it does so now. See Answer to Question # 1.

(3) What is the meaning of the phrase "if the determination be approved by the court" as that phrase is used in § 57-9(A)? Specifically, once this court determines that § 57-9(A) has been properly invoked, is the "approval" limited to a review of the vote taken or does it permit, or even require, as ECUSA and the Diocese assert, that the court examine various other considerations, including those set forth in *Green v. Lewis*?

*Decision of the Court*: For the answer to the question as to the meaning of "if the determination be approved by the court," this Court first looks to the various orders that were entered pursuant to petitions filed under the predecessor statute to § 57-9 in the time period directly following the passage of that original statute. These petitions were filed by congregations seeking to join one branch or the other of a hierarchical church that had divided. In looking at the language of the various orders entered by Virginia courts in response to such petitions, it becomes clear as to what the meaning of the phrase "if the determination be approved by the court" actually means.

For example, Plaintiffs' Ex. 96 contains an order from the Augusta County CL Order Book, entered on June 28, 1867, which reads as follows:

> A Religious Congregation of Methodists in the town of Staunton this day presented to the Court certain papers in which it is recited and claimed that "the .Baltimore Conference of the Methodist Episcopal Church severed its connection with the General Conference of said Church, by resolution adopted during its [illegible] in Staunton, Va., in March, 1861 and in February, 1866 by a unanimous vote, formed a union with the Methodist Episcopal Church South" – which the said Congregation is one of the congregations of the said Baltimore Conference, known as Staunton Station, in Rockingham District, and which the said Congregation of Staunton Station having assembled at their Church on the [illegible] day of April, 1867, to determine to which division of the Church they should thereafter belong; and the question having been submitted to the communicants and pew holders and pew-owners of said congregation over twenty-one years of age – it was determined by vote of the majority of the whole number, that said congregation should thereafter belong to the Methodist Episcopal Church South; and it appearing to the Court from an inspection of the said papers that the vote of the said Congregation has been fairly taken, according to the provisions of the Act of Assembly in such cases made and provided, and that of 118 members of the said Congregation, entitled to vote [illegible] voted in accordance with the determination of the Congregation, and the remaining 17 either failed or refused to vote – the Court doth approve the proceedings of the said Congregation and their said determination, as having been taken and ascertained according to law, and doth order that such approval be entered of record; and that the said papers be filed and preserved by the Clerk among the records of the Court.

(Pls.' Ex. 96, "Augusta County CL Order Book 6/28/1867.")

Similarly, Plaintiffs' Ex. 97, which is an order from the Augusta County CL Order Book, entered on November 20, 1867, states as follows:

A Religious congregation of Presbyterians, worshipping at [illegible], in Augusta County, this day presented to the Court certain papers, in which it is recited and claimed, that "whereas the church to which this church congregation has been attached, has been divided, and now exists as two separate and distinct Presbyterian Churches, the one known as the "Presbyterian Church in the United States of America," and the other as the "Presbyterian Church in the United States" – and that the said Congregation of [illegible] having assembled in their church on the [illegible] day of November, 1867, to determine to which branch of the said church they should thereafter belong, and the question having been submitted to the pew-holders and pew-owners of said congregation over twenty-one years of age – it was determined by vote of the majority of the whole number, that said congregation should thereafter belong to the Presbyterian Church in the United States (South), and it appearing to the Court, from an inspection of the said papers that the vote of the said Congregation has been fairly taken according to the provisions of the Act of Assembly in such cases made and provided, and that of 163 members of said Congregation entitled to vote, 118 voted in accordance with the determination of the congregation, and the remaining 45 either failed or refused to vote – the Court doth approve the proceedings of said Congregation and their said determination, as having been taken and ascertained according to law, and doth order that such approval be entered of record; and that the said papers be filed and preserved by the Clerk among the records of the Court.

(Pls.' Ex. 97, "Augusta Co CL Order Book 11/12/1867.") See also, Pls.' Ex. 98, "Augusta Co. CL Order Book 11/20/1867, Pls.' Ex. 118, "Rockbridge Co. CL Order Book, 9/26/1867, and Pls.' Ex. 119, "Rockbridge Co. CL Order Book, 4/17/1869," which each contain similar language in regard to the particular court's consideration of the congregational vote.

In addition, relevant case law, which has previously been explicated in full within this Court's § 57-9 Opinion, 2008 Va. Cir. LEXIS 22, also supports the Court's holding as to the meaning of "if the determination be approved by the court." For example, in *Hoskinson v. Pusey*, 73 Va. (32 Gratt.) 428 (1879), the Supreme Court of Virginia addresses the predecessor statute to § 57-9. Its discussion of that statute is telling.

It is also insisted that the action of the congregation of "Harmony" church, after the conference at Alexandria held in 1866, operated to transfer the title and control of the property to that portion of the congregation which adhered to the Methodist Episcopal Church South. That action has already been adverted to, and is claimed to have been had under an act of the general assembly, passed February 18th, 1867 (acts of 1866-7, ch. 210, pp. 649, 650; Code of 1873, ch. 76, § 9), which had the effect, as contended, to transfer the control and use of the property as aforesaid. It is not clear, from the evidence, whether this action of the congregation was had before or after the passage of the act referred to. I should rather infer that it was in 1866, before the act was passed. If that were so, of course there would be nothing in the point made by the appellants on the operation of the act. But suppose it was after the passage of the act. It is a sufficient answer to the claim of the appellants based on this statute, that it does not appear by the record that the provisions of the statute have been fully complied with. The portion bearing on this case reads as follows: "And whereas divisions have occurred in some churches or religious societies to which such religious congregations have been attached, and such divisions may hereafter occur, it shall, in any such case, be lawful for the communicants and pewholders over twenty-one years of age, by a vote of a majority of the whole number, as soon as practicable after the passage of this act, or whenever such division shall occur, to determine to which branch of the church or society such congregation shall thereafter belong; and which determination shall be reported to the said court, and, if approved, shall be so entered on the minutes, and shall be conclusive as to the title to and control of any property held in trust for such congregation, and shall be respected and enforced accordingly in all the courts of this commonwealth.

A vote of the members of the congregation[1] was taken at some time, as already stated, but there is no evidence that the determination of the congregation manifested by the vote was

---

[1] Here the *Hoskinson* Court refers to the particular congregation seeking to invoke the statute in that case.

reported to the circuit court of Loudoun county, approved by that court, and so entered on its minutes. Compliance with these requirements is essential to the effect given by the statutes.

*Id.* at 439-40.

Thus, the *Hoskinson* Court sets forth the "requirements" that are essential in order for the statute to have its effect: (1) a determination of the congregation manifested by a vote; (2) a report of that vote to the appropriate circuit court; and (3) approval of that vote by the circuit court. Nowhere does *Hoskinson* suggest that the various "factors" similar to those set forth in *Green v. Lewis* must also be examined in order to give effect to the statute.

Likewise, in *Finley v. Brent*, 87 Va. 103, 12 S.E. 228 (1890), the Supreme Court of Virginia describes the lower court's finding regarding a petition that had been filed in the circuit court pursuant to the predecessor statute to § 57-9 as follows:

The circuit court of Northumberland county dismissed the bill of the plaintiffs, by virtue of the provisions of the act of the Legislature of 1867, (Sess. Acts, pp. 649-50), providing that, in the contingency of a division of any religious society, it should be lawful for a majority to determine to which branch such congregation shall hereafter belong, which determination, duly reported to court, should conclude questions as to the property held in trust for such congregation.

*Id.* at 108. Although the Supreme Court in *Finley* held that the predecessor statute to § 57-9, as applied, violated the Contracts Clause, and thus gave effect to the 1860 deed at issue, *Finley*'s brief discussion of the "act of the Legislature of 1867" is telling. For, as in *Hoskinson*, nowhere in that brief discussion is found any reference to "factors" similar to those described in *Green v. Lewis*.

Thus, in light of the above orders and case law, the definition of "if the determination be approved by the court" becomes clear. That phrase, in fact, means that the Court must consider whether the congregational vote was "fairly taken,"[2] in accordance with the provisions of § 57-9(A). Thus, the word "if" as used within § 57-9(A) does not mean that this Court can or should consider the factors set forth in *Green v. Lewis*, a case that did not involve the application of § 57-9(A).

---

[2] See *supra*, Pls.' Ex. 96 & 97.

(4) What is the meaning of the phrase "shall be conclusive as to the title to and control" of the property in question, as that phrase is used in § 57-9(A)?

*Decision of the Court*: Once the Circuit Court approves the determination of the congregation as to which branch of a church or society such congregation shall belong, the Court's approval under § 57-9(A) "shall be conclusive as to the title to and control of any property held in trust for such congregation. . . ." There is nothing ambiguous or elusive in this language. Conclusive means final. In other words, if a trial court finds § 57-9(A) to have been properly invoked (as this Court has done), and if a trial court finds § 57-9(A) to be constitutional (which this Court does today, except in regard to the Contracts Clause issue which is not yet decided), and if the trial court approves the determination of the congregation regarding its majority vote as to its choice of branch, this then becomes a matter decided. In that event, and only as to those churches that filed § 57-9(A) petitions, the declaratory judgment actions will have been rendered moot. If, on the other hand, the trial court ultimately rules that the Contracts Clause claim renders § 57-9(A) unconstitutional as applied to one or more of the churches that have filed § 57-9(A) petitions, the declaratory judgment actions regarding those churches must be heard and decided, because petitioners, in that event, will not be able to avail themselves of the division statute. In addition, if the Court does not approve the majority vote determination under § 57-9(A) as to one or more churches, the declaratory judgment actions regarding those churches must be heard and decided.

(5) What is the meaning of the phrase "congregation whose property is held by trustees," as that phrase is used in § 57-9(A)? Specifically, is Mr. Hurd correct when he asserted at oral argument on May 28, 2008, that the phrase "congregation whose property is held by trustees" is not simply a reference to the property that is the subject of the § 57.9(A) petition but, rather, requires the Court to make an initial determination, prior to the Court's consideration of the validity of the vote, as to "who" owns the property at issue?

*Decision of the Court*: ECUSA/Diocese contended at the May 28, 2008, hearing on the constitutional issues that the 2005 amendments to § 57-9 were substantive and constitute a change in the law. The Court does not find merit in this contention. This is confirmed by a reading of the legislative history surrounding the 2005 amendments, which confirms that the phrase "whose property is held by trustees" was also added to § 57-13, and § 57-14.

These changes were implemented by the legislature simultaneously with the addition of § 57-16.1. The purpose of § 57-16.1, added in the wake of *Falwell v. Miller*, 203 F. Supp. 2d 624 (W.D. Va. 2002), was to allow churches in Virginia to incorporate. See 2005 Va. ALS 772 (LexisNexis 2008) ("*synopsis*: An Act to amend and reenact Sections 57-7.1 through 57-11, 57-13, 57-14, 57-15, 57-16, 57-17, 57-21, and 57-32 of the Code of Virginia and to amend the Code of Virginia by adding a section numbered 57-16.1, relating to conversion of church entities and church property to corporate status."). Viewed in context, the phrase "whose property is held by trustees" was added in order to make clear that § 57-9 can be invoked only in the event that property is held by trustees, and not when the property is held in other forms, such as corporate.

ECUSA/Diocese's argument that the phrase "whose property" should be read by this Court to mean that this Court is required to make a determination of ownership prior to determining whether a congregation has satisfied the requirements of § 57-9(A) would, in fact, make § 57-9(A) a nullity. This is because the purpose of § 57-9(A) is to settle the question of ownership of property that is held by trustees in the event of a division. This Court will not interpret a statute so as to deprive it of its independent meaning. Rather:

> [t]he rules of statutory interpretation argue against reading any legislative enactment in a manner that will make a portion of it useless, repetitious, or absurd. On the contrary, it is well established that every act of the legislature should be read so as to give reasonable effect to every word and to promote the ability of the enactment to remedy the mischief at which it is directed.

*Jones v. Conwell*, 227 Va. 176, 181, 314 S.E.2d 61 (1984).

Thus, the phrase "whose property is held by trustees" is simply a reference to the property at issue. These six words, added to § 57-9(A) in 2005, do not change the substantive meaning of the statute. The Court would also note that ECUSA/Diocese make a claim within their briefs which amounts to an argument that they should be allowed to prove that the CANA Congregations have waived the right to invoke § 57-9(A). Because the issue of waiver was not posed to the parties within the Court's five questions, the Court does not address that issue within this opinion. Any party wishing to address the issue of waiver should file an appropriate motion.

ECUSA/Diocese further argue that Va. Code § 57-7.1, enacted in 1993, requires this Court to make a preliminary determination of ownership before embarking on a § 57-9 analysis. The Court finds no merit in this position, because § 57-7.1 did not change long-established precedent in Virginia regarding trusts for general hierarchical churches. 57-7.1 states as follows:

> Every conveyance or transfer of real or personal property, whether inter vivos or by will, which is made to or for the benefit of any church, church diocese, religious congregation, or religious society, whether by purchase or gift, shall be valid.
>
> Any such conveyance or transfer that fails to state a specific purpose shall be used for the religious and benevolent purposes of the church, church diocese, religious congregation, or religious society as determined appropriate by the authorities which, under its rules or usages, have charge of the administration of the temporalities thereof.
>
> No such conveyance or transfer shall fail or be declared void for insufficient designation of the beneficiaries in any case where the church, church diocese, religious congregation, or religious society has lawful trustees in existence, is capable of securing the appointment of lawful trustees upon application as prescribed in § 57-8, is incorporated, has created a corporation pursuant to § 57-16.1, or has ecclesiastical officers pursuant to the provisions of § 57-16.

Va. Code § 57-7.1 (2008). Clause 3 of the 1993 Act which enacted this section states that it is "declaratory of existing law." 1993 Va. ALS 370 (LexisNexis 2008).

Since its original enactment in 1993, this code section has been interpreted to validate transfers of real property for the benefit of local congregations. See *Trustees of Asbury United Methodist Church v. Taylor & Parrish, Inc.*, 249 Va. 144, 152, 452 S.E.2d 847 (1995) ("[A]cquisition and ownership of property by churches are matters governed by statute, in accordance with Article IV, § 14, of the Constitution of Virginia. *Code § 57-7.1 validates transfers, including transfers of real property, for the benefit of local religious organizations.*") (citing *Norfolk Presbytery v. Bollinger*, 214 Va. 500, 506, 201 S.E.2d 752, 757 (1974)) (emphasis added). The Attorney General has found likewise:

> The provisions of Article 2 relate to property held "for the benefit of any *church,* church diocese, *religious congregation, or religious society.*" Section 57-7.1 (emphasis added). While these terms are not defined, the Supreme Court of Virginia has held that Article 2 encompasses property held for the benefit of a local congregation, as opposed to property held by a larger hierarchical body.

1996 Va. Op. Att'y Gen. 194 (April 4, 1996) (citation omitted). Thus, § 57-7.1 did not change the policy in Virginia, which is that church property may be held by trustees for the local congregation, not for the general church. See, e.g., *Reid v. Gholson,* 229 Va. 179, 187, n. 12, 327 S.E.2d 107 (1985) ("Because of this strong tradition, we have, for instance, refused to adopt the "implied trust" theory in favor of hierarchical churches, [*Norfolk Presbytery v. Bollinger*], 214 Va. 500, 201 S.E.2d 752 (1974), notwithstanding its acceptance by the federal courts and by the majority of our sister states, and we have refused to apply the traditional chancery doctrine of judicial cy pres, in favor of religious trusts for indefinite beneficiaries. *Gallego's Ex'ors v. Attorney General,* 30 Va. (3 Leigh) 450, 24 Am. Dec. 650 (1832)); see also *Norfolk Presbytery v. Bollinger,* 214 Va. 500, 507, 201 S.E.2d 752 (1974) ("As express trusts for super-congregational churches are invalid under Virginia law, no implied trusts for such denominations may be upheld."); *Hoskinson v. Pusey,* 73 Va. (32 Gratt.) 428, 431 (1879) ("The deed is the same in substance as the deed in *Brooke v. Shacklett;* 54 Va. (13 Gratt.) 301, and the construction must be the same. According to that construction, the conveyance is not for the use of the Methodist Episcopal Church in a general sense. Such a conveyance in this state would be void. But it is a conveyance for the use of a particular congregation of that church, in the limited and local sense of the term, that is, for the members, as such, of the congregation of the Methodist Episcopal Church, who, from their residence at or near the place of public worship, may be expected to use it for that purpose.").

## June 27, 2008

On April 3, 2008, the Court issued its letter opinion (hereinafter "§ 57-9 Opinion" (2008 Va. Cir. LEXIS 22)) on the applicability of Va. Code § 57-9(A) (hereinafter "§ 57-9(A)"). In that Opinion, this Court set forth the factual background of the present dispute in its entirety and, in its legal analysis, concluded that the CANA Congregations had properly invoked § 57-9(A).

Because that factual background has been previously set forth in that April 3, 2008, opinion, the Court today dispenses with any recitation of the facts, except those facts that relate specifically to the constitutional issues before this Court.

Post-decision briefs regarding the constitutionality of § 57-9(A) have been filed by all parties, including amicus briefs from the Commonwealth, and from various churches and other parties (hereinafter "Church Amici"). These churches and parties include the General Council on Finance and Administration of the United Methodist Church; the African Methodist Episcopal Zion Church; the African Methodist Episcopal Church; the Worldwide Church of God; the Rt. Rev. Charlene Kammerer, Bishop of the Virginia Annual Conference of the United Methodist Church; W. Clark Williams, Chancellor of the Virginia Annual Conference of the United Methodist Church; the Dioceses of Southern Virginia and Southwestern Virginia; Clifton Kirkpatrick, Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.); the General Conference of Seventh-Day Adventists; the Rev. Dr. G. Wilson Gunn, Jr., General Presbyter National Capital Presbytery; Elder Donald F. Bickhart, Stated Clerk, Presbytery of Eastern Virginia; the Virginia Synod of the Evangelical Lutheran Church in America, the Metropolitan Washington, D.C., Synod of the Evangelical Lutheran Church in America; the Virginia District Board, Church of the Brethren, Inc.; and the Mid-Atlantic II Episcopal District of the African Methodist Episcopal Zion Church.

The one discrete constitutional issue raised in those briefs which the Court does not resolve in today's opinion is the assertion by ECUSA/Diocese that § 57-9(A) violates their rights under the Contracts Clause. Specifically, they assert that applying § 57-9(A) to the instant dispute impairs their contractual rights by not giving appropriate weight and significance to the contractual relationships between the local congregations and the hierarchical church. Because the resolution of this issue may require an evidentiary hearing, the Court has previously separated the resolution of this issue from the resolution of all other constitutional issues. The Court would note, however, that the parties disagree and this Court has not yet resolved the question of whether the Contracts Clause issue applies to all the CANA Congregations or only to those with deeds pre-dating the 1867 enactment of § 57-9.

On May 28th, 2008, this Court heard oral argument as to whether § 57-9(A) violates the First Amendment to the United States Constitution.

If a statute satisfies the Establishment and Free Exercise Clauses of the U.S. Constitution, it is also consistent with the Virginia Constitution's corresponding religious freedom provisions. See, e.g., *Cha v. Korean Presbyterian Church of Washington*, 262 Va. 604, 612, 553 S.E.2d 511 (2001) (holding that "[t]he Free Exercise Clause of the First Amendment to the Constitution of the United States and Article I, § 16, of the Constitution of Virginia do not permit a circuit court to substitute its secular judgment for a church's judgment when the church makes decisions regarding the selection or retention of its pastor"); *Habel v. Industrial Dev. Auth.*, 241 Va. 96, 100, 400 S.E.2d 516 (1991) (describing language in Article I, § 16, of the Constitution of Virginia as "analogous" to the Establishment Clause); *Reid v. Gholson*, 229 Va. 179, 190-91, 327 S.E.2d 107 (1985) (describing Article I, § 16, of the Constitution of Virginia and the First Amendment to the U.S. Constitution as containing equivalent "guarantees of religious freedom"); *Mandell v. Haddon*, 202 Va. 979, 989, 121 S.E.2d 516 (1961)) (holding that the law in question did not violate either Article I, § 16, of the Constitution of Virginia or the First Amendment to the Constitution of the United States).

The Court has reviewed the briefs and hearing transcript in their entirety. For the reasons stated below, the Court finds that the application of § 57-9(A) to the instant dispute does not violate the First Amendment, nor does it violate the Equal Protection and Takings Clauses of the U.S. Constitution.

## Summary

Each law enacted by the legislature "carries a strong presumption of validity." *City Council of the City of Emporia v. Newsome*, 226 Va. 518, 523, 311 S.E.2d 761 (1984)). So strong is this presumption, that "[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely [a Court] may think a political branch has acted." *Vance v. Bradley*, 440 U.S. 93, 97, 99 S. Ct. 939, 59 L. Ed. 2d 171 (1979). As a corollary to this principle, "[t]he party challenging an enactment has the burden of proving that the statute is unconstitutional, and every reasonable doubt regarding the constitutionality of a legislative enactment must be resolved in favor of its validity." *Marshall v. Northern Va. Transp. Auth.*, 275 Va. 419, 428, 657 S.E.2d 71 (2008).

Set against this heavy presumption, ECUSA/ Diocese's various arguments against the constitutionality of § 57-9(A) fail. Although ECUSA/Diocese assert that this Court has entered into the forbidden religious thicket – indeed, entangled and enmeshed itself in that thicket – this Court finds their arguments unpersuasive, not least because their arguments are predicated in no small measure on a characterization of this Court's April 3rd opinion that bears only a passing resemblance to the opinion itself. That is with one exception. Apparently because it believes this represents the most egregious example of this Court's thicket intrusions, ECUSA's counsel at oral argument quoted *verbatim* the Court's concluding paragraph from its April 3rd opinion. That paragraph reads as follows:

> ECUSA/Diocese argue that the historical evidence demonstrates that it is the "major" or "great" divisions within nineteenth-century churches that prompted the passage of § 57-9, such as those within the Presbyterian and Methodist Churches. ECUSA/Diocese argue that the current "dispute" before this Court is not such a "great" division, and, therefore, this is yet another reason why § 57-9(A) should not apply. The Court agrees that it was major divisions such as those within the Methodist and Presbyterian churches that prompted the passage of § 57-9. However, it blinks at reality to characterize the ongoing division within the Diocese, ECUSA, and the Anglican Communion as anything but a division of the first magnitude, especially given the involvement of numerous churches in states across the country, the participation of hundreds of church leaders, both lay and pastoral, who have found themselves "taking sides" against their brethren, the determination by thousands of church members in Virginia and elsewhere to "walk apart" in the language of the Church, the creation of new and substantial religious entities, such as CANA, with their own structures and disciplines, the rapidity with which the ECUSA's problems became that of the Anglican Communion, and the consequent impact – in some cases the extraordinary impact – on its provinces around the world, and, perhaps most importantly, the creation of a level of distress among many church members so profound and wrenching as to lead them to cast votes in an attempt to disaffiliate from a church which has been their home and heritage throughout their lives, and often back for

generations. Whatever may be the precise threshold for a dispute to constitute a division under § 57-9(A), what occurred here qualifies.

§ 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *172-174.

Far from proving that the Court has improperly tread upon religious territory, this paragraph establishes that the Court has not. This paragraph summarizes six principal factual bases for the Court's finding of division: (1) numerous churches across the country have separated from ECUSA; (2) hundreds of church leaders have participated in these separations; (3) thousands of church members in Virginia have separated as well; (4) new religious entities have been established with their own codes and procedures; (5) the dispute within ECUSA has spilled over into the Anglican Communion, as demonstrated by such objective criteria as the Church of Nigeria's revision of its Constitution; and (6) the decision by church members in Virginia to seek to disassociate from ECUSA and the Diocese was anything but a casual decision about a matter of little consequence to the members. If, as ECUSA suggests, a § 57-9 division can be provoked by a disagreement over something as trivial as "the color of the carpet," see The Episcopal Church's Supplemental Br. on Constitutional Issues (hereinafter "ECUSA Br.") at 29, the disagreement that actually brought the parties before this Court – as objectively measured by the tangible acts taken by many church members to disaffiliate from the church that had been their home – was of a different quality entirely.

Not one of these six findings is religious or ecclesiastical or involve the Court in church polity or doctrine. They are secular findings; indeed, in some cases, they are actual numerical findings, hardly the stuff of religious entanglement.

For the reasons stated below, the Court today holds that § 57-9(A) does not violate the Free Exercise Clause, it does not violate the Establishment Clause, it does not violate the Equal Protection Clause and it does not violate the Takings Clause. Simply put, § 57-9(A) was constitutional in 1867 when it became the law of the Commonwealth of Virginia, and it remains constitutional in 2008. Once again, the Court emphasizes that, when it refers to § 57-9(A) as constitutional, it is not addressing the Contracts Clause attack on the constitutionality of § 57-9(A).

*Analysis*

As a preliminary matter, this Court will not entertain a facial challenge to § 57-9(A). Facial challenges to statutes are highly disfavored within our legal system, as confirmed by the U.S. Supreme Court just three months ago:

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. . . . Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people."

*Washington State Grange v. Washington State Republican Party, U.S.*, 128 S. Ct. 1184, 1191, 170 L. Ed. 2d 151 (2008) (citations omitted).

Rather, the Court will consider only whether § 57-9(A) is constitutional as applied to the specific private parties before this Court and the specific facts presented by those parties. The opinion first sets forth a brief history of United States Supreme Court jurisprudence as it relates specifically to the law surrounding church property. The opinion next addresses each of the major arguments set forth by ECUSA/ Diocese and explains how each of those arguments fails to rebut the presumption that § 57-9(A) is constitutional as applied by this Court.

## I. *History of U.S. Supreme Court's Church Property Law Jurisprudence*

### A. *Kedroff v. Saint Nicholas Cathedral*

In 1952, the U.S. Supreme Court first considered whether a lower court's resolution of a church property dispute contravened the First Amendment to the U.S. Constitution. See *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696,

730, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976) (Rehnquist, J., dissenting) ("The year 1952 was the first occasion on which this Court examined what limits the *First* and *Fourteenth Amendments* might place upon the ability of the States to entertain and resolve disputes over church property.") Although ECUSA specifically relies upon *Watson v. Jones*, 80 U.S. 679, 20 L. Ed. 666 (1872), to support its position, *Watson* does not provide the Court with helpful guidance in the resolution of the First Amendment issues currently before this Court. *Watson* stands for the proposition that, when issues regarding church "discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest [authority within a hierarchical church] to which the matter has been carried, the legal tribunals must accept such decisions as final and as binding on them in their application to the case before them." *Id.* at 727. However, *Watson* was based upon federal common law, a point ECUSA acknowledges. See ECUSA Br. at 3 (stating that *Watson* "was technically decided as a matter of federal common law"). Most significantly, the Virginia Supreme Court has expressly stated that it is not bound by the holding of *Watson*. See *Norfolk Presbytery v. Bollinger*, 214 Va. 500, 504, 201 S.E.2d 752 (1974) ("We are not bound by the rule of *Watson v. Jones* . . . for that case rested on federal law.").

In *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 73 S. Ct. 143, 97 L. Ed. 120 (1952) (hereinafter *Kedroff*), the particular dispute before the Court involved "[t]he right to the use and occupancy of a church in the city of New York," the Saint Nicholas Cathedral. *Id.* at 95. In order to resolve the dispute, the Court was forced to determine essentially who was the "true" bishop. See *id.* at 96-97 ("Determination of the right to use and occupy Saint Nicholas depends upon whether the appointment of Benjamin by the [Moscow-controlled] Patriarch or the election of the Archbishop for North America by the convention of the American churches validly selects the ruling hierarch for the American churches.") In deciding this question, the Court of Appeals of New York had applied Article 5-C of the Religious Corporations Law of New York. *Id.* at 97. In order to justify its application of Article 5-C to the facts before it, the Court of Appeals of New York reasoned that, "[s]ince certain events . . . indicated to [the Court of Appeals] that the Russian Government exercised control over the central church authorities and that the American church acted to protect its pulpits and faith from such influences . . . the Legislature's reasonable belief in such conditions justified the State in enacting [Article 5-C] to free the American group from infiltration of . . . atheistic or subversive influences." *Id.* at 108-09.

The U.S. Supreme Court ultimately held that Article 5-C was constitutionally invalid, because it violated the Free Exercise Clause. See *id.* at 107-08. Specifically, the U.S. Supreme Court found it impermissible that the express language of the statute actually "regulate[d] church administration, the operation of the churches, the appointment of clergy, by requiring conformity to church statutes 'adopted at a general convention (sobor) held in the City of New York on or about or between October fifth to eighth, nineteen hundred thirty-seven'. . . ." and that the "statute [also] require[d] the New York churches to 'in all other respects conform to, maintain, and follow the faith, doctrine, ritual, communion, discipline, canon law, traditions, and usages of the Eastern Confession (Eastern Orthodox or Greek Catholic Church)'. . . ." *Id.* at 107-08. In sum, the Court concluded that it was simply impermissible for the New York legislature to "[b]y fiat," replace "one church administrator with another," and to "prohibit[] the free exercise of an ecclesiastical right, the Church's choice of its hierarchy." *Id.* at 119. The Court thus reversed and remanded the case to the Court of Appeals of New York "for such further action as it deem[ed] proper and not in contravention of th[e] [*Kedroff*] opinion. *Id.* at 121.

On remand, the Court of Appeals of New York essentially arrived at the same decision as it had previously, "holding that, by reason of the domination . . . of the Patriarch by the secular authority in the U.S.S.R.," the Patriarch's appointee therefore "could not under the common law of New York validly exercise the right to occupy the Cathedral." *Kreshik v. Saint Nicholas Cathedral,* 363 U.S. 190, 191, 80 S. Ct. 1037, 4 L. Ed. 2d 1140 (1960). The U.S. Supreme Court unanimously reversed, holding that, even though, during this second round, the Court of Appeals of New York based its decision on common law, rather than on a statute, the inquiry as to who was the "true" leader of the church was still as constitutionally impermissible as it had been in *Kedroff. Id.* at 191.

B. *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*

In *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969) (hereinafter "*Hull Church*"), the U.S. Supreme Court held that the First Amendment does not "permit a civil court to award church property on the basis of the interpretation and significance the civil court assigns to aspects of church doctrine." *Id.* at 441. In *Hull Church,* two local churches that were

formerly part of the Presbyterian Church in the United States, "voted to withdraw from the general church and to reconstitute the local churches as an autonomous Presbyterian organization." *Id.* at 442. At the trial court level, the case had been submitted to the jury, who were "instructed to determine whether the actions of the general church 'amount to a fundamental or substantial abandonment of the original tenets and doctrines of the [general church], so that the new tenets and doctrines are utterly variant from the purposes for which the [general church] was founded'." *Id.* at 443-44. This abandonment of the original doctrines and tenets of the faith included, as summarized by the Supreme Court of Georgia:

> ordaining of women as ministers and ruling elders, making pronouncements and recommendations concerning civil, economic, social, and political matters, giving support to the removal of Bible reading and prayers by children in the public schools, adopting certain Sunday School literature and teaching neo-orthodoxy alien to the Confession of Faith and Catechisms, as originally adopted by the general church, and causing all members to remain in the National Council of Churches of Christ and willingly accepting its leadership which advocated named practices, such as the subverting of parental authority, civil disobedience, and intermeddling in civil affairs"; also "that the general church has . . . made pronouncements in matters involving international issues such as the Vietnam conflict and has disseminated publications denying the Holy Trinity and violating the moral and ethical standards of the faith."

*Id.* at 443 (quoting 224 Ga. 61, 159 S.E.2d 690, 692 (1968)). The jury held for the local churches, and the Supreme Court of Georgia affirmed that verdict. *Id.* at 444. The U.S. Supreme Court reversed. *Id.* In two key passages from its opinion, the Court fixed the boundary lines within which future Supreme Court jurisprudence would evolve. The Court clarified that "[i]t is obvious . . . that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment." *Id.* at 449. The Court further states:

> Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all

property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.

*Id.* at 449. The Court held that the Georgia Supreme Court had in fact resolved the property dispute before it by resolving matters involving "religious doctrine and practice" in that:

> The departure-from-doctrine element of the implied trust theory which [the Georgia courts] applied requires the civil judiciary to determine whether actions of the general church constitute such a "substantial departure" from the tenets of faith and practice existing at the time of the local churches' affiliation that the trust in favor of the general church must be declared to have terminated. This determination has two parts. The civil court must first decide whether the challenged actions of the general church depart substantially from prior doctrine. In reaching such a decision, the court must of necessity make its own interpretation of the meaning of church doctrines. If the court should decide that a substantial departure has occurred, it must then go on to determine whether the issue on which the general church has departed holds a place of such importance in the traditional theology as to require that the trust be terminated. A civil court can make this determination only after assessing the relative significance to the religion of the tenets from which departure was found. Thus, the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion – the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role.

*Id.* at 449-50.

Thus, the *Hull Church* Court held that it violates the First Amendment when courts decide church property disputes based upon the courts' or juries' own opinion as to whether the church in question has substantially departed "from the tenets of faith and practice existing at the time of the local churches' affiliation." *Id.* at 450.

C. *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*

In *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 90 S. Ct. 499, 24 L. Ed. 2d 582 (1970) (hereinafter *Maryland & Va. Churches*), the Court dismissed, "for want of a substantial federal question," the "General Eldership" of the Church of God's appeal of a Maryland Court of Appeals' decision in favor of "two secessionist congregations." *Id*. at 367. In deciding in favor of the two departing congregations:

> the Maryland Court of Appeals [had] relied upon provisions of state statutory law governing the holding of property by religious corporations, upon language in the deeds conveying the properties in question to the local church corporations, upon the terms of the charters of the corporations, and upon provisions in the constitution of the General Eldership pertinent to the ownership and control of church property.

*Id*. at 367 (citations omitted).

The appellants argued that the Maryland statutory provisions relied upon by the Maryland Court "as applied, deprived the General Eldership of property in violation of the First Amendment." *Id*. at 367-68.

The U.S. Supreme Court rejected this argument in a *per curiam* opinion, holding that "the Maryland court's resolution of the dispute involved no inquiry into religious doctrine" *Id*. at 368. Justice Brennan wrote a concurrence in which he specifically states that "a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id*. Justice Brennan prescribed three different "approaches" that he believed each of the fifty States could permissibly choose in deciding how to resolve church property disputes. These include (1) deferring to the decision of a majority of the members of a church with a congregational polity, or "within a church of hierarchical polity by the highest authority that has ruled on the dispute at issue, unless 'express terms' in the 'instrument by which the property is held' condition the property's use or control in a specified manner" (*Id*. at 368-69 (footnotes omitted)); (2) the "neutral principles of law" approach, in which church property ownership may

be resolved "by studying deeds, reverter clauses, and general state corporation laws," for example; or (3) "the passage of special statutes governing church property arrangements in a manner that precludes state interference in doctrine?" *Id*. at 370.

D. *Serbian Eastern Orthodox Diocese for the U.S.A. and Canada v. Milivojevich*

In *Serbian Eastern Orthodox Diocese for the U.S.A. and Canada v. Milivojevich*, 426 U.S. 696, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976) (hereinafter *Milivojevich*), the U.S. Supreme Court held that judicial and legislative inquiries forbidden by the First Amendment include: (1) questions regarding whether internal church proceedings regarding the suspension and removal of church leaders are "procedurally and substantively defective under [a particular church's] internal regulations," *id*. at 698, and (2) the validity of a church's "reorganization," as, for example, a change in diocesan boundaries. *Id*. at 708. In *Milivojevich*, a bishop of the American-Canadian Diocese of the Serbian Orthodox Church (referred to by the U.S. Supreme Court as the "Mother Church") who had been defrocked by that Mother Church and then replaced by someone else, brought suit in an Illinois Circuit Court. Upon removing the former bishop and then installing his replacement, the Mother Church promptly reorganized the former single diocese into three separate ones. *Id*. at 698. The Supreme Court of Illinois ultimately "held that the proceedings of the Mother Church respecting [the defrocked bishop] were procedurally and substantively defective under the internal regulations of the Mother Church and were therefore arbitrary and invalid," and in addition "invalidated the Diocesan reorganization into three Dioceses." *Id*. at 698. Underlying this doctrinal dispute was the issue as to who would hold the church property in question, but as the *Milivojevich* Court emphasized, "th[e] case essentially involves not a church property dispute, but a religious dispute the resolution of which under [U.S. Supreme Court precedent] is for ecclesiastical and not civil tribunals." *Id*. at 709.

The *Milivojevich* Court held that the Illinois Supreme Court had tread upon forbidden ground, since "[f]or civil courts to analyze whether [a church's] ecclesiastical actions . . . are . . . 'arbitrary' must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question." *Id*. at 713. The Court made clear that "this is exactly the inquiry that the First

Amendment prohibits." *Id.* at 713. The Court pointed out that the Illinois Supreme Court's holding essentially "ordered the Mother Church to reinstate as Bishop one who espoused views regarded by the church hierarchy to be schismatic and which the proper church tribunals have already determined merit severe sanctions." *Id.* at 720. Justices William Rehnquist and John Paul Stevens dissented, presumably because they "[r]egard[ed] the Court's approach as one of blind deference." Kent Greenawalt, *Hands Off! Civil Court Involvement in Conflicts Over Religious Property*, 98 Colum. L. Rev. 1843, 1859 (1998). Justices Rehnquist and Stevens protested that:

> [a] casual reader of some of the passages in the Court's opinion could easily gain the impression that the State of Illinois had commenced a proceeding designed to brand Bishop Dionisije as a heretic, with appropriate pains and penalties. But the state trial judge in the Circuit Court of Lake County was not the Bishop of Beauvais, trying Joan of Arc for heresy; the jurisdiction of his court was invoked by petitioners themselves, who sought an injunction establishing their control over property of the American-Canadian Diocese of the church located in Lake County.
>
> The jurisdiction of that court having been invoked for such a purpose by both petitioners and respondents, contesting claimants to Diocesan authority, [the court] was entitled to ask if the real Bishop of the American-Canadian Diocese would please stand up.

*Id.* at 725-26 (Rehnquist, J., dissenting).
The dissent further declared that:

> Unless civil courts are to be wholly divested of authority to resolve conflicting claims to real property owned by a hierarchical church, and such claims are to be resolved by brute force, civil courts must of necessity make some factual inquiry even under the rules the Court purports to apply in this case.

*Id.* at 726. Both Justice Rehnquist and Justice Stevens joined in the majority opinion in *Jones v. Wolf*, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979), which this Court discusses next.

E. *Jones v. Wolf*

The most recent U.S. Supreme Court case to consider a church property dispute was *Jones v. Wolf*, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979). *Jones* considered "a dispute over the ownership of church property following a schism in a local church affiliated with a hierarchical church organization," the Presbyterian Church in the United States ("PCUS"). *Id.* at 597. The *Jones* Court described the polity of the PCUS as follows:

> The PCUS has a generally hierarchical or connectional form of government, as contrasted with a congregational form. Under the polity of the PCUS, the government of the local church is committed to its Session in the first instance, but the actions of this assembly or "court" are subject to the review and control of the higher church courts, the Presbytery, Synod, and General Assembly, respectively. The powers and duties of each level of the hierarchy are set forth in the constitution of the PCUS, the Book of Church Order, which is part of the record in the present case.

*Id.* at 597-98.

The issue considered in *Jones* was "whether civil courts, consistent with the First and Fourteenth Amendments to the Constitution, may resolve the [church property] dispute on the basis of 'neutral principles of law,' or whether they must defer to the resolution of an authoritative tribunal of the hierarchical church." *Id.*

The *Jones* Court provides the following background regarding the particular church property in dispute:

> The Vineville Presbyterian Church of Macon, Ga., was organized in 1904, and first incorporated in 1915. Its corporate charter lapsed in 1935, but was revived and renewed in 1939, and continues in effect at the present time.
>
> The property at issue and on which the church is located was acquired in three transactions, and is evidenced by conveyances to the "Trustees of [or 'for'] Vineville Presbyterian Church and their successors in office," or simply to the "Vineville Presbyterian Church." The funds used to acquire the property were contributed entirely by local church members.

Pursuant to resolutions adopted by the congregation, the church repeatedly has borrowed money on the property. This indebtedness is evidenced by security deeds variously issued in the name of the "Trustees of the Vineville Presbyterian Church," or, again, simply the "Vineville Presbyterian Church."

In the same year it was organized, the Vineville church was established as a member church of the Augusta-Macon Presbytery of the Presbyterian Church in the United States (PCUS).

*Jones v. Wolf*, 443 U.S. 595, 597, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979) (citations omitted).

The relevant facts in *Jones* are as follows. At a congregational meeting of the Vineville Presbyterian Church of Macon, Georgia, held on May 27, 1973, the congregation voted 164 to 94 to separate from the PCUS. Promptly following this vote, the "majority immediately informed the PCUS of the action, and then united with another denomination, the Presbyterian Church in America." *Id.* at 598. The minority who had voted against separation from the PCUS, "remained on the church rolls for three years," even though the minority had effectively "ceased to participate in the affairs of the Vineville church and conducted [its] religious activities elsewhere." *Id.* at 598. Following this "schism within the Vineville congregation, the Augusta-Macon Presbytery appointed a commission to investigate the dispute and, if possible, to resolve it." *Id.* The Presbytery ultimately concluded that, despite the vote, the 94-member minority faction was in fact "the true congregation of Vineville Presbyterian Church," and thus "withdr[ew] from the majority faction 'all authority to exercise office derived from the [PCUS]'."*Id.* 'Both the trial court and Supreme Court of Georgia disregarded the Presbytery's decision, and instead decided that the majority faction of the Vineville Presbyterian Church should be awarded the property. *Id.* at 599.

*Jones* begins its analysis by emphasizing that "the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice," and in addition "[a]s a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." *Id.* at 602 (citing *Milivojevich*, 426 U.S. at 710; *Maryland & Va. Churches*, 396 U.S. at 368; *Hull Church*, 393 U.S. at 449). The *Jones* Court emphasized, however, that the First Amendment does not require any kind of cookie-cutter approach that all fifty states must follow.

Instead, *Jones* quotes Justice Brennan's words from *Maryland & Va. Churches*, in which he declared that "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id*. at 602 (quoting *Maryland & Va. Churches*, 396 U.S. at 368) (Brennan, J., concurring) (emphasis in original). *Jones* rejected the proposition, voiced by the *Jones* dissent, that "the First Amendment requires the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes. . . ." *Id*. at 605. The essential problem with the compulsory deference approach, as articulated by the *Jones* majority, is that:

> Under [the compulsory deference] approach . . . civil courts would always be required to examine the polity and administration of a church to determine which unit of government has ultimate control over church property. In some cases, this task would not prove to be difficult. But in others, the locus of control would be ambiguous, and "[a] careful examination of the constitutions of the general and local church, as well as other relevant documents, [would] be necessary to ascertain the form of governance adopted by the members of the religious association." In such cases, the suggested rule would appear to require "a searching and therefore impermissible inquiry into church polity." The neutral-principles approach, in contrast, obviates entirely the need for an analysis or examination of ecclesiastical polity or doctrine in settling church property disputes.

*Id*. at 605 (citations omitted).

The *Jones* majority also responded to the dissent's contention that "neutral principles" violated the Free Exercise rights of the PCUS, a hierarchical church: "[T]he neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods." *Id*. at 606. *Jones* sets forth several suggestions as to ways in which "the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property." *Id*. The suggested alternatives include "modify[ing] the deeds or the corporate charter to include a right of reversion or trust in favor of the general church,"

or altering "the constitution of the general church . . . to recite an express trust in favor of the denominational church." *Id.* The *Jones* majority believed that the "burden involved in [implementing any of the alternatives listed above] will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form." *Id.*

The Supreme Court ultimately remanded the case for further proceedings in order to determine "whether the Georgia neutral-principles analysis was constitutionally applied on the facts of th[e] case." *Id.* This was because the Georgia state courts that had thus far considered the case had "each concluded without discussion or analysis that the title to the property was in the local church and that the local church was represented by the majority rather than the minority." *Id.* at 607. *Jones* held that:

> [i]f in fact Georgia has adopted a presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means . . . this would be consistent with both the neutral-principles analysis and the First Amendment. Majority rule is generally employed in the governance of religious societies. Furthermore, the majority faction generally can be identified without resolving any question of religious doctrine or polity. Certainly, there was no dispute in the present case about the identity of the duly enrolled members of the Vineville church when the dispute arose, or about the fact that a quorum was present, or about the final vote.

*Id.* (citation omitted).

The *Jones* Court emphasized, however, that, if a state adopts a presumptive rule of majority representation, there must also be an escape hatch, and that a "State may adopt *any* method of overcoming the majoritarian presumption, so long as the use of that method does not impair free-exercise rights or entangle the civil courts in matters of religious controversy." *Id.* at 608 (emphasis added). Thus, *Jones* concludes with a remand to the Supreme Court of Georgia, to essentially allow Georgia to "explicitly state[]" the actual law of Georgia in regard to the resolution of church property disputes. *Id.* at 608. The Court stated that "[i]f the Georgia Supreme Court adopts a rule of presumptive majority representation on remand, then it should also specify how, under Georgia law, that presumption may be overcome." *Id.* at 608, n. 5.

One scholar describes the *Jones* majority's inquiry on remand as essentially asking the question whether:

> the [Georgia] courts [had] merely adopted an ordinary, acceptable, legal presumption that, absent a contrary indication, a majority represents a voluntary religious association, or had the courts relied on laws and regulations of the Presbyterian Church to determine who represents the local church? The latter reliance could require civil courts to resolve debatable matters of church polity – the very difficulty that doomed the efforts of the Illinois courts in *Serbian Eastern Orthodox Diocese*. An ordinary presumption of majority rule, however, would be entirely appropriate.

Kent Greenawalt, *Hands Off: Civil Court Involvement in Conflicts over Religious Property*, 98 Colum. L. Rev. 1843, 1860 (1998).

Thus, *Jones* invests the States with broad discretion to resolve church property disputes. Its holding demonstrates a deference to, and respect for, an individual State's prerogative to specify its own specific method of resolving church property disputes. In addition, *Jones* stands for the proposition that the First Amendment does not require a particular State's civil court to defer to a hierarchical church's view as to who has control over a particular piece of church property.

Indeed, *Jones* was in fact a watershed case in church property law jurisprudence, as recognized by the dissent. Justice Powell, the author of that dissent, in fact complained that:

> The schism in the Vineville church ... resulted from disagreements among the church members over questions of doctrine and practice. Under the Book of Church Order, these questions were resolved authoritatively by the higher church courts, which then gave control of the local church to the faction loyal to that resolution. The Georgia courts, as a matter of state law, granted control to the schismatic faction, and thereby effectively reversed the doctrinal decision of the church courts. This indirect interference by the civil courts with the resolution of religious disputes within the church is no less proscribed by the First Amendment than is the direct decision of questions of doctrine and practice.

*Id.* at 613 (Powell, J., dissenting).

The *Jones* dissent further protests that:

> In essence, the Court's instructions on remand therefore allow the state courts the choice of following the long-settled rule of *Watson v. Jones* or of adopting *some other rule, unspecified by the Court, that the state courts view as consistent with the First Amendment. Not only questions of state law but also important issues of federal constitutional law thus are left to the state courts for their decision*, and, if they depart from *Watson v. Jones*, they will travel a course left totally uncharted by this Court.

*Id.* at 616 (emphasis added).

## II. § 57-9(A), As Applied, Is Constitutional

In light of the above case law, the Court now turns to an analysis of the various arguments asserted by both ECUSA and the Diocese in their attempt to convince the Court that § 57-9(A) is unconstitutional. For the reasons stated below, the Court is not persuaded by any of these arguments.

### A. § 57-9(A), As Applied, Does Not Violate the Free Exercise Clause

The Free Exercise Clause of the First Amendment to the United States Constitution reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const., Amend. I. It was made applicable to the States by the Fourteenth Amendment. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301, 120 S. Ct. 2266, 147 L. Ed. 2d 295 (2000).

ECUSA/Diocese first argue that § 57-9(A) violates the federal and state Free Exercise Clauses. (Suppl. Constitutional Br. of the Diocese of Virginia Pursuant to April 3, 2008, Order (hereinafter "Diocese Br.") at 2.) They make several sub-arguments in support of this claim, each of which the Court addresses below.

#### 1. Application of Jones v. Wolf to the Instant Case

ECUSA/Diocese argue that the "holding" of *Jones v. Wolf* was that "amending a hierarchical church's governing documents before a dispute [arises] [i]s sufficient to resolve property disputes in favor of the hierarchical

church and ... civil courts [are] bound to follow the adopted provisions." (Diocese Br. at 3-4.) In other words, they argue that "applying section § 57-9(A) as the Congregations suggest would override the property provisions in the Episcopal Church's and the Diocese's governing documents, and such provisions are binding on civil courts." (Diocese Br. at 3.)

ECUSA/Diocese further claim that they amended their governing documents to "provide that all real and personal property held by or for the benefit of any Church or Mission within the Diocese is held in trust for the Episcopal Church and the Diocese," in order to specifically respond to what ECUSA/Diocese perceived to be the holding of *Jones*. See Diocese Br. at 3-4. That is, ECUSA/Diocese assert that *Jones v. Wolf* held that an express trust will *always* overcome a State's presumption of majority rule. The problem with ECUSA/Diocese's argument is that the Supreme Court of Virginia, in *Green v. Lewis*, 221 Va. 547, 272 S.E.2d 181 (1980), an opinion issued after the United States Supreme Court's decision in *Jones v. Wolf*, specifically states: "As express trusts for supercongregational churches are invalid under Virginia law, no implied trusts for such denominations may be upheld." *Id.* at 555 (quoting *Norfolk Presbytery v. Bollinger*, 214 Va. 500, 507, 201 S.E.2d 752 (1980)). Thus, the Supreme Court of Virginia's holding in *Green v. Lewis* does not square with ECUSA/Diocese's interpretation of *Jones v. Wolf*'s holding.

ECUSA/Diocese further put forward the following interpretation of *Jones*: They argue that *Jones* "involved two issues and a two-step analysis," in that:

> The first question in *Jones v. Wolf* was who owned the property, was it the property of the congregation or the property of the general church. And in that case, the Georgia Supreme Court looked at the constitution, the Book of Church Order for the Presbyterian Church, and found in there nothing like what is in our documents, found no trust in favor of the general church and, therefore, as its first step, the Georgia Supreme Court said, based on neutral principles, the property belongs to the congregation.
>
> But then there was a second step in *Jones v. Wolf*, because there were two competing groups of people, each claiming to be the congregation. And what the Court said in the second part of *Jones v. Wolf* – which is encapsulated under Roman numeral IV of that decision – is that, when you have that

issue – which is not an issue for most of these churches – when you have that issue, who is the true congregation, then you can look to a majoritarian presumption which is defeasible by the church having taken some steps in advance.

(Transcript from May 28, 2008, Constitutional Issues Hearing, at 19:7-20:6.) (hereinafter "Const. Tr.") This argument regarding *Jones'* supposed "two-step" analysis has also been presented in the Episcopal Church and Diocese of Virginia's Opening Brief Pursuant to June 6, 2008, Order. See ECUSA/Diocese Opening 6/6 Br. at 16-19 (describing their theory as to *Jones'* supposed "two-stage analysis").

The Court notes that, to the extent that counsel for the Diocese suggest that *Jones v. Wolf* posed a situation utterly different from that involved in the instant case, the Court disagrees. *Jones v. Wolf* presents a scenario similar to the instant facts, an exception being that the PCUS, unlike ECUSA/Diocese, did not have any language of express trust within its governing documents. Indeed:

> [E]ven if *Jones* governed only disputes over which part of a congregation was entitled to the property, it would still govern here. Historically, Virginia law has not recognized denominational trust interests in congregational property. . . . Moreover, [ECUSA/Diocese] is not seeking to use the properties at issue for denominational activities; it has asserted the interests of "loyal" Episcopalians who voted against disaffiliation. . . . That is consistent with the Church's canons, which do not assert outright ownership of congregational property, only a beneficial interest for congregational use. Thus, the underlying dispute here is effectively between different factions of the congregations.

(CANA Congregations' Responsive Br. Pursuant to the Court's June 6, 2008, Order at 10) (citations omitted).

As a preliminary matter, counsel for ECUSA/Diocese's description of *Jones'* holding as a "two-step" process is actually taken from the *Jones* dissent, not the *Jones'* majority. Second, while it is true that, unlike ECUSA/Diocese, the PCUS in *Jones* did not have "any language of trust in

favor of the general church" within its governing documents,[3] it is not accurate to characterize the "holding" of *Jones* as mandating that each of the fifty States must first check to see whether there is an express or implied trust within a church's governing documents before turning to a presumption of majority rule. If that were truly the holding of *Jones*, it would have made no sense for the majority to declare, toward the conclusion of its opinion, that:

> any rule of majority representation can always be overcome, under the neutral-principles approach, either by providing, in the corporate charter or the constitution of the general church, that the identity of the local church is to be established in some other way, or by providing that the church property is held in trust for the general church and those who remain loyal to it. Indeed, the State may adopt any method of overcoming the majoritarian presumption, so long as the use of that method does not impair free exercise rights or entangle the civil courts in matters of religious controversy.

*Jones*, 443 U.S. at 608.

If the holding of *Jones* truly is what ECUSA/Diocese argue that it is, which is that the First Amendment *requires* each of the fifty States to have a rule of majority presumption that is *always* defeasible by language of express trust in a hierarchical church's governing documents, how then, can the line, "Indeed, the State may adopt any method of overcoming the majoritarian presumption" be explained? Under ECUSA/Diocese's reading of *Jones*, it cannot. ECUSA/Diocese's reading of *Jones* renders the foregoing sentence entirely meaningless. In addition, ECUSA/Diocese's reading of *Jones* would render meaningless two other sentences within *Jones*, in which Justice Blackmun, quoting Justice Brennan's *Maryland & Va. Churches* concurrence, states that:

> the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith."

---

[3] See *Jones*, 443 U.S. at 601.

*Id.* at 602 (citation omitted).

In sum, ECUSA/Diocese misperceive the holding of *Jones*. The passage to which ECUSA/Diocese refer as *Jones*' "holding" simply provides suggestions as to ways in which a State might allow a hierarchical church to overcome a presumption of majority rule. That passage is as follows:

> The neutral-principles approach cannot be said to "inhibit" the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. *At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property.* They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, *the constitution of the general church can be made to recite an express trust in favor of the denominational church.* The burden involved in taking such steps will be minimal. And *the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.*

Diocese Br. at 4 (citing *Jones v. Wolf*, 443 U.S. at 606 (emphasis added by the Diocese)). In short, *Jones* grants States the freedom to develop their own church property rules.

### 2. § 57-9(A) Is a Neutral Law of General Applicability

ECUSA/Diocese next argue that § 57-9(A) violates the Free Exercise Clause in that it "discriminates against hierarchical churches by allowing congregational majorities that have disaffiliated to take church property, when no such rule applies to secular voluntary associations." (Diocese Br. at 10.) On this basis, they argue that § 57-9(A) is not a neutral, generally applicable law, because "it 'has no meaning within the secular context' and 'distinguishes churches and religious denominations from other groups in the broader context of Virginia law'." (Diocese Br. at 12 (citing *Falwell v. Miller*, 203 F. Supp. 2d 624, 630 (W.D. Va. 2002); *Church of Lukumi Babalu Aye v. City of*

*Hialeah*, 508 U.S. 520, 533, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)). ECUSA/Diocese argue that "Section § 57-9 lacks general applicability because it treats religious entities differently from secular entities 'on account of religious status'." (Diocese Br. at 12-13 (citing *Falwell*, 203 F. Supp. 2d at 631; *Lukumi*, 508 U.S. at 542-43)).

ECUSA/Diocese's position assumes that the Free Exercise Clause somehow mandates that the legislature treat church property disputes identically to disputes involving secular voluntary associations. It does not. And the cases cited by ECUSA Diocese, *Falwell* and *Lukumi*, fail as well to support this proposition.

For example, the *Falwell* court held that Article IV, § 14(20), of the Virginia Constitution, which prohibited the incorporation of churches, violated the U.S. Constitution. *Falwell*, 203 F. Supp. 2d at 626. But a state constitutional provision that imposes a blanket ban against incorporation for all churches and religious denominations is entirely distinguishable from § 57-9(A), which is a law that simply imposes a presumption of majority rule and applies only in the event that a religious body happens to experience a split.

As for *Lukumi*, that case in fact contradicts the position taken by ECUSA/Diocese. The Attorney General's analysis in this regard is helpful. Quoting *Lukumi*, the Attorney General states that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." (Commonwealth's Response to the Post-Decision Briefs (hereinafter "Commonwealth's Resp.") at 22 (quoting *Lukumi*, 508 U.S. at 531 (1993)).) Therefore, "if section § 57-9 is a neutral law of general applicability, then the Episcopal Church's Free Exercise claim fails." (Commonwealth's Resp. at 22.)

*Lukumi* sets forth the standard for determining whether or not a law is "neutral" and/or "generally applicable." Under *Lukumi*, neutrality refers to whether or not "the object of the law is to infringe upon or restrict practices *because of their religious motivation.*" (Commonwealth's Resp. at 23) (quoting *Lukumi*, 508 U.S. at 533) (emphasis added). If a law does so restrict or infringe, then it is not neutral. Likewise, "[t]he related principle of 'general applicability' forbids the government from 'impos[ing] burdens only on conduct motivated by religious belief in a 'selective manner'." (Commonwealth's Resp. at 23) (quoting *Lukumi*, 508 U.S. at 543).

Applying these standards from *Lukumi*, the Attorney General argues: "Section § 57-9 does not refer to a religious practice without a secular meaning discernible from the language or context. It does not single out the

Episcopal Church or hierarchical churches. Rather, the text refers simply to a means of holding church property. Thus, it is facially neutral." (Commonwealth's Resp. at 23) (citation omitted). Facial neutrality is not the end of the story, however, since a court must still "ask whether [a statute] embodies a more subtle or masked hostility to religion." (Commonwealth's Resp. at 23) (quoting *St. John's United Church of Christ v. Chicago*, 502 F.3d 616, 633 (7th Cir. 2007). Such subtle or masked hostility to religion may be detected by analyzing "the 'historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the [act's] legislative or administrative history'." (Commonwealth's Resp. at 23) (quoting *Lukumi*, 508 U.S. at 540.)

It cannot credibly be argued that either the historical background or legislative history leading up to the enactment of § 57-9 demonstrates a "subtle or masked hostility to religion." Rather, as this Court's § 57-9 Opinion makes clear, § 57-9 appears to have been passed in light of the various splits that occurred within multiple different religious denominations from the early to mid-nineteenth century. Thus, § 57-9 was likely passed with the "motivat[ion] to ensure prompt and peaceful resolutions of church property disputes." (Commonwealth's Resp. at 23.) The legislative history produced at trial indicates that one of the purposes of the passage of § 57-9 was "to protect local religious congregations who when their church divided were compelled to make a choice between the different branches of it, and to allow them in some such cases to take their property with them." § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *115 (citing Trial Tr. 224:1-8.) Thus, neither the historical context, nor the legislative history indicate that § 57-9 was motivated by any type of hostility to religion in general, and certainly not hostility directed specifically toward the Episcopal Church. In short, "[b]ecause the General Assembly was motivated by a non-discriminatory purpose – resolving property disputes quickly and peacefully when a denomination divided – § 57-9 is neutral and generally applicable." (Commonwealth's Resp. at 24.)

Finally, ECUSA/Diocese argue that § 57-9(A) violates the Free Exercise Clause because it treats church property differently from property of secular entities. Numerous other states, however, have laws regarding the disposition of church property. Indeed, many of them single out *specific religious denominations* for special treatment. See, e.g. CANA Congregations' Post-Decision Responsive Br. at 43, which cites N.Y. Relig. Corp. Law § 12(2) ("The trustees of an incorporated Protestant Episcopal church shall not vote upon any resolution or proposition for the sale,

mortgage, or lease of its real property, unless the rector of such church, if it then has a rector, shall be present, and shall not make application to the court for leave to sell or mortgage any of its real property without the consent of the bishop and standing committee of the diocese to which such church belongs. . . ."); Md. Code, Corps. & Ass'ns § 5-333(a) ("This part applies to every religious corporation formed in this State by a parish or separate congregation that is in union with or intending to apply for union with the convention of the Protestant Episcopal Church in the Diocese of Maryland. . . ."); *id.* § 5-335 ("A parish [of the Protestant Episcopal Church, Diocese of Maryland] may not be subdivided into a new parish or added in whole or in part to any existing parish unless approved by a majority vote of the vestry of each parish affected by the subdivision or addition"); Md. Code, Corps. & Ass'ns § 5-326 ("All assets owned by any Methodist Church . . . whether incorporated, unincorporated, or abandoned," [s]hall be held by the trustees of the church in trust for the United Methodist Church and [a]re subject to the discipline, usage, and ministerial appointments of the United Methodist Church. . . ."). This argument also presumes (erroneously) that a State may not pass statutes specifically governing the resolution of church property issues. As Justice Brennan stated in his concurrence in *Maryland & Va. Churches*, states may, in fact, pass "special statutes governing church property arrangements in a manner that precludes state interference in doctrine." 396 U.S. at 370.

### 3. The "Dumas Act" Is Distinguishable from § 57-9

In a further attempt to buttress their Free Exercise claims, ECUSA/Diocese argue that the fact that Alabama's "Dumas Act," which, over forty years ago, was held to violate the First Amendment, necessitates that this Court likewise strike down § 57-9. See *Goodson v. Northside Bible Church*, 261 F. Supp. 99, 104 (S.D. Ala. 1966), aff'd 387 F.2d 534 (5th Cir. 1967); see also *First Methodist Church of Union Springs v. Scott*, 284 Ala. 571, 226 So. 2d 632, 640 (1969). As a preliminary matter, this Court notes that the cases invalidating the Dumas Act pre-date *Jones v. Wolf* by about a decade. But even if these pre-*Jones* cases are still good law, a review of the Dumas Act demonstrates that it is in fact a drastically different statute from § 57-9.

The Dumas Act, as passed by the Alabama legislature, specifically and explicitly singled out protestant churches. See, for example, its definition of "Local church:" "Local church means any charge, church, parish, or mission of the Protestant faith, whether or not incorporated, in any city, town, or

county in Alabama. . . ." The Dumas Act, 58 Ala. Code § 104(b) (Supp. 1971). While that alone might not have doomed the statute, the Dumas Act was fatally flawed because it contained a "departure-from-doctrine" provision that was unconstitutional. See *Hull Church*, 393 U.S. at 449-50. Specifically, § 107 of the Dumas Act states:

> Whenever, as a result of action of the parent church or any of its authoritative subdivisions or its law-making body, the majority group of any local church shall determine that there has been a change of social policies, within the meaning hereof, or that any act, declaration, law, policy, social creed, or jurisdictional system of the parent church is contrary to the basic intent, understanding, or basic assumption existing between the contributors, donors, or grantors of the church property and the local church, or between such contributors, grantors or donors and any trustee of property held for the benefit of the local church or held by or for the use of the local church subject to the trust clause; and whenever such majority group shall find and determine that such act, declaration, or policy of the parent church is not only contrary to such basic intent, understanding, or assumption but that acquiescence therein would be contrary to the welfare of the local church or the peace, order, friendliness, or good will within the membership of the local church, or be inconsistent with the effective and harmonious continuation of church work, or involve the church in public controversy, thereupon the majority group shall have the right without sacrifice or loss of any title, interest, or matured equity or rights in property, funds, or benefits, to set up a local church or unit independent of the authority of the parent church; the local church or unit so set up shall be in corporate form as may be provided for under the laws of Alabama for the formation of church or non-profit charity corporations.

The Dumas Act, 58 Ala. Code § 107 (Supp. 1971).

There is simply no comparison between the Dumas Act and § 57-9, as "§ 57-9 contains no sect-specific language – it applies to any "congregation" attached to any "church or religious society," and it contains no "departure-from-doctrine requirement." (CANA Congregations' Post-Decision Responsive Brief (hereinafter "CANA Br.") at 24.) Section 57-9 states in its entirety:

A. If a division has heretofore occurred or shall hereafter occur in a church or religious society, to which any such congregation whose property is held by trustees is attached, the members of such congregation over 18 years of age may, by a vote of a majority of the whole number, determine to which branch of the church or society such congregation shall thereafter belong. Such determination shall be reported to the circuit court of the county or city, wherein the property held in trust for such congregation or the greater part thereof is; and if the determination be approved by the court, it shall be so entered in the court's civil order book, and shall be conclusive as to the title to and control of any property held in trust for such congregation, and be respected and enforced accordingly in all of the courts of the Commonwealth.

B. If a division has heretofore occurred or shall hereafter occur in a congregation whose property is held by trustees which, in its organization and government, is a church or society entirely independent of any other church or general society, a majority of the members of such congregation, entitled to vote by its constitution as existing at the time of the division, or where it has no written constitution, entitled to vote by its ordinary practice or custom, may decide the right, title, and control of all property held in trust for such congregation. Their decision shall be reported to such court, and if approved by it, shall be so entered as aforesaid, and shall be final as to such right of property so held.

Va. Code Ann. § 57-9 (2008).

4. Section 57-9(A), Considered with Other Provisions of the Virginia Code, Preserves a Hierarchical Church's Ability to Ensure That the Faction Loyal to the Hierarchical Church Will Retain the Church Property

ECUSA/Diocese's final argument related to the Free Exercise Clause is that § 57-9(A)'s "supposedly 'conclusive' rule of decision removes hierarchical churches from determinations regarding property ownership, disregarding neutral principles as defined by the Supreme Courts of the United States and Virginia." (Diocese Br. at 18.)

922

In fact, ECUSA/ Diocese could have, at any time within the past 140 years since § 57-9 (or the predecessor thereto) was originally passed, re-titled their properties in the name of a bishop or other ecclesiastical officer. Other religious entities in Virginia, by this means, have entirely put themselves beyond the reach of § 57-9(A). See Stipulations of Fact, ¶¶ 5-8, which state as follows:

> 5. Title to the real property of parishes (local congregations) in Virginia attached to the Roman Catholic Church is held in the name of the Bishop of the Diocese in which the parishes are located.
> 6. Title to the real property of parishes (local congregations) in Virginia attached to the Greek Orthodox Church in the Metropolis of New Jersey, which includes Greek Orthodox parishes in Virginia, is held in the corporate names of the parishes and no other, except as otherwise required by any applicable civil law.
> 7. Title to the real property of congregations in Virginia attached to the Foursquare Church is held in the name of the International Church of the Foursquare Gospel, a California religious corporation.
> 8. Title to the real property of congregations in Virginia attached to the Church of Jesus Christ of Latter-Day Saints (sometimes known as the Mormons) is held in the name of Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints, a Utah corporation sole, authorized to do business in Virginia.

If they had done so, they could have permanently avoided any potential application of § 57-9(A). ECUSA/Diocese protest that this 're-titling' argument dismisses as 'minimal' what would be a significant practical burden on the Episcopal Church and the Diocese." (Diocese Br. at 21.) They in fact argue that to place their Virginia properties in the name of an ecclesiastical officer, or to incorporate, would place a substantial burden upon their religious exercise. ECUSA/Diocese's argument becomes much less persuasive in light of the fact that Bishop Lee already holds about twenty-nine properties in his own name. Counsel for the Diocese testified that of these twenty-nine properties, some are "mission congregations," some are "full functioning churches," and some are "parish houses." (Const. Tr. at 33:8-21.) Thus, the

Diocese itself regularly, and of its own free will, engages in the very practice which it simultaneously protests "substantially burdens" its free exercise of religion.

During the hearing on constitutional issues, counsel for the Diocese also argued that re-titling all their properties in Virginia in the name of an ecclesiastical officer would "breed suspicion. It would breed resentment. It would provoke the very kinds of departures that we have seen today. All of this would distract the Church from its mission, would disturb the peace of the Church." (Const. Tr. 34:19-35:1.) This argument is unconvincing in light of the fact that ECUSA/Diocese concedes – indeed, they trumpet – the fact that they amended their governing documents after *Jones v. Wolf* in order to overcome a presumption of majority rule. Why the re-titling of deeds would be problematic when the amendment of governing documents is not problematic was not adequately explained.

ECUSA/Diocese claim that the State is dictating to it a certain method of property ownership and, thus, this violates the Free Exercise Clause. But the State is dictating no such thing. Section 57-9(A) leaves all denominations free to hold property in any manner they wish. However, if a religious society or church chooses to hold property by trustees in Virginia, then that religious society or church is subject to § 57-9(A). However, § 57-9(A) of course only applies in the limited circumstance in which there is a conflict within that religious society or church that leads to a division.

The Free Exercise Clause protects the free exercise of religion; it does not protect religious organizations from all administrative inconveniences that may arise from a religious organization's compliance with neutral laws of general applicability. See *Wisconsin v. Yoder*, 406 U.S. 205, 215-16, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) ("[T]o have the protection of the Religion Clauses, the claims must be rooted in religious belief. Although a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests.").

Even more importantly, ECUSA/Diocese's argument that re-titling would prove intolerably burdensome also proves problematic when one considers that the majority in *Jones* appears to disagree with ECUSA/Diocese's "burden" argument. In fact, *Jones* expressly states that one way in which a religious organization can avoid the presumptive rule of majority representation is to modify its deeds and describes any burden involved in making such a modification as "minimal." See *Jones v. Wolf*, 443 U.S. at 606.

In short, *Jones* requires an "escape hatch." And the Code of Virginia, by permitting church property to be held in the name of an ecclesiastical officer or in corporate form, satisfies that requirement. Section 57-9(A), as applied in the instant case, does not violate the Free Exercise Clause.

Va. Code § 57-16(A) states:

> Whenever the laws, rules, or ecclesiastic polity of any church or religious sect, society, or denomination commits to its duly elected or appointed bishop, minister, or other ecclesiastical officer, authority to administer its affairs, such duly elected or appointed bishop, minister, or other ecclesiastical officer shall have power to acquire by deed, devise, gift, purchase, or otherwise, any real or personal property, for any purpose authorized and permitted by its laws, rules, or ecclesiastic polity, and not prohibited by the laws of Virginia, and the power to hold, improve, mortgage, sell, and convey the same in accordance with such laws, rules, and ecclesiastic polity and in accordance with the laws of Virginia.

Va. Code Ann. § 57-16(A) (2008).

Va. Code § 57-16.1 states:

> Whenever the laws, rules, or ecclesiastic polity of an unincorporated church or religious body provide for it to create a corporation to hold, administer, and manage its real and personal property, such corporation shall have the power to (i) acquire by deed, devise, gift, purchase, or otherwise, any real or personal property for any purpose authorized and permitted by the laws, rules, or ecclesiastic polity of the church or body, and not prohibited by the law of the Commonwealth and (ii) hold, improve, mortgage, sell, and convey the same in accordance with such law, rules, and ecclesiastic polity, and in accordance with the law of the Commonwealth.

Va. Code Ann. § 57-16.1 (2008).

## B. *Section 57-9(A), As Applied, Does Not Violate the Establishment Clause*

ECUSA/Diocese argue that § 57-9(A) violates the Establishment Clause, arguing that it (1) violates the "neutrality rule," as enunciated in *Larson v. Valente*, and that it also (2) violates the "*Lemon* Test."

## 1. Larson v. Valente Is Inapplicable

ECUSA/Diocese claim that § 57-9(A) "fails to conform to the Establishment Clause's neutrality rule," which they describe as "[t]he principle that 'government should not prefer one religion to another, or religion to irreligion'." (Diocese Br. at 23) (citing *Board of Education v. Grumet*, 512 U.S. 687, 703, 704, 114 S. Ct. 2481, 129 L. Ed. 2d 546 (1994)). The Establishment Clause reads: "Congress shall make no law respecting an establishment of religion. . . ." The Fourteenth Amendment applies the Establishment Clause to the States. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940). In support of their position that § 57-9(A) violates this so-called neutrality rule, ECUSA/Diocese cite *Larson v. Valente*, 456 U.S. 228, 102 S. Ct. 1673, 72 L. Ed. 2d 33 (1982). ECUSA/Diocese argue that the *Larson* Court "invalidated the fifty per cent rule as a facial discrimination among religious groups," since the statute [struck down in *Larson*] was "not simply a facially neutral statute, the provisions of which happen[ed] to have a 'disparate impact' upon different religious organizations," but instead made "explicit and deliberate distinctions between different religious organizations." (Diocese Br. at 23-24 (citations omitted.)) The phrase "fifty per cent rule" refers to the Minnesota statute at issue in *Larson*, which "provided that only those religious organizations that received more than half of their total contributions from members or affiliated organizations would remain exempt from [certain state-imposed] registration and reporting requirements. . . ." *Larson*, 456 U.S. at 231-32. According to ECUSA/Diocese, "Section § 57-9(A) likewise 'makes explicit and deliberate distinctions between different religious organizations,' 'grants denominational preferences'," (Diocese Br. at 24) and thus should be struck down by this Court.

Along these same lines, the Church Amici focus upon this Court's observation regarding the "voting age" provision within § 57-9, and appear to suggest that this "voting age" provision somehow violates the neutrality rule, and "violates the prohibition against denominational preferences." (Church Amici Brief at 10.) The Church Amici state that "for the entirely illegitimate purpose of 'protecting' local congregations from 'a hierarchical church's constitution or canons,' the statute erects unique rules of decision for church property disputes – rules that draw civil courts into a theological thicket. . . .") (Church Amici Brief at 4) (citing § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *97).

The Church Amici attach far too much import to the Court's use of the word "protect" in reference to the voting age provision of § 57-9(A). What the Court wrote is that § 57-9(A) "appears to reflect a determination by the Virginia legislature to protect the voting rights of any local congregation which is subject to a hierarchical church's constitution or canons." § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *97. The Court could have just as easily used the word "ensure" in place of "protect," and the resulting meaning would have been the same. As to why the "over 18" requirement is in § 57-9(A) but not in § 57-9(B), the Court does not know why. Conceivably, the General Assembly may have believed that congregational churches, with their tradition of local control and majority rule, did not need the General Assembly to set out a voting age requirement. Whatever the rationale, however, this small distinction between § 57-9(A) and § 57-9(B) is of no constitutional significance. At the end of the day, both provisions require a majority vote.

ECUSA/Diocese's assertion that the fifty percent rule and § 57-9 are somehow similar is wrong. As the Attorney General states in his brief:

> the statute's text [in *Larson*] differentiated between religious sects based upon how much money they raised from their members. In sharp contrast to the statute at issue in *Larson*, the text of section § 57-9 does not make explicit and deliberate distinction between religious sects. The text does not state hierarchical churches are subject to the law while non-hierarchical churches are not, but rather applies based upon the form in which churches choose to hold property. It does not require that some denominations be treated differently from other denominations. It applies equally to all religious sects. When there is no facial discrimination between religious denominations, *Larson* is inapplicable.

(Commonwealth's Resp. at 15-16) (citations omitted).

During the constitutional issues hearing, counsel for the Diocese also seemed to suggest that, apart from the text of § 57-9, the historical context in which the statute was passed itself suggests discrimination against certain religious denominations. Counsel stated:

> During the first phase of this case, the Court was called upon to decide the meaning of several terms found in Section § 57-9, and during the course of that argument, the Congregations made

a point about the historical circumstances under which the original version of this statute was enacted. And surely, those circumstances were unique. The Bill of Rights did not apply to the States, Virginia had just lost our war for independence from the North, and the legislature was, perhaps understandably, less than sensitive to the constitutional rights of church hierarchies that appeared to be dominated by the North.

(Const. Tr. at 9:19-10:8). Evidence produced at trial, however, tends to negate the Diocese's apparent intimation that § 57-9 was passed by the Virginia legislature in an attempt to "get at" church hierarchies "dominated" by the North. Specifically, an expert witness for the CANA Congregations during the § 57-9 trial, confirmed that, among the Methodist petitions that were filed in 1867 or soon thereafter, not all were petitions from congregations seeking to affiliate with the southern branch of the Methodist church. Dr. Irons testified that he located at least one congregation that voted to join the northern branch and subsequently filed the appropriate petition with the local circuit court. See § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *118.

Further, as the CANA Congregations note, the holding in *Larson* turned heavily on the fact that "the legislative history [of the Minnesota statute at issue in *Larson*] evidenced an explicit intent to 'get at' the 'Moonies' but to protect the 'Roman Catholic Archdiocese,'" and thus "[i]t was against this backdrop that the Court held that the amendment's 'explicit and deliberate distinctions between different religious organizations' had the 'express design' of 'religious gerrymandering' and effecting a 'denominational preference,' warranting application of strict scrutiny." (CANA Br. at 42) (citations omitted). In contrast, the legislative history of § 57-9 demonstrates no such hostility or animus toward a specific denomination or religious sect.

## 2. Section 57-9(A) Does Not Violate the *Lemon* Test

Although ECUSA/Diocese argue that § 57-9(A) violates the *Lemon* test, their arguments are not persuasive. The so-called "*Lemon* test" is derived from *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971). The U.S. Supreme Court itself has frequently failed to apply *Lemon*. See, e.g. Commonwealth's Resp. at 12 (citing *Van Orden v. Perry*, 545 U.S. 677, 125 S. Ct. 2854, 162 L. Ed. 2d 607 (2005); *Zelman v. Simmons-Harris*, 536 U.S. 639, 122 S. Ct. 2460, 153 L. Ed. 2d 604 (2002); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 S. Ct. 2093, 150 L.

Ed. 2d 151 (2001); *Capitol Square Review & Advisory Bd. v. Pinette*; 515 U.S. 753, 115 S. Ct. 2440, 132 L. Ed. 2d 650 (1995); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995); *Lee v. Weisman*, 505 U.S. 577, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992); *Marsh v. Chambers*, 463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983)). Nevertheless, *Lemon* appears to have been revived in *McCreary County v. A.C.L.U.*, 545 U.S. 844, 901, 125 S. Ct. 2722, 162 L. Ed. 2d 729 (2005), and likewise continues to be employed by the Supreme Court of Virginia. See, e.g. *Virginia College Bldg. Auth. v. Lynn*, 260 Va. 608, 629, 538 S.E.2d 682 (2000). This Court therefore concludes that it should apply *Lemon*. According to *Lemon*, a statute is constitutional if (1) it has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not foster an excessive entanglement with religion. § 57-9 easily meets these three requirements.

### a. *Section 57-9(A) Has a Secular Purpose*

*Jones* states that "[t]he State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones*, 443 U.S. at 602. The evidence indicates that the purpose of § 57-9 was to provide a rule that would allow for peaceful conflict resolution upon the occurrence of church property disputes following a division in a church or religious society. Section 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *115 ("The object of the statute was to protect local religious congregations who, when their church divided, were compelled to make a choice between the different branches of it, and to allow them, in some such cases, to take their property with them. . . ."). Clearly, then, § 57-9 possesses a secular purpose.

### b. *Section 57-9(A) Does Not Have the "Primary Effect" of Advancing or Inhibiting Religion*

ECUSA/Diocese argue that § 57-9(A) "advances religion," but their argument is without support in the record or the law. There are, in fact, specific criteria that must be applied in considering whether a statute meets this "primary effect" prong of *Lemon*. These include consideration of whether the statute "result[s] in governmental indoctrination," and whether it "define[s] its recipients by reference to religion." *Agostini v. Felton*, 521 U.S.

203, 234, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997). In addition, government "advancement" of religion has been held to include such elements as "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission of N.Y.*, 397 U.S. 664, 668, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970). Given this, or for that matter, any similar criteria, § 57-9(A) does not even come close to government "advancement" of religion. As the Attorney General states in his brief, "Section § 57-9 neither advances nor inhibits religion. It does not differentiate between religious sects. Rather, it differentiates on how property is held. It does nothing to indoctrinate anyone in a particular religious belief. Rather, the statute exists only to resolve church property disputes fairly and efficiently." (Commonwealth's Resp. at 19.)

### c. *Section 57-9(A) Does Not Result in "Excessive Entanglement"*

ECUSA/Diocese argue that § 57-9(A) violates this third prong of *Lemon*, in that, by applying § 57-9(A) to this case and these facts, this Court has excessively entangled itself with religion in a manner forbidden by *Lemon*. Specifically, ECUSA/Diocese focus upon certain legal conclusions within this Court's § 57-9 Opinion and claim that those conclusions hopelessly entangle this Court in the religious thicket. The Court addresses each of these arguments below.

#### i. *This Court's Definition and Application of the Term "Branch" from § 57-9(A) Did Not Require Inquiry into or Decisions Regarding Matters of Religious Doctrine or Polity*

Although they claim that several different aspects of this Court's § 57-9 Opinion caused the Court to descend into the religious thicket, ECUSA/Diocese focus most heavily upon the "branch" element of § 57-9(A). See Diocese Br. at 29 ("In particular, the Court determined that CANA and the ADV shared sufficient theological relationships, history, and beliefs to constitute "branches" of the Episcopal Church and the Diocese."); ECUSA Br. at 21 ("[T]he Court's April 3 ruling determined, among other things, that CANA and ADV are 'branches' of the Episcopal Church, the Diocese of Virginia, and the Anglican Communion . . . the Court's decision on this point has no secular basis.").

Likewise, ECUSA/Diocese suggest that this Court's reference to the Episcopal missionary diocese in Mexico, see § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *163, demonstrates that this Court applied an improper

theological interpretation of "branch." That is not so. The Court was simply addressing the fact that this particular hypothetical, as presented by ECUSA/Diocese, was entirely irrelevant. No part of the Court's definition and application of the term "branch" turned upon the Court's brief discussion of that hypothetical.

ECUSA/Diocese's protestations to the contrary, however, the term "branch" as used within § 57-9(A) does not take this Court into the religious thicket, and in fact does not even scratch its surface. A "branch" is "simply the logical corollary of [a] division." (CANA Br. at 29, n. 11.) A synonym for "branch" is "part,"[4] and indeed, the word "part" can be substituted in § 57-9(A) without altering the statute's meaning. In fact, it would make little sense for the statute to use the term "division" without also employing the word "branch," or a similar synonym such as "part," "fragment," etc. to describe the entities that remain in the aftermath of a division.

This Court applied a broad definition to the term "branch," defining the term as "a part of a complex body," and "any arm or part shooting or extended from the main body of a thing." Section 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *161. As the CANA Congregations point out, *Hoskinson v. Pusey*, 73 Va. (32 Gratt.) 428 (1879), demonstrates another historical division, the resulting "branches" of which bear a striking resemblance to the very parties before this Court. That particular division also suggests that this Court was correct in applying a broad definition of "branch:"

> There, [in *Hoskinson*] although MEC South predated the Baltimore Conference division (much as the Church of Nigeria predated the division in [ECUSA]), a new Conference was created as a result of that division to receive those leaving MEC (much as CANA and ADV were created to receive those congregations leaving [ECUSA]). Thus, the most typical use of § 57-9 involved congregations from one church (MEC) joining a new religious society (the Southern Baltimore Conference) affiliated with MEC South, a "preexisting church." And such divisions fit comfortably within the language of the statute, as it is common to refer to a "branch" [or "part"] that has broken off of one tree and been grafted onto another.

---

[4] See § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *161.

(CANA Br. at 35, n. 19.)

It requires no sophisticated theological or doctrinal analysis to apply this definition to the facts at hand; in fact, it requires no theological or doctrinal analysis at all, since "[t]he degree to which the members of CANA and ADV currently share any theological similarities to the Episcopal Church is irrelevant to whether they 'descended from' or 'extended from' that Church, and the Court need not (and did not) resolve any such questions to find the 'branch' requirement satisfied." (CANA Br. at 30.) There has never been any dispute among the parties before this Court "that the members of CANA and ADV were previously attached to the Episcopal Church, that these organizations were established specifically to form a new denominational home for those separating from the Episcopal Church, or that they are made up almost entirely of former Episcopal congregations, clergy, and members." (CANA Br. at 30.)

In addition, the Anglican Communion component of the Court's "branch" definition was no different from its definition of "branch" on the ECUSA and Diocese levels. In determining that CANA and the ADV are "branches," (or "parts" or "fragments") of the Anglican Communion (as they are of ECUSA and the Diocese) for purposes of § 57-9(A), the Court simply considered evidence such as the following: (1) the Articles of Incorporation and Bylaws of CANA[5] and ADV,[6] which are purely secular documents, state that CANA and ADV are part of the Church of Nigeria; (2) the Church of Nigeria's Constitution states that it is a member of the Anglican Communion,[7] as does the Constitution of the Anglican Consultative Council;[8] and (3) the opening sentence of ECUSA's Constitution and Canons states that it is a "constituent member of the Anglican Communion,"[9] and the Constitution of

---

[5] See Pls.' Ex. 69, "August 2, 2005, Articles of Incorporation for the Convocation of Anglican Nigerians in America (CANA)," at 3.

[6] See Pls.' Ex. 70, "December 4, 2006, Articles of Incorporation for the Anglican District of Virginia, an Association of Churches," at 1.

[7] See Pls.' Ex. 137, "Constitution of the Church of Nigeria, Authenticated by the Primate, Archbishop & Metropolitan 9/20/1997" at 1.

[8] See Defs.' Ex. 42, "The Constitution of the Anglican Consultative Council," at 451 (listing the Church of Nigeria (Anglican Communion) under the "Schedule of Membership").

[9] See Defs.' Ex. 2, "Constitution and Canons of the Episcopal Church in effect since January 1, 2007," at 1.

the Anglican Consultative Council likewise states that ECUSA is a member of the Anglican Communion (Defs.' Ex. 2 at 451) (listing the Episcopal Church under the "Schedule of Membership"); see also § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *42 (citing Resolution R-24sa of the 209th Annual Diocesan Council, in which the entire Council declared that they were "members of the worldwide Anglican Communion"); § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *46 (quoting Resolution R22s of the 210th Diocesan Annual Council, which reads "We in the Diocese of Virginia are members of the Anglican Communion. . . . We desire to serve as a model of civility to the Anglican Communion for resolution of the present divisions by working together and honoring conscience through a process that is respectful and peaceful. . . ."); § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *60 (quoting the Special Committee's Report, which states "we candidly and regretfully acknowledge that we may be entering a period in the history of the Anglican Communion when we . . . will be walking . . . apart."); § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *71 (quoting Bishop Guernsey's testimony that All Saints decided to join the Church of Uganda . . . because it wanted to remain a part of the Anglican Communion, "the worldwide church that [All Saints] understood that [it] always had been a part of"; § 57-9 Opinion, *supra*, 2008 Va. Cir. LEXIS 22, at *77-78 (quoting Archbishop Akinola's words that "the Church of Nigeria established CANA as a way for Nigerian congregations and other alienated Anglicans in North America to stay in the Communion . . . CANA is an initiative of the Church of Nigeria and therefore a bona fide branch of the Communion.").

No religious or doctrinal analysis was involved in the Court's review of this evidence, and ECUSA thus has no basis to assert that this Court's ruling "necessarily rests on its own view of the significance of the purely theological relationship between the entities involved." (ECUSA Br. at 22.)

Indeed, by repeatedly complaining that this Court has not attached ECUSA/Diocese's preferred theological, as opposed to the Court's own secular, definition to the term "branch," ECUSA/Diocese ironically appear to be attempting to draw this Court into the very thicket that they simultaneously argue this Court should avoid. But just as the Georgia courts were not constitutionally bound to adhere to the PCUS's view as to who was the "true" congregation in *Jones*,[10] so this Court is not constitutionally bound to adopt

---

[10] See *Jones*, 443 U.S. at 598 ("In response to the schism within the Vineville congregation, the Augusta-Macon Presbytery appointed a commission to investigate the dispute and, if possible, to resolve it. The commission eventually issued a written ruling declaring that the minority faction constituted 'the true congregation of Vineville Presbyterian Church,' and

ECUSA/Diocese's view on the matter for purposes of determining the applicability of § 57-9(A). Nor does the plain text of the statute require theological or doctrinal analysis.

Even though ECUSA claims that CANA and ADV should not be considered "branches" of the Anglican Communion, ECUSA's Presiding Bishop, the Rev. Katherine Jefferts Schori, referred to both CANA and the Church of Nigeria as, in fact, "branches" of the Anglican Communion. See, e.g. Pls.' Ex. 288A, "Videotape Deposition Designations of Bishop Katharine Jefferts Schori," at 54-55, in which ECUSA's Presiding Bishop states, in response to the question, "Did you refer to the rise of CANA as a further provocation?": "I do not recall exactly. We probably did talk about CANA and its interesting presence in the United States. I certainly did say something about the Episcopal Church's policy having no way of recognizing another branch of the Anglican Communion in our territory;" see also Pls.' Ex. 288A at 83 ("I told [Bishop Lee] that the National Church had an interest both in the financial compensation and that another branch of the Anglican Communion not be set up in our territory for reasons of mission strategy.").

Likewise, in other portions of her deposition, the Presiding Bishop referred to the CANA Congregations as setting up as other "parts" of the Anglican Communion.

> Q. Did you not tell Bishop Lee to pull out of negotiations with the eleven congregations?
>
> A. I told Bishop Lee that I could not support negotiations for sale if the congregations intended to set up as other parts of the Anglican Communion.
>
> Q. But if the congregations had chosen to affiliate with other organizations, you would not have interfered with Bishop Lee's prerogative; would you?
>
> A. Depending on what the mission's strategy, what the mission strategy said about where they were going, and provided that he negotiated a fair price.

(Pls.' Ex. 288A at 62.) As this Court has stated previously within this letter opinion, "part" is a synonym for "branch" under this Court's definition of "branch." Thus, although the Court does not need to reach the issue, it would

---

withdr[ew] from the majority faction 'all authority to exercise office derived from the [PCUS]'.").

appear that CANA and ADV may in fact be "branches" of the Anglican Communion on the simple basis that this fact has been established as a party admission.

### ii. This Court's Definition and Application of the Term "Division" from § 57-9(A) Did Not Require Inquiry into or Decisions Regarding Matters of Religious Doctrine or Polity

As with the term "branch," ECUSA/Diocese also argue that § 57-9(A)'s requirement that a Court conclude that a "division" exists within a church or religious society "overrules important aspects of the Episcopal Church's own polity and rules," and, therefore, violates their First Amendment rights. (ECUSA Br. at 15.) But the same complaint could have been made by the PCUS against the U.S. Supreme Court that decided *Jones*, since the *Jones* Court referred to the withdrawal of a *single majority faction within a single congregation* as a "schism." See *Jones*, 443 U.S. at 598 ("In response to the *schism* within the Vineville congregation, the Augusta-Macon Presbytery appointed a commission to investigate the dispute and, if possible, to resolve it. The commission eventually issued a written ruling declaring that the minority faction constituted the true congregation of Vineville Presbyterian Church," and withdrew from the majority faction "all authority to exercise office derived from the [PCUS].") (emphasis added). In fact, *Jones'* use of the term "schism" was itself explicitly more of a religious statement, and less neutral, than the precise, neutral term "division" as used in § 57-9(A).

The elements of this Court's definition of "division" as used in § 57-9(A) include (1) a split or rupture in a religious denomination, (2) the separation of a group of congregations, clergy, or members from the church, and (3) the formation of an alternative polity that disaffiliating members could join. No aspect of any of these three elements requires a civil court to delve into, or make decisions regarding, aspects of a church or religious society's polity or doctrine. None of these elements require decisions regarding who is the "true" bishop or ecclesiastical leader, which was held unconstitutional in *Kedroff.* Nor do any of these elements require a civil court to determine whether a denomination has substantially departed from the church doctrines or theological positions that were in effect at the time the original trust was created, which was held unconstitutional in *Hull Church*. Likewise, none of these elements require a civil court to determine whether a bishop was properly or improperly defrocked under a particular denomination's internal rules, or whether a diocese was "properly" reorganized under a particular church's rules and regulations, which was held unconstitutional in

*Milivojevich.* Rather, the three elements that constitute this Court's definition of the term "division" simply require a civil court to make neutral, objective observations and finding regarding whether there has been a split within a church or religious society that leads to a separation and corresponding formation of an alternative polity. Nothing in this definition requires a civil court to resolve or delve into *any* matter of religious/theological belief, doctrine, or practice.

### iii. This Court's Definition and Application of the Term "Attach" from § 57-9(A) Did Not Require Inquiry into or Decisions Regarding Matters of Religious Doctrine or Polity

As with the terms "branch," and "division," ECUSA argues that this Court's "ruling that the CANA congregations were (and are) "attached" to the Anglican Communion also necessarily and impermissibly rests on purely theological grounds." (ECUSA Br. at 23.) First, it did not. Rather, the Court used secular definitions and objective facts to conclude that CANA is attached to the Anglican Communion. To the extent that ECUSA/Diocese's real complaint is that the Court failed to adopt ECUSA/Diocese's views on the matter of attachment, this Court is an independent fact-finder applying a secular statute to objective and ascertainable facts. Just as the United States Supreme Court did not automatically defer in *Jones* to the PCUS' judgment as to the "true" owners of a church, this Court would abdicate its responsibility by simply and automatically adopting as its § 57-9(A) findings the interpretation of § 57-9(A) given by any party to this litigation.

### iv. This Court Did Not "Delve[] into the Religious Thicket and Independently Resolve[] Numerous Ecclesiastical Issues," as Asserted by ECUSA

Note ECUSA Br. at 18, where the headings include "The Court's Ruling Delves into the Religious Thicket and Independently Resolves Numerous Ecclesiastical Issues," and "The Court Conducted a Searching Inquiry into Purely Religious Documents and Relationships."

As evidence of entanglement, ECUSA cites the length of this Court's Background section within its § 57-9 Opinion, stating that "the Court's ruling displays a constitutionally prohibited 'searching inquiry' into numerous ecclesiastical matters," in that "[t]he Court spends almost forty pages on a recitation of the facts and evidence it deems relevant to this ruling." (ECUSA Br. at 18.)

The length of the Court's opinion is hardly proof of religious entanglement. On a matter of such moment to the parties and given the need to make multiple factual findings, this Court was in fact obligated to provide "[a] proper perspective on the relationship of [the parties before it]," and in fact "the nature of this dispute require[d] some background discussion." *Milivojevich*, 426 U.S. at 699.

ECUSA expresses similar dismay over the fact that this Court's § 57-9 Opinion referenced "numerous" "purely religious documents," including "individual pieces of correspondence both among religious leaders and between some of these clergy and their respective flock." (ECUSA Br. at 19.)

The Court is puzzled by these assertions, for some of the very cases ECUSA/ Diocese cite in support of their legal positions contain references to the very same types of materials referenced by this Court. For example, in *Milivojevich*, the U.S. Supreme Court provides a lengthy background description of the strife and discord within the Serbian Orthodox Church and its American-Canadian Diocese. In that discussion, the U.S. Supreme Court refers to a "May 30 letter," which was an individual piece of correspondence between two religious leaders;[11] a "commission's report and recommendations;"[12] and a "circular" mailed from a member of the clergy to various parishes. See *id.* at 704 ("On May 25, 1963, he [the suspended bishop] prepared and mailed a circular to all American-Canadian parishes stating his refusal to recognize [his suspension]."). Likewise, in *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 73 S. Ct. 143, 97 L. Ed. 120 (1952), the U.S. Supreme Court quotes from a "Ukase"[13] of the "Moscow Patriarchy," *id.* at 105. See *Kedroff* at 105 ("There came to the Russian Church in America this

---

[11] See *Milivojevich*, 426 U.S. at 704 ("Dionisije . . . continued to officiate as Bishop, refusing to turn administration of the Diocese over to Firmmilian; in a May 30 letter to Firmmilian, Dionisije repeated this refusal, asserted that he no longer recognized the decisions of the Holy Assembly and Holy Synod, and charged those bodies with being 'communistic'.").

[12] *Id.* at 705 ("On the basis of the commission's report and recommendations, which recited Dionisije's refusal to accept the decisions of the Holy Synod and Holy Assembly and his refusal to recognize the court of the Holy Synod or its competence to try him, the Holy Assembly met on July 27, 1963, and voted to remove Dionisije as Bishop.").

[13] A "ukase" is a Russian/French word, defined as: 1 : a proclamation by a Russian emperor or government having the force of law 2 : edict. Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/Ukase (last visited June 24, 2008). As used in context within *Kedroff*, a "ukase" appears to be a written decree of the Moscow Patriarchy.

Ukase of the Moscow Patriarchy of February 14 or 16, 1945, covering Moscow's requirements for reunion of the American Orthodox Church with the Russian. It required for reunion that the Russian Church in America hold promptly an all American Orthodox Church Sobor that it express the decision of the dioceses to reunite with the Russian Mother Church, declare the agreement of the American Orthodox Church to abstain 'from political activities against the U.S.S.R.' and so direct its parishes, and elect a Metropolitan subject to confirmation by the Moscow Patriarchy.").

In short, to describe a religious controversy, *even in detail,* is not to make a religious determination or a religious statement. Context, as much here as in any other situation, is critical, and for this Court to have dispensed with the background of this dispute, out of some fear that to do otherwise would open the Court to accusations of theological entanglement, would, yes, have made the opinion shorter, but at the substantial cost of making it impossible to understand the Court's findings of fact and conclusions of law.

### C. Section 57-9(A), As Applied, Does Not Violate the Constitution's Equal Protection Clause

That Clause mandates that "[n]o State . . . shall deny to any person within its jurisdiction of the equal protection of the laws." U.S. Const., Amend. XIV, § 1.

In considering whether a statute violates the Equal Protection Clause, the "general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). Along these same lines, "[l]aws are presumed to be constitutional under the equal protection clause for the simple reason that classification is the very essence of the art of legislation." *Moss v. Clark,* 886 F.2d 686, 689 (4th Cir. 1989) (citation omitted). ECUSA/Diocese's claim that § 57-9(A) violates Equal Protection "is nothing more than a reframing of its Free Exercise claim." (Commonwealth's Resp. at 26.) But "[w]here a plaintiff's First Amendment Free Exercise claim has failed, the Supreme Court has applied only rational basis scrutiny in its subsequent review of an equal protection fundamental right to religious free exercise claim based on the same facts." (Commonwealth's Resp. at 26) (citing *Wirzburger v. Galvin,* 412 F.3d 271, 282-83 (1st Cir. 2005); *Johnson v. Robison,* 415 U.S. 361, 375, n. 14, 94 S. Ct. 1160, 39 L. Ed. 2d 389 (1974); *St. John's,* 502 F.3d at 638).

Thus, because ECUSA/Diocese's Free Exercise Clause and Establishment Clause claims both fail, rational basis applies to § 57-9(A) and ECUSA/Diocese cannot realistically argue that there is *no* conceivable rational basis for § 57-9(A). Under this rational basis standard, the party challenging a statute bears the burden "to negat[e] every conceivable basis which might support" the statute. *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S. Ct. 1001, 35 L. Ed. 2d 351 (1973); see also *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 510, 57 S. Ct. 868, 81 L. Ed. 1245 (1937) ("This restriction upon the judicial function, in passing on the constitutionality of statutes, is not artificial or irrational. A state legislature, in the enactment of laws, has the widest possible latitude within the limits of the Constitution. . . . [C]ourts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.") In addition, "a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality'." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970) (citation omitted).

There are many different bases, all of which are rational, upon which the 1867 General Assembly, as well as the subsequent legislatures which have repeatedly re-codified § 57-9, could have decided to implement § 57-9(A). For example:

> the Virginia General Assembly may have wished to create a presumption in favor of ownership at the local level, because of its recognition that property [in cases in which it is held by trustees] is generally managed from the local level, or it may have believed that a presumption of local majority ownership was appropriate given that most (if not all) funding for local churches, even in denominations, comes from the local level.

(CANA Br. at 51.)

At the hearing on the constitutional issues, counsel for the Church Amici attempted to argue that there was no rational basis for the legislature to have implemented a presumption of majority rule, stating "§ 57-9 says that . . .

we are going to ignore the rights of any beneficiary and instead apply a rule that is no different from saying draw straws, flip a coin. That is what the majority representation rule really is no different from." (Const. Tr. at 256:11-257:1.) This assertion appears to ignore the following language from *Jones* regarding the "rationality" of employing a presumption of majority rule:

> If in fact Georgia has adopted a presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means, we think this would be consistent with both the neutral-principles analysis and the First Amendment. *Majority rule is generally employed in the governance of religious societies.* See *Bouldin v. Alexander*, 82 U.S. 131, 15 Wall. 131, 21 L. Ed. 69 (1872). *Furthermore, the majority faction generally can be identified without resolving any question of religious doctrine or polity.* Certainly, there was no dispute in the present case about the identity of the duly enrolled members of the Vineville church when the dispute arose, or about the fact that a quorum was present, or about the final vote.

*Jones v. Wolf*, 443 U.S. 595, 607, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (U.S. 1979) (emphasis added) Thus, the U.S. Supreme Court obviously disagrees with the Church Amici's assertion that "the majority representation rule really is no different from [drawing straws or flipping a coin for the property]. To put it another way, flipping a coin is arbitrary, as our own Supreme Court of Virginia has recently had occasion to note. See *Judicial Inquiry & Review Comm'n v. Shull*, 274 Va. 657, 676, 651 S.E.2d 648 (2007) ("In tossing a coin to resolve a matter before him, [the judge] denigrated both the litigants and our justice system.") Majority rule is not.

D. *Section 57-9(A), As Applied, Does Not Violate the Takings Clause*

This Clause states "nor shall private property be taken for public use, without just compensation." U.S. Const., Amend. V.

A "[s]tate does not 'take' property when it adjudicates competing claims to title by private parties based on neutral legal principles." (Commonwealth's Resp. at 31.) An apt comparison is a divorce between two individuals; in such a scenario, a court's "routine adjudication of property rights when a married couple divorces does not constitute a 'taking' in favor

of one spouse." (Commonwealth's Resp. at 32.) Indeed, ECUSA/Diocese's reasoning that § 57-9 violates the Takings Clause is "entirely circular," in that "[t]he Diocese *assumes* that it (and ECUSA) own the property at issue in this case, and then declares that § 57-9 would 'take' it from them. But the very purpose of § 57-9 is to settle . . . a dispute over who owns property held in trust for local congregations." (CANA Br. at 55.)

The circular nature of ECUSA/Diocese's argument is made clear upon an examination of relevant cases involving the Takings Clause, which, significantly, proceed from a presumption of ownership. For example, in *Kelo v. City of New London*, 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005), New London sought to condemn the properties of "the nine petitioners [who] *own*[ed] 15 properties."[14] *Id.* at 475 (emphasis added). Likewise, in *Texaco, Inc. v. Short*, 454 U.S. 516, 102 S. Ct. 781, 70 L. Ed. 2d 738 (1982), "the Indiana Legislature enacted a statute providing that a severed mineral interest that is not used for a period of twenty years automatically lapses and reverts to the current surface *owner* of the property, unless the mineral *owner* file[d] a statement of claim in the local county recorder's office." *Id.* at 518 (emphasis added). The U.S. Supreme Court upheld the statute against the Takings Clause challenge. *Id.* at 518.

Section 57-9(A) does not violate the Takings Clause of the U.S. Constitution. Rather, it is a statute designed to resolve church property disputes. When a Court, pursuant to that statute, makes an adjudication, its decision for or against either party does not constitute a "taking."

*Conclusion*

Today, this Court finds that § 57-9(A), as applied, is constitutional. Specifically, this Court finds that the statute, as applied in the instant case, does not violate the Free Exercise or Establishment Clauses of the First Amendment, nor does it violate the Equal Protection Clause of the Fourteenth Amendment, nor does it violate the Takings Clause of the Fifth Amendment.

For 141 years, the Commonwealth of Virginia has had a statute available to congregations experiencing divisions for the purpose of resolving church property disputes. Section 57-9(A) did not parachute into this dispute from a clear blue sky. Its existence cannot have been a surprise to any party to this litigation, each of whom is charged with knowledge of its contents and,

---

[14] One of the petitioners was born in the house on her property and had lived there her entire life. *Id.* at 475.

more significantly, its import. That the Commonwealth of Virginia, in enacting and reenacting a "division" statute, may be unique among our fellow states is of no considerable moment, for in a federalist system each State is free to determine its own path for the resolution of church property disputes within constitutional boundaries. Whether § 57-9(A) would be constitutional absent the ability of a church to hold property in forms that would place such property beyond the reach of § 57-9(A) is a hypothetical question which this Court need not address; the Code of Virginia most certainly does provide for such alternative forms of church property ownership. That the Diocese availed itself of this alternative ownership in some cases but chose not to do so in others (and not in the instant cases) does not turn a constitutional statute into an unconstitutional one. Nor is the statute rendered unconstitutional because it requires this Court to make factual findings in a matter involving religious organizations. It is not mere semantics to observe that there is a difference, a constitutionally significant difference, between a finding involving a religious organization and a religious finding. While it is true, of course, that § 57-9(A) requires the Court to make factual findings involving religious entities, each of those findings are secular in nature. Hence, for this and all the other reasons cited in this Opinion, § 57-9(A) is constitutional. Whether it violates the Contracts Clause is a matter expressly reserved for a later date.

## Order

In accordance with the two letter opinions issued today by this Court, the parties are hereby ordered to address the following three issues, pursuant to the briefing schedule set forth below:

(1) How do the Court's two letter opinions issued on June 27, 2008, affect the scope of the October trial? What issues remain to be addressed by this Court in that October trial?

(2) In light of today's letter opinions, how should this Court appropriately adjust the scope of discovery so as to ensure that it only encompasses those issues that remain to be heard at the October trial?

(3) What are the parties' positions regarding the Attorney General's renewed motion to intervene?

The parties are directed to submit briefs regarding the above three issues pursuant to the following schedule:

Opening Briefs: Filed by 4 p.m. on Wednesday, July 2, 2008.

Response Briefs: Filed by 4 p.m. on Monday, July 7, 2008.

In addition, the Court requests briefing from the Attorney General of Virginia regarding his renewed motion to intervene, pursuant to the Opening/Response Brief schedule set forth above.

The parties should assume that the Court will make any necessary decisions based on the papers, although the Court, of course, reserves the right to set any issue raised by the parties' submissions for oral argument. So entered this 27th day of June, 2008.

## July 16, 2008

This matter comes before the Court on the Commonwealth's Renewed Motion to Intervene for the limited purpose of defending the constitutionality of Va. Code § 57-9(A). For the reasons stated below, the Court today grants the Commonwealth's motion to intervene.

Because the Commonwealth seeks leave to intervene for the limited purpose of defending the constitutionality of § 57-9(A), the Court accordingly grants the Commonwealth leave to intervene solely for its requested purpose. The Court does not decide today any issue regarding whether the Commonwealth should be granted leave to intervene for any purpose broader than that specifically requested by the Commonwealth.

The Court further notes that the Attorney General states that, "[b]ecause the Episcopal Church and the Diocese claim that [§ 57-9(A)] is unconstitutional and because the CANA Congregations take the opposite view, the Commonwealth requests that it be aligned with the CANA Congregations in all proceedings in which the constitutionality of the statute is at issue." (Commonwealth's Opening Br. Concerning its Renewed Mot. to Intervene at 1, n. 1.) Although the Court is not convinced that it is necessary for the Commonwealth to be "aligned" with one side or the other in these proceedings for purposes of intervention to defend a statute's constitutionality, the Court also does not find any such alignment problematic. In any event, the Court does not find it necessary to rule upon whether or not the Attorney General should be granted leave to intervene so as to be "aligned" with the CANA Congregations.

Va. Sup. Ct. Rule 3:14 states in pertinent part that "[a] new party may by leave of court file a pleading to intervene as a plaintiff or defendant to assert any claim or defense germane to the subject matter of the proceeding." Va. Sup. Ct. R. 3:14 (LexisNexis 2008). Rule 3:14 does not specifically address the question presented here, which is whether the Attorney General of Virginia may be permitted to intervene in a Virginia state court to defend the

constitutionality of a Virginia state statute. However, as the Attorney General notes, it is in fact "somewhat unusual" for the Commonwealth to move to intervene in a state court to defend the constitutionality of a state statute, given that most constitutional challenges to Virginia statutes occur in federal court. At the federal level, a state attorney general's specific interest in defending the constitutionality of state statutes is explicitly recognized, both in 28 U.S.C. § 2403(b), and in U.S. Sup. Ct. R. 29(4)(c).

28 U.S.C. § 2403(b) states:

[i]n any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

28 U.S.C. § 2403(b) (LexisNexis 2008). .
U.S. Sup. Ct. R. 29(4)(c) states as follows:

In any proceeding in this Court in which the constitutionality of any statute of a State is drawn into question, and neither the State nor any agency, officer, or employee thereof is a party, the initial document filed in this Court shall recite that 28 U.S.C. § 2403(b) may apply and shall be served on the Attorney General of that State. In such a proceeding from any court of the United States, as defined by 28 U.S.C. § 451, the initial document also shall state whether that court, pursuant to 28 U.S.C. § 2403(b), certified to the State Attorney General the fact that the constitutionality of a statute of that State was drawn into question. See Rule 14.1(e)(v).

U.S. Sup. Ct. R. 29(4)(c) (LexisNexis 2008).

ECUSA/Diocese object to the Commonwealth's intervention, asserting that, under Va. Sup. Ct. R. 3:14, "[t]he Commonwealth cannot intervene as a plaintiff or defendant in this matter because it does not assert any claims or interests that would properly place it in the shoes of the Episcopal Church, the Diocese, or the Congregations." However, as noted above, Rule 3:14 does not specifically address the precise issue presented here. The Attorney General of Virginia has a unique interest in defending the constitutionality of the statutes of the Commonwealth. Indeed, as the State Solicitor General stated at the January 25, 2008, hearing on the Commonwealth's initial motion to intervene:

> Your Honor, I would like to address a distinction which I think the Episcopal Church has blurred, perhaps unintentionally, and that is the distinction between having a right to intervene and having a duty to defend the constitutionality of the statute.
>
> We have never asserted that we have a right to intervene. Now, in Federal Court, we do. 28 U.S.C. § 2403(b) gives a state the right to intervene whenever . . . the constitutionality of a statute is raised, and neither the state nor . . . an officer is a party to [that] litigation. We do not have a statute like that in Virginia, so there is no right to intervene. But the fact that there is no right to intervene does not mean that there is a prohibition against this Court's deciding to allow us to intervene.
>
> The Attorney General feels, as do all of his recent predecessors, if you read their opinions, that they have an obligation to defend the constitutionality of statutes enacted by the democratically-elected representatives of the People and then signed into law by the People's democratically-elected governor. That is what is going on here. They are attacking the constitutionality of the statute. The Attorney General has a duty to defend that statute. He has chosen to exercise or attempt to exercise that duty to defend the statute by asking this Court for permission to intervene in this litigation.

Hr'g Tr. 26:14-27:18.

The Court further notes that, while ECUSA/Diocese cite several Virginia cases in support of their position, none of those cases involve a Virginia court's denying the Attorney General intervenor status to defend the constitutionality of a Virginia statute. Nor is the Court aware of any such case.

Thus, the Court today grants the Attorney General permission to intervene in this litigation for his stated purpose.

Nothing in today's decision granting the Commonwealth's motion to intervene alters the result of this Court's letter opinion of May 12, 2008, regarding ECUSA/Diocese's Motion for Leave to Amend Answers to § 57-9 Petitions. In their brief in support of their Motion for Leave to Amend, ECUSA/Diocese had argued that the Attorney General's involvement in this litigation supported ECUSA/Diocese's invocation of Va. Code § 57-2.02 as a defense. The Court does not agree. The Attorney General has sought to intervene in this litigation in order to defend the constitutionality of § 57-9(A). The Attorney General's defense of that statute does not change the fact that this remains a property dispute between private parties.

*Order*

The court hereby orders the following:

1. For the reasons stated in a letter opinion issued today, the Commonwealth's Renewed Motion to Intervene for the purpose of defending the constitutionality of Va. Code § 57-9(A) is hereby granted.

2. After careful consideration of the positions of the parties regarding the scope of discovery, the Court has determined that it cannot disturb its previous discovery rulings at this time. To do so when the parties remain in such fundamental disagreement as to the scope of the October trial, and even as to whether certain issues are matters of fact or questions of law, could place at risk the October trial date. This the Court is unwilling to do.

3. There are certain matters that this Court has already determined will be heard in the October trial. They are as follows:

A. The declaratory judgment actions as to any congregation that did not file a § 57-9 petition.

B. As to all congregations that filed § 57-9 petitions, the Court must determine whether the vote was "fairly taken" in accordance with § 57-9, and approve or disapprove the determination of the congregation regarding its majority vote as to its choice of branch.

C. As to all congregations that filed § 57-9 petitions, and where the Contracts Clause issue has not already been resolved prior to trial, the Court must determine whether the statute is unconstitutional on Contracts Clause grounds as to that particular congregation.

D. The declaratory judgment action as to any congregation that did file a § 57-9 petition, where *either* the Court disapproves the determination of the congregation regarding its majority vote as to its choice of branch *or* the Court finds § 57-9 to be unconstitutional as to that congregation on Contracts Clause grounds.

4. There are certain other issues that may affect the scope of the October trial:

A. Whether any of the congregations that did not file § 57-9 petitions are covered by or subject to a petition filed by another congregation a claim that has been asserted by the CANA Congregations.

B. The precise property subject to each § 57-9 petition.

C. Whether ECUSA/Diocese may assert at the October trial that the CANA Congregations have contracted away, waived, abandoned, or relinquished their right to file a § 57-9 petition, a claim that the CANA Congregations argue is untimely and unpleaded.

D. Whether the Contracts Clause protects only contractual rights that existed prior to the effective date of the 1867 predecessor statute to § 57-9, a position asserted by the CANA Congregations.

E. Whether in determining the applicability of the Contracts Clause to particular congregations, the Court should consider only the applicable deeds, a position asserted by the CANA Congregations.

4(A) and 4(B) are matters that may require an evidentiary hearing, and it is not the Court's present intention to resolve these questions prior to the October trial. 4(C), 4(D), and 4(E) are pure questions of law and will be resolved prior to trial.

The parties are to address 4(C), 4(D), and 4(E) as follows:

1. Opening briefs of no more than 20 pages to be filed by July 28, 2008;

2. Opposition briefs of no more than 15 pages to be filed by August 4, 2008;

3. Reply briefs of no more than 10 pages to be filed by August 7, 2008;

4. Oral argument on these questions to be held at 10 a.m. on Monday, August 11, 2008.

It is so ordered, this 16th day of July 2008.

August 19, 2008

On July 16, 2008, this Court issued an order requesting briefing and oral argument on three distinct questions of law. The Court further stated in that same order that these three questions of law would be resolved prior to the October trial. The parties have now fully briefed the issues, and oral argument on these issues was held on August 11, 2008. The following letter opinion sets forth the Court's decision regarding issue 4C from its July 10, 2008, Order which is "Whether ECUSA/Diocese may assert at the October trial that the CANA Congregations have contracted away, waived, abandoned, or relinquished their right to file a § 57-9 petition, a claim that the CANA Congregations argue is untimely and unpleaded."

The Court today holds that ECUSA/Diocese may not now – long after the first § 57-9 petitions were filed and long after the Court held a five day trial regarding whether or not Va. Code § 57-9(A) had been properly invoked – assert that the CANA Congregations have contracted away, waived, abandoned, or relinquished their right to file their § 57-9 petitions. To have their day in Court on this claim, ECUSA/Diocese had to do two things: (1) plead their claim and (2) do so timely. They did neither. After a five day trial, this Court issued a lengthy opinion finding § 57-9 to have been properly invoked. Then, after extensive briefing and oral argument, this Court issued another lengthy opinion finding § 57-9 to be constitutional. Now, in effect, ECUSA/Diocese assert that the past year of litigation was unnecessary because CANA never had the right to file § 57-9 petitions in the first place. It is too late. While a court has discretion to hear untimely claims and permit late amendments to answers, it should not exercise its discretion in a manner that would severely and unduly prejudice the other side. Put simply, to hear now whether § 57-9 could have been invoked at all, after this Court has *already* determined that it was both properly and constitutionally invoked, would constitute an injustice.

While this Court has a duty to ensure that each party receives a full and fair hearing on all its claims and defenses, it is simultaneously this Court's duty to ensure that no parry is treated in a manner that is fundamentally unfair, that all parties are given appropriate and adequate notice of arguments actually pleaded, and that no party is unduly surprised or prejudiced by lack of notice or by arguments and defenses that are simply set forth too late. *See e.g., Kole v. City of Chesapeake*, 247 Va. 51 (1994), in which the Supreme Court of Virginia concluded that the trial court should have allowed "the filing of [an]

amended [complaint]," but only after the Supreme Court of Virginia had fully reviewed the record in order to discern whether or not the opposing party would have been subject to prejudice by allowance of the amended complaint. *Id.* at 57.

For the reasons set forth below, ECUSA/Diocese's motion to amend its answers and to otherwise assert these defenses is denied.

*Analysis*

A. *ECUSA/Diocese's Argument That the CANA Congregations Have Waived/Contracted Away Their Right to Ever Invoke Va. Code § 57-9(A) in the First Place is Untimely and Unpleaded.*

ECUSA/Diocese argue that they have in fact pleaded the affirmative defense of "waiver" all along, ever since the filing of their answers to the original § 57-9 petitions, or at least since the filing of their brief in response to the Court's August 31, 2007, order. That order addressed the relationship between the § 57-9 petitions and the declaratory judgment actions. They argue that the issue as to whether the CANA Congregations in fact waived or contracted away their rights to ever invoke § 57-9(A) in the first place is a "long-discussed issue,"[1] that was previously "explicitly laid out" at least eleven months ago,[2] that "[a]ll parties understood that the 'waiver' defense was in the case all along,"[3] and that "[i]t would he ironic and bizarre to penalize the Episcopal Church and the Diocese for not including in [their] pleadings a specific term that represents only the Congregations' preferred label for an issue *clearly identified* in the pleadings and numerous filings since." ECUSA/Diocese Opening Br. at 8 (emphasis added).

---

[1] ECUSA/Diocese Opening Br. Pursuant to July 16, 2008, Order (hereinafter "ECUSA/Diocese Opening Br.") at 1.

[2] See ECUSA/Diocese Opening Br. at 3 ("After [the briefing in response to the Court's August 31, 2007, Order], which explicitly laid out [ECUSA's] and the Diocese's belief and intent to litigate (if necessary) whether the Congregations had contracted away or 'waived' the ability to avail themselves of § 57-9(A)'s procedures, the Court on September 14, 2007, conducted a lengthy hearing regarding the scope of the trial to be conducted in November 2007.").

[3] ECUSA/Diocese Opp'n Br. Pursuant to July 16, 2008, Order (hereinafter "ECUSA/Diocese Opp.") at 2.

The Court has carefully considered ECUSA/Diocese's arguments and reviewed the history of the filings and key events that have occurred since the beginning of this litigation, a summary of which this Court sets forth below. Upon this review, it is clear to this Court that what ECUSA/Diocese earlier pleaded and asserted was not the contracted away or waiver argument it makes today but the following argument, articulated in various ways, but coming down to this, "[ECUSA/Diocese's] canons are binding as a matter of Virginia church property law and, therefore, govern *notwithstanding* § 57-9." CANA Congregations' Responsive Br. Pursuant to the Court's July 16, 2008, Order (hereinafter "CANA Resp.") at 3. *That* issue, however, has already been resolved by this Court in both its April 3, 2008, Opinion on the Applicability of Va. Code § 57-9(A),[4] as well as in this Court's Five Questions Letter Opinion.[5] Moreover, "[i]t is almost impossible to reconcile [the Court's] letter

---

[4] See "Letter Opinion on the Applicability of Va. Code § 57-9(A)," in which the Court then noted that "ECUSA/Diocese argue that 'Virginia law confirms that a legally cognizable. "division" affecting property rights, as described in § 57-9(A), must be a structural division of the denomination accomplished in accordance with that denomination's own rules and polity,' and therefore 'without official action of the General Convention, the evidence demonstrates that no such division has occurred.' But if this Court were to accept the ECUSA/Diocese's definition of 'division,' § 57-9(A) would *never* apply to the ECUSA/Diocese, since the record shows that, according to ECUSA's canons, the only 'divisions' that are allowed are essentially geographic and an ECUSA congregation is not allowed to decide which diocese to join. Under applicable case law and rules of statutory construction referred to elsewhere in this letter opinion, this Court cannot apply a statute in such a way as to render it meaningless as applied to a particular private party. Perhaps even more significantly, the definition urged by ECUSA/Diocese would make § 57-9(A) a nullity, for if division is defined as requiring the consent of the hierarchy, all the hierarchy need do to defeat the invocation of § 57-9(A) is refuse to recognize or approve the division. Moreover, if the history of division within churches or religious societies in the United Slates informs this Court of anything, it is that division is frequently nonconsensual and contested and takes place without the approval or affirmation of the hierarchy. Indeed, were it otherwise, there would be little need for a division statute, for churches would simply approve divisions and amicably divide up their property without intervention from secular institutions of government." *Id.* at 60-81.

[5] See "Letter Opinion on the Court's Five Questions," (June 27, 2008), in which the Court states: "Once the Circuit Court approves the determination of the congregation as to which branch of a church or society such congregation shall belong, the Court's approval under § 57-9(A) 'shall be conclusive as to the title to and control of any property held in trust for such congregation. . . .' There is nothing ambiguous or elusive in this language. Conclusive means final. In other words, if a trial court finds § 57-9(A) to have been properly invoked (as this Court has done), and if a trial court finds § 57-9(A) to be constitutional (which this Court does today, except in regard to the Contracts Clause issue, which is not yet decided),

opinion on April 3rd and the letter opinion on the [F]ive [Q]uestions with [the] position that the Episcopal Church and the Diocese [are] taking now." 10 August 11, 2008, Hr'g Tr. (hereinafter "Hr'g Tr.") at. 14:13-16. At the August 11, 2008, hearing, the Court further elaborated upon this point in an exchange with counsel for ECUSA/Diocese:

> [Y]ou say that the CANA Congregations are not surprised at all by this. Well, I am skeptical of that, because in my orders and in the litigation that has ensued, I certainly was not under the impression that there was a whole other phase to this litigation.
>
> And, you know, I can tell you that, had I been aware that there was a whole other phase to this litigation dealing with waiver, your position that it was only efficient to [try the waiver issue at the end of the litigation] to me, is not at all persuasive.
>
> The idea that – essentially, you are suggesting that the past year of litigation that we have spent since November 2007 and before the April 3rd opinion I issued, the June 27th five-question opinion I issued, the constitutionality opinion, they all turn out to be a complete waste of time.
>
> And if it is true that, from the beginning, your position was that they waived § 57-9, I do not understand why that would not have been tried first. Because, if they waived it, I would not have had to spend two weeks in trial with you all going over the history of divisions and the history of the Episcopal and Methodist and all the various churches that we discussed and their various divisions and the Civil War statutes and constitutionality issues. All that would never have been addressed by this Court.

---

and if the trial court approves the determination of the congregation regarding its majority vote as to its choice of branch, this then becomes a matter decided. In that event, and only as to those churches that filed § 57-9(A) petitions, the declaratory judgment actions will have been rendered moot. If, on the other hand, the trial court ultimately rules that the Contracts Clause claim renders § 57-9(A) unconstitutional as applied to one or more of the churches that have filed § 57-9(A) petitions, the declaratory judgment actions regarding those churches must be heard and decided, because petitioners in that event will not be able to avail themselves of the division statute. In addition, if the Court does not approve the majority vote determination under § 57-9(A) as to one or more churches, the declaratory judgment actions regarding those churches must be heard and decided." *Id.* at 11.

Hr'g Tr. 15:12-16:17.

The new argument that ECUSA/Diocese are now attempting to assert is "that there is a third component to whether [§ 57-9(A)] applies: Did the CANA Congregations contractually relinquish their rights"[6] to invoke § 57-9(A) in the first place? *That* affirmative defense – the contention that the CANA Congregations have given up or waived their right to ever invoke § 57-9(A) in the first place – is an entirely different creature from any affirmative defense previously pleaded or articulated by ECUSA/Diocese, and, coming as it does a year and eight months after the filing of the original § 57-9 petitions, is untimely in the extreme.

## B. *History of This Litigation*

The following timeline of key events in this litigation illuminates the Court's reasons for concluding that ECUSA/Diocese's new waiver argument untimely and unpleaded.

1. December 2006: The first § 57-9 petitions are filed.

2. January 2007: ECUSA and the Diocese file their answers to the § 57-9 petitions, which also contain affirmative defenses.

The Diocese's affirmative defenses are as follows:

> 1. The property held by the trustees for [specific congregation] was acquired and has been maintained for hundreds of years through charitable gifts donated to and by members of a parish of the Episcopal Church. Principles of charitable trust law preclude the current membership of [specific congregation] from diverting that property to another mission of their own choosing.
>
> 2. Pursuant to the Canons of The Episcopal Church and the Diocese, which are binding on [insert specific congregation], real and personal property held by and for the benefit of churches such as [specific congregation] must be used for the mission and ministry of the Episcopal Church and the Diocese and may not be diverted to any other mission.
>
> 3. The rules of the Episcopal Church and the Diocese of Virginia, by which [specific congregation] is bound, do not permit [specific congregation] or any other parish to unilaterally "disaffiliate" from the Episcopal Church.

---

[6] CANA Resp. at 3.

 4. If Va. Code § 57-9 is interpreted in the fashion that [specific congregation] appears to interpret it, then it is in violation of the Constitution of the United States and the Constitution of Virginia.

The Episcopal Church's affirmative defenses are virtually identical to those of the Diocese.

 A review of the actual language used within these answers and affirmative defenses confirms that they do not contain the contention that the CANA Congregations could not invoke § 57-9(A) due to the fact that the CANA Congregations had contractually waived or otherwise given up their rights to ever invoke § 57-9(A).

 3. January 31, 2007: Diocese files complaints against each of the eight CANA Congregations that had filed § 57-9 petition, as well as against three other CANA Congregations.

 4. February 9, 2007: ECUSA files its own separate complaint against the eleven CANA Congregations and their rectors, vestry members, and other leaders.

 5. April 10, 2007: A three-judge panel is appointed by the Supreme Court of Virginia pursuant to Va. Code § 8.01-267.4. That panel issues an order transferring to, and consolidating all of the above proceedings, in the Circuit Court of Fairfax County.

 6. May 11, 2007: Counsel for ECUSA and the Diocese each send letters to the Court in response to its request for briefing on case management. Neither of these letters contains an assertion that the Court should consider or address the issue as to whether the CANA Congregations contractually waived their rights to ever invoke § 57-9(A) in the first place. Rather, the letters suggest that the application, interpretation, and, if necessary, consideration of the constitutionality of Va. Code § 57 9(A) are "discrete, key issue[s]" that this Court should resolve as soon as possible. *See, e.g.,* May 11, 2008, Letter from ECUSA:

 We believe that the interpretation and application of § 57-9 is indeed a discrete, key issue that can and should be decided as soon as practicable. The resolution of this issue *would dispose of the eight § 57-9 proceedings filed by the departed congregations,* as well as resolve the validity of what we understand to be defendants' principal defense to the declaratory

judgment actions, thus clearing the way for additional summary judgment motions on other issues that may well limit, or perhaps eliminate, the need for trial.

*Id.* (emphasis added). Likewise, the May 11, 2008, Letter from the Diocese reads in pertinent part:

> The Diocese believes that the interpretation and application of Va Code § 57-9 is a discrete, key issue, that can be tried separately and should be tried as soon as practicable. This will dispose of the eight § 57-9 proceedings, adjudicate the primary defense to the declaratory judgment actions, and potentially enable the Court to rule on the declaratory judgment actions by summary judgment.

*Id.*

7. May 21, 2007: Court conducts a pretrial conference regarding case management. ECUSA/Diocese do not now assert that, at that conference, they contended that a component to be considered in the application and interpretation of § 57-9 was whether the CANA Congregations had contractually given up their rights to invoke the statute in the first place.

8. May 31, 2007: Based upon the issues discussed in the May 21, 2007, scheduling conference, this Court issues an order stating that it will hold a November trial for the purpose of addressing the applicability of § 57-9 to the instant dispute. That order directs the parties to complete discovery regarding *all issues* related to this litigation at least fifteen days prior to the November 2007 trial. Subsequently, in response to a specific interrogatory that the CANA Congregations served upon ECUSA/Diocese, which requested that ECUSA/Diocese identify "all factual and legal bases for [their] contention that the [CANA] congregations' petitions do not comply with Va. Code § 57-9,"[7] ECUSA/Diocese respond only by contesting the meaning of the various statutory terms utilized in to § 57-9(A) and contending that application of § 57-9(A) to this litigation would be unconstitutional.

The Court notes that ECUSA/Diocese argue that, "[a]s early as July 2007, the Congregations served discovery addressing our contractual claims the same factual issues that underlie the 'waiver' defenses," (ECUSA/Diocese

---

[7] See CANA Opening Br., Exs. C & D.

954

Opp. at 3), and thus ECUSA/Diocese claim that this provides further proof that the CANA Congregations have been on notice of ECUSA/Diocese's waiver theory all along. The Court has carefully reviewed the specific discovery requests that ECUSA/Diocese claim indicate that the CANA Congregations were "on notice of ECUSA/Diocese's waiver theory," but the Court does not find that any of these discovery requests provide any such definitive proof. For example, ECUSA/Diocese cite the following requests for admission, among others, as examples of such "discovery," none of which in the Court's opinion indicate that the CANA Congregations were on notice of any such "waiver" theory:

> 10. Falls Church real property is currently titled in the names of Trustees for Falls Church.
> 11. Falls Church personal property was purchased by Falls Church.
> 12. You have never purchased or contributed to the purchase of Falls Church real property.
> 13. You have never purchased or contributed to the purchase of the Falls Church personal property.
> 14. You have never had possession of Falls Church real property. . . .
> 20. You have never paid for or contributed to the cost of the maintenance of Falls Church real property.
> 21. You have never paid for or contributed to the cost of the maintenance of Falls Church personal property. . . .
> 26. You have never accepted liability as a land owner for any personal injury on Falls Church real property.
> 27. You have never accepted liability upon any monetary obligation of Falls Church. . . .
> 44. At all relevant times, Falls Church has had the responsibility of hiring, supervising, and paying the employees who operate at Falls Church.

ECUSA/Diocese Opp. at Ex. 3 ("Defendant, The Falls Church's First Individual Request for Admissions Directed to The Episcopal Church and to the [sic] Episcopal Church in the Diocese of Virginia").

The argument that the CANA Congregations contractually waived their rights to ever invoke § 57-9(A) in the first place is nowhere to be found.

9. August 17, 2007: The parties file briefs regarding their view as to what the scope of the November trial should be. The main thrust of ECUSA/Diocese's brief addressing the scope is found in the following excerpt from their August 17th brief:

> We expect that the principal disputed issues to be decided at or in connection with the November 19, 2007, hearing will be: (1) Is the Anglican Communion a "church or religious society" for purposes of § 57-9(A); (2) does the disaffiliation of a majority of the members of one or more congregations of a hierarchical church constitute a "division" for purposes of § 57-9(A); and (3) have the petitioner congregations joined a "branch" of the Episcopal Church or the Diocese within the meaning of § 57-9?

ECUSA/Diocese Mem. Regarding Scope of § 57-9 and Application of Va. Code § 57-9 to these Cases at 13. Again, the waiver argument is nowhere to be found.

10. August 31, 2007: This Court issues an order requesting that the parties address certain questions regarding the relationship of the § 57-9 petitions to the declaratory judgment actions. ECUSA/Diocese assert that the following excerpt from their brief responding to that August 31, 2007, order, which was filed on September 10, 2007, clearly sets forth a "waiver" theory in "unmistakable terms:"

> The churches cannot obtain a final judgment in their favor in the § 57-9 actions without succeeding in each of two steps. First, the Court must find that the requirements of the statute are satisfied. . . . Second, the Court must find both that the congregations may utilize these statutory provisions of § 57-9, in view of other statutory requirements and the congregations' other legal obligations and commitments, *and* that application of the statute does not violate any constitutional mandates or prohibitions. As the Virginia Supreme Court has made clear, both of these latter issues are inextricably tied to the Diocese's and the Episcopal Church's affirmative claims in the Declaratory Judgment actions. . . . These issues (if it were necessary to reach them) thus should be tried simultaneously with the Declaratory Judgment actions. . . .

956

> The Church and the Diocese will submit evidence that the congregations and their leaders are bound by the Church's and the Diocese's Constitutions and Canons and that those documents, the deeds to the property, and the course of dealings between the parties establishes their trust, contractual and proprietary interests in the property at issue. . . . [T]he congregations and their leaders have legally bound themselves to an alternative structure and rules that preclude a congregation from controlling the disposition of property through a majority vote. . . .

ECUSA/Diocese Opp. at 5 (emphases omitted).

A corresponding footnote to the above excerpt cites various cases that supposedly establish that "generally speaking, parties may privately order their affairs in a manner that supersedes otherwise-applicable statutory provisions." ECUSA/Diocese Opp. at 5 (citing The Diocese of Virginia's and The Episcopal Church's Response to August 31, 2007, Order of the Court (filed Sept. 10, 2007) at 8, n. 5). Though ECUSA/Diocese assert that the above-quoted excerpt and corresponding footnote from one brief set forth the waiver theory to the parties and to this Court in "unmistakable terms," "[b]riefs . . . are not pleadings." *International Longshoremen's Assn v. Virginia Intern. Terminals, Inc.*, 904 F. Supp. 500, 504 (E.D. Va. 1995). And, in fact, this Court agrees with the CANA Congregations that "[the above-quoted sentence and footnote were] legally insufficient to preserve the defense," since "[i]ncluding one sentence buried in hundreds of pages of briefs submitted before trial does not equate to raising a defense via a formal amendment to an answer." CANA Resp. at 4.

In addition, the Court finds that this one sentence and footnote from a brief filed on September 10, 2007, are anything but a clear and unequivocal assertion that the CANA Congregations had contracted away, waived, or otherwise abandoned their right to ever invoke § 57-9(A) in the first place. This Court agrees with CANA's assertion that:

> [t]he sentence to which ECUSA and the Diocese point did not speak of the CANA Congregations having agreed *not to invoke* § 57-9 in the event of a division. Rather, it twice referenced the CANA Congregations and their leaders being "legally bound" by ECUSA's and the Diocese's constitutions and canons. This was simply a reiteration of what the answers claimed – that the

constitution and canons did not allow individual congregations to disaffiliate, and that to hold otherwise would violate ECUSA's and the Diocese's constitutional rights – issues that the Court has addressed in its prior opinions on the applicability and constitutionality of § 57-9.

Of course, if the issue had actually been framed as whether ECUSA's and the Diocese's constitution and canons contained a waiver of the congregations' rights under § 57-9 should a division occur, that issue could have been addressed long ago.

CANA Resp. Br. at 5 (citation omitted).

11. November 13-20, 2007: The Court conducts a five-day trial on the meaning and applicability of Va. Code § 57-9(A). Extensive post trial briefing follows by all parties.

12. April 3, 2008: This Court issues an 83-page letter opinion, concluding that "the CANA Congregations have properly invoked § 57-9(A)." In a corresponding order, the Court requests further briefing upon the relevant constitutional issues, as well as oral argument upon the specific Free Exercise and Establishment Clause issues involved. In fact, in that order, the Court goes so far as to *invite* the parties to raise any *additional* constitutional issues that have not yet been raised in the litigation. ECUSA/Diocese respond by alleging Equal Protection and Takings Clause violations.

13. May 28, 2008: The Court conducts a full-day hearing on the Free Exercise Clause and Establishment Clause issues.

14. June 27, 2008: The Court issues a 49-page decision rejecting ECUSA/Diocese's Free Exercise, Establishment Clause, Equal Protection Clause, and Takings Clause challenges. On that that day, the Court issues a fourteen-page decision addressing five statutory issues relevant to the interpretation of § 57-9(A).

It is a full eighteen months since the filing of the first § 57-9 petitions in December of 2006 and a full nine months since this Court and the parties conducted a trial on the applicability of Va. Code § 57-9(A). It is far too late for ECUSA and the Diocese to put forth a new and untimely pleaded affirmative defense of waiver.

ECUSA/Diocese assert that by denying them the right to raise this issue at this late date, the Court would be granting "summary judgment" against them. But this misstates the issue. The issue is not whether this Court should grant a motion for summary judgment against ECUSA/Diocese. Rather, the

issue is whether ECUSA/Diocese should be allowed to litigate a new affirmative defense that asserts that a statute may not be invoked at all, long after that statute has been meticulously dissected at trial and in voluminous briefs and long after the Court has determined that the statute was properly invoked. The answer to that question is "No." And, to the extent ECUSA/Diocese claim that the issue is not new but, rather, an old issue previously pleaded and asserted, the Court rejects that claim. What ECUSA/Diocese now assert is not an issue which can be characterized as mere gloss or a slight variation on a theme or a splinter on the main body of wood. It is no less than a third front comparable in scope to whether § 57-9 was properly invoked and comparable in scope to § 57-9's constitutionality. The notion that it could have been overlooked in litigation this zealously prosecuted and this seriously addressed is, to put it mildly, unpersuasive. In short, the affirmative defense of waiver was not pleaded, and, by failing to do so, the defense of waiver has itself been waived. See CANA Opening Br. at 2 (citing *Virginia Civil Benchbook for Judges and Lawyers* I-72-72 (2007-2008 ed.)). ECUSA/Diocese concede that the *Virginia Civil Benchbook for Judges and Lawyers* cuts against them, agreeing that the *Benchbook* "lists twenty-one affirmative defenses under an introductory paragraph stating the proposition that '[a]ffirmative defenses may be waived unless pleaded'." ECUSA/Diocese Opening Br. at 9, n. 5. ECUSA/Diocese then complain that "[i]n contrast to many other parts of the *Benchbook*, no authority whatever is cited for that proposition." *Id.* That is likely due to the fact that the authors of the *Benchbook* simply assumed that a specific citation was not needed for the proposition that an affirmative defense must be sufficiently pleaded so as to put all opposing parties, as well as the Court, on notice as to what is actually being pleaded.

C. *ECUSA/Diocese's Motion for Leave to Amend to Clarify Defenses in Answers to § 57-9 Petitions is Denied.*

ECUSA/Diocese's position, as this Court understands it, is that it need not be granted leave to amend its affirmative defenses because the matter at hand has already properly been pleaded. In the event however, that this Court were to find that it has not pleaded this matter already, as the Court so finds today, ECUSA/Diocese assert that a motion to amend should be granted. Even if one puts aside the inconsistency of these positions, the relief sought by ECUSA/Diocese ought not, and will not, be granted.

The standard to be applied by a trial court in deciding whether to grant a motion for leave to amend has been previously articulated in full in this Court's May 12, 2008, Letter Opinion regarding ECUSA/Diocese's motion for leave to amend answers to § 57-9 Petitions to add the defense that the application of § 57-9(A) in this litigation violates Va. Code § 57-2.02. That standard is as follows:

Rule 1:8 of the Rules of the Supreme Court of Virginia states:

No amendments shall be made to any pleading after it is filed save by leave of court. Leave to amend shall be liberally granted in furtherance of the ends of justice.

In granting leave to amend, the court may make such provision for notice thereof and opportunity to make response as the court may deem reasonable and proper.

Va. Sup. Ct. Rule 1:8 (2008).

Amendments to pleadings "are not a matter of right, but a trial court's decision refusing leave to amend after a showing of good cause is, *in ordinary circumstances*, an abuse of discretion." *Ford Motor Co. v. Benitez*, 273 Va. 242, 251 (2007) (citing *Mortarino v. Consultant Eng'g Servs.*, 251 Va. 289, 295-96, (1996)) (emphasis added). A court's primary consideration in deciding whether to allow an amendment is whether the opposing party will be prejudiced by allowing the amendment. *See, e.g., Kole v. City of Chesapeake*, 247 Va. 51, 57 (1994) ("in the present case, nothing in the record suggests that the City would have been prejudiced by allowance of the amended bill of complaint. We conclude, therefore, that the trial court abused its discretion in failing to allow the filing of the amended bill.").

The current situation before this Court presents a classic scenario in which an opposing party, in this case, the CANA Congregations, would be severely prejudiced were this Court to now grant ECUSA/Diocese's present Motion for Leave to Amend. The Court need say no more than to simply refer all parties to the timeline outlined above in § B of this letter opinion, which provides abundant evidence that the CANA Congregations would otherwise be severely prejudiced if this amendment were permitted. ECUSA/Diocese's Motion for Leave to Amend to Clarify Defenses in Answers to § 57-9 Petitions is denied.

August 19, 2008

*ECUSA/Diocese's Assertion That § 57-9 is Unconstitutional Because it Violates the Contracts Clause.*

Left unresolved in this Court's June 27, 2008, opinion on the constitutionality of § 57-9 was the contention asserted by ECUSA/Diocese that § 57-9 is unconstitutional because it violates the Contracts Clause. Today, this Court answers several questions of law that collectively resolve the Contracts Clause issue, as follows: § 57-9, as applied to the churches that filed petitions in the instant case, is not unconstitutional on Contracts Clause grounds. With this opinion, the last remaining open question regarding the constitutionality of § 57-9, as applied, has been resolved. For purposes of this litigation, § 57-9 is constitutional.

Specifically, this letter opinion addresses issues 4D and 4E as presented in the Court's Order of July 16, 2008. Those issues are: first (4D): whether the Contracts Clause[8] protects only contractual rights that existed prior to the effective date of the 1867 predecessor statute to § 57-9; and second (4E): whether, in determining the applicability of the Contracts Clause to particular congregations, the Court should consider only the applicable deeds.

Upon a careful review of the briefs submitted to the Court and upon oral argument regarding these issues held on August 11, 2008, the Court holds, for reasons set forth in the following letter opinion, that the answer to Issue 4D is that the Contracts Clause protects only contractual rights that existed prior to the effective date of the 1867 predecessor statute to § 57-9 (hereinafter February 18, 1867). See *Hoskinson v. Pusey*, 73 Va. (32 Gratt.) 428 (1879) ("It is also insisted that the action of the congregation of 'Harmony' church, after the conference at Alexandria held in 1866, operated to transfer the title and control of the property to that portion of the congregation which adhered to the Methodist Episcopal Church South. That action has already been adverted to, and is claimed to have been had under an act of the general assembly, passed February 18th, 1867. . . ."). Further, the Court today holds that, in regard to the question as to the exact nature of the "contractual rights" relevant to issue 4D, the only "contractual rights"

---

[8] U.S. Const., art I, § 10, cl. 1, states, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts. . . ."

that are even possibly subject to the protection of the Contracts Clause here are contractual rights that ECUSA/Diocese possessed in the *property itself* of the CANA Congregations that *vested* prior to February 18, 1867.

The Court also resolves, within this letter opinion, several sub-issues related to 4D that were presented to this Court in both the briefs and during oral argument. These are:

(1) Whether the Contracts Clause protects ECUSA/Diocese's alleged contractual rights in "church plants," that is, rights in the property of congregations that came into existence *after* February 18, 1867, but which were "planted" or "started" by other congregations that existed and possessed property prior to February 18, 1867.

The Court today holds that "church plants" which came into existence subsequent to February 18, 1867, are not subject to a Contracts Clause claim.

(2) Whether the Contracts Clause protects ECUSA/Diocese's alleged contractual rights in property as to congregations that were founded or that "existed" prior to February 18, 1867, but that did not possess actual *parcels of property* prior to 1867.

The Court holds today that the property subject to a § 57-9 petition must have been obtained by the church prior to the enactment of § 57-9's predecessor in order to even be potentially subject to a Contracts Clause claim.

(3) Whether the holding of *Green v. Lewis*, 221 Va. 547 (1980), addresses the question as to whether this Court should look to the law as it existed in the Commonwealth of Virginia as of February 18, 1867, in order to determine whether ECUSA/Diocese had any vested property rights as of that date.

The Court holds that *Green* does not speak to this issue.

(4) Whether, under Virginia law in effect on February 18, 1867, denominations and dioceses could own, hold, or otherwise acquire an enforceable contractual interest in property in the Commonwealth of Virginia. This specific issue was not presented to the parties in the Court's July 16, 2008, order; rather, at oral argument on August 11, 2008, the Court ordered two additional rounds of supplemental briefs on this issue, which have now been submitted.

The Court holds today that they could not, an answer which by itself is dispositive of all Contracts Clause claims.

The Court, therefore, need not reach Issue 4E, which is rendered moot by the Court's decision as to sub-issue # 4. The Court further notes that, in its briefs, the Commonwealth of Virginia argues that, even "if this litigation involves contracts formed prior to 1867, § 57-9 does not violate the Contracts

Clause." Commonwealth's Resp. Br. Pursuant to the July 16, 2008, Order at 1. This is because, according to the Commonwealth, "[i]n determining whether § 57-9 impairs contracts that existed prior to its enactment, this Court must apply a three-step analytical inquiry." Commonwealth's Br. in Resp. to the Post-Decision Briefs at 29 (citing John E. Nowak and Ronald D. Rotunda, *Constitutional Law*, § 11.8 (7th ed. 2004)). These three steps include, "[f]irst, has the enactment of § 57-9 'operated as a substantial impairment of a contractual relationship'," Commonwealth's Br. in Resp. at 29 (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)), "[s]econd, '[i]f the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem'," Commonwealth's Br. in Resp. at 30 (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983)), and "[t]hird, the finding of a significant and legitimate public purpose is not, by itself, enough to justify the impairment of contractual obligations," in that "[a] court must also satisfy itself that the legislature's 'adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption'." Commonwealth's Br. in Resp. to the Post-Decision Briefs at 30 (citing *Keystone Bituminous Coal Ass'n v. DeBenticus*, 480 U.S. 470, 506 (1987)). The Court need not reach the issues raised by the Commonwealth's argument, because it finds the Contracts Clause to be inapplicable to any of the petitioner congregations.

### I. The Contracts Clause Protects Only "Contractual Rights" That Existed Prior to February 18, 1867.

#### A. The Contracts Clause Only Applies Retrospectively.

On this issue, the parties are in agreement. As ECUSA/Diocese state, "according to applicable case law, legislative action may violate the Contracts Clauses when it impairs 'preexisting' or 'past' contracts. In other words, the Contracts Clauses protect rights and obligations in contracts that existed prior to February 18, 1867, the effective date of the predecessor statute to § 57-9." ECUSA/Diocese Opposition Br. Pursuant to July 16, 2008, Order (hereinafter "ECUSA/Diocese Opp.") at 6. It is, in fact, black-letter constitutional law that the Contracts Clause has only a retrospective application. See *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 260-62 (1827). Similar to the Due

Process Clause, the Contracts Clause "solely protect[s] pre-existing entitlements," *Weaver v. Graham*, 450 U.S. 24, 30 (1981), and thus "whether a right has vested is important for claims under the Contracts or Due Process Clauses." *Id.* at 29-30. It follows, then, that, in applying the Contracts Clause to this litigation, the Court must consider February 18, 1867, as the "cut-off date" for determining whether "rights" relevant to this litigation were vested and thus protected by the Contracts Clause.

B. *Definition of "Contractual Rights"*

The parties do not agree, however, as to the actual nature of the "contracts" that are subject to the Contracts Clause in the present litigation. On this point, ECUSA/Diocese assert that it "is not disputed that the polity and rules of the Episcopal Church and the Diocese pre-date 1867. Those contracts have continued to the present, and the relevant contractual obligations have not changed." ECUSA/Diocese Opp. at 6. Similarly, ECUSA/Diocese argue that "case law cited by both sides refutes the argument that the Contracts Clauses protect only interests in specific pieces of property." ECUSA/Diocese Opp. at 7. To this end, ECUSA/Diocese frame the issue as follows:

> [T]he issue is *not* whether the Church and the Diocese have title or "property ownership" rights (which are enforceable against the property itself).[9] The issue is whether the Episcopal Church and the Diocese have *contractual* rights (which are enforceable *in personam* against the Congregations), which are protected from divestiture by the Contracts Clauses.

ECUSA/Diocese Opp. at 8.

ECUSA/Diocese further argue that "the [CANA] Congregations cite no decision holding that the Contracts Clauses protect only vested interests in specific real property." ECUSA/Diocese Opp. at 7-8. However, this statement does not accurately describe the CANA Congregations' position, which can be summarized as follows:

---

[9] See August 11, 2008, Hr'g Tr. (hereinafter "Hr'g Tr.") at 61:20-62:13, in which Mr. Somerville, arguing for ECUSA/Diocese, argued that neither ECUSA nor the Diocese were asserting a vested right in real property prior to 1867.

Rather [the CANA Congregations] are noting that the Contracts Clause protects only contractual rights that vested prior to the challenged statute's adoption, and that whether a right has vested *here* must be analyzed under the specific law (church property) that applied in the relevant jurisdiction (Virginia) during the relevant time period (prior to 1867). In some hypothetical case, the Contracts Clause might prevent impairment of vested contract rights based on associational rules.

CANA Congregations' Reply Brief Pursuant to the Court's July 16, 2008, Order (hereinafter "CANA Reply") at 5. See also the statement of CANA's counsel at oral argument on August 11, 2008: "Mr. Johnson: I did not mean to suggest that the Contracts Clause in the abstract could not protect some other sort of contractual interest, but this case is about property and the statute is about property." August 11, 2008, Hr'g Tr. 84:15-18.

The Court today finds that ECUSA/Diocese's argument in regard to the "contractual rights" at issue in this litigation contains a fatal flaw in logic. That is, ECUSA/Diocese proceed upon the assumption that there is ultimately a difference between the assertion of "contractual rights" enforceable *in personam* against the Congregations versus asserting contractual rights enforceable against the *actual property at issue in this litigation* itself. But ECUSA/Diocese's *in personam* contractual rights argument ultimately places them in the same position as if they were in fact asserting "property ownership" rights enforceable against the property itself, since ECUSA/Diocese, under either assertion, are in fact "asserting rights to specific properties and they are seeking specific relief" from this Court, "an order transferring title to the diocesan bishop." CANA Reply at 10. In other words, both assertions of contractual rights are ultimately the same, and they lead to the same relief.

Moreover, § 57-9(A) is a statute that determines *property rights* upon a division in a church or religious society. ECUSA/Diocese state that "the Contracts Clauses . . . protect more than just vested interests in specific pieces of real property. Existing contractual commitments are protected, whether they establish only contingent interests in property or indeed have nothing to do with real property at all." The Episcopal Church's and the Diocese of Virginia's Opening Br. Pursuant to July 16, 2008, Order (hereinafter "ECUSA/Diocese Opening Br.") at 16. The Court fully agrees with this statement. The problem with the statement, however, is that it makes an irrelevant point, since, at its

heart, this dispute is about specific pieces of property. When this Court eventually issues a final order, that final order will determine which of two competing parties is entitled to a *specific piece of property*.

Even assuming, *arguendo* that there were somehow a valid distinction between (a) a claim of pre-1867 vested rights in a contractual agreement with a congregation that all property it owns or will own will be for the benefit of ECUSA/Diocese versus (b) a pre-1867 vested right *in the property itself*, any such *beneficial* ownership interest would not have been recognized prior to 1867. *See, e.g., Maguire v. Lloyd*, 193 Va. 138, 149 (1951), in which the Supreme Court of Virginia remarks that:

> [i]n the light of the historical background, the constitution, and the legislative enactments [in Virginia], it is clear that the economic and resulting political power of churches was what was sought to be limited. The limitation contemplates a restriction on this power in all its forms, not only where the legal title is vested in the church or religious congregation, or the trustees thereof, but where the *beneficial title*, the right to use the fruits of the corpus of the gift, grant, or bequest, is vested in the church or religious congregation, or the trustees thereof.

*Id*. at 149 (emphasis added).

## II. *The Contracts Clause Does Not Protect ECUSA/Diocese's "Contractual Rights" in "Church Plants" That Came into Existence after February 18, 1867.*

ECUSA/Diocese argue, for example, that "Church of the Apostles, Church of the Epiphany, and Potomac Falls Church claim to be 'plants' of pre-1867 congregations and may be bound by the contractual obligations of the 'planter' congregations." ECUSA/Diocese Opp. at 6, n. 4. ECUSA/Diocese cite *National Collegiate Athletic Assn. v. Roberts*, 1994 U.S. Dist. LEXIS 21576 (N.D. Fla. 1994), in support of this argument, even while acknowledging that it does not "squarely address[] this issue." ECUSA/Diocese Opening Br. at 13. ECUSA/Diocese state that, in *Roberts*:

> the court held that a state statute establishing requirements and procedures applicable to the NCAA's disciplinary proceedings that varied from those set forth in the NCAA's own rules and

bylaws violated the Contracts Clause *in toto*, and it permanently enjoined the defendants from enforcing the statute. At the time of the decision, there was at least one Florida institution (the University of North Florida) that had joined the NCAA after the adoption of the statute in 1991. Several others have joined subsequently. The Court did not hold or even suggest that the statute might be constitutionally applied to the NCAA in its dealing with new members. The statute purported to impact the NCAA's pre-existing rules and procedures, and that legislative intervention could not survive the Contracts Clause challenge. The same is true here.

ECUSA/Diocese Opp. at 13 (citations and footnotes omitted).

*Roberts*, however, is not binding upon this Court, nor does it address the subject of vested rights in real property. But even if it were relevant, *Roberts* appears actually to support the CANA Congregations' position here. *Roberts* relies upon *National Collegiate Athletic Assn. v. Miller*, 795 F. Supp. 1476 (D. Nev. 1992), *aff'd* 10 F.3d 633 (9th Cir. 1993), *cert. denied* 511 U.S. 1033 (1994), for its holding in regard to the Contracts Clause. In *Miller*, the court held that the "threshold issue" for it to consider in determining whether a Contracts Clause violation had occurred was "whether a contractual relationship existed between the Nevada member institutions and the NCAA prior to the passage of [the state statute at issue]." *Id.* at 1486. Because both of the Nevada NCAA member institutions in question became members of the NCAA before the passage of the statute, the *Miller* Court concludes that "the record establishes that the NCAA and the Nevada NCAA member institutions have a contractual relationship sufficient to trigger review under the Contract Clause." *Id.* Thus, it is true that, "even judged by [ECUSA/Diocese's] own standard of what is relevant (cases involving laws restricting NCAA rules), the only reported decision rejects their position that the affected party need not have been a member of the association prior to the statute's adoption." CANA Resp. at 12.

Even assuming, *arguendo*, that ECUSA/Diocese possessed vested "contractual obligations" relevant to this litigation in any pre-1867 congregations, it does not follow that they would thus also have rights in the property of congregations that came into existence *after* February 18, 1867, but which were "planted" or "started" by other pre-1867 congregations. That is because a "vested" right is "a right, so fixed that it is not dependent on any future act, contingency, or decision to make it more secure." *Kennedy Coal*

*Corp. v. Buckhorn Coal Corp.*, 140 Va. 37, 45 (1924). ECUSA/Diocese thus cannot have a pre-1867 vested right in properties of congregations that did not even exist prior to 1867, because that would mean that any "rights" of ECUSA/Diocese in such "planted" congregations were dependent upon a future event or contingency (the formation of the new congregation), and thus not vested. Indeed, "forming a contract requires *mutual* assent and the communication of that assent. A congregation that did not yet exist and hold property in 1867, therefore, cannot have communicated its assent to grant the Church pre-1867 vested rights." CANA Reply at 4. At oral argument, counsel for ECUSA/Diocese conceded that its position presented a "question of first impression:"

> The Court: But how — well, let us address the various issues one at a time . . . it sounds like you acknowledge the fact that your strongest case involves a congregation that existed prior to 1867.
>
> You are saying that a congregation that comes into existence after 1867, that knowingly signs on to the agreements that existed prior to 1867, is in the same posture as a congregation that existed prior to 1867.
>
> Mr. Somerville: Yes, and we think the best analogy would be a collective bargaining agreement between an employer and a union. New workers who are employed after the date of the collective bargaining agreement are bound by that agreement, and the employer is bound by that agreement as to those workers. We think that is a good analogy to the case that we have here.
>
> The Court: Except there is a strong public policy, even a constitutional interest, in a legislative body, such as the General Assembly, being able to have statutes that . . . are enforced, and the Contract Clause, it appears, makes – renders unenforceable and unconstitutional those statutes.
>
> So it is a little different from a collective bargaining agreement. Here you are asking me to invalidate a statute as applied based on a contract, that there were not two parties to it at the time the statute was passed. . . .
>
> [I]t is a pretty ambitious position you are asking me to take, that a congregation that came into existence, say, in 1980 would – that the 1867 statute would be unconstitutional on

Contract Clause grounds because they accepted the polity and the Constitution and the Canons of the Episcopal Church that existed back in 1867.

Mr. Somerville: Well, we think, Your Honor, that it makes sense for the same rules to apply to all parties to the contract. . . .

The Court: Excuse me. Isn't there a difference? The difference is the contract that existed, according to you, between the congregation and the general church in 1867, it existed at the time the statute was passed.

The contract between a church that came into existence in 1960 or 1980, that contract did not exist back in 1867. They were not parties to that contract. You are saying that an entity in 1980 can invalidate a statute passed in 1867 by agreeing to the general church's Constitution and Canons that existed in 1867. Don't you see that as a pretty ambitious position?

Mr. Somerville: I see that as a question of first impression.

Hr'g Tr. 54:13-57:1.

### III. *The Contracts Clause Does Not Protect ECUSA/Diocese's Alleged Contractual Rights in Property Not Acquired Prior to February 18, 1867, Whether or Not the Congregations Acquiring the Property Did Themselves Exist Prior to 1867.*

The Court today finds that, even if a congregation was "in existence" prior to February 18, 1867, if that congregation had not actually acquired a specific parcel of property by that date, the Contracts Clause would not protect any alleged "rights" that ECUSA/Diocese may have as to any post-1867 property obtained by that congregation. At oral argument, counsel for ECUSA/Diocese conceded that this also appears to be a question of "first impression." Hr'g Tr. 57:8-59:5. Vested rights in property cannot lie where the property itself has not been acquired as of the date of the supposed vesting. Nor can ECUSA/Diocese convert or transmute property acquired after 1867 into property treated as if it was acquired *prior* to 1867, even by reference to ECUSA/Diocese's constitution or canons. The Contracts Clause limits the power of the state to impair contract rights. It is not alchemy.

In fact, although it is not the basis of this Court's decision, it is worth noting that the approach urged upon this Court by ECUSA/Diocese, which would require significant parsing of their canons and rules, would risk placing this Court in the midst of the very religious thicket about which ECUSA/Diocese has frequently warned the Court. See *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969), in which the U.S. Supreme Court held that the First Amendment does not "permit a civil court to award church property on the basis of the interpretation and significance the civil court assigns to aspects of church doctrine." *Id.* at 441.

IV. *The Holding of Green v. Lewis Does Not Address*
*the Issues Presented in Today's Letter Opinion,*
*and More Specifically, Green Does Not Address*
*the Question as to Whether This Court Should Look*
*to the Law as It Existed in the Commonwealth of Virginia*
*as of February 18, 1867, in Order to Determine*
*Whether ECUSA/Diocese Had Any Vested Property Rights*
*as of That Date, a Question That the Court Today*
*Answers in the Affirmative.*

*Green v. Lewis*, 221 Va. 547 (1980), does not speak to whether the Contracts Clause renders § 57-9(A) unconstitutional as applied to the specific properties at issue in this litigation. ECUSA/Diocese argue that "the Virginia Supreme Court has specifically identified the evidence that religious denominations may use . . . to prove a contractual interest in local church property: the rules of the general church and the 'course of dealing between the parties,' no less than the deeds, may reveal such contractual interests." ECUSA/Diocese Opening Br. at 17. ECUSA/Diocese also argue that *Green v. Lewis* "answers th[e] question" as to "whether [the Court] should look only to the law in effect in 1867 or look to the law in effect today." Hr'g. Tr. 62:16-18. As the Court has previously held, however, *Green v. Lewis* is not a § 57-9(A) case,[10] nor a Contracts Clause case. That is a significant distinction because the question of vested rights must turn on the law as it existed at the alleged date of vesting.

---

[10] "Letter Opinion on the Court's Five Questions" (June 17, 2008), *supra* ("*Green v. Lewis* is not a case interpreting or applying § 57-9(A).").

V. *Under Virginia Law in Effect on February 18, 1867,*
*Denominations and Dioceses Could Not Own, Hold, or Otherwise Acquire*
*an Enforceable Contractual Interest in,*
*Property in the Commonwealth of Virginia.*

The Court has already partially ruled upon this issue in its Five Questions Letter Opinion of June 27, 2008,[11] and today, it does so completely.

It is a historical and legal fact that, as the CANA Congregations argue, "Virginia law in effect in 1867 did not permit denominations such as the Episcopal Church or the Diocese of Virginia to hold or acquire interests in property." CANA Congregations' Opening Br. on Supplemental Issue Pursuant to the Court's August 11, 2008, Hearing (hereinafter "CANA Supp'l Opening Br.") at 2. In 1867, Virginia churches and religious societies were not permitted to incorporate; in 1850, the Virginia Constitution had specifically provided that "[t]he General Assembly shall not grant a charter of incorporation to any church or religious denomination, but may secure the title to church property to an extent to be limited by law." CANA Supp'l Opening Br. at 2-3 (citing Va. Const., art. IV, § 32 (1850)). This changed in 2005, when, in the wake of *Falwell v. Miller*, 203 F. Supp. 2d 624 (W.D. Va. 2002), Va. Code § 57-16.1 was added, which allowed Virginia churches to incorporate. *See* "Letter Opinion on the Court's Five Questions," *supra*. Because they could not incorporate, "[d]enominations were therefore without a 'legal existence' in Virginia." CANA Supp'l Opening Br. at 3 (citations omitted).

Because denominations did not have a legal existence, they "held the status of voluntary associations under 1867 Virginia law," and "[b]ecause their membership was 'indefinite,' attempts to transfer interest in property to (or for the benefit of) such entities were void unless expressly authorized by statute." CANA Supp'l Opening Br. at 5. *Brooke v. Shacklett*, 54 Va. (13 Gratt.) 301 (1856), provides a helpful summary of the history of early church property law in Virginia:

> In the case of *Gallego's ex'ors v. Attorney General*, 3 Leigh 450, decided by this court in 1832, it was held that the courts of chancery in this state had no jurisdiction to enforce devises and bequests to religious societies or congregations. The court said,

---

[11] *See* "Letter Opinion on the Court's Five Questions," *supra* ("Thus, § 57-7.1 did not change the policy in Virginia, which is that church property may be held by trustees for the local congregation, not for the general church.").

that as the statute of charitable uses, 43 Eliz. under which alone such vague bequests could be established, if ever in force in Virginia, had been repealed in 1792, in the general repeal of English statutes, charitable bequests were to be treated as standing on the same footing with other bequests. If definite, they were to be treated as trusts which courts of equity would execute by virtue of their ordinary jurisdiction; but if indefinite, they were no longer recognized by law, and could not be enforced: *And a devise or bequest of property to or for the uses of a religious congregation was, it was said, of the character last mentioned. It was too uncertain as to the beneficiaries.*

*Id*. at 309 (emphasis added). *Brooke* further adds, however, that an "act" passed in 1842 and then reenacted and amended in 1849[12] specifically authorized conveyances, devises, and dedications of property to religious societies and congregations, so that such conveyances, devises, and dedications of property would not fail for indefiniteness. However, the Court in *Brooke* further clarifies that:

the conveyances, devises, and dedications to which the acts mean[t] to give validity, are conveyances, devises, and dedications of property for the use of the "religious congregations" therein mentioned, in the limited and local sense of the term, *viz.* for the members (of these religious congregations) as such, who, from their residence at or near the place of public worship, may be expected to use it for such purpose.

*Id*. at 313. Indeed, the Court added that:

[n]o dedication of property to religious uses, which does not respect these rights of the local society or religious congregation, no deed which does not design such enjoyment of the uses of the

---

[12] The text of this "act" reads in pertinent part: "Every conveyance, devise, or dedication, shall be valid, which since the first day of January, seventeen hundred and seventy-seven, has been made, and every conveyance shall be valid which hereafter shall be made, of land for the *use or benefit of any religious congregation* as a place for public worship or as a burial place or a residence for a minister; and the land shall be held for such use or benefit, *and for such purpose and not otherwise*." Code of Va., Ch. 77, § 8, p. 362 (1849) (emphasis added).

property conveyed, by the local religious society or congregation, can be placed within the influence and protection of the statutes.

*Id*. (emphasis added). Thus, if, for example, the deed at issue in *Brooke* had established a:

trust, not for the benefit of a local society, or congregation of Methodists worshiping or expected to worship at a particular place, but for the benefit of the 'Methodist Episcopal church in the United States as an aggregate body or sect,' to the exclusion of any peculiar rights of property in the land conveyed, in such local society or congregation. . . . [the deed at issue] would plainly stand . . . out of the influence and operation of the statutes.

*Id*. at 314. In other words, the deed would have been void. *Brooke* was an 1856 case, but the law in effect in 1856 remained essentially unchanged by 1867, as confirmed by a review of *Hoskinson v. Pusey*, 73 Va. (32 Gratt.) 428 (1879), in which the Court there states that:

[t]he deed is the same in substance as the deed in *Brooke & others v. Shacklett*, 13 Gratt. 301, and the construction must be the same. According to that construction, the conveyance is not for the use of the Methodist Episcopal Church in a general sense. *Such a conveyance in this state would be void. But it is a conveyance for the use of a particular congregation of that church, in the limited and local sense of the term* – that is, for the members, as such, of the congregation of the Methodist Episcopal Church, who, from their residence at or near the place of public worship, may be expected to use it for that purpose. Such a conveyance is valid under our statutes. See Code of 1873, ch. 76, § 8.

*Id*. at 431 (emphasis added).

ECUSA/Diocese cite *Brooke*, *Finley v. Brent*, 87 Va. 103 (1890), and *Hoskinson* for the proposition that a denomination or diocese could in fact own, hold, or otherwise acquire an enforceable contractual interest in property in the Commonwealth of Virginia prior to 1867. A close examination of these

cases, however, demonstrates that none of these cases support ECUSA/Diocese's position, and in fact cut directly against it. That is because the warring parties in *Brooke, Hoskinson,* and *Finley,* were in fact all *members* of specific local congregations.

In *Brooke,* for example, the dispute was between "factions of the *members* of the congregations worshipping at two church-houses in Fauquier county, Virginia – one faction supported the Methodist Episcopal Church, while the other supported the Methodist Episcopal Church South." "Letter Opinion on the Applicability of Va. Code § 57-9(A)," (April 3, 2008), at 63 (emphasis added). In *Hoskinson,* "[t]he respective claimants belong[ed] to separate and distinct religious organizations. On the one side, they are *members* of the Methodist Episcopal Church, on the other, *members* of the Methodist Episcopal Church South." *Hoskinson,* 73 Va. at 431 (emphasis added). And in *Finley,* "the plaintiffs, *members* of the Methodist Protestant Church, alleged that they had been shut out of their church building by *members* of the Methodist Episcopal Church South." "Letter Opinion on the Applicability of Va. Code § 57-9(A)," (April 3, 2008), at 68 (emphasis added).

In none of these cases was the general denomination or diocese an actual party to the dispute. And although ECUSA/Diocese argue that the Court in *Brooke, Hoskinson,* and *Finley* "enforced the restrictions and interests that the deed [in each of those cases] simultaneously granted to the identified denomination,"[13] the Court agrees with CANA's position that:

> ECUSA and the Diocese are confusing the question whether a grantor could restrict the use of church property to those members of the congregation adhering to a specific denomination with the question whether a denomination could itself have an enforceable interest in such property. No nineteenth century Virginia case finds *any* denomination or diocese – entities that lacked legal standing and the ability to contract – to have had *any* enforceable interest in property.

The CANA Congregations' Reply Br. on Supplemental Issue Pursuant to the Court's August 11, 2008, Hr'g at 4. The CANA Congregations further assert that "[n]or do the pre-1867 deeds [of the CANA Congregations]

---

[13] The Episcopal Church's and the Diocese of Virginia's Opening Brief Pursuant to August 11, 2008, Order at 3.

restrict the property here to use for worship under [ECUSA/Diocese's] auspices," *Id.* at 4, but the Court need not, and does not, reach that factual issue.

Finally, the Court would note that ECUSA/Diocese argue that "[t]he General Assembly's restrictions on denominational ownership are unconstitutional and may not be enforced today." The Episcopal Church's and the Diocese of Virginia's Opening Brief Pursuant to August 11, 2008, Order at 9. But that is not the question that this Court must consider. For the purpose of determining vested rights in a Contracts Clause analysis, the question is whether the Commonwealth's rule prohibiting denominations and dioceses from holding property was unconstitutional in 1867. And the answer to *that* question is a definite "no," since, as of February 18, 1867, the First Amendment to the United States Constitution was not even applicable to the Commonwealth of Virginia, since the Fourteenth Amendment was not even ratified until 1868. *Danforth v. Minnesota*, 128 S. Ct. 1029, 1034 (2008) ("The ratification of the Fourteenth Amendment radically changed the federal courts' relationship with state courts. That Amendment, one of the post-Civil War Reconstruction Amendments, [was] ratified in 1868. . . .").

*Order*

In light of the two letter opinions issued today, August 19, 2008, the Court hereby orders the following:

(1) ECUSA/Diocese's Motion for Leave to Amend to Clarify Defenses in Answers to § 57-9 Petitions is denied;

(2) At the hearing at 2 p.m. on August 22, 2008, the Court will hear from each party regarding the scope of the October trial in light of the decisions issued today.

October 17, 2008

Before the Court is the Diocese's and TEC's Motion for Partial Summary Judgment regarding The Falls Church Endowment Fund, Inc. (hereafter "the Endowment Fund.") The issue before the Court is whether the Endowment Fund is subject to The Falls Church's (hereafter "TFC") petition filed pursuant to § 57-9(A) of the Virginia Code. The Diocese and TEC argue that the Endowment Fund is not subject to § 57-9(A); TFC argues that it is.

In large measure, the facts are not in dispute. The Endowment Fund is a non-profit corporation, organized in 1976, whose "main purpose" is "to further the ministry and outreach of the Christian Church." (Articles of Incorporation of the Endowment Fund, at p. 1.) The Articles provide that the membership of the Corporation is comprised of two classes. Class A members are individuals serving as the vestry of TFC. Class B members are members of the parish who are eligible to vote for the vestry at TFC's annual meeting. According to the Articles, Class A members, i.e., the vestry of TFC, have the duty of electing Directors of the Endowment Fund.

The Diocese and TEC argue that, because the Endowment Fund is a corporation, because it is a distinct legal entity from TFC, because its Directors are appointed by the vestry of TFC rather than by its trustees, and because TFC cannot have a "personal property" interest in a charitable non-profit entity, there is no basis for a finding that its property is subject to TFC's § 57-9(A) petition. TFC does not dispute a number of these assertions. It agrees that the Endowment Fund is a corporation, that it has a distinct legal existence, that its assets are not property held by TFC's trustees, that its directors are not elected by TFC's trustees, and that it is indeed a charitable non-profit entity. TFC asserts, however, that it does have a "personal property" interest in the Endowment Fund that brings the Endowment Fund within the scope of its § 57-9(A) petition.

The resolution of this issue actually turns on the application of § 57-10, rather than § 57-9(A), as both parties recognize and concede. Section 57-10 states the following:

> When personal property shall be given or acquired for the benefit of an unincorporated church or religious body, to be used for its religious purposes, the same shall stand vested in the trustees having the legal title to the land, to be held by them as the land is held, and upon the same trusts or, if the church has created a corporation pursuant to § 57-16.1, to be held by it as its land is held, and for the same purposes.

Thus, if personal property is "given or acquired for the benefit" of a church, it stands "vested in the trustees having the legal title to the land. . . ." and would therefore be subject to a § 57-9(A) petition. In this case, TFC does not assert that its personal property interest arises out of some ownership interest it claims to have in the assets of the Endowment Fund. Rather, TFC asserts that its personal property interest is the power of the vestry to appoint the Endowment Fund's Directors. The Diocese and TEC argue that the right to appoint Directors to a non-profit corporation can never be a "personal property" interest and that, as a pure question of law, the Court should reject TFC's argument and grant the Diocese's and TEC's Motion for Partial Summary Judgment. TFC argues that there are factual matters relevant to the resolution of this issue and, on that basis, the Motion for Partial Summary Judgment should be denied.

The Court takes the Motion for Summary Judgment under advisement and will give both parties the opportunity to present such evidence as each party deems warranted on the question of whether TFC — at the time of the vote to disaffiliate — had a personal property interest in the Endowment Fund by virtue of its vestry's power to appoint the Directors of the Fund. While the Court is skeptical that there is a factual component to this question and is inclined to believe that it is a pure question of law, the Court will give the parties the opportunity to put their facts before the Court.

December 19, 2008

This Letter Opinion resolves the eight remaining issues related to the § 57-9 petitions. All other issues relating to § 57-9, including the applicability and constitutionality of § 57-9, have been addressed in the Court's prior letter opinions. This will permit the Court to enter a Final Order resolving all the § 57-9 petitions and those Declaratory Judgment actions now rendered moot. Those Declaratory Judgment actions which have not been rendered moot have been stayed pending resolution of the appeals of the final order in the § 57-9 proceedings.

I. *CANA Congregations' Motion*
*To Strike Praecipe Filed November 18, 2008*

CANA's motion is denied. All that ECUSA and the Diocese have done is file copies of briefs filed with the Supreme Court of Virginia in connection with the *Trustees of Asbury United Methodist Church v. Taylor & Parrish,*

*Inc.*, 249 Va. 144, 452 S.E.2d 847 (1995). This Court finds no prejudice to CANA or grounds for relief.

### II. *ECUSA'S and the Diocese's Motion To Reconsider Part of the Letter Opinion on the Court's Five Questions*

ECUSA's and the Diocese's motion to reconsider is denied. In their pleadings, the parties argue about the scope and meaning of the Court's Five Question opinion. The opinion, however, speaks for itself, and this Court sees no basis to reconsider or revise its decision.

### III. *The Falls Church's Motion To Strike the Diocese's and the Episcopal Church's Proffer of Evidence as to the Falls Church, Episcopal "Continuing Congregation."*

The Falls Church's Motion to Strike is granted. Throughout this litigation, this Court has endeavored to accommodate counsel, both in connection with the scheduling of hearings and the setting of deadlines for the filing of pleadings. Indeed, to the extent possible, the Court has permitted counsel to consult with each other and come up with their own proposed deadlines, and then this Court has incorporated those agreed-upon deadlines into its scheduling orders. In turn, counsel for both parties, despite the enormous pressures of trial preparation and the requirement of voluminous filings, have been respectful of the Court's orders and the deadlines contained therein. Where the parties have been unable to meet a deadline and properly sought an extension, this Court has consistently accommodated counsel.

Nevertheless, the situation now confronting the Court requires it to grant The Falls Church's Motion to Strike. In order to allow the Diocese and ECUSA to make its record for appellate purposes, the Court permitted the filing of a proffer regarding evidence excluded by the Court. The Court set a firm deadline for the filing of the proffer and reiterated that deadline multiple times. The Diocese and ECUSA, however, did not file their proffer in a timely fashion. And, when they did file the proffer two weeks late, they provided no explanation for the late filing. Nor, significantly, did they seek leave from the Court for permission to make a late filing. Only in response to the Motion to Strike does the Diocese and ECUSA now seek to extend the time for proffer. That Motion is itself untimely.

This Court rejects the explanation now submitted by the Diocese and ECUSA that they did not seek leave of court because "Virginia law does not require leave of court to make a proffer. . . ." (Opp'n TFC's Mot. Strike 86 Mot. Extend Time 1.) If that is the case, the Diocese and ECUSA should have advised the Court at the time it established the deadline that it needed no deadline because it could file its proffer when it saw fit to do so. The salient point is that this Court authorized a specific proffer with specific parameters[2] and with specific deadlines (for both the proffer and counter-proffer). The Diocese and ECUSA did not meet that deadline.

This Court also rejects the Diocese's and ECUSA's argument that The Falls Church is not prejudiced by the Diocese's and ECUSA's untimely filing for the reasons stated at paragraph 10 of the Memorandum in Support of Falls Church's Motion to Strike. (See Mem. Supp. TFC's Mot. Strike ¶ 10.)

Finally, this should be said: The Falls Church argues that ECUSA and the Diocese have acted in "willful disregard" of the Court's deadlines. (Mem. Supp. ¶ 9.) The Court does not so find. Indeed, ECUSA's and the Diocese's explanation that it failed to make its filing in a timely fashion because it "slipped through the cracks amidst the flurry of post-trial filings," strikes the Court as credible. (See Opp'n ¶ 1.) But the issue here is not one of good faith versus bad faith. Rather, the issue here is that a party missed a material and specific deadline by two weeks, that it did not seek leave of the Court for permission to late file its pleading, and that the opposing party has been prejudiced.

Therefore, The Falls Church's Motion to Strike is granted. However, because the granting of the Motion to Strike may itself be an appellate issue, the Court directs the Clerk of the Court to retain in the record the proffer filed by ECUSA and the Diocese and the briefings filed by the parties on the Motion to Strike.

### IV. ECUSA'S and the Diocese's Motion To Reconsider Ruling from the Bench on October 8, 2008

On October 8, 2008, this Court held that it did not have jurisdiction to review Judge Keith's September 29, 2006, final order authorizing the transfer of the property of Christ the Redeemer Episcopal Church to Truro Church. ECUSA and the Diocese now seek reconsideration of that ruling. Their Motion to Reconsider is denied.

---

[2] Because this Court rejects the proffer on timeliness grounds, the Court does not reach The Falls Church's alternative argument that the Diocese and ECUSA have exceeded the parameters authorized for the proffer.

First, the Court finds that Rule 1:1 of the Supreme Court of Virginia is applicable to this situation. Rule 1:1 states that "[a]ll final judgments, orders, and decrees . . . shall remain under the control of the trial court and subject to be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer." Va. Sup. Ct. R. 1:1. Here, well over twenty-one days elapsed before ECUSA and the Diocese challenged Judge Keith's Order, and thus, this Court has no jurisdiction to modify, vacate, or suspend the Order. While ECUSA and the Diocese now argue that they are not directly attacking Judge Keith's Order and that the instant proceedings are separate and distinct (Mot. to Reconsider Ruling from Bench and Supporting Mem. ¶ 4), this Court finds, as Truro Church argues at page 6 of its brief, that ECUSA and the Diocese are making "a direct attack on the September 29, 2006, final Order" and that ECUSA and the Diocese are "specifically seek[ing] to have the order modified, vacated, or suspended, actions which are prohibited by Rule 1:1." (Truro Church's Opp'n Mot. Reconsider 6.) Moreover, this Court does not find that the resolution of this matter is controlled by *Niklason v. Ramsey*, 233 Va. 161, 353 S.E.2d 783 (1987).

Second, the Court does not find at all persuasive the argument by ECUSA and the Diocese that what is at issue here is merely a "clerical error" subject to subsequent correction by this Court pursuant to § 8.01-428(B). Va. Code Ann. § 8.01-428(B) (2007). (See Mot. Reconsider ¶ 6.) That term is defined narrowly because it has the potential to undermine finality of judgments. Thus, it typically applies to scrivener's errors and the like. It certainly does not apply to the instant situation, which is an attack on the substance of Judge Keith's Order.

Finally, although the Diocese and ECUSA allude to § 8.01-428(D) as a basis to re-open and set aside Judge Keith's Order (see Mot. to Reconsider ¶ 6), the Court does not have before it an "independent action" the purpose of which is "to set aside a judgment or decree for fraud upon the court." Va. Code § 8.01-428(D).

Therefore, the Motion to Reconsider is denied.

### V. *The St. Stephen's Church 1874 Deed*

The sole issue regarding St. Stephen's Church is whether the 1874 deed contains an enforceable restriction as to the use of the property that takes it beyond the reach of § 57-9(A). Va. Code Ann. § 57-9(A) (2007). The Court rules that the property conveyed pursuant to the 1874 deed is subject to § 57-9(A) and rejects the arguments asserted by ECUSA and the Diocese in this regard.

In large measure, this matter has already been decided by the Court. As this Court has stated on more than one occasion, § 57-9(A) covers property of a congregation held by trustees. The parties in this case do not dispute that the congregational property in question is held by trustees. The Stipulation provides that "[s]ince the date of the Deed, legal title has been vested in the trustees of St. Stephen's Church." (Stipulation Regarding St. Stephen's Church 1874 Deed ¶ 6.) Therefore, unless § 57-9(A) raises a Contracts Clause issue in the context of this particular deed, the property is subject to § 57-9(A).

ECUSA and the Diocese argue, however, that there is language in the deed which restricts the assignment of this property pursuant to § 57-9(A) to an entity other than an Episcopal Church. They cite the following deed language:

> "To have and to hold the said lot . . . [i]n trust nevertheless and for the sole use and benefit of the religious society and congregation known as the Protestant Episcopal church for the purpose of erecting a house for divine worship and such other houses as said congregation may need,'" and further, provided that "said church or house for divine worship when so built shall be used and enjoyed by said religious society or congregation according to the laws and canons of said church. . . ."

(ECUSA/ Diocese Opening Br. Regarding St. Stephen's 1874 Deed 1-2 (emphasis omitted).)

It should be noted that the parties disagree as to the meaning and significance of this language. ECUSA and the Diocese argue that the language constitutes "an intent to restrict the estate conveyed." (ECUSA/Diocese Responsive Br. Regarding St. Stephen's 1874 Deed 4.) St. Stephen's Church argues that language "referring to the Protestant Episcopal Church is language of identification only, used but once in the deed" and that "this identifier should not be read permanently to restrict the use of the property solely to and by those affiliated with a particular denomination, for if it were so construed, it would defeat entirely the purpose of [§] 57-9(A)." St. Stephen's Church Opening Br. Re 1874 Deed 8-9). The Court does not resolve this dispute because under either interpretation, this is still "property held in trust for such congregation," which is the operative language of § 57-9(A). Va. Code Ann. § 57-9(A) (2007).

This deed, however, was entered into after the passage of the predecessor statute to § 57-9(A) and is, therefore, subject to its terms. Nor were the parties involved unaware of the portion of the Virginia Code containing the division statute. (See St. Stephen's Opening Br. 7 ("Indeed, not only does the 1874 Deed expressly state that the property is to be used in a manner 'not inconsistent with the laws and constitution of Virginia,' the 1874 Deed and the circuit court order authorizing the conveyance both expressly cited Chapter 76 of the 1873 Virginia Code, the very statute that authorized disaffiliation votes as a remedy for denominational divisions.").) While not necessary to the resolution of this matter, it is worth noting that the deed, itself, recognizes the preeminence of Virginia law, stating that "said church or house for divine worship when so built shall be used and enjoyed by said religious society or congregation according to the laws and canons of said church *not inconsistent with the laws and constitution of Virginia. . . .*" *Id.* (emphasis added and omitted). One of those laws, of course, was the 1867 division statute, and this deed, to the extent that it involves property held in trust for a congregation, is subject to the division statute.

As to the Contracts Clause, as this Court stated in its August 19, 2008, Letter Opinion on the Contracts Clause, it "protects only contractual rights that existed prior to the effective date of the 1867 predecessor statute to § 57-9. . . ." In re Multi-Circuit Episcopal Church Prop. Litig. (Aug. 19, 2008), *supra.* Significantly, each of the cases relied upon by ECUSA and the Diocese, *Finley v. Brent*, 87 Va. 103, 12 S.E. 228 (1890), *Brooke v. Shacklett*, 54 Va. (13 Gratt.) 301 (1856), and *Hoskinson v. Pusey*, 73 Va. (32 Gratt.) 428 (1879), involve deeds that *pre-dated* the predecessor statute to § 57-9. (Cf. ECUSA/ Diocese Opening Br. 4-8.)

As to the assertion that parties are free to "order their affairs in a different manner" than contemplated by § 57-9(A), see *id.*, this is a variant of the "contracting around" theory that this Court has already rejected as untimely and waived. See In re Multi-Circuit Episcopal Church Prop. Litig. (Aug. 19, 2008), *supra.* More significantly, however, is the fact that there is no evidence of an effort to "contract around" or avoid the reach of § 57-9(A) in this Deed. To the contrary, the Deed expressly notes the preeminence of Virginia law, which would of course include the division statute.

Therefore, the Court finds for St. Stephen's Church.

## VI. *The Church of the Word Property Dispute*

One issue remains related to the applicability of § 57-9(A) to the Church of the Word (hereafter "COTW"). That is whether the property in question, conveyed by deed dated December 3, 1993, from the Resolution Trust Corporation to "Bradfute W. Davenport, Jr., A. C. Epps, and H. Merrill Pascoe, as Trustees for the Episcopal Church in the Diocese of Virginia, whose address is 8317 Centreville Road, Manassas, Virginia 22111, as Grantee," is subject to COTW's § 57-9(A) petition. The Court finds that the property is subject to the petition.

COTW argues, and ECUSA and the Diocese concede, that this Court's June 27, 2008 Five Questions Opinion disposes of this matter. (COTW Opening Br. 12; ECUSA/Diocese Opening Br. Regarding COTW 4-5.) That opinion held, in part, that, in Virginia, "church property may be held by trustees for the local congregation, not for the general church." In re Multi-Circuit Episcopal Church Prop. Litig. (June 27, 2008), *supra*. Therefore, if the property in question can only be held in trust for the local congregation, ECUSA's and the Diocese's argument that this particular property was held in trust for the Diocese cannot prevail. With that in mind, ECUSA and the Diocese seek reconsideration of that portion of the Court's Five Questions Opinion. (ECUSA/Diocese Opening Br. 4-6.)

The parties make multiple additional arguments.

On the issue of who has made the biggest financial contributions to purchase and maintain the property, ECUSA and the Diocese argue that the Diocese and its member churches contributed far more than COTW. (ECUSA/Diocese Opening Br. 15.) In contrast, COTW argues that it has contributed almost $1 million toward the purchase of the property and servicing the mortgage for the past fifteen years. (COTW's Opp'n Br. 2-3, 5, n. 2.)

On the issue of the significance of a September 2005 Circuit Court Order replacing the Diocesan trustees with trustees selected by COTW (see Stipulation Ex. 28), ECUSA and the Diocese argue that it is irrelevant because the Deed was unchanged and replacing one group of trustees with another has no effect on the beneficial owners of the property. (ECUSA/Diocese Responsive Br. Re COTW 7-9.) COTW argues that replacing the Diocesan trustees with trustees selected by COTW establishes COTW's beneficial interest in the property. (COTW Opening Br. 9-10; COTW Opp'n Br. 4-7.)

On the issue of the language of the Deed itself, ECUSA and the Diocese state that it unambiguously states that the beneficial owner is the Diocese. (ECUSA/ Diocese Opening Br. 11-12.) COTW argues that, by using

a Manassas address in the Deed that is associated only with COTW, and not with the Diocese, the Deed makes clear that the beneficial owner is the congregation, not the Diocese. (COTW Opening Br. 7-8.)

The Court need not resolve these issues because it declines to reconsider its Five Questions Opinion. Both parties recognize that this resolves the instant dispute. Section 57-9(A) covers "property held in trust for such congregation. . ." and covers those "congregation[s] whose property is held by trustees. . . ." Va. Code Ann. § 57-9(A) (2007). The property in question meets this criteria and is, therefore, subject to the disposition under § 57-9(A).

VII. *The Applicability of § 57-9(A)*
*to the Falls Church Endowment Fund*

The sole question before the Court is whether The Falls Church ("TFC") at the time of the vote to disaffiliate had a personal property interest in The Falls Church Endowment Fund by virtue of its vestry's power to appoint the Directors of the Fund. If so, the Endowment Fund is subject to TFC's § 57-9(A) petition. If not, final disposition of the Endowment Fund, *i.e., Who owns the Endowment Fund?*, will have to await the Declaratory Judgment trial. For the reasons stated below, the Court grants ECUSA's and the Diocese's Motion for Partial Summary Judgment and finds that the Endowment Fund is not subject to TFC's § 57-9(A) petition. Disposition of the Endowment Fund is therefore reserved for resolution in the Declaratory Judgment action.

A. *October 17, 2008, Letter Opinion*

On October 17, 2008, this Court issued a Letter Opinion laying out the background of the instant dispute. The Court's Opinion read in part as follows:

> In large measure, the facts are not in dispute. The Endowment Fund is a non-profit corporation, organized in 1976, whose "main purpose" is "to further the ministry and outreach of the Christian Church." (Articles of Incorporation of the Endowment Fund, at p. 1.) The Articles provide that the membership of the Corporation is comprised of two classes. Class A members are individuals serving as the vestry of TFC.

Class B members are members of the parish who are eligible to vote for the vestry at TFC's annual meeting. According to the Articles, Class A members, i.e., the vestry of TFC, have the duty of electing Directors of the Endowment Fund.

The Diocese and TEC argue that, because the Endowment Fund is a corporation, because it is a distinct legal entity from TFC, because its Directors are appointed by the vestry of TFC rather than by its trustees, and because TFC cannot have a "personal property" interest in a charitable non-profit entity, there is no basis for a finding that its property is subject to TFC's § 57-9(A) petition. TFC does not dispute a number of these assertions. It agrees that the Endowment Fund is a corporation, that it has a distinct legal existence, that its assets are not property held by TFC's trustees, that its directors are not elected by TFC's trustees, and that it is indeed a charitable non-profit entity. TFC asserts, however, that it does have a "personal property" interest in the Endowment Fund that brings the Endowment Fund within the scope of its § 57-9(A) petition.

The resolution of this issue actually turns on the application of § 57-10, rather than § 57-9(A), as both parties recognize and concede. Section 57-10 states the following:

When personal property shall be given or acquired for the benefit of an unincorporated church or religious body, to be used for its religious purposes, the same shall stand vested in the trustees having the legal title to the land, to be held by them as the land is held, and upon the same trusts or, if the church has created a corporation pursuant to § 57-16.1, to be held by it as its land is held, and for the same purposes.

Thus, if personal property is "given or acquired for the benefit" of a church, it stands "vested in the trustees having the legal title to the land. . . ." and would therefore be subject to a § 57-9(A) petition. In this case, TFC does not assert that its personal property interest arises out of some ownership interest it claims to have in the assets of the Endowment Fund. Rather, TFC asserts that its personal property interest is the power of the vestry to appoint the Endowment Fund's Directors. The Diocese and TEC argue that the right to appoint Directors to a non-profit corporation can never be a "personal property" interest and that, as a pure question of law, the Court should reject TFC's

argument and grant the Diocese's and TEC's Motion for Partial Summary Judgment. TFC argues that there are factual matters relevant to the resolution of this issue and, on that basis, the Motion for Partial Summary Judgment should be denied.

The Court takes the Motion for Summary Judgment under advisement and will give both parties the opportunity to present such evidence as each party deems warranted on the question of whether TFC — at the time of the vote to disaffiliate — had a personal property interest in the Endowment Fund by virtue of its vestry's power to appoint the Directors of the Fund. While the Court is skeptical that there is a factual component to this question and is inclined to believe that it is a pure question of law, the Court will give the parties the opportunity to put their facts before the Court.

In re Multi-Circuit Episcopal Church Prop. Litig., Oct. 17, 2008, *supra*.

B. *Discussion*

Following issuance of the Court's Letter Opinion, the Court presided over the trial on issues related to the Endowment Fund. Having now heard this evidence and reviewed the documentation offered by the parties in support of their respective positions and having studied what little legal authority exists on the issue, the Court is convinced that, as it is suspected, this is a pure question of law.

The Court's opinion on this issue can be summarized in two words: *form matters*. Indeed, form matters so much that it is a principal reason the Court upheld the constitutionality of § 57-9(A). See In re Multi-Circuit Episcopal Church Prop. Litig. (Letter Opinion of June 27, 2008, on the Constitutionality of Va. Code § 57-9(A)), *supra*. That ECUSA and the Diocese could have held the departing churches in a different form, e.g., in corporate form or in the name of the Bishop, and thus, placed the church properties beyond the reach of the Division Statute is a critical reason for the Court's ultimate holding that the statute did not offend the Free Exercise Clause of the First Amendment. *Id.*

Here, the funds in question are held by a corporation, the Falls Church Endowment Fund. They are not held by the Diocese. They are not held by TFC. They are not held by its trustees. This form of corporate ownership takes the Endowment Fund wholly beyond the reach of TFC's § 57-9(A) petition,

except for the thinnest of reeds upon which TFC's entire argument is precariously premised. That reed is that the vestry's power to appoint the directors of the Endowment Fund constitutes "personal property" under § 57-10. (TFC's Opening Br. Regarding Endowment Fund 1.) The Court disagrees.

There is no controlling case law in Virginia that defines the term "personal property" as it is used in § 57-10. Thus, the parties with the Court's encouragement have had to look elsewhere for authority as to whether the power to appoint directors to a charitable, non-stock, non-profit corporation constitutes a "personal property" interest.

The Court is persuaded by the cases cited by ECUSA and the Diocese that, as a matter of law, the power to appoint directors to a charitable, non-stock, non-profit corporation is not a "personal property" interest. See, e.g., *In re Mount Sinai Hospital*, 164 N.E. 871 (N.Y. 1928) ("[W]hen in the judgment of the Legislature the interests of a charitable corporation will be promoted by a change in the method of electing trustees, once intrusted to the members, whereby the members are disfranchised and the board is made self perpetuating, no one's property is taken. . . .") While TFC argues that this case, and other cases cited by ECUSA and the Diocese, principally involve issues of vested rights (TFC's Opp'n Br. Concerning Endowment Fund 2-4), the Court finds that TFC reads these cases too narrowly. These cases, and others involving similar matters, see, e.g., *Commonwealth v. Joco Found.*, 263 Va. 151, 163, 558 S.E.2d 280, 286 (2002) (members of a charitable corporation acquire no property rights in the assets of the corporation), support the general proposition that an individual's or entity's control or influence over a non-stock, non-profit charitable corporation is not a "personal property" interest. See, e.g., 1 Marilyn E. Phelan, *Nonprofit Enterprises: Corporations, Trusts, and Associations*, § 3.06 (2000), cited in (ECUSA's and Diocese's Renewed Mot. Strike and Opening Br. Regarding Endowment Fund 3) ("[T]he right of a member of a nonprofit corporation to vote is not constitutionally protected because a member of a nonprofit corporation does not have any interest in the property of the corporation.").

Therefore, this Court finds that § 57-10 and, hence, § 57-9, do not control the disposition of the Endowment Fund, and the matter is therefore reserved for the Declaratory Judgment action.

Without expressing a view as to the merits, the Court would note that many of the factual arguments made by the parties regarding the Endowment Fund, while not relevant to the § 57-9(A) petition, might well be relevant to a declaratory judgment action.

## VIII. *The Falls Church's Two-Acre Parcel*

On March 20, 1746, John T. Trammole deeded to "the . . . Vestry of Truro parish and their Successors" a two-acre parcel, upon which the original Falls Church sanctuary was built. (Diocese Ex. 64, at 249.) The ultimate question before the Court today is whether the vestry of TFC is the legal successor to the vestry of Truro Parish as to this two-acre parcel. The Court finds for TFC on this matter and holds that the vestry of TFC *is* the legal successor to the vestry of Truro Parish as to this two-acre parcel.

The Court categorically rejects the claims of ECUSA and the Diocese that the true legal successor in connection with this two-acre parcel is Christ Church, Alexandria. (See ECUSA/Diocese Br. Supp. Mot. Strike Concerning Two+ Acres Parcel 9-14, 25.) TFC argues that ECUSA's and the Diocese's claims regarding Christ Church, Alexandria's ownership of this property is an eleventh hour revision in theory made seventeen months into this litigation which was designed to fit within the narrowing window left by this Court's multiple letter opinions. (See TFC's Opp'n Br. Concerning 1746 Parcel 1.) The Court does not need to adopt such a characterization to find that ECUSA's and the Diocese's claims regarding Christ Church, Alexandria's interest in this property are wholly at odds with the historical record, with numerous court orders and petitions over the past century and a half, with the land records of Fairfax and Arlington Counties, and with ECUSA's and the Diocese's own repeated assertions and admissions recognizing TFC as the legal owner of this two-acre parcel. Moreover, this Court rejects ECUSA's and the Diocese's argument that what is before the Court is really an adverse possession claim that TFC has failed properly to present or prosecute. (See ECUSA/Diocese Responsive Br. Regarding Two+ Acres Parcel 10-14.) Suffice it to say, one need not claim adverse possession of that which one legally owns.

In sum, for the reasons stated below, the two-acre parcel is subject to TFC's § 57-9(A) petition.

## A. *Discussion*

There is actually little in factual dispute regarding the history of this matter, although the parties of course sharply contest the implications of those undisputed facts.

In 1765, by act of the General Assembly, Truro Parish was split into Fairfax Parish and Truro Parish. The two-acre parcel, at that point, became

part of the new Fairfax parish. (See Test. Diocese's expert witness, Dr. Edward Lawrence Bond, Trial-Day 3 Tr. 49-51, Oct. 20, 2008.) Eventually, the church at the Falls fell into disuse and disrepair. *Id.* at 98-99. In 1836, however, TFC petitioned the Diocesan convention, which admitted TFC " 'as a separate and distinct church,' pursuant to Canon XII. *Id.* at 88-89 (quoting Diocese Ex. 75 at 13).[3] According to Dr. Bond, after TFC was admitted to the Diocese, the vestry of TFC and the vestry of Christ Church, Alexandria, operated independently. *Id.* at 107-08. Each elected its own vestry and took over the management of its own affairs. *Id.* at 106. Dr. Bond also testified that, when a new parish was created, "[i]f the property was in the new parish, it stayed with the new parish." *Id.* at 54.

ECUSA and the Diocese argue that the admission of TFC as a separate and distinct church did not have the effect of making TFC the legal successor to the vestry of Truro parish in connection with the two-acre parcel.[4] The Court disagrees. Indeed, it would make little sense for TFC to even have come into existence "as a separate and distinct church from the Parish Church of Fairfax Parish" (see Diocese Ex. 75 at 13) *with its own vestry*, if it was not the legal successor to the property in question.

The Court also finds persuasive TFC's additional argument that it is "the 'successor' to . . . Truro Parish under the 1746 deed [because its] vestry's function most closely parallels that of the Truro Parish vestry in colonial times," albeit it with only ecclesiastical powers, rather than the additional governmental powers that Truro Parish exercised. (TFC's Opening Br. 14.) Thus, it is the TFC's vestry that for more than 150 years has governed the property in question, raised funds to upgrade the property, repaired the property, financed additions to the property, and decided how the property was to be used.

---

[3] ECUSA and the Diocese suggest that it is inconsistent with the positions taken by TFC and the other CANA congregations for TFC *now* to rely upon a Diocesan canon and the acts of the Diocese's Annual Convention, where, in the past, TFC has argued that the canons and actions of the convention did not create enforceable property rights. (See ECUSA/Diocese Responsive Br. 4-5 and n. 4.) TFC argues, and this Court is persuaded, that it is not taking inconsistent positions. (See TFC's Reply Br. Concerning 1746 Parcel 5, n. 3.)

[4] ECUSA and the Diocese argue that TFC was admitted into the Diocese in 1836 "as a separate and distinct church," not a parish. (ECUSA/Diocese Responsive Br. 6 (quoting Trial-Day 3 Tr. 88-89).) But, as TFC notes in its Reply Brief, TFC was admitted pursuant to Canon XII, "For the Division of Parishes," pursuant to which a new entity was "received as a distinct Parish." (TFC's Reply Br. 1-2 (quoting Diocese Ex. 116 at 12-13).)

Professor Bond, who was ECUSA's and the Diocese's own expert witness, testified that "you could not have two vestries in the same parish." (Trial-Day 3 Tr. 107.) Yet, as TFC points out, if this Court accepts the arguments of ECUSA and the Diocese, this is precisely what the Court would be required to find existed from 1836 to the present, i.e. one vestry to manage and administer the two-acre parcel (TFC) and another vestry actually to own it (Christ Church, Alexandria). (See TFC's Reply Br. 1.) Once ECUSA and the Diocese concede, as they must, that TFC did in fact manage and administer the property for the past 150 years and more, it cannot escape the implications of its "two vestry" theory, not the least of which is that it is at odds with the testimony of their own expert.

This Court's conclusion that the vestry of the TFC is the legal successor of the vestry of Truro parish is dispositive of the question now before the Court. Having said that, the Court will note three other points in support of TFC's position.

First, there is a record of court orders, petitions, resolutions, and related documentation demonstrating that, for more than 150 years, the circuit courts of Fairfax and Arlington have clearly and explicitly understood the two-acre parcel to be the property of the vestry of TFC. (See TFC's Opening Br. 1.)

Second, prior to the instant litigation, Christ Church, Alexandria, never asserted a claim on this two-acre parcel, nor contributed to its development, maintenance, repairs, or improvements. (See ECUSA/Diocese Br. Supp. Mot. Strike 3 (citing Test. William E. Deiss, Trial-Day 2 Tr. 45-78, Oct. 15, 2008).)

Third, there is a clear record of admissions by ECUSA and the Diocese recognizing TFC's ownership of this property. While ECUSA and the Diocese seek to diminish the significance of these admissions and argue that, at most, they constitute evidential admissions, this Court finds the admissions to be quite significant. They establish in this Court's view that, until quite recently, even ECUSA and the Diocese understood that the vestry of TFC owned the two-acre parcel. TFC, in its Opening Brief, cites the following examples of ECUSA's and the Diocese's admissions (TFC's Opening Br. 11-13.)

ECUSA and the Diocese argue that these admissions are of "limited probative value." (See, e.g. ECUSA/Diocese Br. Supp. Mot. Strike 21). Given the repeated and categorical nature of these admissions, the Court does not agree that they should only be assigned "limited probative value." See *West v. Anderson*, 186 Va. 554, 564 (1947) ("The admission of a party during the course of a judicial proceeding, relevant to an issue, is of the highest evidential value.") Nor does the Court find persuasive ECUSA's and the Diocese's

argument, in connection with the Lis Pendens action, that the memorandum signed and filed by the Diocese's counsel should not be attributed to the Diocese itself. (ECUSA/Diocese Br. Supp. Mot. Strike 22.)

"[O]n February 5, 2007 . . . the Diocese brought a Lis Pendens action against TFC and its trustees in Arlington County Circuit Court. See TFC Exh. 61. That action sought 'to establish and confirm title' in [the Diocese's Bishop] to various parcels of property, including" the two-acres at issue here. "[T]he Diocese's suit . . . recognized the 'Record Owner[s]' of these parcels" as the trustees of TFC. (TFC's Opening Br. 11 (quoting TFC Ex. 61 at 1-2) (alteration in original).)

ECUSA in its answer to TFC's § 57-9 petition states that "[t]he Episcopal Church admits and avers that trustees for the Falls Church hold legal title to the real property currently possessed by The Falls Church for the congregation of The Falls Church, a parish or mission of the Episcopal Church, subject to the Constitution and Canons of the Episcopal Church and the Diocese of Virginia." *Id.* at 11-12 (quoting TFC Ex. 4, at ¶ 2) (citation omitted).

"ECUSA's [Declaratory Judgment] complaint states "[the Trustees] are named as defendants in this action because, on information and belief, they continue to hold legal title to some of the real property at issue in this case, which was deeded over the years to the 'Vestry of Truro Parish.'. . ." *Id.* at 12 (quoting ECUSA Complaint ¶ 23.) Similar language appears in the Diocese Complaint at ¶ 5. *Id.*

In response to a TFC request for admission that "Falls Church real property is currently titled in the names of Trustees for Falls Church," *id.* at 12 (quoting TFC Ex. 9 at 3), the Diocese responded that "The deeds grant the subject property to trustees for the Falls Church, a subordinate, constituent part of the Diocese and the Episcopal Church. . . ." *Id.* (quoting TFC Ex. 10 at 5) (citing TFC Ex. 10 at 9.) ECUSA made similar admissions. *Id.* at 12-13 (citing TFC Ex. 11 at 4.)

That the Diocese formally denied the Request for Admission does not take away from the significance of these admissions. Moreover, the claim of ECUSA and the Diocese that it "limit[ed]" its admission by noting that TFC held title as an Episcopal entity subject to the Constitutions and Canons of the Episcopal Church and the Diocese (see ECUSA/Diocese Responsive Br. 4, n. 2) does not limit the admission at all. The significance of the admission is that ECUSA and the Diocese was not challenging that TFC held legal title to the property in question (at least not until well into the instant litigation). The fact that ECUSA and the Diocese viewed TFC as subordinate to the Episcopal

Church and the Diocese is a different matter and one that does not help resolve the question of whether TFC was the lawful successor to Truro Parish's interest in the two-acre parcel.

These admissions provide compelling support for the conclusion that the two-acre parcel is owned by the vestry of TFC and not by any other entity, including Christ Church, Alexandria. The Court need not reach the question posed by ECUSA and the Diocese as to whether these are "judicial" admissions that bind a party or merely "evidential" admissions that a court may consider. (See ECUSA/Diocese Br. Supp. Mot. Strike 21-25.) Under either characterization, the Court finds the admissions to be persuasive evidence in support of TFC's position that the legal holder of title to the two-acre parcel was TFC *and no one else*.

### B. *ECUSA and the Diocese's Arguments*

1. ECUSA's and the Diocese's Claim That Mason v. Muncaster Controls the Outcome of This Controversy

In *Mason v. Muncaster*, 22 U.S. 445 (1824), the Supreme Court of the United States held that the "Vestry of the church in Alexandria [Christ Church] is, in succession, the regular Vestry of the parish of Fairfax." *Id.*, at 469. Since it is undisputed that the "parish of Fairfax" was at that point in time the legal successor to Truro Parish, ECUSA and the Diocese argue that the vestry of Christ Church, Alexandria, is, by dint of this Supreme Court opinion, the successor to Truro Parish's property interest in the two-acre parcel. (See TFC Opening Br. 13-18; ECUSA/Diocese Br. Supp. Mot. Strike 12-14.) While TFC makes a number of arguments to rebut the assertions of ECUSA and the Diocese, (e.g., that the Supreme Court was applying District of Columbia law, not Virginia law, and that there is language in the lower court's opinion, *Mason v. Muncaster*, 2 Cranch C.C. 274 (C.C. D.C. 1821), that supports TFC's contentions), their principal assertion, which is one this Court adopts, is that there is nothing in either opinion to suggest or imply that its findings on succession are immutable and unchangeable over the course of time. In fact, *Mason v. Muncaster*, explicitly recognizes a procedure for the creation of new Episcopal entities. See 22 U.S. at 464 ("And yet it is not denied that, by the rules and customs of the sect, new Episcopal societies are not admitted to be formed within the bounds of existing parishes, without the consent of the proper ecclesiastical authority.") In 1836, as this Court has found, the vestry of TFC became the

successor to the vestry of Truro Parish in connection with the two-acre parcel. (See TFC Opening Br. 13-18.) Nothing in *Mason v. Muncaster* prohibited such an eventuality.

This is especially the case given the fact, as TFC notes in its Opening Brief that, at the time *Mason* was decided in 1824, there was "only one vestry for the whole parish." (TFC Opening Br. 17.) When TFC was subsequently admitted to the Diocese in 1836 as a distinct and separate church, there then existed a distinct and separate vestry, as well. *Id.* at 17-18.

2. ECUSA's and the Diocese's Claim That No Deed Conveys the Property to TFC's Trustees

It is undisputed that no deed conveys the two-acre parcel to the vestry of TFC. If, however, the vestry of TFC is the legal successor to the vestry of Truro Parish, as this Court has concluded, no deed was required. ECUSA and the Diocese explicitly acknowledge this principle in their final brief. (See ECUSA/ Diocese Reply Br. 5 ("[W]e have never argued that such a deed is required. We have merely pointed out that the Property is not subject to TFC's § 57-9 Petition because TFC has no deed to its trustees *and* has failed to prove that it is the legal successor to the entity named in the Deed.") In other words, ECUSA and the Diocese acknowledge that, if TFC is the legal successor to Truro Parish as to the two-acre parcel, no deed was required.

It naturally follows from this acknowledgement that, if no deed was required, § 55-2 of the Virginia Code would not compel a different result. The current version of the law reads as follows:

> No estate of inheritance or freehold or for a term of more than five years in lands shall be conveyed unless by deed or will, nor shall any voluntary partition of lands by coparceners, having such an estate therein, be made, except by deed; nor shall any right to a conveyance of any such estate or term in land accrue to the donee of the land or those claiming under him, under a gift or promise of gift of the same not in writing, although such gift or promise be followed by possession thereunder and improvement of the land by the donee or those claiming under him.

Va. Code Ann. § 55-2 (2007). TFC argues, first, that it is not clear that § 55-2 even applies to church property and, second, that the Virginia Supreme Court has recognized exceptions to § 55-2, as for example where there has been a

long period of prior peaceful possession by one claiming to be a fee owner. TFC cites *Prettyman v. M. J. Duer & Co.*, 189 Va. 122, 139 (1949), for the proposition that "[i]t requires no stretch of the imagination to presume that a grantee has legal title to land which has been in the possession of himself and his predecessors in title for 190 years." (TFC Opp'n Br. 3-4 (quoting *Prettyman v. M. J. Duer & Co.*, 189 Va. 122, 139, 52 S.E.2d 156, 164 (1949)).) The Court does not need to resolve either of these arguments because both parties in the instant case agree that no deed to TFC was required if TFC was the legal successor to Truro Parish as to this two-acre parcel. (See TFC Opp'n Br. 2-6; ECUSA/Diocese Reply Br. 5.)

Moreover, as TFC notes in its Opposition Brief, if it is necessary for a deed to have conveyed the two-acre parcel, that assertion would also negate Christ Church, Alexandria's claim on the property. (TFC Opp'n Br. 2.)

3. ECUSA's and the Diocese's Claim That the Testimony of TFC's Expert on Land Records, Kenneth Schrantz, Does Not Establish TFC's Ownership Claim

ECUSA and the Diocese argue that Kenneth Schrantz, who was TFC's expert title examiner, would go no farther than to tell the Court what the land records "indicate" regarding ownership of the two-acre parcel, rather than explicitly expressing an opinion on the issue of ownership. (ECUSA/Diocese Br. Supp. Mot. Strike 3-4.) Given that Mr. Schrantz testified that "[t]he land records indicate the property is owned by the trustees of The Falls Church," and further testified that "[e]very indication would be that the trustees of The Falls Church as to this property are the successors to Truro, the Vestry of Truro Parish" (Trial-Day 2 Tr. 121-22, Oct. 15, 2008), the Court finds that Mr. Schrantz' testimony unequivocally supports TFC on this issue. ECUSA and the Diocese argue that the use of the word "indicate" is "manifestly insufficient" (ECUSA/ Diocese Opening Br. Supp. Mot. Strike 4) to prove title. The Court disagrees that there is any material difference between the use of the term "indicate" and similar terminology to describe the title examiner's findings.

4. ECUSA's and the Diocese's Dismissal of the Significance of the Various Court Orders and Related Documents Confirming TFC as the Property Owner

ECUSA and the Diocese argue that none of the court orders, resolutions, petitions, easements, encumbrances, deeds of trust, property exchange documents, and other documentation prove anything other than that TFC was making the "bald allegation" of ownership of the two-acre parcel. *Id.* at 5-8. The Court disagrees.

These documents go back to 1851 and demonstrate a consistent understanding on the part of both the circuit courts of Fairfax and Arlington that the property in question was owned by the vestry of TFC. These records and court orders encumbered property, granted easements over property, exchanged property, consolidated property, and took numerous other actions regarding the two-acre parcel.[5] Some of these actions were taken with the knowledge of the Diocese, which interposed no objection. (See, e.g., TFC's Opening Br. 9, n. 5; TFC Exs. 20, 48, 55A, 57, 62.) To dismiss more than 150 years of such documentation as some huge misunderstanding is just not persuasive.

ECUSA and the Diocese further argue that these orders were "not the product of adjudication designed to test evidence and reach the correct legal conclusion. . . ." (ECUSA/Diocese Br. Supp. Mot. Strike 6.) Even if correct, however, it does not alter the Court's view of the legal significance of these orders. Virtually every day this Court signs uncontested orders that, like the documents in question, are not the "product of adjudication." Nevertheless, such orders have the same force and effect as if they were the product of a hotly contested trial. ECUSA and the Diocese further argue that the orders were *ex parte*. See *id.* The fact that the orders were *ex parte*, however, does not undermine the Court's finding that they reflect a consistent understanding by the courts regarding ownership of the two-acre parcel.

5. ECUSA's and the Diocese's Claim That Christ Church, Alexandria, is the Legal Successor to the Vestry of Truro Parish as a Matter of "Historical Fact"

As stated above, the Court is not persuaded that Christ Church, Alexandria, has any interest in the property in question. After 1836, for the reasons stated above, it was the vestry of TFC that succeeded to Truro Parish's interest in the property.

---

[5] The implication of the position taken by ECUSA and the Diocese is that all of these court orders, and the actions taken pursuant to these orders, are invalid. ECUSA and the Diocese adopt this implication most explicitly when they argue that any claim of ownership based on multiple *ex parte* orders would be a "legal nullity." (ECUSA/Diocese Responsive Br. 1.)

### 6. ECUSA's and the Diocese's Claim That TFC Never Pleaded Adverse Possession

This is, of course, true. It is equally true, however, that TFC was no more under an obligation to plead or establish adverse possession than any typical owner of a house or a commercial property is required to prove adverse possession of that which the owner actually owns.

Because the Court finds no merit in the assertion that TFC had to plead adverse possession, this Court does not reach two questions contested by the parties: first, whether TFC properly pleaded an adverse possession claim and, second, whether TFC established the elements of adverse possession. (ECUSA/Diocese Responsive Br. 10-14.) Similarly, the Court need not reach the question of laches, which has been raised in this litigation by TFC as part of its defense against the claims of Christ Church, Alexandria. (TFC Opening Br. 22-25.)

Therefore, for the foregoing reasons, the Court finds in TFC's favor and holds that the two-acre parcel is subject to TFC's § 57-9 petition.